# Ferris State University

# AGREEMENT

## FSU & FFA, MEA-NEA
## Expires June 30, 2023

Agreement between the
Board of Trustees
of
Ferris State University
and the
Ferris Faculty Association
MEA-NEA

**EXHIBIT L**
**Page 1**

# TABLE OF CONTENTS

<u>Page</u>

**SECTION 1 - BASIC CONTRACTUAL PROVISIONS**...............................................**5**
    1.1.    Agreement and Definitions ..................................................5
    1.2.    Purpose................................................................................7
    1.3.    Recognition ..........................................................................7
    1.4.    No Past Practice ...................................................................7
    1.5.    Separability and Precedence ................................................7
    1.6.    Meetings...............................................................................8
    1.7.    FFA Membership Dues Deduction ......................................8
    1.8.    Headings ..............................................................................8
    1.9.    Waiver..................................................................................8

**SECTION 2 - RIGHTS OF MEMBERS IN THE FFA**..........................................**8**
    2.1.    Rights of Members in the FFA .............................................8
    2.2.    FFA Business .......................................................................9
    2.3.    Meeting Rooms ....................................................................9
    2.4.    Posting of FFA Notices .......................................................9
    2.5.    No Strike ..............................................................................9
    2.6.    Official Sessions:  Local, State or National Education Association
           Business ...............................................................................9
    2.7.    Released Time for the FFA president and FFA officer .........10
    2.8.    Aid to Other Collective Bargaining Agents.........................10
    2.9.    Information .........................................................................10
    2.10.   Non-Discrimination ...........................................................11

**SECTION 3 - TENURE**............................................................................**11**
    3.1.    Definitions and General Conditions....................................11
    3.2.    Employer Tenure Policy .....................................................12
    3.3.    Department Tenure Policy and Procedures...........................12
    3.4.    Evaluation and Reappointment/Non-Reappointment of Non-
           Tenured Faculty .................................................................13
    3.5.    Attainment of Tenure.........................................................16
    3.6.    Academic Administrator Appointment with Tenure ...........17

**SECTION 4 - REPRESENTATION AND PROFESSIONAL CONDUCT** ............**18**
    4.1.    Discipline ...........................................................................18
    4.2.    Personnel Files ..................................................................19
    4.3.    Faculty Participation: Educational Policy...........................20

**SECTION 5 - RIGHTS OF THE EMPLOYER**.................................................**20**

**SECTION 6 - SENIORITY**........................................................................**20**
    6.1.    Determination of Seniority/Definitions ..............................20
    6.2.    Change in Employment Status.............................................21
    6.3.    Seniority Groups ................................................................22
    6.4.    Loss of Seniority ................................................................22
    6.5.    Seniority List(s) .................................................................23

i

**EXHIBIT L**
**Page 2**

**SECTION 7 - WORKING CONDITIONS**................................................................**23**
   7.1.    Professional Responsibilities ........................................................23
   7.2.    Workload......................................................................................24
   7.3.    Health and Safety.........................................................................28
   7.4.    Academic Freedom .......................................................................30
   7.5.    Department Procedures .................................................................30
   7.6.    Hiring ...........................................................................................31
   7.7.    Summer ........................................................................................32
   7.8.    Performance Review .....................................................................35
   7.9.    Transfers ......................................................................................36
   7.10.  Academic Calendar.......................................................................37

**SECTION 8 - RETRENCHMENT**................................................................**37**
   8.1.    Definition .....................................................................................37
   8.2.    Retrenchment by Attrition and Voluntary Reassignment.............37
   8.3.    Retrenchment by Layoff ...............................................................37
   8.4.    Notification ..................................................................................38
   8.5.    Layoff Benefits ............................................................................38
   8.6.    Recall ...........................................................................................39
   8.7.    Layoff Alternatives ......................................................................39
   8.8.    Retraining Sabbatical ...................................................................40
   8.9.    Buy Out ........................................................................................41

**SECTION 9 - GRIEVANCE PROCEDURE** ................................................**41**
   9.1.    Definition - Grievance .................................................................41
   9.2.    Flow .............................................................................................42
   9.3.    The Grievance Procedure..............................................................42

**SECTION 10 - PAID LEAVES OF ABSENCE** ...........................................**44**
   10.1.  Paid Sick Leave............................................................................44
   10.2.  Use of Paid Sick Leave for Other Reasons ..................................47
   10.3.  Bereavement Leave.......................................................................47
   10.4.  Sabbatical Leave ..........................................................................48
   10.5.  Jury Duty......................................................................................54
   10.6.  Absentee Replacement..................................................................54
   10.7.  Personal Leave Day ......................................................................54
   10.8.  Military Leave...............................................................................54
   10.9.  Fulbright Leaves ..........................................................................55
   10.10. Consulting Leave .........................................................................55

**SECTION 11 - UNPAID LEAVES**..............................................................**55**

**SECTION 12 - HOLIDAYS AND VACATIONS** ........................................**56**
   12.1.  Designated Holidays ....................................................................56
   12.2.  Vacations......................................................................................56

**SECTION 13 - FRINGE BENEFITS**...........................................................**57**
   13.1.  Liability Insurance .......................................................................57
   13.2.  Health Insurance..........................................................................57
   13.3.  Flexible Spending Account:..........................................................60

**EXHIBIT L**
**Page 3**

13.4.   Payroll Deduction - MEA Financial Services Programs ............................60
13.5.   Implementation of Related Insurance Benefits....................................60
13.6.   Travel Increment ...........................................................................61
13.7.   Fee Waiver/Fee Reduction...............................................................62
13.8.   Tuition Waiver ..............................................................................62
13.9.   Tuition Assistance Program for Employee Spouses and Children ..................63
13.10.  Kendall College of Art and Design (KCAD) Tuition Credit
        Program for Members ...................................................................64
13.11.  KCAD Tuition Credit Program for Spouses and Children of
        Members ....................................................................................64

**SECTION 14 - SALARY**..............................................................................**65**
14.1.   General Provisions ........................................................................65
14.2.   Percentage Increase to Base Salary....................................................65
14.3.   Supplemental Market Adjustments....................................................66
14.4.   New Faculty Orientation .................................................................68

**SECTION 15 - PROMOTION AND MERIT INCREASES**...................................**69**
15.1.   Promotion...................................................................................69
15.2.   Promotion/Merit Procedures ...........................................................69
15.3.   Compensation for Promotions/Merit ..................................................72
15.4.   Degrees ......................................................................................72

**SECTION 16 - REDUCED WORK LOAD STATUS FOR FACULTY** ...................**72**

**SECTION 17 - RETIREMENT** ......................................................................**73**
17.1.   Retirement System Selection ...........................................................73
17.2.   Retirement System Payments ...........................................................74
17.3.   Retirement System Vesting...............................................................74
17.4.   Other Retirement Benefits ...............................................................74
17.5.   Notice of Retirement......................................................................75

**SECTION 18 - OVERLOAD** .........................................................................**75**

**SECTION 19 - PART TIME INSTRUCTION** ...................................................**76**

**SECTION 20 - VOLUNTARY RESIGNATION INCENTIVE PLAN** ...................**77**
20.1.   Eligibility - In order to be eligible, the Member must:...............................77
20.2.   Application Procedure ....................................................................77
20.3.   Limitations .................................................................................77
20.4.   Resignation Benefits ......................................................................78
20.5.   Term of Program ..........................................................................78

**SECTION 21 - DURATION OF CONTRACT** ..................................................**79**

**APPENDIX A OTHER ELIGIBLE ADULTS**....................................................**80**

**APPENDIX B INTELLECTUAL PROPERTY RIGHTS AND
ELECTRONIC  DISTANCE LEARNING MATERIALS LETTER OF
AGREEMENT** ...........................................................................................**84**

**APPENDIX C COURSE DEVELOPMENT AGREEMENT**.................................**104**

iii

**EXHIBIT L**
**Page 4**

Attachment C-1 Distance Learning Course Completion Checklist Course
Payment Authorization ........................................................................111
Attachment C-2 List of Works Created and Owned Exclusively by Course
Developer Prior to Creation of Distance Learning Course...................113
Attachment C-3 FSU Business Policy Letter 99:10 Legal Representation
and Indemnification (Supersedes 89.11).............................................114

**APPENDIX D LETTER OF AGREEMENT – AGENCY SHOP**........................................**118**

**APPENDIX E LETTER OF AGREEMENT – DEPARTMENT CHAIR** ...........................**122**

**EXHIBIT L**
**Page 5**

**AGREEMENT**

## Section 1 - BASIC CONTRACTUAL PROVISIONS

1.1.    <u>Agreement and Definitions</u>

      A.     This Agreement, entered into this 13th day of November, 2018, is between the Board of Trustees of Ferris State University (hereinafter referred to as "FSU" or "University" or "the Employer") and the Ferris Faculty Association (hereinafter referred to as "FFA"), an affiliate of the Michigan Association for Higher Education MEA-NEA.

      Definitions - Unless otherwise specified, glossary terms mean:

| Term | Definition |
| --- | --- |
| Academic year | Two consecutive semesters beginning in the fall, excluding summer semester |
| Administrator | A non-bargaining unit University employee with supervisory or managerial responsibilities |
| Agree | Agree in writing |
| Agreement | The current collectively bargained agreement between the Ferris State University Board of Trustees and the Ferris Faculty Association/MEA-NEA |
| AACP | American Association of Colleges of Pharmacy |
| ASAHP | Association of Schools of Allied Health Professions |
| ASCO | Association of Schools and Colleges of Optometry |
| ASEE | American Society for Engineering Education |
| By | When used with a date as a deadline means on or before 5:00 p.m. on the date |
| Course | Credit course |
| CUPA-HR | College and University Professional Association of Human Resources |

5

**EXHIBIT L**
**Page 6**

| | |
|---|---|
| Day (when used to compute a period of time) | Calendar day exclusive of contractual holidays |
| Department | This term is synonymous with school.  The smallest administrative unit to which a Member is assigned. In colleges without departments, the department is the college |
| Department head | The administrator immediately responsible for a department. This term is synonymous with supervisor and director.  In colleges or units without department heads, the dean would be the administrator immediately responsible for a department |
| FMLA | Family and Medical Leave Act |
| HEIDI | Higher Education Institutional Data Inventory |
| HR | Human Resources |
| IPEDS | Integrated Post-Secondary Education Data Systems |
| Majority | More than 50 percent of the Members of a department |
| Member | A bargaining unit Member |
| Notice | Written notice |
| Provost/vice president for Academic Affairs | Provost/vice president for Academic Affairs or designee except as to Members reporting outside the division of Academic Affairs in which case it means the vice president of the division in which the Member is assigned |
| TRC | Tenure Review Committee |
| Unit | Synonymous with department and school |
| Vacancy | A bargaining unit position which the Employer posts as a board-appointed position |
| Working Day | Monday through Friday on which University classes are scheduled at the Big Rapids campus |

**EXHIBIT L**
**Page 7**

1.2. <u>Purpose</u>

The purpose of this Agreement is to set forth agreements reached between the Employer and the FFA with respect to wages, hours, and other terms and conditions of employment for the employees in the bargaining unit detailed in the recognition clause below.

1.3. <u>Recognition</u>

A. In conformity with its responsibility under the laws of the State of Michigan with respect to the collective bargaining rights of the faculty, the Employer recognizes, for the term of this Agreement, the FFA as the collective bargaining agent for the persons included in the bargaining unit, hereinafter "Member," as herein defined:

B. All full-time board-appointed FSU teaching faculty (Academic Year or 12 month); librarians; educational counselors; admissions counselors; personal counselors; program coordinators; academic advisors; and Board-appointed part-time faculty who are employed for at least one-half of the average load for their department, excluding all other University personnel and supervisors.

C. Regular faculty rank above the level of instructor shall not be granted to staff who are not Board-appointed.

D. If the FFA believes hiring temporary employees to replace Members who are absent or new hires who are not available has resulted in erosion of the bargaining unit, the FFA must raise such issue for discussion with the Employer. If this is done and if the discussion does not resolve the matter, the FFA may pursue the matter through the grievance/arbitration procedure.

1.4. <u>No Past Practice</u>

There are no verbal or written understandings or agreements, or past practices which are binding on either the Employer or the FFA other than those set forth in this Agreement. No future agreement or practice shall be binding on the Employer unless in writing and signed by both the provost/vice president for Academic Affairs and the president of the FFA.

1.5. <u>Separability and Precedence</u>

A. If any decision of any Michigan or United States court or administrative body of competent jurisdiction affects any provision of this Agreement, each such provision will be deemed amended to the extent necessary to comply with such decisions, but otherwise this Agreement will not be affected.

B. This Agreement shall supersede any rules, regulations or practices of the Employer which shall be contrary or inconsistent with its terms. It shall likewise supersede any contrary or inconsistent terms contained in any individual contracts heretofore in effect.

**EXHIBIT L**
**Page 8**

1.6.   Meetings

Regular meetings between designated representatives of the FFA and of the Employer will consider problems and concerns of mutual interest including amendments to this Agreement. In this regard, such designated representatives shall meet at least once each academic semester. Additional meetings shall be held at other reasonable times upon request of either the president of the University or the president of the FFA.

If the Employer and the FFA both consent, agreements reached at these meetings shall be reduced to writing and submitted to the appropriate ratification procedures of the Employer and the FFA. At such time as the agreement(s) have been ratified by both the Employer and the FFA, the agreement(s) shall become a part of this Agreement.

1.7.   FFA Membership Dues Deduction

FFA Members may authorize the Employer, by executing the proper forms as provided by the Employer, to make a prorated automatic payroll deduction on consecutive pay periods for FFA dues. The Employer will have no obligation to deduct or remit the dues payable for the account of any Member for any pay date where his/her withholding authorization reaches the Payroll Office later than the pay ending date for each pay period one (1) week prior to each pay date.

The FFA and/or the MEA-NEA will indemnify the Employer against all liability the Employer may incur by reason of any dues deduction or remittance pursuant to this paragraph.

1.8.   Headings

Headings used in the Agreement are for informational purposes only and are not a part of the Agreement.

1.9.   Waiver

During the negotiations which resulted in this Agreement each party had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining. Therefore, the Employer and the FFA, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated, to bargain collectively with respect to any subject or matter referred to or covered by this Agreement or with respect to any subject or matter which was raised in negotiations but as to which no agreement was reached.

**Section 2 - RIGHTS OF MEMBERS IN THE FFA**

2.1.   Rights of Members in the FFA

The Employer hereby agrees that every Member of the bargaining unit shall have the right to freely join and to support the FFA for the purpose of engaging in collective

8

**EXHIBIT L**
**Page 9**

bargaining or negotiation. As a duly appointed body exercising power under the laws of the State of Michigan, the Employer undertakes and agrees that it will not directly or indirectly discourage or deprive or coerce any Member in the enjoyment of any rights conferred by the laws of Michigan or the constitutions of Michigan and the United States; that it will not discriminate against any Member with respect to hours, wages or any terms or conditions of employment by reason of membership in the FFA, or participation in any lawful activities of the FFA or collective negotiations with the Employer, or institution of any grievance, complaint or proceeding under this Agreement. The Employer will not interfere with, restrain or coerce the employees covered by this Agreement because of membership in or non-membership in, or lawful activities on behalf of the FFA.

2.2.     FFA Business

        Duly authorized representatives of the FFA may transact official FFA business on FSU property, provided that this shall not interfere with or interrupt normal FSU operations. The FFA will provide a list in writing of their duly authorized representatives.

2.3.     Meeting Rooms

        The FFA and its authorized representatives may use FSU facilities for lawful meetings on the same basis as other organizations.

2.4.     Posting of FFA Notices

        The FFA may post notices of its activities and matters of FFA concern on a faculty bulletin board, at least one (1) of which shall be provided in each academic building on the campus. The FFA may use campus mail for distribution of material. Such material will be distributed by the college or department office personnel. Copies of all material to be distributed through the University facilities shall be submitted to the provost/vice president for Academic Affairs before distribution.

2.5.     No Strike

        So long as this Agreement is in effect, there shall be no strikes, slow-downs, stoppages of work, boycotts or any concerted effort not to meet classes or otherwise interrupt other bargaining unit work. Any violation of the foregoing may be made a subject of disciplinary action and damage action, including discharge or suspension, and this provision shall not be by way of limitation of the Employer's right to any remedy under law for such violation.

2.6.     Official Sessions: Local, State or National Education Association Business

        Representatives of the FFA are entitled to attend official sessions of the Michigan Education Association Representative Assembly and other local, state or National Education Association business limited to a total of thirty-five (35) days per academic year, unless such attendance creates unreasonable programmatic difficulties. Such time

EXHIBIT L
Page 10

is considered FSU travel as long as such sessions are not related to collective bargaining activities.

2.7.     Released Time for the FFA president and FFA officer

The FFA president and an additional designated FFA officer shall each be granted one-half (½) release time per academic year to be spread over fall and spring semesters in a manner mutually agreeable to the FFA president and his/her department head and the additional designated FFA officer and his/her department head.

2.8.     Aid to Other Collective Bargaining Agents

The Employer shall not aid, promote or finance any group or organization which purports to undermine the FFA in its legitimate collective bargaining activities.

2.9.     Information

A.     The Employer will provide the president of the FFA with the following:

1.     A list of all Members noting those who are on leave(s) of absence by type and duration. The list will be provided within six (6) weeks after the beginning of classes for the fall and spring semesters; and

2.     A list of all non-bargaining unit persons teaching in the following categories:

a.     Part-time;

b.     Temporary or grant supported;

c.     Administrators.

3.     This list will include the name, job group, assignment start and stop date, Full Time Equivalent (FTE), college and department. The list will be provided on or before January 15 for the first semester and June 15 for the second semester; and

4.     Workload for specified areas upon request; and

5.     A current seniority list. The list will be provided within thirty (30) working days of the beginning of fall and spring semesters and by July 30 of each year of this Agreement; and

6.     A list of all Members and all dues or agency shop fees withheld for the fiscal year. The list will be provided at the end of each fiscal year; and

7.     Copies of minutes of official meetings of the Board of Trustees and the annual audited financial statement; and

10

**EXHIBIT L**
**Page 11**

8.      So long as IPEDS and HEIDI reports are produced in hard copy by the Employer, they shall be provided to the University library within ten (10) days after they are created. However, recognizing that such data may be submitted in electronic form to the state as part of a state regulated data system and that the state determines the form of such reports and who has access to the data base, if and when such reports are submitted electronically, the Employer cannot guarantee FFA access to the data base.

9.      Copies of the CUPA-HR, ASEE, ASAHP, ASCO and AACP reports. These reports will be provided within ten (10) days after they are received.

10.      Copies of formally approved University procedures, rules and/or policies. These documents will be provided within ten (10) working days of receipt of a written request from the FFA.

B.      Member Responsibilities:

Members are responsible for providing the Employer with the address and telephone number at which they are to be contacted. The Employer has no liability if written notices are sent to such addresses or calls are made to such telephone numbers.

2.10.   <u>Non-Discrimination</u>

The Employer and the FFA both recognize their responsibilities under federal, state and local laws pertaining to fair employment practices as well as the moral principles involved in the area of civil rights. Accordingly, both parties reaffirm by this Agreement the commitment not to discriminate against any person or persons because of race, creed, color, religion, national origin, ancestry, age, gender, marital status, sexual preference, handicap, FFA or MEA-NEA affiliation. Any Member claiming a violation of this Section must seek relief in the appropriate legal forum and may not use the grievance process unless the nature of the alleged discrimination is not a violation of the law.

**Section 3 - TENURE**

3.1.   <u>Definitions and General Conditions</u>

A.      Tenure is the right to continual employment in a bargaining unit position until voluntary separation from FSU employment, lay-off or termination for just cause under the contractual process in Section 4.

B.      All employees of the University awarded tenure prior to the ratification of this Agreement shall retain such tenure.

11

**EXHIBIT L**
**Page 12**

3.2.    Employer Tenure Policy

A.    The tenure policy described in this Agreement applies only to non-tenured Member. Tenure shall not be acquired automatically by length of service, but rather through the criteria and procedures set forth in this Agreement. There shall be no arbitrary establishment of a fixed proportion of tenured to non-tenured Members by the FFA, the Employer or any division(s) thereof. Only continuous appointment as a Member shall be counted toward qualification for tenure. However, except in the specific case of FSU administrators, the following applies:

1.    One full year's absence, or less, from the bargaining unit but not the University shall not be considered an interruption of continuous service with respect to qualification for tenure.

2.    All time in excess of one full year's absence from the bargaining unit but not the University shall, by rounding to the nearest academic semester, correspondingly reduce the time counted toward qualification for tenure previously accumulated in the bargaining unit.

B.    The granting of tenure results from a deliberative process involving a department tenure review committee, the department head, the dean, the provost/vice president for Academic Affairs, and the president of FSU.

C.    New Members may be granted tenure at the time of their initial appointment subject to prior concurrence of a majority of the tenured Members of the department, the department head, the dean, the provost/vice president for Academic Affairs, and the president of FSU. The subject Member must have previously attained tenure at the University or another regionally accredited, post-secondary or first professional-degree-granting institution.

3.3.    Department Tenure Policy and Procedures

Each department shall set policy and procedures for the attainment of tenure within the following guidelines:

A.    The tenured Member of each department shall be responsible for:

1.    Devising the department policy and procedures for attainment of tenure. This process may include the establishment of a subcommittee(s).

2.    Determining, as part of the policy and procedures, the criteria for attainment of tenure based in part on the following:

a.    Assigned professional responsibilities, such as teaching, advising, counseling, or librarianship;

b.    Professional development, such as research, scholarship, creative endeavors and/or consulting; and,

12

EXHIBIT L
Page 13

         c.      Service, such as service on committees, service to the student body, service to the profession, and/or professionally-related community service.

       3.      Establishing tenure review policy and procedures for: reviewing the applicant's material, providing for applicant's rebuttal, and evaluating the rebuttal and material. This review must occur prior to submission of the tenure review committee's final recommendations to the appropriate department head.

       4.      Amending tenure review policy and procedures.

    B.      Any proposed amendment(s) must be submitted to the department head by January 30. The department head shall forward the proposal and his/her recommendation to the dean by February 15.

    C.      The dean shall forward the proposal and his/her recommendations to the provost/vice president for Academic Affairs who shall either accept or reject the proposed amendments by April 15. Failure by the provost/vice president for Academic Affairs to act upon the submitted amendments within the timeline given shall constitute disapproval thereof and the proposed amendment shall not be effective.

    D.      The provost/vice president for Academic Affairs may impose amendments to the policies and procedures, at any time, only when such amendments are based upon the institutional necessity to conform with federal, state and/or local laws and/or regulations. Amendments imposed under this provision are subject to the grievance procedure of this Agreement as an FFA grievance and shall begin at 9.3. D. Step 4 of such procedure.

    E.      Amendments to tenure review policies and procedures created under this Agreement shall apply only to those tenure applicants hired after formal implementation of the amendments. Tenure applicants hired prior to the implementation of the amendments may elect to be reviewed by the newly implemented policies and procedures or the policy and procedures otherwise applicable pursuant to this Agreement. Selection of amended policy and procedures by a Member shall not extend his/her non-tenured period.

    F.      Present Tenure Policies and Procedures will remain in effect until such time as amended in accordance with this Agreement.

## 3.4.   Evaluation and Reappointment/Non-Reappointment of Non-Tenured Faculty

    A.      Prior to the attainment of tenure, all Board-appointed Members shall be on a non-tenured appointment. Non-tenured appointments are renewable appointments of an academic year or twelve (12) months in length.

    B.      Except as otherwise provided in 3.2.C above, all new Members must serve a non-tenured period prior to applying for tenure. The non-tenured period shall commence with the first fall semester of a Member's non-tenure appointment. A non-

**EXHIBIT L**
**Page 14**

tenured Member must apply for tenure no later than his/her fifth academic year.  Failure to apply for tenure consideration shall result in denial of tenure.  A non-tenured Member with an initial academic rank of instructor or assistant professor may not apply for tenure prior to his/her fifth year.  A non-tenured Member with an initial academic rank of associate professor may not apply for tenure prior to his/her fourth year.  A non-tenured Member with an initial academic rank of professor may not apply for tenure prior to his/her third year.

C.      During his/her first semester of appointment and prior to any evaluation, the non-tenured Member shall receive, in writing, the effective department tenure and evaluation policy and procedures.  The chair of his/her department tenure review committee shall provide this document.  This department policy and procedures shall provide a basis for the decision to renew non-tenured appointments and shall provide a basis for determining the attainment of tenure itself.

D.      All non-tenured Members shall be observed by at least one tenured faculty Member of the tenure review committee during the fall and spring semesters of each year, with the exception of the year tenure is requested.

E.      The non-tenured Member shall be evaluated annually by the department tenure review committee by November 1 of his/her first and subsequent academic years of service. These evaluations shall include recommendation for reappointment or non-reappointment and shall be forwarded to the department head.

F.      At each of these annual evaluations, the Member shall be afforded an opportunity to submit to this committee any documentation to support his/her continued non-tenured appointment.  The tenure review committee will advise the non-tenured Member of its preliminary evaluations and recommendation for reappointment or non-reappointment by November 1.  The non-tenured Member shall be afforded an opportunity to meet with the tenure review committee to discuss its preliminary recommendation.  Such meeting shall take place by November 10.  The tenure review committee will forward in writing the final evaluation and recommendation to the non-tenured Member and the appropriate department head by November 20.

1.      On or before November 30, a Member who disagrees with any or all of the TRC's annual evaluation/recommendation must deliver a written response to the department head.  The response must identify all aspects with which there is disagreement and the factual basis for such disagreement.

2.      The written response by the Member will be attached and remain with the TRC'S evaluation/recommendation.

G.      The non-tenured Member shall be evaluated annually by the appropriate department head in a manner consistent with Section 3.3.A.2.  The department head will provide a written copy of his/her evaluation and recommendation to the Member by December 10.  The department head will also forward written copies of his/her

14

**EXHIBIT L**
**Page 15**

evaluation/recommendation, the TRC's evaluation/recommendation, and the Member's response (if any) to the dean by December 10.

    1.    On or before December 20, a Member who disagrees with any or all of the department head's annual evaluation/recommendation must deliver a written response to the dean. The response must identify all aspects with which there is disagreement and the factual basis for such disagreement.

    2.    The written response by the Member will be attached and remain with the review.

    H.    On or before January 15 the dean will submit his/her recommendation and all materials submitted in accordance with 3.4.E-G to the provost/vice president for Academic Affairs. The decision to grant or deny the first non-tenure reappointment rests solely with the provost/vice president for Academic Affairs. All subsequent reappointment decisions require affirmative recommendations by both the appropriate tenure review committee and the provost/vice president for Academic Affairs. However, failure by the tenure review committee to file its recommendation with the department head in a timely manner shall constitute complete concurrence with the decision of the provost/vice president for Academic Affairs with regard to reappointment or non-reappointment of the non-tenured Member.

    I.    The timetable for formal notice of reappointment or non-reappointment shall be as follows:

    1.    Not later than March 15 of the first year of service;

    2.    Not later than January 30 for each subsequent year except for the year tenure is requested.

    J.    In the case of non-reappointment, the specific reasons for denial shall be cited in writing.

    K.    In the event the tenure review committee and the provost/vice president for Academic Affairs concur in recommending reappointment, the reappointment is granted. In any other scenario, reappointment is denied as described below:

    1.    In the event the tenure review committee and the provost/vice president for Academic Affairs both recommend against reappointment, the reappointment is denied and the Member may appeal to the president. This appeal is limited to a claim that the contractual and/or department/college procedures were not followed.

    2.    In the event that either the tenure review committee or the provost/vice president for Academic Affairs recommend against reappointment, the reappointment is denied and the Member may appeal to the president. This appeal is not limited to procedures.

**EXHIBIT L**
**Page 16**

3.      Any appeal must be in writing, be delivered to the office of the president of FSU on or before April 15 for Members in their first year of service and February 15 for each subsequent year.  The appeal must state the specific reasons for the appeal.

4.      The decision of the president of FSU is final, binding and not subject to arbitration.

L.      The failure of the tenure review committee to comply with any of its obligations under Section 3 is exempt from the grievance process and the Employer shall have no liability because of such failure.

3.5.    Attainment of Tenure

A.      By October 1 of the tenure decision year, the Member must apply for tenure and present evidence in support of his/her application.

B.      By November 1, the tenure review committee will advise the applicant of its evaluation and intended recommendation.  By November 15, the applicant may request in writing a meeting with the tenure review committee, which shall be scheduled as soon as reasonably possible.  The final recommendation of the tenure review committee shall not be made until after the meeting.

C.      The tenure review committee shall prepare a written report, with all supporting documents, containing its recommendations.  This report shall not include the committee deliberations or a personnel-specific record of the vote.  The written recommendation shall be one of the following:

1.      Grant tenure, beginning with the start of the University's next academic year;

2.      Grant one (1) additional non-tenured year during which the applicant must fulfill specific conditions that are determined by the provost/vice president for Academic Affairs following input from the TRC, department head and dean.  During that conditional year, the tenure application process will again be followed.  In the event of denial of tenure, employment will be terminated at the end of the academic year in which tenure is denied; or

3.      Deny tenure and terminate employment at the end of the next regular academic year.

D.      By December 15, the final report and recommendation by the committee together with supporting data shall be presented to the department head and to the tenure applicant.

E.      Failure by the tenure review committee to timely deliver its recommendation to the department head constitutes concurrence with the decision of the provost/vice president for Academic Affairs.

EXHIBIT L
Page 17

F.     The department head shall attach his/her evaluation and recommendation and shall forward all material to the dean. The dean shall forward the recommendations and supporting documentation to the provost/vice president for Academic Affairs and shall append his/her recommendation and evaluation. Neither the department head nor the dean may change the tenure review committee's recommendations.

G.     By March 1, the provost/vice president for Academic Affairs shall notify, in writing, all applicants for tenure of his/her decision. Failure by the provost/vice president for Academic Affairs to act on the recommendations constitutes his/her concurrence with the tenure review committee's recommendation.

H.     If either the provost/vice president for Academic Affairs or the tenure review committee recommends the granting of an additional year, that year is granted. A Member can be granted only one extension of the non-tenured period. When the tenure review committee recommends the granting of tenure and the provost/vice president for Academic Affairs concurs, tenure is awarded. In all other cases, tenure is denied.

I.     A Member denied tenure may appeal the decision in writing to the president of FSU by March 15. The president of FSU, following a review of the tenure materials, shall communicate in writing his/her decision to either grant tenure, deny tenure, or grant one additional non-tenured year, provided that such a year has not previously been granted. The decision of the president of FSU is final, binding and not subject to arbitration.

J.     The failure of the tenure review committee to comply with any of its obligations under Section 3 is exempt from the grievance process and the Employer shall have no liability because of such failure.

3.6.     Academic Administrator Appointment with Tenure

A.     Academic department heads, directors, deans, the provost/vice president for Academic Affairs and the president may be granted tenure subject to the following conditions:

1.     The academic department head, director, dean, provost/vice president for Academic Affairs and president must possess qualifications appropriate to the academic discipline in which tenure is conferred.

2.     The academic department head, director, dean, provost/vice president for Academic Affairs and president must have previously attained tenure at a regionally accredited post-secondary or first professional-degree-granting institution.

3.     The tenured faculty in the academic discipline in which the person is to be conferred tenure must be provided the opportunity to review and share comments with their department head, dean, and the provost/vice president for Academic Affairs or the president of FSU on the candidate's qualifications preceding the offer of tenure to the candidate.

17

EXHIBIT L
Page 18

B.     Academic administrators who are granted tenure according to Section 3.6.A will not accrue seniority during the course of their administrative appointment. If an academic administrator with tenure moves from his/her administrative position to a faculty position, he/she will commence accruing seniority in the bargaining unit and will thereafter be subject to all provisions of this Agreement, except those having to do with the attainment of tenure.

## Section 4 - REPRESENTATION AND PROFESSIONAL CONDUCT

4.1.   <u>Discipline</u>

A.     The Employer and the FFA recognize a mutual responsibility for promoting professional conduct that encourages quality in the educational process, thereby reflecting favorably upon the University. Breaches of professional conduct, as differentiated from incompetence, are subject to discipline including, but are not limited to: abuse of sick leave and other leaves, excessive tardiness, willful deficiencies in professional conduct and/or performance, violation of Employer policies, regulations and administrative directions not inconsistent with the terms of this Agreement, and violation of the terms of this Agreement. Alleged breaches of professional conduct shall be reported promptly to the offending Member.

Issues pertaining to competence will be handled through evaluation.

B.     Disciplinary action shall be defined as any oral or written warning; oral or written reprimand; disciplinary probation; suspension, except for suspensions pending investigation; discharge for misconduct or any combination of the above, of which a formal record is kept or of which the disciplined Member is thereafter formally prejudiced. In no case will a Member be subjected to disciplinary action without just cause or on the basis of any anonymous information.

C.     A Member shall be notified of the right to have FFA representation at any meeting at or from which disciplinary action, as defined in this Section, may result. In no event shall any Member be disciplined in, or as a direct result of, a meeting at which FFA representation was not permitted.

D.     If some disciplinary action may result from/during a meeting in which the right to FFA representation was not permitted, or waived by the Member, the Member has the right to terminate the meeting pending the arrival of an FFA representative.

E.     Whenever the result of any disciplinary action, or delinquency in professional performance is reduced to writing, the findings and decisions of the Employer shall be filed in the Member's personnel file and a copy thereof given to the Member.

F.     In cases involving disciplinary suspension or discharge, the Member is entitled to due process which is as follows:

18

EXHIBIT L
Page 19

1.     A written statement from the appropriate administrator notifying a Member with sufficient particularity of the preliminary charges;

2.     A conference before an impartial administrator, of which the Member is duly notified, at which the Member must present any evidence in support of his/her position. A full investigation of the charges shall be conducted;

3.     Representation by his/her association representative and/or by counsel of his/her choosing;

4.     A decision, in writing, after the conclusion of the conference setting forth the decision of the appropriate administrator;

5.     There shall be no disciplinary suspension without salary, or disciplinary discharge, until the above written decision is rendered;

6.     Before suspending or discharging a Member, the administration shall consult with the president of the FFA;

7.     The above procedure will be administered in a timely fashion; and

8.     Said decision is grievable starting with Step 4 of the grievance procedure.

4.2.    Personnel Files

A.     No material originating after initial employment will be placed in a Member's official personnel file unless the Member receives a copy of the material. No anonymous information or derivatives thereof shall be placed or retained in any bargaining unit Member's official personnel file. Subsequent to the date of this Agreement in the case of disciplinary information or performance evaluations, Members will be given the opportunity to sign or initial the document before including the material in the file. Unsigned or uninitialed disciplinary information or performance evaluations shall not be used in grievance procedures or disciplinary action unless the Employer can establish the Member was given a copy or was given the opportunity to initial the material. A Member's signature or initials on such material does not imply agreement with the contents.

The Member may submit a written statement regarding any material, and the same shall be attached to the file copy of the material in question.

B.     No more than one (1) official personnel record may be maintained for any Member of the bargaining unit. Any Member of the bargaining unit may examine his/her post-employment personnel record. A Member shall have access to his/her records during normal business hours by appointment and may elect to be accompanied by a representative of the FFA when the Member examines it. Upon request and at the Member's own cost, the Member will be provided a copy of such post-employment records as requested.

19

EXHIBIT L
Page 20

4.3.    Faculty Participation: Educational Policy

      A.    This Agreement shall not be construed to deny faculty the opportunity to participate on committees.

      B.    The FFA may raise for discussion, with faculty and administration, issues of concern to faculty including the adoption of new educational policies.

## Section 5 - RIGHTS OF THE EMPLOYER

      It is the responsibility of the Employer to fulfill the role and mission of the University stated in the Ferris State University Mission Statement.  In fulfilling its role and mission:

      A.    The Employer, on its own behalf, hereby retains and reserves unto itself, without limitation except as herein provided, all power, right, authority, duties, and responsibilities conferred upon and vested in it by laws and the constitution of the State of Michigan, and of the United States, including all of the customary and usual rights, powers, functions and authority of management.

      B.    The exercise of the foregoing powers, rights, authority, duties and responsibilities by the Employer, the adoption of reasonable policies, rules, regulations and practices in furtherance thereof, and the use of judgment and discretion in connection therewith shall be limited only by the specific and express terms of this Agreement and then only to the extent such specific and express terms are in conformance with the Constitution and the laws of the State of Michigan and the Constitution and laws of the United States.

## Section 6 - SENIORITY

6.1.    Determination of Seniority/Definitions

      A.    For full-time Board-appointed Members, seniority shall be defined as length of continuous service from the actual date the Member was scheduled to report for bargaining unit work, unless otherwise expressly defined herein.

      B.    For Board-appointed part-time Members who have been employed for at least one-half of the average load for their department, seniority shall be defined as length of continuous service from the actual date the Member was scheduled to report for bargaining unit work.

      C.    As between any two or more Members who have the same seniority date, seniority shall be determined as follows:

      1.    If the Members' seniority date is prior to June 30, 1984, the tie shall be broken based on the dates of issuance of their initial contracts.  The Member with the earliest-issued Board-approved contract shall have the most seniority; or

EXHIBIT L
Page 21

2.      If the Members' seniority date is after June 30, 1984, the tie shall be broken by using the last four (4) digits of the affected Members' Social Security number. The Member with the highest last four digits shall have the most seniority.

D.      All provisions of Section 6 regarding seniority shall have no application with respect to non-tenure and tenure matters.

6.2.    Change in Employment Status

A.      For the purpose of seniority, all paid leaves of absence shall be considered as continuous employment.

B.      A Member who accepts a grant position of either a full or part-time assignment shall retain his/her bargaining unit status and shall continue to accrue seniority.

C.      A Member who accepts a part-time, acting or interim administrative position at the University and who is not otherwise excluded from the bargaining unit pursuant to Section 1.3 of the Agreement, shall continue his/her bargaining unit status and shall continue to accrue seniority while occupying such position.

D.      A Member who leaves employment with the University and subsequently is rehired shall be considered a new employee without seniority.

E.      After June 30, 1984, Members who begin their employment with the University as faculty on part-time assignment (non-bargaining unit only) or as temporary and/or grant-supported faculty shall not accrue seniority while occupying such positions.

F.      Except as provided in Section 7.9, any employee of the University holding a position not listed in Section 1.3 of the Agreement who transfers into the bargaining unit shall accrue and/or retain seniority as follows:

1.      A non-bargaining unit employee who transfers into the bargaining unit shall begin to accrue seniority immediately upon recognized entry into the bargaining unit;

2.      A non-bargaining unit employee who has previously accrued seniority as a Member, in a seniority group of the bargaining unit for instruction at least the equivalent of two (2) academic semesters, shall, upon re-entry into that same seniority group(s) within one (1) year of when he/she left the seniority group, resume accrual of seniority within that seniority group(s) with recognition fully given to the previously accrued seniority within that same seniority group. If a former Member returns to the bargaining unit after being absent from it for more than one (1) year, he/she shall not retain any previously accrued seniority within the unit. This paragraph is inapplicable to an employee who leaves the employment of the University; and

21

EXHIBIT L
Page 22

3.      In no event shall seniority accrue to any employee of the University while not in the bargaining unit, nor shall seniority accrue in any seniority group, to any employee while not in that seniority group of the bargaining unit.

G.      The president of the FFA shall be provided written notice confirming any University administrative appointment that results in a Member leaving the bargaining unit.  Such notice shall be provided by HR within ten (10) working days of HR's receipt of notice of administrative approval of the transaction.

6.3.    Seniority Groups

A.      Each Member shall be assigned to a seniority group based on the original position for which employed and/or to which specifically assigned at a later date in accordance with departmental procedures.  In the event that a Member transfers to another seniority group, he/she shall retain, but not accumulate, seniority in the seniority group from which transferred.  A Member who transfers or is transferred under any conditions of employment to another seniority group shall earn seniority credit at a rate of one (1) year credit for each year of service, beginning with his/her first day of work in the new seniority group.

B.      Seniority groups shall not be created, merged or deleted without an advisory vote of the affected Members at least sixty (60) working days before the action takes place.

6.4.    Loss of Seniority

Seniority is lost and, except under paragraph F, employment in the bargaining unit is terminated and, if applicable, a Member's name is removed from the preferred hiring list if a Member:

A.      Resigns;

B.      Retires;

C.      Is discharged for just cause or otherwise lawfully terminated, including termination resulting from the expiration of time on the recall list;

D.      Rejects in writing an offered position which is at least the same rank and salary as the position held by the Member immediately prior to retrenchment (as defined in Section 8), or if the Member does not respond in writing within thirty (30) days after being offered, in writing, such position;

E.      Except as provided in Section 7.9, leaves the bargaining unit for more than one (1) continuous year while remaining in the employ of the University; or

F.      Does not return to work after a sick leave of absence for the period of one (1) year, provided that notwithstanding termination of employment under this paragraph,

22

EXHIBIT L
Page 23

the Member's entitlement to sick leave pay or LTD benefits, if any, is not affected. Termination under this paragraph is discretionary with the Employer.

6.5.    Seniority List(s)

The FFA shall have sixty (60) working days after the transmittal of the seniority list(s) to raise any objections it may have to the composition of the seniority list(s). If any objections are formally raised by the FFA, a meeting shall be held between the Employer and the FFA to attempt reconciliation of the seniority list(s). Unresolved disputes shall be subject to the grievance procedure.

**Section 7 - WORKING CONDITIONS.**

7.1.    Professional Responsibilities

A.      The primary professional responsibilities of Members are teaching and the provision of counseling, library, and other educational services.

B.      Further, Members of the bargaining unit have professional responsibilities which may include advising students; orientation; registration of students; participation in University committees; keeping regular posted office hours, which are scheduled at times convenient for students; and participation in traditional functions which have academic significance. Members shall not be asked to spend an excessive or unreasonable amount of time on such services. A Member shall not be required to serve in a program coordinator, department chair, director or acting/interim administrative position. Faculty Members may agree to be given release time from their normal professional responsibilities. Such agreements must be in writing and for a specified length of time which may be renewable upon mutual agreement of the Member and the Employer at least one (1) month prior to the initiation of the renewed period of released time.

C.      In addition to traditional uses for professional development money, Timme Professional Development Incentive Funds and college professional development funds may be used to develop new teaching techniques (including taking for-credit and not-for-credit coursework in Member's field); to collect materials for new programs; to develop new ways of presenting material; to develop new curricula for implementation at the University; to establish linkages between University programs and other organizations, agencies, or institutions; or to survey what is being done at other institutions as models for programs at the University. Specific course work for the purpose of receiving additional degrees will not be funded using professional development funds. Professional development funds for the purposes above will require department head approval.

D.      The nature of FSU as an educational institution is such that the performance of teaching faculty duties extends beyond classroom responsibilities and cannot be restricted to a fixed amount of time or points in time. Therefore, this Agreement shall not be construed either to require a specific number of hours of service to the University, nor to give any Member the right to additional compensation based on

23

**EXHIBIT L**
**Page 24**

the number of hours of service performed, except as elsewhere provided in this Agreement.

        E.      Subject to the satisfactory performance of academic and/or professional duties, Members may engage in other activities for financial consideration that do not conflict with professional duties, providing, however, that prior permission to engage in duties that might reasonably impinge upon professional and/or academic duties is first obtained.  Such approval will not be unreasonably withheld.

7.2.    <u>Workload</u>

        A.      Teaching Faculty:

            1.      Courses Taught by Traditional Methodology:

                a.      All present department workload policies continue unless revised under this Section, provided that present policies which identify semester workloads which can be annualized as the sum of the semester workloads shall be so annualized.

                b.      The establishment or revision, as applicable, of any workload policy may be requested by either the written request of a majority of a department's Members or directed by the provost/vice president for Academic Affairs.

                    i.      A Member request shall be made to the department head and shall include the proposed policy or changes and the rationale.

                    ii.      If the provost/vice president for Academic Affairs directs, the department head shall notify the department Members and provide them an opportunity to participate in the preparation/change within the time directed by the provost/vice president for Academic Affairs.

                    iii.      Workload policies shall incorporate relevant criteria including but not limited to the following:

                      a)      Semester credit hours, student credit hours, or contact hours.

                        (1)      In this regard, twenty-four (24) semester hours per academic year, excluding summer shall be weighed as a standard workload but, recognizing the differences between colleges and between departments within colleges, shall be neither a minimum nor a maximum. For equivalency purposes, twenty-four (24) semester

24

**EXHIBIT L**
**Page 25**

hours is equivalent to thirty-six (36) contact hours or seven hundred twenty (720) student credit hours per academic year, excluding summer semester.

(2) Provided that not more than two-thirds (2/3) of an annual normal load will be assigned in any one (1) semester unless the Member agrees.

b) Occupational and professional standards for the discipline, course content, course difficulty, class size, course development, program coordination, research and other relevant factors.

c) See also Section 13.6.B.

iv. If the department head and a majority of the department Members agree, the proposal and rationale shall be delivered to the dean. The dean shall forward the proposal along with his/her recommendation to the office of the provost/vice president for Academic Affairs.

v. If the provost/vice president for Academic Affairs approves, the policy shall be effective as of the date determined by the provost/vice president for Academic Affairs.

vi. If the provost/vice president for Academic Affairs does not approve, the proposal shall be returned to the department for revision and resubmission as directed including, but not limited to a date for resubmission.

vii. If the department head and a majority of the department Members agree upon the resubmission, the proposal will be delivered to the dean. The dean shall forward the proposal, along with his/her recommendation, to the office of the provost/vice president for Academic Affairs.

viii. If the provost/vice president for Academic Affairs approves, the proposal shall become the policy effective as determined by the provost/vice president for Academic Affairs.

ix. If the provost/vice president for Academic Affairs does not approve, he/she shall notify the department. Either a majority of the department Members or the department head may, within ten (10) working days, request the appointment of an *ad hoc* committee pursuant to paragraph v. If there is no request within the ten (10) working days, the provost/vice president for Academic Affairs shall determine the policy.

25

EXHIBIT L
Page 26

x.    If the department head and a majority of the department Members do not agree upon the resubmission, not later than ten (10) working days after the resubmission date, either may request to the provost/vice president for Academic Affairs that the proposal be reviewed by an *ad hoc* workload committee which will be formed and respond as set forth below.

xi.    If the department head and a majority of the department Members do not agree, either a majority of the department Members or the department head may, within ten (10) working days, request the appointment of an *ad hoc* committee. If there is no request within the ten (10) working days, the provost/vice president for Academic Affairs shall determine the policy.

xii.    Upon the request as in paragraph v, the provost/vice president for Academic Affairs will direct that an *ad hoc* workload committee comprised of four (4) people, two (2) of whom will be appointed by the FFA and two (2) of whom will be appointed by the provost/vice president for Academic Affairs, be formed, notify the FFA that such committee is to be formed and set a date for the FFA to identify its appointees. If the FFA fails to timely identify its appointees, either the provost/vice president for Academic Affairs appointees will review the policy or the provost/vice president for Academic Affairs will determine the policy as the provost/vice president for Academic Affairs determines in his/her sole discretion.

xiii.    The *ad hoc* committee shall consider the proposals and rationale and deliver its written recommendations to the office of the provost/vice president for Academic Affairs within two months of its formation or by such other date as may be agreed by and between the provost/vice president for Academic Affairs and the FFA.

xiv.    The provost/vice president for Academic Affairs shall then determine the policy.

xv.    The decision of the provost/vice president for Academic Affairs is final, binding and not arbitrable.

2.    Courses Taught by Non-Traditional Methodology:

a.    Courses taught by nontraditional methodology include but are not limited to: television, computer-aided instruction, video-tape lecture, electronic or other media.

EXHIBIT L
Page 27

b.    Courses taught by nontraditional methodology shall be first offered to qualified volunteers.  If there are insufficient volunteers, Members may be assigned consistent with department procedures developed in Section 7.5 and the applicable workload policy.  If such assignment is not addressed by the workload policy and the department head and Member cannot agree in advance on the workload credit for the assignment, the Member can request a workload review under Section 7.2.C and D.

c.    Intellectual Property Rights and Electronic Distance Learning Materials.  See Appendix C.

B.    Counselors and Librarians:

1.    Weekend and evening assignments for counselors and librarians shall be rotated within the seniority group consistent with department needs.

2.    Counselors and librarians have access to the workload review process when appropriate.

C.    Request for Individual Workload Review:

1.    Members may request a workload review for any of the following reasons:

a.    If they think their workload is unreasonable or inequitable when compared to other Members within that seniority group;

b.    If they think their workload does not comply with the policies for their department or seniority group or this Agreement;

c.    If they think that changes in their usual workload caused by program changes, different course assignments, or changes in non-teaching assignments have created an increase in their workload; or

d.    If vacancies over three (3) months in their seniority group have caused an increase in their workloads.

D.    Procedure for Individual Workload Review:

1.    A request for an individual workload review must be filed within twenty (20) working days from the date of the events causing the alleged problem and must include the following:

a.    a clear and concise statement of the alleged problem;

b.    the time frame over which the alleged problem has taken place; and

27

EXHIBIT L
Page 28

          c.      a suggested remedy.

2.      Should more than one (1) Member from the same department file the same request, all such requests may be combined for review.

3.      The request must be submitted in writing to the department head.

4.      Unless the dean assigned the workload under review, in which case paragraph 5 applies, the dean will review the request and render a decision including the following:

          a.      a description of the issue;

          b.      an analysis of the relevant workload data covering the time period in question; and

          c.      a decision.

5.      a.      If the dean's decision does not resolve the matter, within ten (10) working days of the dean's decision, the Member must deliver a written request for review by an *ad hoc* workload review committee to the provost/vice president for Academic Affairs. The provost/vice president for Academic Affairs will direct that an *ad hoc* workload committee comprised of four (4) people, two (2) of whom will be appointed by the FFA and two (2) of whom will be appointed by the provost/vice president for Academic Affairs, be formed, notify the FFA that such committee is to be formed and set a date for the FFA to identify its appointees. If the FFA fails to timely identify its appointees, either the provost/vice president for Academic Affairs appointees will review the workload or the provost/vice president for Academic Affairs will determine the workload as the provost/vice president for Academic Affairs determines in his/her sole discretion.

          b.      The committee may meet with the Member(s), the department head, dean, school director, or other persons, and may request pertinent information from the Employer sufficient to perform its analysis.

          c.      The committee shall analyze the relevant data and deliver its written recommendation(s) to the office of the provost/vice president for Academic Affairs within two (2) months of its formation or by such other date as may be agreed by and between the provost/vice president for Academic Affairs and the FFA.

6.      The decision of the provost/vice president for Academic Affairs is final, binding and not arbitrable.

### 7.3.  Health and Safety

A.      The Employer agrees to provide working conditions. that meet health and safety standards provided for in applicable state and federal statutes. No FFA Member

**EXHIBIT L**
**Page 29**

shall be compelled to work under conditions which confront him/her or his/her students with an imminent safety and/or health danger. For the purposes of this Section, imminent danger is defined as a condition where there is reasonable certainty that a hazard exists that can be expected to cause death or serious physical harm immediately or before the hazard can be eliminated through regular procedures. When there is a risk of exposure to recognized hazards in the workplace, the Employer is obliged to take all reasonable non-discriminatory steps to ameliorate the hazard. Additionally, the Employer agrees to make all means of egress, including access to work sites, safe from undesirable conditions caused by inclement weather, in a reasonable manner as determined by the affected area's health and safety team.

   B. The FFA and the Employer recognize that a cooperative approach between Members and administrators at the work site, stressing the preventative aspects of safety/health problems affecting them both and the students of the institution, is essential to the solution of those problems. To these ends, they can best implement this cooperative approach through the establishment of health and safety teams at the college/bargaining unit employment area or office level. A health and safety team will be made up of an administrator co-chairperson and a Member co-chairperson, one (1) additional administrator and three (3) additional Members from the same college/employment area. The Members of the college/employment area will select their team co-chairperson and Members.

   C. Any Member who believes there are situations which are in violation of local, state or federal environmental, health and/or safety regulations shall report such situations to the University's health and safety coordinator immediately with a copy to the unit health and safety team leader. Meetings of the health and safety teams shall be called by the co-chairpeople during normal working hours or in response to a concern from either group of represented participants. The team will be free to discuss, consider and decide upon proposed means to remedy the problem/concern identified. A brief report of each proposal will be sent to the dean of the affected college/employment area, the vice presidents for Administration and Finance and Academic Affairs, and the department head of the affected area. It is agreed by both the FFA and the Employer that timeliness is essential in the correction/prevention of health and safety deficiencies and the team will not delay in its deliberations or the issuance of its proposals.

   D. Appropriate items of discussion for the team may include, among other things, the availability of protective equipment, clothing and devices necessary for the safe pursuit of assigned Member duties, and concerns received from participants' constituencies and the immediate review of any determination of imminent danger. Appropriate data (i.e., levels of chemicals, noise, radiation and air contaminants) generated by the University's health and safety officer shall be made readily available to the teams for analysis.

   E. The team will inform affected constituencies of all identified hazards in the workplace, along with federal and state recommended standards of safety and remedy for exposure to such hazards.

29

EXHIBIT L
Page 30

F.     The team shall additionally be charged with implementation and promotion of a program to educate its constituencies concerning safe work practices and potential dangers.

G.     Failure of the Employer to implement recommendations of the committee that exceed the requirements of applicable state and federal law shall not be subject to the grievance procedure and arbitration.

7.4.    Academic Freedom

A.     The Member is entitled to full freedom in research and in the publication of the results, subject to the adequate performance of other academic duties; but research for pecuniary return using University facilities must be based upon an understanding with the authorities of the institution.

B.     Members are entitled to academic freedom in the classroom in discussing their assigned subjects and disciplines, and should alert their students to the various scholarly views related to those subjects, and avoid presenting totally unrelated material.

C.     The concept of freedom should be accompanied by an equally demanding concept of responsibility. When Members speak or write as citizens, they should be free from institutional censorship or discipline. They should at all times make every effort to be accurate, exercise appropriate restraint, show respect for the opinions of others and indicate that they are not an institutional spokesperson.

D.     The above shall be construed to mean that no limitations shall be placed upon study, investigation, presenting and interpreting facts and ideas concerning human society, the physical and biological world and other branches of learning subject to accepted standards of professional responsibility. The right to academic freedom herein established shall include the right to support or oppose political causes and issues as long as that recognized right shall not be brought to bear on regular instructional activities.

E.     As a component of academic freedom, Members are responsible for decisions regarding the classroom instruction of students, in accordance with department procedures.

F.     No Member shall have his/her instruction or lab viewed or recorded electronically by the Employer with any video or sound equipment without reasonable advance notification from the Employer, typically no less than twenty-four (24) hours.

7.5.    Department Procedures

A.     To involve Members in the decision-making process regarding matters of departmental concern, department heads shall provide not less than thirty (30) calendar days for department Member input before the following:

1.     Forwarding a new course or curriculum to the dean or next level of course/curricular review;

30

EXHIBIT L
Page 31

   2. Forwarding a revision of an existing course or curriculum to the dean or next level of course/curricular review;

   3. Submission of the department's course schedule and proposed teaching assignments to the dean;

   4. Submission of annual department budget request; or

   5. Any other matters which the department head and the Members agree to consider.

  B. If the department head must take action in less than thirty (30) days or learns of the need to take action such that it is impracticable to provide thirty (30) days written notice, he/she shall provide the opportunity for input as soon as reasonably practicable.

   1. Failure to provide such opportunity shall not be the basis for either delay of such action or for overturning such action.

   2. When less than thirty (30) days written notice is given, the Member may respond directly to the dean/provost/vice president for Academic Affairs.

  C. Before the Employer makes a final decision in the hiring of a department head or program director, department Members will be offered an opportunity to:

   1. Submit a recommendation to the dean on the expertise and/or credentials for the position;

   2. Interview candidates; and

   3. Review and submit recommendations regarding the credentials and suitability of the candidates.

  D. Any referendum or vote on department matters used to determine the view of the majority of the Members of a department shall be limited to the Members of that department.

  E. In the event a rotation list needs to be established, the initial rotation shall be based on the seniority of the affected Members. A new Member is added to the bottom of the rotation list as it exists on the first day he/she reports for work as a bargaining unit Member.

7.6. <u>Hiring</u>

  A. The parties recognize their mutual interest in recruiting and hiring into the bargaining unit only the most qualified applicants available in order to insure quality education. In order that the Employer can act promptly to recruit such individuals,

31

EXHIBIT L<br>Page 32

Members shall form search committees in accordance with department procedures jointly adopted by the department head and a majority of the department Members, provided that if the Members do not form a search committee or there are no department procedures for forming such committee, the department head shall form such committee. The committee shall:

    1.    Identify the position expertise required;

    2.    Review credentials of applicants and recommend those qualified for interviews. The Employer may add additional interviewees from applicants already a part of the applicant pool and who meet the posted qualifications after consultation with the search committee;

    3.    Interview applicants and conduct open sessions for all interested Members;

    4.    Evaluate interviewed applicants; and

    5.    Submit a prioritized list of all qualified interviewed applicants to the department head. The Employer may add additional applicants to such list from among those interviewed after consultation with the search committee.

    B.    The department head will submit the recommended list of qualified applicants along with his or her own recommendation to the dean. The dean shall either select from the list or initiate a new search in accordance with the foregoing provisions.

    1.    Within fifteen (15) days of the hiring of an applicant who does not appear on the prioritized list submitted by the search committee, the president of the FFA may request in writing a written explanation as to why the candidate was added. Within fifteen (15) days, the provost/vice president for Academic Affairs will provide the explanation; such explanation is not subject to the grievance procedure.

    C.    The review of candidates shall be conducted in accordance with the University's procedures and policies. The final decision regarding employment of candidates is reserved to the Employer.

7.7.    <u>Summer</u>

    A.    Determination of Summer Course Offerings Commencing Summer 2019:

    1.    Summer school offerings, herein defined as "courses/sections published in the Summer Bulletin," to be taught for full pay when minimum enrollments are met or *pro rata* pay when minimum enrollments are not met, will be determined by the Employer in a manner consistent with procedures for course/section determination during the regular academic year, except where modified as follows:

**EXHIBIT L**
**Page 33**

2.      By December 15, department Members may suggest to their dean or designee, as appropriate, those courses which might be taught during the summer semester.

3.      By January 15, each dean or designee where appropriate, shall have composed a list of potential summer school courses/sections for the following summer school semester. This list may include courses to accommodate students who are enrolled in programs that operate throughout the calendar year, students who are seeking to graduate at the end of the summer semester or the following academic semester, students who have been admitted to begin their programs in the summer, and students for whom FSU has an obligation to offer a supervised internship. It may also include such other courses deemed appropriate by academic deans, or designee(s).

4.      Summer Course Offerings

a.      All summer course offerings for which enrollments reach fifty percent (50%) of the academic year capacity (hereinafter "cap" rounded down to the nearest whole student) or fifteen (15) students, whichever is less, by the Monday of finals week in May shall not be canceled by FSU, provided that there are qualified persons to teach the courses. Courses/sections for which enrollments do not reach fifty percent (50%) of cap (rounded down to the nearest whole student) or fifteen (15) students, whichever is less, may be canceled by FSU only when no qualified Member within the academic department is willing to teach the course/section for *pro rata* pay. However, FSU retains the right to offer more than *pro rata* pay (within the restraints of the department summer teaching rotation list) to such a Member willing to teach such a course/section.

5.      The dean or designee shall offer course assignments to Members within the seniority group consistent with the seniority group rotation list prior to making offers to other sources.

B.      Compensation:

1.      Salary for a full summer teaching load of courses/sections in which minimum enrollments are met, [i.e. fifty percent (50%) of cap (rounded down to the nearest whole student) or fifteen (15) students, whichever is less] shall be thirty-five percent (35%) of the Member's regular academic year salary.

2.      Determination of enrollment for determining full pay shall be by the Wednesday after grades are due in May.

3.      Salary for less than a full load, either in number of courses/sections, or in courses/sections which do not meet minimum enrollment requirements for full pay, will be compensated on a *pro rata* basis.

33

**EXHIBIT L**
**Page 34**

a.      Salary for courses/sections will be pro-rated until official enrollment (as set out in paragraph b. below) reaches fifty percent (50%) of the official course cap or fifteen (15) students, whichever is less. Pro-rata will be based on fifty percent (50%) of the official course cap, or fifteen (15) students, whichever is less. (Examples: For a course with an official course cap of twenty (20) with an enrollment of nine (9), the faculty Member will receive 9/10 of full pay of the course. For courses with an official course cap of greater than thirty (30), with an enrollment of 14, the faculty Member will receive 14/15 of full pay for the course).

b.      Minimum compensation for *pro rata* courses/sections will be based on the official enrollment in the course section on the official count date.

c.      Courses/sections taught for *pro rata* compensation do not affect an instructor's position on his/her summer teaching rotation list. However, such courses/sections, when not covered, shall be offered to instructors in a manner consistent with the operation of the summer teaching rotation list.

d.      Under normal circumstances, it shall not be the practice of the Employer to pay a non-Member more than a Member would receive for teaching the same course. Exceptions shall be reported in writing by the provost/vice president for Academic Affairs or designee to the FFA president prior to the start of class.

C.      Summer Rotation List:

1.      By September 15, department heads will distribute a questionnaire to Members requesting that they express their interest in teaching summer semester.

2.      By October 1, Members must return the questionnaire to their department head. Failure to return the questionnaire will be deemed a negative response.

3.      Members who respond in the negative will not be considered for summer employment but will maintain their relative position on the rotation list.

4.      Members who respond in the affirmative have until the beginning of early summer registration (generally the third week of spring semester) to decline employment without prejudice to their position on the rotation list. Members accepting summer employment will be expected to carry out the assigned responsibilities. Requests after the beginning of early summer registration to decline employment which are made for professional reasons or reasons of health, will be considered on their merit.

34

**EXHIBIT L**
**Page 35**

5.      No Member shall be required to accept less than a full load. Members declining less than a full load shall remain in place on the rotation list.

6.      Each Member shall have the opportunity to accumulate a full load before starting over on the rotation list.

7.      Once the initial assignments are made, mutually agreeable exchanges may occur between qualified Members with the concurrence of the department head or dean until the beginning of fall registration, generally the third week of March, and continued summer registration. Denial of a proposed trade must be based on lack of course-specific qualifications.

8.      Summer courses listed as internship, co-op, or clinical will continue to use the existing per student formulas for computing summer salary.

9.      Teaching loads for summer semester will be consistent with department work load policies. In addition, summer semester projects for which a Member's rate of pay is determined as a fraction of load shall be equated as part of a full load compensation for summer.

10.     Any of the following for which a Member's rate of pay is determined as a fraction of load shall be credited against his/her summer rotation list position: on-campus courses, off-campus courses, online courses, courses outside the Member's seniority group, and special projects.

11.     Any "extra class" assignments (overloads) will be assigned last and the pay rate for those assignments will be at the normal overload rate.

D.      Summer Semester Review Committee

1.      The committee shall consist of two (2) administrators selected by the Employer, and two (2) Members selected by the FFA.

2.      The committee will meet early in November to review the previous summer semester experience and submit recommendations to the FFA and to the FSU administration.

7.8.    Performance Review

A.      Tenured Members' performance shall be reviewed in accordance with the individual college's post-tenure review policy. Review may include, but is not limited to, peer review, student evaluations, and other performance assessment methods.

B.      To involve Members in the development and/or change in standards, department heads will provide not less than thirty (30) calendar days for department Members' input before submission to the dean.

C.      The content of reviews is not subject to the grievance procedure.

35

EXHIBIT L
Page 36

D.    A Member who disagrees with all or any part of the review must deliver a written response to the department head within fifteen (15) working days of knowledge of the review. The response must identify all aspects with which there is disagreement and the factual basis for such disagreement. The response will be attached to and remain with the review. Upon request by the Member, the next higher administrator shall meet with the Member to discuss the review within fifteen (15) working days of the request. The administrator will give the Member a written response to his/her areas of disagreement within fifteen (15) days.

7.9.    Transfers

A.    An administrator may seek to transfer into the bargaining unit as follows:

1.    With timely notice by the provost/vice president for Academic Affairs to the appropriate department, an administrator who was previously in the bargaining unit may return to the bargaining unit with previous rank, tenure, and seniority as of the date he/she left the bargaining unit. Such a return may be effectuated when a vacancy exists and the administrator is qualified to fill the vacancy. The decision of the provost/vice president for Academic Affairs may be appealed to the president by a majority vote of the tenured Members of that seniority group. The decision of the president is final, binding, and not subject to arbitration. If such administrator does not have tenure, he/she is subject to the tenure review process in Section 3.

2.    The provost/vice president for Academic Affairs may assign to a faculty position an administrator who was not previously in the bargaining unit. The decision of the provost/vice president for Academic Affairs may be appealed to the president of FSU by a majority vote of the tenured Members of that seniority group. The decision of the president is final, binding and not subject to arbitration.

a.    The provost/vice president for Academic Affairs may, after receiving the recommendation from the appropriate Members, assign rank to an administrator.

b.    An administrator who has not previously been granted tenure at FSU but who transfers to a bargaining unit position shall be subject to the tenure review process in Section 3, except that the non-reappointment provisions of Section 3 shall become effective after the third year of the faculty appointment.

3.    The salary for an administrator assigned to a bargaining unit position will be determined by the provost/vice president for Academic Affairs, taking into consideration the existing salaries of Members in the seniority group, the College and University Personnel Association (CUPA) salary survey for state colleges and universities, individual credentials, rank and degree.

B.    A Member may seek to transfer from one seniority group to another without losing benefits under this Agreement, provided he/she meets all the qualifications

EXHIBIT L
Page 37

for the position to which he/she is seeking to transfer. His/her credentials shall be reviewed pursuant to Section 7.6.

C.      Except as provided in Section 8.7.C, tenure granted a Member is retained regardless of position within or without the bargaining unit while an employee of the University. Tenure status of non-tenured Members shall be in accordance with Section 3 of this Agreement.

7.10.   Academic Calendar

The academic calendar will continue to be determined by the Employer in a manner consistent with current practice and the 1994 semester conversion previously approved by the Employer and the FFA. The Employer recognizes the FFA's reservation of right to bargain over issues related to the calendar in accordance with applicable law should it elect to do so in successor negotiations.

**Section 8 - RETRENCHMENT**

8.1.    Definition

A.      Retrenchment is defined as a reduction in the number of faculty in any curriculum area, department or seniority group.

8.2.    Retrenchment by Attrition and Voluntary Reassignment

A.      Retrenchment may be accomplished through attrition, including, but not limited to, resignation or retirement.

B.      Retrenchment may also be achieved by voluntary reassignment within the bargaining unit that is mutually agreeable between the Employer and the Member.

8.3.    Retrenchment by Layoff

A.      Layoff is the involuntary reduction in the number of Members for educational, business, or economic reasons other than for cause or non-reappointment.

B.      When, in the sole judgment of the Employer, retrenchment through attrition or voluntary reassignment does not meet its needs, it may be accomplished through layoff.

C.      The provost/vice president for Academic Affairs will give the president of the FFA written notice of the Employer's preliminary proposal to retrench through layoffs of Members, including whether the decision is fiscally based or programmatic based, not less than sixty (60) calendar days before the presentation of the proposal to the president. The FFA may comment during the sixty (60) calendar days, including but not limited to options under Section 8.7.

EXHIBIT L
Page 38

D. The final proposal will be determined by the provost/vice president for Academic Affairs and reported to the president of the FFA.

E. The following order of layoffs will be utilized:

1. part-time and temporary faculty;

2. non-tenured full-time Members;

3. part-time tenured Members; and

4. full-time tenured Members.

F. With respect to the application of Section 8.3.E, layoff shall be in inverse order of seniority group seniority, within the curriculum area, department or seniority group in which the reduction will occur, as applicable, consistent with programmatic academic needs as determined by the Employer, including but not limited to qualifications.

1. When the Employer departs from compliance with Section 8.3.E above for "programmatic needs" the president of FFA will be notified in writing by the administration. The written notice will be issued at least thirty (30) days prior to the notification date of layoff and will include but not be limited to the following:

a. Name of Member affected;

b. Reasons for the exception; and

c. Projected date of layoff.

2. Where layoff is by curriculum area, for purposes of this Section only, the area in which a Member is classified will be determined by the area in which he/she taught the most credit hours in the current and immediately preceding two (2) academic years.

8.4. Notification

A. Members who are to be laid off shall be notified as follows:

1. A non-tenured Member shall be notified by February 1 of his/her last year of employment; or

2. A tenured Member shall be notified by July 1 of the year preceding the last year of employment.

8.5. Layoff Benefits

A. Insurance - Insurance benefits shall be continued to the end of the month in which the layoff occurs (May, if at the end of the academic year) and for the following

EXHIBIT L
Page 39

twelve (12) months, even if he/she continues employment in a bargaining unit position on a part-time basis.

      B.     Sick leave – The Employer shall pay a laid off Member fifty percent (50%) of his/her accumulated sick leave not to exceed one hundred (100) days at his/her rate of pay at the time of layoff. Such payout will occur on or after the beginning of the semester following layoff.

         1.     A Member who is recalled may either repay the sick leave payout and have his/her sick leave reinstated or start with no accumulated sick leave.

      C.     While a laid off Member is employed on a part-time basis, the Employer shall:

         1.     Except as provided in 8.5.A, contribute toward the premium for insurance benefits in the same proportion as the assigned semester workload is to one-half (1/2) the annual workload, not to exceed either (1) one hundred percent (100%) or (2) that same proportion of the cap on the Employer's contribution; and

         2.     Pay the Member as follows:

            a.     If assigned a full load, the salary as of the time of layoff; or

            b.     If assigned less than a full load, *pro rata* salary per semester based upon salary as of the time of layoff in the same proportion as the assigned load is to one-half (1/2) an annualized full load.

### 8.6.   Recall

      A.     A laid off tenured Member shall be on a recall list for three (3) years. A laid off non-tenured Member shall be placed on the recall list for two (2) years.

      B.     No Member laid off from another seniority group, no new person, whether full-time, part-time, or temporary, will be hired to fill, and no administrator will be transferred into a vacancy in the seniority group of a Member on the recall list unless the vacancy is first offered in writing to all qualified laid off Members from such seniority group on the recall list, in order of seniority, for a period of thirty (30) calendar days.

      C.     A recalled Member shall have at least the same rank and salary held when laid off, shall retain all sick leave accumulation, subject to Section 8.5.B, and credits for tenure and sabbatical leave and shall not be considered a new employee.

### 8.7.   Layoff Alternatives

      A.     The Employer will review alternatives to layoff with the president of the FFA as described below:

39

EXHIBIT L
Page 40

        1.      Assignment to vacancies consistent with the employee's experience, credentials and qualifications;

        2.      A retraining sabbatical as described in Section 8.8; or

        3.      The buy-out option as described in Section 8.9.

    B.      The Employer will send written notice of vacancies to the FFA president and will, for informational purposes, mail written notice of vacancies to Members who have been notified of layoff and laid off Members on the recall list. Failure to comply with this requirement shall be subject to the grievance procedure; provided however, that the exclusive remedy shall be a twenty-five dollar ($25) contribution to the student emergency loan fund.

    C.      A laid off Member may apply to fill vacancies in bargaining unit positions for which he/she is qualified.

        1.      Members on the recall list and Members who have been notified of layoff who apply for a vacancy will be evaluated pursuant to Section 7.6.

        2.      A laid off Member who is selected to fill a vacancy, shall be issued a one-year temporary contract which may be renewed for up to an additional one (1) year. While employed on a temporary contract, he/she will accumulate seniority pursuant to Section 6. Not less than one (1) month before the expiration of such temporary contract, the Employer shall notify him/her of:

        3.      Disqualification from consideration for the vacancy, in which case the Member reverts to previous layoff status; or

        4.      Offer of the vacancy. If accepted, tenure status, if any, shall be reinstated and the Member shall earn seniority at a rate of one (1) year for each year of service. If rejected, he/she shall in all respects be treated as a voluntary quit.

    D.      The final decision regarding employment of laid off Members in vacancies shall be made in accordance with Section 7.6.

8.8.    Retraining Sabbatical

    A.      A tenured Member notified of layoff or laid off is eligible for a retraining sabbatical. He/she may prepare a proposal which describes the intended education or work-related program and submit it to the provost/vice president for Academic Affairs. If the provost/vice president for Academic Affairs believes the proposal has merit, it shall be granted.

    B.      Retraining sabbaticals shall be governed by Section 10.4 regarding duration and pay. However, they shall be granted only when connected with layoff and shall not be considered under Section 10.4.

EXHIBIT L
Page 41

8.9. <u>Buy Out</u>

      A.    A buy out must be offered to each Member in the curriculum area, department or seniority group in which the reduction occurs. The provost/vice president for Academic Affairs may refuse any Member the right to participate. Acceptance of a buy out constitutes termination of employment under the following conditions:

         1.    The Employer will pay one (1) year's salary at his/her rate of pay at the time of termination. The Member may elect to receive the pay in either (1) a lump sum, (2) in installments over the regular academic year, or (3) in installments over the regular fiscal year;

         2.    Provided the insurance carrier agrees, the life insurance, health insurance and dental insurance in effect at the time of termination will be continued for one (1) calendar year with premiums fully paid by the Employer;

         3.    Accumulated sick leave will be paid as though he/she had retired according to Section 10.1.E.3 of this Agreement; and

         4.    The Member forfeits and waives all rights to recall or other options pursuant to this Agreement.

      B.    The buy out is effective June 1 or July 1 for 10 or 12 month Members, respectively, following termination of employment.

      C.    Having accepted a buy out, a Member may elect to forfeit the last year of employment as described in Section 8.4.

**Section 9 - GRIEVANCE PROCEDURE**

9.1. <u>Definition - Grievance</u>

      A.    A grievance is an alleged violation of a specific section of this Agreement.

      B.    A grievance may be initiated by one or more Members and must be signed by all grievants, and the conclusion of the grievance shall be applicable to all grievants.

      C.    An Association grievance may be initiated by the FFA when the FFA's specific rights, as distinguished from the rights of the individual Members of the FFA, under this Agreement have been violated. A grievance filed by the FFA hereunder shall be initiated at step 4 of the grievance procedure.

      D.    A grievance affecting more than one Member may be consolidated by agreement of the Association and the provost/vice president for Academic Affairs and brought forth as a single Association grievance by the FFA. A consolidated grievance affecting Members from more than one department or more than one college shall be reduced to writing and forwarded for processing at step 3 or step 4 of the grievance

**EXHIBIT L**
**Page 42**

procedure, respectively. In such consolidated grievance cases all grievants must be identified and the conclusion of the grievance shall be applicable to all such grievants.

9.2. Flow

A.    The purpose of this Section is to provide a prompt and efficient procedure for investigation and resolution of grievances. The review processes set forth are the sole methods for the resolution of grievances. All time limits will be adhered to, except where changed by mutual agreement in writing. It is the intention of the parties to expedite the handling of grievances that otherwise extend beyond the semester or academic year if all facts pertaining to that grievance are known by both parties. If such facts are not known to other parties, or if the parties are unavailable, the time limits will be extended until the commencement of the following semester.

B.    A grievance not advanced to the next higher level within the time limit provided shall be deemed permanently withdrawn. Lack of timely response by the Employer at any stage will serve to advance the grievance to the next higher step if the grievant so desires and signifies the desire by written notice to this purpose; but in no event does such lack of response give rise to further grievance.

C.    The grievant may withdraw a grievance at any time.

D.    Any grievance which occurs during the term of this Agreement and is commenced according to the terms of the grievance procedure within twenty (20) days of the termination of this Agreement shall be processed through the grievance procedure to final resolution.

E.    The Employer and the FFA may mutually agree to skip steps of the grievance procedure.

9.3. The Grievance Procedure

A.    Step 1 - Discussion

Within twenty (20) working days of the time a grievance might reasonably be known to exist, the aggrieved Member(s) shall discuss the grievance with his/her immediate administrator, identifying it as a grievance, either with or without representation by the FFA, at the grievant's (s') election. In all instances, the Association shall have the right to be present.

B.    Step 2 - Written Level

1.    In the event the grievance is not resolved in step 1, the grievance shall be written and signed by the grievant(s) and by the FFA on a standard Employer/FFA grievance form and presented to the administrator in step 1 within ten (10) working days of the discussion at step 1, and shall set forth the specific acts that constitute the basis for the grievance and identify the specific language of the contract that is claimed to have been violated by those specific acts.

42

EXHIBIT L
Page 43

2.    The administrator shall communicate a decision in writing to the grievant(s) as promptly as possible, but no later than fifteen (15) working days after the grievance has been received.

3.    Any settlement, withdrawal, or other disposition of a grievance at this step is not a binding precedent in the disposition of similar grievances.

C.    Step 3

1.    In the event the grievance is not resolved at step 2, the FFA and grievant(s) shall present it to the administrator to whom the administrator in step 2 reports within ten (10) working days after the step 2 decision. The written grievance must be signed by the aggrieved Member and the FFA and, in addition to the required information outlined in step 2 above, shall include the reasons the proposed resolution of the grievance at step 2 is not satisfactory. The administrator shall, within ten (10) working days, meet with the grievant(s) and, if the grievant(s) wish (es), with a representative of the FFA. The decision at this step shall be written and communicated to all persons concerned as promptly as possible, but not later than ten (10) working days after the meeting. If the grievance is initiated at step 3, the grievance shall be presented to the administrator to whom the administrator in step 2 reports within twenty (20) working days of when the grievance might reasonably be known to exist.

D.    Step 4 - provost/vice president for Academic Affairs Level

1.    In the event the grievance is not resolved at step 3, the FFA and grievant(s) may advance the grievance to the provost/vice president for Academic Affairs within ten (10) working days after the decision in step 3. This written submission must be signed by the grievant(s) and the FFA and shall include, in addition to the initial grievance, any amendments or appendices thereto, as required by steps 2 and 3 and the reason(s) the FFA and grievant(s) consider the disposition at step 3 to be unsatisfactory. If the grievance is initiated at step 4, the grievance shall be presented to the provost/vice president for Academic Affairs within twenty (20) working days of when the grievance might reasonably be known to exist.

2.    Following this submission, no more than ten (10) working days shall elapse before a meeting is held between a representative of the FFA and the provost/vice president for Academic Affairs or designee. The provost/vice president for Academic Affairs or designee shall answer the grievance, in writing, within ten (10) working days from the date of the meeting at which the grievance was discussed.

E.    Step 5 – Arbitration

1.    If the grievance is not satisfactorily resolved at step 4, the FFA only may submit the grievance to binding arbitration. The FFA will notify the Employer of its intent to arbitrate by serving written notice of such intent upon the provost/vice president for Academic Affairs within twenty (20) working days after

43

EXHIBIT L
Page 44

the step 4 answer. If a mutually satisfactory arbitrator cannot be found, the FFA may file a request for a panel of arbitrators within fifteen (15) additional working days after written notice of intent to arbitrate is given to the American Arbitration Association (AAA).

    2.    The arbitrator and the arbitration shall be subject to the following:

    a.    The arbitrator shall have no power to alter, add to or subtract from the terms of this Agreement. The decision of the arbitrator, within the scope of his/her authority, is binding upon the parties;

    b.    The cost of arbitration shall be borne equally by both parties. Expenses for witnesses, however, shall be borne by the party who calls them;

    c.    Only one (1) grievance shall be presented to an arbitrator in any one (1) hearing, unless the parties agree to combine grievances; and

    d.    The arbitrator shall conduct the hearing in accordance with the labor arbitration rules of the American Arbitration Association.

## Section 10 - PAID LEAVES OF ABSENCE

10.1.   <u>Paid Sick Leave</u>

    A.    General Conditions:

    1.    Academic-year Members accrue eighty (80) hours of paid sick leave per year and full-year Members accrue one hundred four (104) hours of paid sick leave per year pro-rated by pay period, not to exceed a total accrual of twenty-four hundred (2400) hours.

    2.    Summer semester Members who teach a full load will be credited with twenty-four (24) hours of sick leave. Sick leave for less than full load assignments will be pro-rated. Sick leave will be credited not later than the first pay period following the completion of the summer semester.

    3.    Paid sick leave may be used only for absence from work because of disability caused by illness or injury, medical examination or treatment, dental examination or treatment, or ocular examination or treatment of the Member, and, subject to the limitations in paragraph 10.2, his/her spouse, parent or minor child.

    4.    The Employer may require verification of the reason for absence when use for reasons other than as allowed in this Section is suspected. Use of sick leave for reasons other than as allowed in this Section may, at the option of the Employer, be treated as an authorized unpaid leave of absence or as an unauthorized absence from employment which shall result in discipline.

EXHIBIT L
Page 45

5.     Paid sick leave upon verbal request or one made on a Member's behalf by another, shall, at the first reasonable opportunity under the circumstances, be supported in writing with such evidence of need as the Employer may request.

6.     The Employer may require that a health care provider satisfactory to it certify or that other satisfactory evidence be provided of either:

a.     Ability to perform all the essential elements of his/her job, with or without reasonable accommodation; or

b.     Continuing disability.

7.     Paid sick leave is solely to provide financial security and is not a guarantee of continued employment.

B.     Sick Leave Bank

1.     Minimum - Each Member is to contribute eight (8) hours from his/her accumulated sick leave the first time his/her sick leave exceeds four hundred eighty (480) hours.  Those Members who have previously contributed will not be required to contribute unless the sick leave bank falls below the operating minimum.

2.     The sick leave bank will maintain a minimum of two thousand (2000) hours.  In the event it goes below two thousand (2000) hours, it will be increased to three thousand (3000) hours through donations or, if donations are insufficient, through the automatic subtraction of four (4) hours from each Member who has more than four hundred eighty (480) hours of accrued sick leave, even though the subtraction will take them below four hundred eighty (480) hours. Those with less than four hundred eighty (480) accrued sick leave hours at the time the bank is increased under this paragraph will have four (4) hours subtracted from their accrued leave as soon as they accrue four hundred eighty (480) hours.  The subtracted hours will be added to the bank.

3.     Eligibility - To be eligible for use of the sick leave bank, the Member must:

a.     Meet the criteria of 10.1.A;

b.     Have used all of his/her accrued sick leave;

c.     Not be eligible for Long Term Disability;

d.     Not be eligible for Workers' Compensation benefits.

4.     Use - The sick leave bank may be used only for personal disability under 10.1.A.

45

EXHIBIT L
Page 46

5.    Termination - Eligibility for use of the sick leave bank terminates upon the earliest of the following:

a.    Eligibility for Long Term Disability; or

b.    Use of seven hundred twenty (720) hours from the bank for each period of disability, as defined by the LTD policy, unless (i.) due to different and unrelated causes and separated by return to active school employment for at least one (1) day, or (ii.) due to the same or related causes and separated by more than six (6) months of continuous active employment.

6.    Accounting and reporting - The HR office will be responsible for the accounting of the number of days in the sick leave bank. The Employer will submit a report on the use and status of the sick leave bank to the FFA at the end of each semester.

C.    Return from Sick Leave

Members shall provide reasonable notice to the Employer when able to return to work.

1.    Ten (10) Days or Less

a.    Provided that the above requirements are met, upon return to work from paid sick leave of ten (10) days or less, the Member shall be returned to his/her regular position.

2.    Eleven (11) Through Sixty (60) Days

a.    Provided that the above requirements are met, upon return to work from paid sick leave of more than ten (10) but not more than sixty (60) consecutive scheduled days, the Member shall be returned to his/her regular or comparable job for the remainder of the academic term, and thereafter, in his/her regular position.

3.    More Than Sixty (60) Days

a.    Provided that the above requirements are met, and provided that employment has not been terminated, upon return to work from paid sick leave of more than sixty (60) consecutive scheduled days, the Member shall be returned to his/her regular position or one comparable to it.

D.    Family and Medical Leave Act (FMLA)

1.    Members may be required to use paid sick leave in lieu of leave under the FMLA in accordance with University policy.

46

EXHIBIT L
Page 47

E.    Sick Leave – Separation

1.    A Member who separates from the University's service because of permanent disability shall be paid the cash value equivalent of his/her accumulated sick leave up to two hundred (200) days. Such compensation will be made at his/her rate of pay at time of separation.

2.    In the event of death, fifty percent (50%) of the cash value of a Member's accumulated sick leave up to two hundred (200) days, computed at the Member's last authorized rate of pay, will be paid to his/her estate or beneficiaries. The maximum amount payable will be the cash value equivalent of one hundred (100) days' pay.

3.    A Member who, during the term of the Agreement, officially retires from the University, either after reaching at least fifty-five (55) years of age with ten (10) years of continuous service to the University or after reaching at least sixty (60) years of age with five (5) years of continuous service to the University, shall be paid fifty percent (50%) of the cash value of the Member's accumulated sick leave up to two hundred (200) days, computed at the Member's rate of pay at the time of retirement. The maximum amount payable will be the cash value equivalent of one hundred (100) days' pay.

10.2.    Use of Paid Sick Leave for Other Reasons

A.    Spouse, child, and/or parent illness:

1.    Paid sick leave of up to five (5) full days with written verification may be used for the illness of a Member's spouse or child(ren).

2.    Where the department head approves, taking into consideration the ability to cover the Member's work responsibilities, the quality of alternate services and other relevant factors, up to three (3) full days of paid sick leave may be used in cases of illness of a parent. A Member may not use more than fifteen (15) days per fiscal year under this provision.

B.    Maternity/Paternity/Adoption Leave:

1.    Upon written notice, a Member may take up to five (5) full days of paid sick leave, upon and as a result of the birth or adoption of his/her child.

10.3.    Bereavement Leave

A.    A Member who is absent from work because of the death of a Member of the immediate family shall, upon completion of the appropriate University form, be entitled to paid bereavement leave not to exceed four (4) consecutive, regularly-scheduled days, one (1) of which must include the day of and attendance at the funeral or bereavement ceremony. Upon authorization by the Employer, a Member may be granted one (1) additional paid day which shall be charged against the Member's accumulated

47

EXHIBIT L
Page 48

sick leave and must be utilized contiguous to the bereavement leave days. Immediate family is defined as follows:

    1.    Spouse;

    2.    Natural or adopted child;

    3.    Natural or adopting parent;

    4.    Step-parent;

    5.    Brother or half-brother;

    6.    Sister or half-sister;

    7.    Grandparent;

    8.    Grandchild;

    9.    Any near relative who resides in the same household with the Member or any person with whom the Member has made his/her home;

    10.    Mother-in-law, father-in-law; or

    11.    Son-in-law; daughter-in-law.

    B.    Upon authorization by the Employer, a Member may be granted paid bereavement leave for deceased persons not listed in 10.3.A above which shall not exceed two (2) regularly scheduled days, one (1) of which must include the day of and attendance at the funeral or bereavement ceremony. Such leave shall be charged against the Member's accumulated sick leave.

    C.    Bereavement leave authorization shall not be unreasonably withheld.

10.4.    <u>Sabbatical Leave</u>

    A.    Purpose – Sabbatical leave is to encourage Members to pursue special studies, investigations, and research that will contribute to their professional development and competence. Sabbatical leaves are granted for special study, research, and/or other projects that will enhance the usefulness of the person to the institution; perform service on the local, state, national, or international level; and/or bring prestige to the University. Endeavors appropriate for consideration as sabbatical leave projects may include but are not limited to the activities listed below:

    1.    Community Service: Faculty may use the leave to help develop programs at the local, state, national, or international level. For example, a faculty Member's expertise might be used in evaluating and improving existing programs, training personnel in such programs, serving in professional organizations, editing professional journals, or organizing professional meetings, provided that the time

EXHIBIT L
Page 49

and effort required by the project justify the extended time and release from duties afforded by a sabbatical leave.

      2.    Professional Development: Faculty may increase their skills and effectiveness as teachers, researchers, or creative professionals, or enhance their usefulness to FSU by developing a new specialty, strengthening a current specialty, or continuing their formal education. The sabbatical leave may be used to pursue a self-designed, structured program of individual study; participate in specialized programs; work with recognized leaders in the field; or pursue graduate, professional, or postdoctoral study, including work that is part of a relevant graduate degree program.

      3.    Program Development: The sabbatical leave may be used to develop new teaching techniques; to collect materials for new programs; to develop new ways of presenting material; to develop new curricula for implementation at FSU; to establish linkages between FSU programs and other organizations, agencies, or institutions; or to survey what is being done at other institutions as models for programs at FSU.

      4.    Research, Artistic, and Creative Activities: The sabbatical leave may be used to pursue a variety of pure or applied scholarly projects that may be interdisciplinary or focused within a discipline or area of specialization. Appropriate projects include creation, studies, or critiques of works of art or artistic performances; investigations undertaken to establish facts, principles, and techniques within a discipline; application of the principles and techniques of one discipline to the problems of another; the systematic collection, analysis, and interpretation of data to address a theoretical or practical problem; and preparation of books, articles, lectures, exhibitions, or performances that illuminate interdisciplinary connections or make theories, issues, or methods of the faculty Member's discipline or specialty accessible to wider audiences.

B.    Eligibility - A Member may apply for sabbatical leave after the completion of ten (10) semesters of continuous employment, excluding summer. The sabbatical leave may take place any time following the completion of the twelfth semester of continuous employment, excluding summer.

      1.    A recipient of a sabbatical leave is eligible for a subsequent sabbatical leave only after again fulfilling all of the above requirements, with time of employment being calculated from the date of return from the previous sabbatical.

C.    Duration - The duration of sabbatical leave shall be determined by the validity of the request and the needs and resources of FSU. Sabbatical leaves may be granted for one (1) or two (2) semesters or twelve (12) consecutive months but shall not exceed the period of time for which the applicant is regularly appointed. Under special circumstances, determined by the needs of the applicant and the interests of FSU, a sabbatical leave of two (2) or more non-consecutive semesters may be granted so long as the

49

EXHIBIT L
Page 50

total period on leave does not exceed the period of time for which the applicant is regularly appointed.

     D.     Sabbatical Review Committee - Each college, the librarians, and the group composed of the personal counselors/admissions counselors may elect from his/her tenured Members a college/unit sabbatical review committee consisting of at least three (3) tenured Members or one (1) tenured Member from each unit elected by the Members of that unit, whichever is greater. Personal counselors and admissions counselors are one "unit" for purposes of this section and, as a unit, are entitled to elect one (1) Member from the unit to serve on the All-University Sabbatical Review Committee, as established in Paragraph E of this section. Each unit sabbatical review committee may publish the guidelines it follows to rank order sabbatical leave requests.

     1.     The Employer has no liability in the event there is no sabbatical review committee or in the event such committee fails to meet its responsibilities.

     E.     All-University Sabbatical Review Committee - Each college, the librarians, and the group composed of the personal counselors/admissions counselors may elect one (1) Member from its sabbatical review committee to serve on the All-University Sabbatical Review Committee which reports to the provost/vice president for Academic Affairs.

     1.     The Employer has no liability in the event there is no All-University Sabbatical Review Committee or in the event such committee fails to meet its responsibilities.

     F.     Application Procedure and Schedule – On or before October 15 of the year preceding the academic year for which leave is requested, applicants must submit a complete application (as described below in Section 2) to their unit/college sabbatical review committee and a copy to their department head/chair.

The dates and steps of the review process are as follows:

     1.     Prior to October 15 the Member shall consult with his/her department head/chair as he/she develops his/her sabbatical leave plan to be certain that the proposal is consistent with the goals and objectives of the unit.

     2.     On or before October 15, the Member shall submit his/her application materials to his/her college/unit sabbatical review committee and to his/her department head.

     a.     The college/unit sabbatical review committee shall inform the applicant of an incomplete application and the applicant shall have until November 1 to resubmit his/her application. A complete application shall include the following:

     i.     A cover page;

50

EXHIBIT L
Page 51

ii.     A clear and concise list of objectives to be accomplished;

iii.     A detailed plan of activity to meet those objectives;

iv.     A discussion of the relationship of sabbatical activities to the applicant's current assignment;

v.     A signed and dated declaration form regarding:

a)     Agreement to return to work at Ferris State University for one year after completion of the sabbatical leave;

b)     Agreement to submit a final sabbatical leave report within the first semester (excluding summer session) of return to work at Ferris;

c)     Agreement to immediately notify the provost/vice president for Academic Affairs, in writing, in the event that proposed sabbatical leave activities change;

b.     Appropriate intellectual property ownership documents if intellectual property (copyrightable or patentable material) materials are being developed during the sabbatical leave;

c.     A listing of any non-Ferris remuneration to be rendered during the sabbatical period;

d.     A statement of where the sabbatical leave activity is to take place and any special arrangements made with the college/university or organization involved;

e.     A bibliography pertinent to the proposed activity; and

f.     A current resume.

3.     On or before November 15: The college/unit sabbatical review committee and the department head independently review and evaluate the applications on the basis of their fulfillment of the purposes and eligibility for a sabbatical leave as listed in Sections 10.4.A and 10.4.B of this Agreement. The committee and the department head may choose to not recommend an application on the basis of a lack of completeness or on the merit of the application relative to Section 10.4.A. The committee and the department head then independently forward to the dean a rank-ordered list of recommended applications and an unranked list of non-recommended applications. A written explanation for each non-recommended application shall also be forwarded to the dean.

51

EXHIBIT L
Page 52

4.      On or before December 1: The dean reviews and evaluates the ranked and unranked applications and forwards both the ranked and the unranked lists with comments as received from the college/unit sabbatical review committee and may add additional comments concerning any application to the provost/vice president for Academic Affairs. The provost/vice president for Academic Affairs shall convene the All-University Sabbatical Review Committee and forward all college/unit rank-ordered, recommended applications to this committee.

5.      On or before January 15: The All-University Sabbatical Review Committee reviews and evaluates the applications. The Committee then creates a single rank-ordered list from the rank-ordered college/unit recommended lists while maintaining the individual college/unit sabbatical leave committees' rank-order. The Committee shall forward these evaluations and a rank-ordered list to the provost/vice president for Academic Affairs.

6.      On or before April 1: the provost/vice president for Academic Affairs reviews and evaluates all recommended, rank-ordered applications received from the All-University Sabbatical Review Committee and all non-ranked, non-recommended applications received from the individual deans and college/unit sabbatical review committees. Following a discussion with the All-University Sabbatical Review Committee, the provost/vice president for Academic Affairs may delete any ranked application and/or add to the bottom of the rank-ordered list any non-recommended application. The provost/vice president for Academic Affairs forwards a list of provost/vice president for Academic Affairs-approved applications in a rank order to the Board of Trustees for official action and funding. The provost/vice president for Academic Affairs shall notify all applicants as to the approval or rejection of their sabbatical leave requests and the final disposition of their sabbatical leave requests: provost/vice president for Academic Affairs approved and funded; provost/vice president for Academic Affairs approved but not funded; or provost/vice president for Academic Affairs not approved. All applications that are not approved or not funded must receive from the provost/vice president for Academic Affairs an explanation which shall include specific suggestions for an improved application.

7.      On or before the end of the first semester following the sabbatical leave, recipients shall prepare a final report detailing the sabbatical leave activities and submit three (3) copies as follows: one copy to the college/unit sabbatical review committee via the department head for evaluation; one copy to the All-University Sabbatical Review Committee; and one copy to the FSU library for the official University file. The college/unit sabbatical review committee and department head will review and evaluate the final report and forward the report with evaluation to the dean. The dean will review and forward the report to the president via the provost/vice president for Academic Affairs. One copy of the report, with all attached evaluations and comments (as well as any submitted rebuttal) shall be retained in the recipient's personnel file. This report will contain the following elements:

52

**EXHIBIT L**
**Page 53**

a.    A cover page;

b.    A detailed description of sabbatical leave activities in relation to objectives of the leave;

c.    A list of publications (submissions) and/or papers presented (scheduled) as a result of leave activities;

d.    A list of graduate courses and/or seminars attended;

e.    Plans for future work in the area of leave activity;

f.    Impact of the leave on the applicant's professional responsibilities.

8.    The written report, with all evaluative comments, shall be available to all evaluating and/or decision-making personnel for purposes of subsequent sabbatical leaves, promotions, and/or merit determinations.

G.    Commitment to Return - Before a sabbatical leave is granted, the recipient must execute a written agreement that in the event he/she fails to return to employment at the University at the expiration of such leave and render services for a period of at least one (1) year thereafter in the same capacity as when the leave started, the Member will reimburse the Employer for all sums paid by the Employer while on leave. The sums paid by the Employer may be withheld by the Employer from sums owed to the recipient, if any.

H.    Compensation and Benefits - Compensation will be at full regular salary for leaves of one semester and two/thirds (2/3) of regular salary for leaves longer than one (1) semester and shall be paid according to the Employer's payroll procedures.

1.    Sabbatical leave is full-time service for the purposes of computing length of service, salary, promotions, assignments, sick leave, insurance, retirement, and other benefits accruing to full-time service for which they would normally be eligible were they not on approved leave.

I.    Termination - A sabbatical leave may be terminated before its expiration date upon mutual agreement between the recipient and the Employer.

J.    Sabbatical Leave Changes: In the event that any of the proposed/approved sabbatical leave activities change, the Member shall immediately notify in writing the provost/vice president for Academic Affairs describing the proposed changes to the sabbatical leave plan. The provost/vice president for Academic Affairs will determine the appropriateness of these revisions and approve or disapprove the modifications to the plan. If disapproved and no other alternative modification to the original plan can be identified and approved by the provost/vice president for Academic Affairs, the leave shall be cancelled effective the date of that decision. The decision of the provost/vice president for Academic Affairs is final, binding, and not subject to arbitration.

53

**EXHIBIT L**
**Page 54**

10.5.  Jury Duty

A.  A Member selected for jury duty shall not suffer any loss of pay while serving as a juror.  Fees received for jury duty, excluding reimbursement for meals, mileage and lodging expenses, shall be given to the Employer.

B.  A Member must notify his/her department head as soon as he/she is notified of selection for jury duty.

C.  Upon release from jury duty, a Member must notify his/her department head as soon as reasonably possible during normal working hours for instructions as to when he/she should report for work.

10.6.  Absentee Replacement

A.  When a Member is absent other Members may, but are not required to, fill temporarily the vacancy.  Replacement faculty must be approved by the immediate supervisor.

B.  If the vacancy is less than five (5) consecutive working days, the Member(s) filling the vacancy will do so as a professional courtesy without compensation.  If the vacancy lasts for more than four (4) consecutive working days, upon written request, the replacement Member(s) will be paid at the overload rate for each class period, retroactive to the first period the replacement member taught.

10.7.  Personal Leave Day

A.  Twelve (12) month Members are eligible for two (2) personal leave days each fiscal year.

B.  Personal leave days are not cumulative from year to year.

C.  The second of the personal leave days may be taken only if the Member has accrued sick leave and will be charged to sick leave.

D.  Personal leave days will be scheduled as mutually agreed with the immediate supervisor.

10.8.  Military Leave

A.  When a Member is involuntarily called for emergency military duty, the Employer will compensate that person for the difference between contractual salary and the military pay and allowances for a period of up to ninety (90) days.  The Employer will continue its required contribution to insurance and other fringe benefits during this period, provided that the insurance carrier agrees to continue to provide benefits for such Member.

54

EXHIBIT L
Page 55

10.9.   Fulbright Leaves

A.   Members who apply for Fulbright leaves shall consult with their department head prior to making such application.

B.   Upon notification from the Council for International Exchange of Scholars that his/her application has been approved, the Member may submit the Fulbright application and the notification of acceptance to his/her department head along with the sabbatical application form for special sabbatical leave consideration.

C.   Within ten (10) working days of receipt of these materials, the department head shall submit them to the dean with his/her recommendation.

D.   Within ten (10) working days of receipt of the materials, the dean shall submit them to the provost/vice president for Academic Affairs with his/her recommendation.

E.   Within ten (10) working days of receipt of the materials, the provost/vice president for Academic Affairs will convene the All-University Sabbatical Review Committee to consider the Fulbright candidate for consideration as an exception to the standard sabbatical review process.  If approved, the provost/vice president for Academic Affairs will recommend approval of the Fulbright sabbatical leave to the Board of Trustees.

F.   If approved, the Fulbright candidate will be subject to the compensation, reporting, commitment to return, termination, sabbatical leave change and other provisions pertaining to sabbatical leaves in this Agreement.  Fulbright scholars approved for sabbatical leaves under this section will be eligible to apply for sabbatical leave again after an additional ten (10) semesters of continuous employment as a Member at FSU.

10.10.   Consulting Leave

A.   Members are eligible to apply for consulting leave in accord with Board policy and academic affairs policy letters, as amended from time to time at the discretion of the Employer.

**Section 11 - UNPAID LEAVES**

A.   Leaves of absence without pay may be granted at the discretion of the Employer for such purposes as professional growth, personal illness, professional service, public service, Fulbright or exchange teaching.

B.   A Member's time while on such leave shall not be counted for tenure requirements, sabbatical requirements, promotion/merit requirements, or in the determination of years of service for the Voluntary Resignation Incentive Plan.  He/she will not receive pay for holidays falling within the leave of absence, nor will he/she accrue sick leave or vacation time, but otherwise the Member shall be entitled to those

55

EXHIBIT L
Page 56

rights and benefits under the terms of this Agreement which are under the control of the Employer, as if he/she were continuously employed.

C.    A Member is responsible for contacting the HR office of the University if he/she wishes to maintain at his/her own expense group insurance coverage, such as life insurance, medical insurance and dental insurance during this period, if available through the insurance carrier.

### Section 12 - HOLIDAYS AND VACATIONS

12.1.  Designated Holidays

A.    All Members will receive the following regularly scheduled holidays:

1.    New Year's Day;

2.    Memorial Day;

3.    Spring mid-semester Friday recess (1 day);

4.    Independence Day;

5.    Labor Day;

6.    Wednesday before Thanksgiving (after 12:00 p.m.);

7.    Thanksgiving Day;

8.    The day following Thanksgiving Day; and

9.    December 25.

B.    Members will not be required to report for duty from December 25 through January 1 of each year; an announcement will be made of the specific dates on which the University will be in operation.

C.    When any holiday falls on Saturday, the preceding Friday will be designated as the holiday; when any holiday falls on Sunday, the following Monday will be designated as the holiday.

12.2.  Vacations

A.    Twelve (12) month Members are eligible for twenty (20) days' vacation each year which accrue at the rate of 6.15 hours/bi-weekly pay period.

B.    Earned vacation must be taken no later than the end of the year following the year in which the vacation is earned. Vacation days will be scheduled as mutually agreed with the immediate supervisor.

56

EXHIBIT L
Page 57

**Section 13 - FRINGE BENEFITS**

13.1. <u>Liability Insurance</u>

     A.     All Members are covered under a liability insurance policy of one million dollars ($1,000,000) per occurrence for the term of the Agreement unless such coverage is only available in a lesser amount, in which case such lesser amount will be maintained.

13.2. <u>Health Insurance</u>

     A.     Except as prohibited by law, the Employer shall provide to all Members on pay status and eligible dependents the following MESSA benefits Options set forth below. Dependents shall be eligible to age 26, effective January 1, 2011.

     1.     **Option 1** MESSA- Choices and Saver Rx:

          a.     Medical health care coverage- $300/$600 deductibles.

          b.     Ancillary Benefits:

          Long Term Disability – 66 2/3%,

          $5,000 Maximum,

          90 calendar days' modified fill,

          Pre-Existing Condition Waiver,

          Alcoholism/Drug – same as any other illness,

          Mental/Nervous-2-year limitation, COLA;

          Negotiated Life – $50,000 AD&D;

          Vision – MESSA VSP 2 Silver; and

          Delta Dental – 100-80-80-80 with $4000 max per person per year and $3,500 lifetime maximum ortho rider.

     2.     **Option 2** MESSA- Choices and Saver Rx:

          a.     Medical health care coverage- $500/$1,000 deductibles.

          b.     Ancillary benefits identical to Option 1 above.

     3.     **Option 3** MESSA- ABC Plan 1 and ABC Rx

          a.     Medical health care coverage- applicable IRS deductibles (currently $1,350/$2,700).

**EXHIBIT L**
**Page 58**

      b.     Ancillary benefits identical to Option 1 above.

4.    **Option 4** MESSA- ABC Plan 2 and 3-Tier RX

      a.     Medical health care coverage- $2,000/$4,000 deductibles.

      b.     Ancillary benefits identical to Option 1 above.

5.    **Option 5** MESSA Pak B (Opt-out)

      a.     No medical health care coverage.

      b.     Ancillary Benefits:

          Long Term Disability – 66 2/3%,

          $5,000 Maximum,

          90 Calendar days' modified fill,

          Pre-Existing Condition Waiver,

          Alcoholism/Drug – same as any other illness,

          Mental/Nervous-2-Year limitation, COLA;

          Negotiated Life – $50,000 AD&D;

          Vision – VSP-2 Silver; and

          Delta Dental – 100/80S/80 with $4,000 max per person per year and $3,500 lifetime max ortho rider.

6.    Members electing MESSA-Pak B (opt-out) shall also receive One Hundred Dollars ($100.00) per month, less withholdings and deductions required by law, or, in lieu thereof, may elect to apply this amount to any of the Michigan Education Special Services Association Variable Option Plans and/or MEA Financial Services Tax Sheltered Annuities.

B.    The Employer's maximum annual contribution towards medical health care coverage shall continue through December 31, 2018, or until final ratification, whichever occurs last, at the following amounts:

| | |
|---|---|
| Individual | $6,345 |
| Individual and Spouse | $13,002 |
| Family | $17,304 |

EXHIBIT L
Page 59

C.     Effective with the plan year commencing January 1, 2019, the Employer's maximum annual contribution towards medical health care coverage shall be increased to the statutory hard caps in effect on January 1, 2019, as set forth by the Publicly Funded Health Insurance Contribution Act, MCL 15.561, et seq. Effective with the plan year commencing January 1, 2022, the Employer's maximum annual contribution towards medical health care coverage shall again be set at the statutory hard caps in effect on January 1, 2022, as set forth by the Publicly Funded Health Insurance Contribution Act, MCL 15.561, et seq.

D.     For all other benefit plan years (January 1 through December 31), for the term of the contract, the above contribution by the Employer will increase, but in no event to exceed, to either the percentage increase in the statutory hard caps or three percent (3%), whichever is less.

E.     In the event the percentage increase in the actual premium or the percentage increase in the statutory hard caps are less than the three percent (3%) increase in the Employer's cap in any of those years, then the difference between the percentage increase in the actual premium or statutory hard caps (whichever is lowest) and the three percent (3%) increase in the Employer's cap shall be carried over and increase the Employer's cap for the following year up to, but in no event to exceed the statutory hard cap. (Example: if for plan year 1/1/19 – 12/31/19 the statutory cap is 2.75% and the actual premium increase exceeds 3.00% then .25% would be added to the 1/1/20 – 12/31/20 Employer's cap to make it 3.25%).

F.     The Employer's maximum annual contribution toward Ancillary Benefits, as described above shall continue through December 31, 2018, at the following amounts:

| | |
|---|---|
| Individual | $1,101 |
| Individual and Spouse | $1,701 |
| Family | $2,729 |

G.     Effective January 1, 2019, the above amounts for Ancillary Benefits shall be increased by 3%. For each benefit plan year thereafter (January 1 through December 31), for the term of the contract, the above maximum contribution for Ancillary Benefits by the Employer will increase by the same percentage increase as the medical healthcare coverage premium increases, up to a maximum of the three percent (3%).

H.     Individual Members are responsible for premium payments in excess of the Employer's maximum contributions. The Employer is authorized by this Agreement to deduct from Member's payroll checks, amounts in excess of the applicable maximum in order to cover full premium rates subject to the terms and conditions of the applicable policy(ies). Other family riders may be available to Members at their expense through payroll deduction.

I.     Individual Members are responsible for all additional costs of improved dental coverage and any increases for coverage for term of Agreement.

59

EXHIBIT L
Page 60

J.        Members who provide acceptable "proof of coverage" and elect not to choose any of the above insurance options will receive One Hundred and Fifty Dollars ($150) per month, less withholdings or deductions required by law, or, in lieu thereof, may elect to apply this amount to any of the Michigan Education Special Services Association variable option plans and/or MEA financial services tax sheltered annuities.

K.        As insurance rate increases are announced at the beginning of each new plan year, the Association may change to a plan design acceptable to the University in order to maintain a rate within the range Members are willing to pay, so long as the changes do not increase the Employer's premium contribution. The acceptance of the University shall not be unreasonably withheld. Any money saved by the Employer in contributions towards medical health care premiums as a result of the Association switching to a HSA shall be used to fund employees' HSA by the Employer, or used to defray other health care costs, up to but in no event to exceed, the statutory hard caps.

L.        The parties agree that health insurance benefits provisions shall be reopened for negotiation, upon request of either party, should the existing provisions generate a tax or penalty to the University under any state and/or federal health care legislation. In no event will the Employer be required to pay more than the obligations set forth in Section 13.2.

13.3.   Flexible Spending Account:

A.        The Employer shall provide Members the following flexible spending account benefits pursuant to a qualified plan under Section 125 of the Internal Revenue Code:

1.        Medical spending account;

2.        Dependent care spending account; and

3.        Insurance premium contributions.

B.        Funding shall be through salary deduction. The Employer will pay the cost of implementation and administration.

13.4.   Payroll Deduction - MEA Financial Services Programs

A.        The Employer shall make available to all Members payroll deduction for all MEA Financial Services programs and annuities.

B.        Payroll deduction shall be available for all insurance programs as herein provided.

13.5.   Implementation of Related Insurance Benefits

A.        A Member receiving a paid leave of absence shall have all insurance benefits continue uninterrupted throughout the period covered by the paid leave of

EXHIBIT L
Page 61

absence. "Paid leave of absence" does not include leaves of absence during which the Member is eligible for Workers' Compensation. benefits.

      B.     A Member who is off work on a non-occupational sick leave of absence and who is not receiving paid sick leave may continue his/her insurance programs, to the extent available through the insurance carrier(s), by contributing the full premium for all desired insurance coverage on or before the first of the month in which the premium is due. These contributions may be made for a period of up to twenty-four (24) months or to the extent possible through the insurance carrier. In cases of occupational sick leave, provided it is available through the insurance carrier, the Member shall not be limited as to the period during which he/she may continue insurance coverage through the timely payment of premiums.

      C.     In the event that a Member dies, and providing that the health insurance policy permits, the Employer shall continue payments of applicable premiums for the spouse and/or dependents of the deceased through the month of the death and continuing for the following two months.

      D.     A Member assigned less than a full work load shall receive the same insurance benefits as Members assigned a full work load.

      E.     The Employer shall pay insurance premiums for all Members beginning:

          1.     September 1 for present employees;

          2.     The date of starting work for those hired after September 1.

               a.     Such coverage shall end on the Member's date of termination, or as to Members who complete the academic year but do not return for the following academic year, August 31, as applicable.

      F.     The open enrollment period shall be jointly established by the Employer, the FFA, and the insurance carriers. In the event the parties are unable to agree to a jointly-established open enrollment period, the open enrollment period shall be established by the insurance carrier.

      G.     Terms and conditions for participation in the various benefit plans set forth above are contained in full in the applicable master policies or insurance contracts which govern in determining any questions regarding eligibility or benefits outlined in this Section.

13.6.   <u>Travel Increment</u>

      A.     A Member who provides off-campus instruction shall receive a travel allowance in accordance with the Employer's institutional travel policy. In addition, for other than credit-bearing work experience courses which are programmatic requirements and study abroad courses, a Member shall receive compensation for time in transit at the following rate:

**EXHIBIT L**
**Page 62**

1.    Twenty dollars ($20.00) per hour. The number of hours for which the Member is to be compensated for ground and air travel shall be as follows:

a.    Ground travel (auto, bus and train):

i.    Total standard round-trip mileage to and from the teaching location divided by 55 equals the number of hours for which the Member is to be reimbursed.

b.    Air travel:

i.    A total of two (2) hours for pre- and post-flight activities plus the actual flight time based upon scheduled departure and arrival times. Exceptions may be approved with the concurrence of the dean.

B.    Assignment for off-campus instruction shall be in the following manner:

1.    If only one Member who normally teaches the class volunteers to teach it off campus, then he/she will be assigned the class.

2.    If more than one Member who normally teaches the class volunteers, the assignment shall be on a rotation basis.

a.    The rotation list shall contain the names of those volunteers who normally teach the class.

b.    The original rotation list shall be based on seniority and the most senior Member shall be at the top of the list.

3.    In the event there are no qualified volunteers for in-load off-campus assignments, the department head may assign a qualified Member in rotation in inverse order of seniority. The unilateral decision of the department head will be subject to review under Section 4.3.B of the Agreement and/or the grievance arbitration procedure.

13.7.    Fee Waiver/Fee Reduction

It is the intent of the Employer to recognize that Members of the bargaining unit are encouraged to attend cultural and athletic events at the University and that admission charges, if any, should recognize their unique status. Retired Members will be treated the same as current Members under this section.

13.8.    Tuition Waiver

A.    All current Members and former Members who have retired may take FSU course offerings pursuant to the provisions of this Agreement. The regular fees for such courses shall be waived according to the following guidelines.

EXHIBIT L
Page 63

B.     For any academic semester in which a Member has academic responsibilities, he/she may take a maximum of three (3) courses that do not, individually or in aggregate, exceed nine (9) credit hours; not to exceed twenty-four (24) hours within any academic year and following summer.

C.     Retired Members may take FSU courses without limitation as to number and credit hours and have the regular fees for such courses waived.

D.     For any academic semester in which a Member does not have academic responsibilities and is not excused therefrom due to sick leave or other approved leave, a current Member may take FSU courses without limitation as to number and credit hours and have the regular fees for the first nine (9) credit hours waived. This benefit will not exceed twenty-four (24) credit hours within any academic year and following summer.

E.     Enrollment in courses under this section is permitted as long as space is available in the class and students of FSU are not displaced or denied a seat in the class. Regular students are defined, for purposes of this provision only, as students not enrolled in the subject course as a result of an employee tuition waiver.

13.9.   Tuition Assistance Program for Employee Spouses and Children

A.     Each Member shall have available a tuition assistance program providing a waiver of thirty percent (30%) of the cost of tuition fees at FSU each semester, or the alternative of transferring the Member's nine (9) credit hours, which shall be available to eligible spouses and children of Members. This benefit will not exceed twenty-four (24) credit hours within any academic year and following summer. A Member is eligible for one (1) selection per semester only.

B.     A Member's spouse or child shall be eligible for a tuition waiver if he/she presents evidence to the FSU registrar's office confirming that:

1.     He/she has satisfied all admission requirements and is eligible to enroll for course(s); and

2.     He/she is the spouse of a Member; or

3.     He/she is a Member's natural or adopted child who was twenty-four (24) years of age or less on the first day of classes for that semester; or

4.     He/she is a stepchild who is twenty-four (24) years of age or less on the first day of classes for that semester and is claimed by the Member as a dependent on his/her federal income tax return.

C.     A Member's spouse or child shall be subject to all University academic standards, policies and practices and may be refused admission to the University, enrollment in course(s), or continued enrollment at FSU the same as any other student of the University.

EXHIBIT L
Page 64

D.     In no event shall more than sixty percent (60%) of the fees be waived nor more than sixteen (16) credit hours be transferred for a spouse or child as above defined.

13.10.  Kendall College of Art and Design (KCAD) Tuition Credit Program for Members

A.     Pursuant to the provisions of this Agreement, all current Members may enroll at KCAD and be eligible to receive credit toward KCAD tuition up to a maximum of nine (9) credit hours per academic semester at the current FSU main campus undergraduate tuition rate; not to exceed twenty-four (24) credit hours within any academic year and following summer.

B.     For any academic semester in which a Member has academic responsibilities, he/she may take a maximum of three (3) courses that do not, individually or in aggregate, exceed nine (9) credit hours.

C.     For any academic semester in which a Member does not have academic responsibilities and is not excused therefrom due to sick leave or other approved leave, a current Member may take KCAD courses without limitation as to number and credit hours, subject to the tuition credit amount identified above not to exceed twenty-four (24) credit hours within any academic year and following summer.

D.     Enrollment in courses under this section is permitted as long as space is available in the class and students of KCAD are not displaced or denied a seat in the class. Regular students are defined, for purposes of this provision only, as students not enrolled in the subject course as a result of an employee tuition credit.

13.11.  KCAD Tuition Credit Program for Spouses and Children of Members

A.     Each Member shall have the alternative of transferring the Member's nine (9) credit hours per semester not to exceed twenty-four (24) credit hours within any academic year and following summer at the current FSU main campus undergraduate tuition rate to eligible spouses and children of Members.

B.     A Member's spouse or child shall be eligible for this transfer if he/she presents evidence to the KCAD Registrar's office confirming that:

1.     He/she has satisfied all KCAD admission requirements and is eligible to enroll for course(s); and

2.     He/she is the spouse of a Member; or

3.     He/she is a Member's natural or adopted child who was twenty-four (24) years of age or less on the first day of classes for that semester; or

4.     He/she is a stepchild who is twenty-four (24) years of age or less on the first day of classes for that semester and is claimed by the Member as a dependent on his/her federal income tax return.

64

EXHIBIT L
Page 65

C.     A Member's spouse or child shall be subject to all KCAD academic standards, policies and practices and may be refused admission to KCAD, enrollment in course(s), or continued enrollment at KCAD the same as any other student of the College.

D.     In no event shall more than sixteen (16) credit hours be transferred for a spouse or child as above defined.

## Section 14 - SALARY

### 14.1.   General Provisions

Salaries, salary increases, and fringe benefits as specified in this Agreement are minimum requirements.  The Employer may provide salaries, salary increases and fringe benefits in excess of these minima when such extra salaries and fringe benefits are essential for the maintenance or improvement of the academic quality of the unit.  A Member on disciplinary probation will not be afforded any salary increase during the year of that probation.

### 14.2.   Percentage Increase to Base Salary

A.     Base salaries will be increased each July 1 for twelve (12) month Members and at the beginning of the academic year for ten (10) month Members.  The amount of such increase for the years 2018-19 through 2022-23 shall be as follows:

1.     2018-19 – $1,841 To base effective upon ratification by FSU Board of Trustees

2.     2019-20 – 2.00%

3.     2020-21 – $1,936

4.     2021-22 – 2.25%

5.     2022-23 – $2,302

a.     Effective upon ratification by the FSU Board of Trustees, Members shall receive a $530 gross lump sum payment, subject to regular deductions.  Payment shall be made with the first full pay check following ratification and shall not be added to base salary.

B.     Base salary is defined for this section only as that continuing contractual monetary commitment for services rendered according to primary contractual appointment and shall not include any additional monies received that are not specifically designated to become part of said contractual commitment.

C.     The percentage increments set out at 14.2.A above shall be calculated after immediate past year promotion/merit increases are added to base salaries.

EXHIBIT L
Page 66

D. New faculty hires during each year of this Agreement shall be eligible for Section 14.2.A salary increases only if specifically provided for in their initial appointments.

14.3. Supplemental Market Adjustments

A. The Employer recognizes that to attract and retain qualified faculty it is necessary to make efforts to offer and maintain salaries that are competitive. To that end, the following salary supplemental market adjustment plan will be administered from FY 2018-19 through FY 2022-23.

B. For the period FY 2018-19 through FY 2022-23, the Employer shall make $300,000 available in each of those fiscal years for supplemental market adjustments.

C. These amounts will be used for supplemental market adjustments for eligible bargaining unit Members. In order to qualify, a Member must be eligible for the across-the-board salary increase described in 14.2 and have a salary below the mean for their discipline and rank as determined in 14.3.C. In addition, eligibility shall be determined according to the following criteria:

1. Any Member who has received a promotion/merit increase during the previous seven (7) years or who receives a promotion/merit increase during the period of this Agreement, or

2. Any tenured Member who has been determined in his or her post tenure performance review to have met or exceeded the performance expectations of the Employer in teaching, service and scholarship during the previous five (5) years, or

3. Any Member who has attained tenure during the past five (5) years or who attains tenure during the period of this Agreement, or

4. Any Member who has successfully completed the pre-tenure review process will qualify for a supplemental market adjustment for the year following that review.

5. Loss of Eligibility: Any Member who meets or exceeds the salary survey average by rank and discipline, who has not received a promotion/merit during the previous seven (7) years and is not eligible by means of successful completion of performance review, or who is currently not eligible for an across-the-board salary increase as provided in Section 14.2.A. shall be removed from consideration for a supplemental market adjustment.

D. Market Data: Supplemental market adjustments will be based upon the salary survey average by discipline and rank according to seniority group using the most current data available from the CUPA-HR, ASEE, ASCO, AACP, ASAHP surveys preceding the committee's first meeting as provided in 14.3.C.1.

66

**EXHIBIT L**
**Page 67**

1.      Updated survey averages shall be determined by a supplemental market adjustment committee comprised of two (2) bargaining unit Members appointed by the FFA and two (2) administrators appointed by the Employer. This committee shall meet annually and not later than June 1 of each year to review the data sources used for supplemental market adjustments.

2.      Where appropriate, the same data sources used in the FY 2018-19 supplemental market plan shall be used in determining adjustments for bargaining unit Members being considered for supplemental market adjustments in the subsequent fiscal years during the life of this Agreement. Disciplines falling outside of the FY 2018-19 supplemental market adjustment plan will be reviewed and approved by this committee using the most current data available from CUPA-HR, ASEE, ASCO, AACP, ASAHP surveys.

E.      Supplemental Market Adjustment Calculation: The supplemental market adjustment to which any Member will be entitled shall be determined as follows:

1.      Step 1: HR shall develop a spreadsheet showing the base salary in effect as of July 1 of the new fiscal year, adding first all promotion and merit salary increases approved during the previous academic year, and then applying the projected across-the-board salary increase for that year.

2.      Step 2: HR shall compare the resulting total for each Member with the market averages identified in 14.3.C in order to identify eligible Members, excluding those whose Step 1 adjusted salaries equal or exceed the market average for that discipline and rank, or are otherwise ineligible to participate in the plan.

3.      Step 3: HR shall total the number of eligible Members in order to apply the following formula. Those Members holding the rank of "professor" shall be eligible to receive a "full share" of the calculated individual increase, but in no event in excess of the amount that is necessary to raise the Member's salary to the level of the comparable survey average salary for his/her discipline and rank. Those Members holding the rank of "associate professor" shall be eligible to receive a "two-thirds share" of the calculated individual increase, but in no event in excess of the amount that is necessary to raise the Member's salary to the level of the comparable survey average salary for his/her discipline and rank. Those Members holding the rank of "assistant professor" or "instructor" shall be eligible to receive a "one-third share" of the calculated individual increase, but in no event in excess of the amount that is necessary to raise the Member's salary to the level of the comparable survey average salary for his/her discipline and rank.

EP = Number of eligible professors
EA = Number of eligible associate professors
EAI = Number of eligible assistant professors/instructors
FS = Adjustment amount (full share)

67

EXHIBIT L
Page 68

$(EP \times FS) + (EA \times (FS \ 2/3)) + (EAI \times (FS \times 1/3)) = \$300,000.00$
(or the amount as listed in Section 14.3.A above)

By example: (Assume 100 eligible professors, 100 eligible associate professors, and 100 eligible assistant professors/instructors; "X" is a "full share" adjustment)

$100X + (100X \times 2)/3 + (100X)/3 = \$300,000$

X ("full share") = \$1500

professors "full share" = \$1500; associate professor "two-thirds share" = \$1000; assistant professor/instructor "one-third share" = \$500.

4.     Step 4: Limitations

a.     No supplemental salary adjustment shall exceed the survey average for each eligible Member's respective discipline and rank.

b.     The supplemental market adjustment amount for Members who elect a reduced load under Section 16 of this Agreement will be pro-rated in accordance with their workload.

5.     Step 5: If the initial projected amount distributed through 14.3.D Steps 1 – 4 above results in a total of less than the total as listed in Section 14.3.A. above, the difference shall be allocated utilizing the procedure of Step 3 until the total as listed in Section 14.3.A above is fully allocated.

F.     The supplemental market adjustments will take effect as of July 1 for 12-month Members and the beginning of the academic year for 10-month Members.

G.     This plan is effective only from July 1, 2018 through the expiration of this Agreement.

14.4.   New Faculty Orientation

A.     Prior to the beginning of the academic year in August, the division of Academic Affairs may sponsor an orientation program for new faculty Members. Attendance at this program is required.

B.     New Members shall receive an amount of $500 for their attendance at this program.

EXHIBIT L
Page 69

## Section 15 - PROMOTION AND MERIT INCREASES

15.1.   Promotion

A.      Each college, the librarians, academic advisors and the group composed of the personal counselors/admissions counselors shall establish or maintain a promotion committee, composed of Members, fifty percent (50%) of whom shall be appointed by the dean. Current promotion policies of college/group will continue and any changes will be implemented when approved by both the dean and a majority vote of the promotion committee.

The criteria and procedures shall include the following:

1.      Promotion policies will be limited to criteria and procedures for promotion to assistant professor, associate professor and professor and for promotion to Academic Advisor 2 and Senior Academic Advisor.

2.      Degree and credit hour requirements presently being utilized will continue as minimum standards for advancement.

3.      Recommendations for exceptions to academic requirements will be considered when other conditions warrant (e.g., license or certification, additional professional experience, related professional recognition or achievement).

4.      Merit increases are an addition to advancement in rank but not a substitute for such advancement. Hence, the criteria and procedures for merit increases are the same as for promotion with the following additions:

a.      Merit increases can only be given to those who have been advanced in rank to the maximum rank consistent with their promotion credentials as defined by the appropriate college/group promotion policy.

b.      A tenured bargaining unit Member is eligible to apply for a merit increase only after a minimum of four (4) years since his/her last advancement of rank or prior merit increase.

c.      Consideration will be given only to accomplishments of the applicant since his/her last promotion or merit increase, or date of hire, whichever is more recent.

15.2.   Promotion/Merit Procedures

A.      For any academic year, each college/group shall have one (1) promotion/merit for every twelve (12) bargaining unit Members.  The number of promotions/merits available for each college/group shall be as follows:

EXHIBIT L
Page 70

| Number of Bargaining Unit Members | Promotions/Merits |
|---|---|
| 0 – 11 | 0 |
| 12 – 23 | 1 |
| 24 – 35 | 2 |
| 36 - 47 | 3 |
| 48 – 59 | 4 |
| -etc.- | |

B.      Fractional Portions

1.      Fractional portions shall be computed by dividing the number of bargaining unit Members in a college/group that exceeds the minimum number in the groupings above by twelve (12) and then rounding to the nearest tenth.

a.      Example: There are fifty (50) bargaining unit Members in a college/group. That college/group is entitled to four (4) promotions/merits. In addition, the college/group is entitled to carry over a fractional portion of two-tenths (.2) since fifty (50) exceeds forty-eight (48) by two (2) and two (2) divided by twelve (12) rounded to the nearest tenth is two-tenths (.2).

2.      All fractional portions may be carried over by a college/group for use in future years. When the accumulated total of such fractions equals one (1.0) in a college/group, the college/group shall be entitled to an additional promotion/merit.

C.      The candidate shall submit a portfolio to the promotion/merit committee. The portfolio shall include a narrative explaining, at a minimum and in clear and explicit terms, how the employee meets the college's eligibility criteria for promotion or merit.  A copy of the narrative shall be submitted simultaneously to the dean for review.

1.      Each college/group promotion committee shall be responsible for transmitting a list to the dean indicating:

a.      The individuals applying for promotion within their college/group that it recommends for promotion/merit.  The number of recommendations shall be equal to or less than the number of promotions/merits available for the college/group.  If the number of promotions/merits is less than the number of promotions/merits available in the college/group, the unused promotions/merits may be carried forward for use in future years.

b.      A rank ordering for all of the additional individuals approved for promotion/merit within the college/group.

c.      If the dean believes a candidate does not meet the college eligibility criteria for promotion/merit, the dean shall call a meeting of the

70

EXHIBIT L
Page 71

committee to discuss his/her concerns. If following this discussion, the committee does not change its recommendation, the dean may strike from the list the candidate in question and shall provide in writing and in clear and explicit terms, to the candidate, committee and the provost/vice president for Academic Affairs, the reason the candidate was struck from the list based upon the college eligibility criteria for promotion/merit.

  d. The decision by the dean to strike a candidate shall be automatically appealed to the provost/vice president for Academic Affairs. If the provost/vice president for Academic Affairs, upon review, agrees with the recommendation of the committee, the candidate shall be restored to the list in his or her original rank order. If the provost/vice president for Academic Affairs concurs with the dean, the recommendation shall automatically be forwarded to the president for review and decision. The president shall either concur with the recommendation of the committee or uphold the decision of the dean to strike the candidate. The president shall issue his/her decision in writing, explaining the basis for his/her decision in clear and explicit terms.

D. 1. The dean may add persons to the extra list generated by paragraph 15.2.C.2 in any position order which he/she believes is appropriate but not altering the relative order established by the college/group promotions/merit committee.

  2. The dean shall forward the lists arrived at in sections 15.2.C and 15.2.D to the provost/vice president for Academic Affairs and the college/group promotion/merit committee.

E. Pending conclusion of any appeal under the provisions of 15.2.C.4, the provost/vice president for Academic Affairs shall forward the lists described in 15.2.D to the president who will recommend the lists arrived at in 15.2.C.1, as amended for any person(s) whose name was struck by the dean and not reinstated by the appeal process, to the Board of Trustees. In addition, the president shall recommend to the Board of Trustees twelve (12) individuals from the lists determined in 15.2.D.1 maintaining the rank order within each college/group. If promotion or merit is granted to an individual who fails to meet either the college/group criteria or contractual criteria for that promotion or merit, this promotion or merit shall not be counted as one of the twelve (12) promotions/merits granted by the president.

F. The provisions of this Section do not preclude the president from recommending to the Board such additional promotions/merits as he/she may deem appropriate (whether or not the bargaining unit Member is on any of the lists described above).

G. A Member who receives a promotion/merit shall be deemed to have been awarded an advancement of rank or merit increase with respect to Section 15 of this Agreement and with respect to any college/unit promotion/merit policy.

71

**EXHIBIT L**
**Page 72**

15.3. Compensation for Promotions/Merit

A. Upon promotion/merit a bargaining unit Member shall receive an increase which in no case shall be less than:

    1. Instructor to Assistant Professor ........................$2,000

    2. Assistant Professor to Associate Professor ............$3,000

    3. Associate Professor to Full Professor ..................$4,500

    4. Academic Advisor 1 to Academic Advisor 2......... $2,000

    5. Academic Advisor 2 to Senior Academic Advisor...$3,000

The above amounts shall be pro-rated up for twelve (12) month bargaining unit Members.

15.4. Degrees

A. A Member who attains a new and higher degree from a fully accredited institution of higher education in his/her discipline or related field of study shall receive a salary increment added to his/her base salary in accordance with the schedule below, provided that the new degree is the first of its level held by the Member in his/her discipline or related field of study.

    1. First masters in field of discipline.......................$1000

    2. First doctorate in field of discipline (generally the Ph.D. and Ed.D. or equivalent) .............................................................$1500

B. A bargaining unit Member entering a new degree program in a discipline directly related to his/her teaching duties, or entering a program to obtain a second degree of the same level in his/her discipline or a related field may receive payment in accordance with the above schedule upon written approval, prior to entering such program, by the provost/vice president for Academic Affairs.

C. It is the intent of this section to provide the faculty Member with some adjustment to take account of his/her starting salary at the University when he/she lacked the degree in question.

D. Adjustments to salary under this section shall be effective the first complete pay period following completion of the degree requirements, as verified by the registrar of the applicable university or through its other official procedure.

## Section 16 - REDUCED WORK LOAD STATUS FOR FACULTY

A. Eligibility – On attaining a combination of age and years of service at the University equaling seventy (70), a Member may make application for reduced teaching

EXHIBIT L
Page 73

load for a predetermined period of time while continuing to be treated as a Member for all other purposes. Such application shall be submitted to the department head who shall forward it to the dean, along with his/her recommendation. The dean shall forward the application to the provost/vice president for Academic Affairs, along with his/her recommendation. The application shall be subject to final review and decision by the provost/vice president for Academic Affairs.

    B.    Description of Reduced Workload Status

    1.    Members electing reduced workload status will receive a salary proportionate to their workload. All fringe benefits shall continue. However, fringe benefits based upon a percentage of compensation, such as F.I.C.A. and retirement contributions will be reduced in accordance with the amount of salary reduction. The workload reduction cannot be more than fifty percent (50%) without the written consent of the Employer.

    2.    If the Employer and the Member agree, a Member with reduced load status may accept additional courses/duties with a corresponding increase in his/her percentage compensation for the semester.

    a.    However, reduced load Members may not accept additional courses during the regular academic year or during the summer semesters if a full-time Member requests the course as part of his/her regular workload or as an overload.

    3.    After electing reduced workload status the Member involved may not thereafter rescind such status without permission from the Employer.

    4.    Workload assignments will be made in accordance with departmental procedures.

    C.    Unless waived by the Employer, a Member requesting reduced load status must give one (1) semester and preferably one (1) year written notice to his/her dean. The change in status must start at the beginning of fall or spring semester.

    D.    A Member and the Employer may agree to a workload reduction on a temporary basis.

## Section 17 - RETIREMENT

17.1.   Retirement System Selection

    A.    Members:

    1.    Members presently in the Michigan Public School Employees' Retirement System (MPSERS) or any other available retirement program provided by the Michigan Public School Employee's Retirement Act (such as MIP) must remain in such system or its successor until retirement. Members presently in the

**EXHIBIT L**
**Page 74**

FSU Tax-Deferred Annuity Plan (TIAA-CREF being one of the fund sponsors under the Plan) must remain in such system or its successor until retirement.

B.    New Members:

1.    Unless legally obligated to allow or require enrollment in MPSERS, within thirty (30) calendar days of the effective date of employment, a Member must elect to participate in a retirement program offered by the Employer.

2.    If an election is not made within the thirty-day (30-day) period, it will be conclusively presumed that the Member has decided to participate in the TIAA-CREF retirement plan or its successor.

17.2.   Retirement System Payments

A.    Contributions on behalf of Members participating in the basic MPSERS or the optional state retirement program (MIP), provided under authority of the MPSERS, shall be made by the Employer pursuant to the Michigan Public School Employees' Retirement Act, as amended.

B.    The Employer shall pay into the retirement account of a Member participating in the FSU Tax-Deferred Annuity Plan (TIAA-CREF or other Fund Sponsor) twelve percent (12%) of the Member's earnings as a Member.

17.3.   Retirement System Vesting

A.    Members participating in the basic MPSERS or the optional state retirement program (MIP), provided under authority of the MPSERS, shall become vested pursuant to the Michigan Public School Employees' Retirement Act, as amended.

B.    Members participating in the FSU Tax-Deferred Annuity Plan shall be fully vested, subject to the provisions of the Plan, in amounts attributable to the contributions properly made under Section 17.2.B.

17.4.   Other Retirement Benefits

A.    A Member who is between the ages of sixty-two (62) and the age for full social security eligibility (i.e. no age penalty) at the time of his/her retirement shall receive MESSA health insurance and the MESSA Delta Dental on the same basis as before retirement until he/she reaches the age for full social security eligibility.  Such individuals, however, are not eligible for medical reimbursement.

B.    Members wishing to continue coverage through MESSA after retirement options paid by the Employer have been exhausted may do so on a direct pay basis to MESSA and at the sole cost of the Member and administered directly between the Member and MESSA.  To be eligible, the Member must be covered continuously, with no lapse in coverage or coverage by MPSERS or until the Member chooses to cancel, or for nonpayment, or cancels due to death.

74

EXHIBIT L
Page 75

17.5. <u>Notice of Retirement</u>

      A.     In order to assure a smooth transition and provide for continuity of instruction, Members who are retiring must do so effective at the end of a semester and will notify their dean at least seven (7) months prior to the date of their retirement. Such written notice will be waived in cases of emergency requiring a Member to retire, or in cases of mutual agreement between the Member and the Employer. Unless waived, failure to give at least seven (7) months written notice will result in forfeiture of ten percent (10%) of payment for accrued sick leave. Monies forfeited under this provision will be contributed to the Student Emergency Loan Fund.

## Section 18 - OVERLOAD

      A.     Additional sections of academic courses requiring part-time instructional staff will be scheduled through the deans of the appropriate colleges. These sections may be staffed by Members of the full-time faculty, where schedules allow, on a voluntary basis, and acceptance on a voluntary basis of such extra assignment shall not make the extra or additional assignment a part of the Member's workload, nor shall such additional responsibilities in any way be subject to review of a Member's workload.

      B.     The deans of the appropriate colleges may allow Members of the full-time faculty to teach in the various programs according to the following criteria:

      1.     A Member with a full workload, including release time, may teach a maximum of six (6) overload credit hours per semester under this policy;

      2.     Retrenched Members, qualified to teach an overload class pursuant to Section 7.6, shall have priority access to overload classes including priority over all qualified full-time Members;

      3.     A rotation list of interested Members from within the discipline will be maintained in the department office. A Member may withdraw his/her name from this list by mid-term of the preceding semester without his/her name being placed at the bottom of the list;

      4.     Selection of Members for these additional assignments shall be from the rotation list of qualified Members available and interested in the specific assignments;

      5.     Participation in this extra class responsibility will require full-time Members to be carrying full-time responsibilities, as defined by the departmental workload policy; and

      6.     These added responsibilities shall not conflict nor interfere with the full-time duties of the applicant. Any Member applying for extra class responsibility under this policy shall inform his/her department head in advance.

**EXHIBIT L**
**Page 76**

C.  If all other factors are relatively equal, subject to B.2 above, consideration will first be given by the dean and department head to the best qualified candidates among those available from the Members within the seniority group before going to other sources. Final selection will be made by the deans and department heads.

D.  The rate of payment for lecture class responsibilities shall be $85 per credit hour per week. Effective the beginning of the spring 2019 semester, the rate of payment for lecture class responsibilities shall be $90 per credit hour per week. Effective the beginning of the fall 2021 semester, the rate of payment for lecture class responsibilities shall be $95 per credit hour per week.

E.  Lab classes will be paid at the rate of fifty percent (50%) of the above rate.

## Section 19 - PART TIME INSTRUCTION

A.  Recognizing that the use of non-bargaining unit temporary and part-time faculty is necessary for the efficient operation of the University, the Employer may establish and maintain full-time equated (FTE) non-bargaining unit temporary and part-time faculty not to exceed the following percentages (listed below) of Members except as set out in 19.B below.

FY19 and thereafter          19%

1.  For the purposes of this provision, part-time and temporary non-bargaining unit faculty excludes clinical faculty, cooperative education, independent study work credited to department heads/school directors, up to one-half (½) load per semester taught by department heads/school directors, work performed because of a Member being on a leave of absence, work performed because of reduced workload under Section 16, non-bargaining unit temporary and part-time faculty teaching at any location other than the FSU campus located in Big Rapids, and any administrator within the division of Academic Affairs who teaches because there is no Member qualified and available.

2.  The percentage of non-bargaining unit temporary and part-time faculty shall be determined annually by using the "unranked" faculty, adjusted for the exclusions in the above paragraph, as the numerator and the number of Members on the fall seniority report as the denominator.

B.  In the event that non-bargaining unit temporary and part-time faculty exceeds the percentages referred to in Section 19.A, in the event any of such excess teach more than two standard work loads in a department for four (4) consecutive semesters, excluding summer semester and overloads, in an otherwise standard work assignment for a Member in that department, unless the need for teaching in such assignment has ended or will be reduced, upon the completion of the four (4) consecutive semesters, the Employer shall hire a full-time Member for each full-load equivalent beyond one (1) full-load assignment in that department.

76

**EXHIBIT L**
**Page 77**

C.      No course shall be taught by a non-bargaining unit employee for more than one (1) semester unless such employee's credentials have been made available for review if written request is made by a majority of the Members in the department.

D.      Whenever one-third (1/3) of the Members of a seniority group in which a course being taught by a non-Member petition for a new evaluation or whenever the department head determines that a new evaluation of the non-Member is necessary, the department head shall institute a new review.

## Section 20 - VOLUNTARY RESIGNATION INCENTIVE PLAN

Eligible full-time Members may apply for the following benefits in return for a voluntary resignation from employment.

20.1.   Eligibility - In order to be eligible, the Member must:

A.      Have completed fifteen (15) consecutive years of employment with the University;

B.      Be at least fifty-eight (58) and less than sixty-two (62) years of age at the effective date of resignation;

C.      Have used all available vacation before resignation; and

D.      Agree to voluntarily terminate all employment with the University.

20.2.   Application Procedure

A.      The Member must make written application to his/her dean on or before November 1;

B.      The Board of Trustees will have final approval of all requests.  For purposes of this Section only, those whose requests are granted are referred to as "resignee;" and

C.      The resignee must execute an effective release of all claims, including, but not limited to claims under the Age Discrimination in Employment Act and the Older Workers Benefits Act for which a lump sum payment of one hundred dollars ($100.00) as additional consideration will be paid.

20.3.   Limitations

A.      The Employer may limit the number of resignations under this plan.

B.      Resignation will be effective at the end of the spring semester unless otherwise agreed by the Employer.

**EXHIBIT L**
**Page 78**

20.4. Resignation Benefits

      A.     Beginning with the first month following date of resignation, and thereafter in accordance with its payroll schedule, the Employer will pay the resignee as follows:

      1.     Resignation at age fifty-eight (58) – Two hundred dollars ($200.00) bi-weekly until the resignee reaches age sixty-two (62); or

      2.     Resignation at ages fifty-nine (59) to sixty-two (62) - Three hundred and thirty dollars ($330.00) bi-weekly until the employee reaches age sixty-two (62).

      B.     Provided that the insurance carrier allows, the resignee may continue health insurance as provided for active employees under this Agreement only until the resignee (1) is eligible for Medicare, (2) is eligible for full social security benefits (i.e., no age penalty), or (3) is eligible for insurance paid for, in whole or in part, by another entity as the primary insured, whichever occurs first. Under no circumstances will the Employer contribute toward the premium for insurance an amount greater than the amount it would have paid on the resignee's behalf had he/she remained employed by the University. The Member is responsible for any premium not paid by the Employer.

      C.     Resignees shall be paid fifty percent (50%) of the cash value of their accumulated sick leave up to two hundred (200) days, computed at his/her rate of pay at the time of resignation. The maximum amount payable is the cash value equivalent of one hundred (100) days' pay.

20.5. Term of Program

      A.     This program is effective only for the duration of the contract.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

**EXHIBIT L**
**Page 79**

## Appendix A
## OTHER ELIGIBLE ADULTS

The parties agree to incorporate, in its original form, the following Letter of Agreement pertaining to Other Eligible Adults, into the collective bargaining agreement, but change the expiration date from June 30, 2013 to June 30, 2023, provided that the medical insurance carrier allows such coverage.

The University reserves the right to terminate this benefit in the event the University could be subject to penalties for maintaining other eligible adult benefits.

**FOR THE UNION:**                                          **FOR THE EMPLOYER:**

_____  6-21-19          _____  6/21/19
Charles Bacon, President/Chief    Date         David L. Eisler, President          Date
Negotiator Ferris Faculty
Association/MEA/NEA


_____  6-21-19          _____  6/25/19
Kurt Murray, MEA/NEA Uniserv   Date         Paul Blake, Provost/Vice President for   Date
Director                                         Academic Affairs

EXHIBIT L
Page 80

## Attachment to Appendix A

### LETTER OF AGREEMENT

Whereas, the FFA desires to extend the definition of persons eligible for certain benefits to "Other Eligible Adults" or "OEA";

Whereas, the University agrees to do so along the following terms and conditions;

THEREFORE THE PARTIES AGREE AS FOLLOWS:

1.   This Letter of Agreement shall commence when it has been signed by all necessary parties and shall expire at midnight on June 30, 2010.

2.   Open Enrollment for OEA shall begin as soon as practicable after this Letter of Agreement has been fully executed.

3.   Initially the decision of whether a Member's OEA is eligible for this Program shall be made by the Associate Vice President for Human Resources. A Member may appeal the decision according to the normal process for appealing such decisions.

4.   The following Program Summary and Enrollment Form outlines the terms and conditions of the Program and eligibility under the Program.

### Other Eligible Adult Health Care Plan (Medical, Hospitalization, Vision, Dental, and Prescription Drug) Program Summary and Enrollment Form

*A program effective as soon as practicable, that changes the eligibility criteria for enrollment in to health care plan(s) (medical, hospitalization, vision, dental, and prescription drug, hereafter referred to as "health care plan."), individuals are strongly encouraged not to forego health and/or dental coverage that may be available to them from other sources. The University reserves complete discretion to determine how the below-listed eligibility criteria and diagnostications will be applied during the program, and the documentation required in connection with enforcement. The University also reserves the right to modify, suspend or terminate this program if required by law to do so.*

Under the program, an employee in the bargaining unit represented by the FFA ("Member") may enroll one (1) "other eligible adult" ("OEA") in an FSU-sponsored health care plan available to Members, but only if ALL of the following OEA eligibility criteria are met:

•    The Member is eligible for and enrolled in the FSU-sponsored health care plan;

•    The Member does not have a current or former spouse who is enrolled in any FSU-sponsored health care plan or receiving any consideration to "opt-out" of any such FSU-sponsored plan, if such enrollment or "opt-out" is based upon any relationship with the Member seeking to designate the OEA;

•    The OEA is an adult under Michigan law;

•    The OEA currently resides in the same residence as the Member and has done so for the last 18 continuous months;[1]

---

[1]   Numerous factors may be considered in determining residency, including such items as: (1) location of a person's principal residence; (2) address listed on a person's driver's license and any changes; (3) registration address of a person's vehicle(s); (4) address of a person's professional license(s); (5) address where a person is registered to

EXHIBIT L
Page 81

1

- The OEA is not a tenant of the Member, and the Member is not a tenant of the OEA;
- The OEA is not a "dependent" of the Member as defined by the IRS; and the Member is not a "dependent" of the OEA; and
- The OEA is not eligible to inherit from the Member, or from the Member's current or former spouse, under the laws of intestate succession in the State of Michigan (This provision does not preclude the Member from naming the OEA in his or her estate plan).

Eligibility to continue coverage for an OEA ceases at the end of the month in which anyone or more of the eligibility criteria are not met.

The following individuals are *disqualified* from eligibility *as an OEA* under this program:

- The current or former spouse of the Member[2]
- The children (including adopted, step- and foster children) of the Member or of the Member's current or former spouse, and their descendents (e.g., children, grandchildren, etc.)
- The parents (including adopted, step- and foster parents) of the Member or of the Member's current or former spouse, and their descendents (e.g., the Member's siblings, nieces, nephews, in-laws, etc.)
- The grandparents of the Member or of the Member's current or former spouse, and their descendents (e.g., aunts, uncles, cousins, etc.)
- The Member's renters, boarders, tenants, landlord, etc.

Eligibility to continue coverage for an OEA ceases immediately upon an OEA becoming disqualified.

An OEA's children (including adopted, step- and foster children) who are qualified and claimed as IRS-defined dependents by the Member's eligible and enrolled OEA are also eligible for health care benefits in the same plan if they are members of the Member's household and under the age of 19 or a full-time student (as defined in the applicable health care plan) and they are unmarried (up to age 23 if an IRS-defined dependent). Such children's eligibility to continue coverage ceases immediately upon the OEA or the child becoming ineligible or disqualified.

Members must notify FSU Human Resources/Benefits in writing of any change in eligibility status or any disqualification, within 15 days after the relevant event.

*The OEA enrollment form can be submitted only during the regular open enrollment period, or within 30 days after all of the eligibility criteria are first met, or within 30 days after an eligible OEA involuntarily loses health care benefits sponsored by another employer (a special enrollment event).*

---

vote; (5) location of the bank(s) where a person maintains accounts and statement address on same; (6) address on checking account, credit accounts/cards, etc. There will not be determined to be a break in residency if the OEA temporarily resides in the FSU employee's and OEA's former residence to sell a home or to stay with minor children to complete the current school year.

[2] A former spouse may be eligible as an OEA if after the divorce the former spouse becomes eligible again under the eligibility requirements above. The period of continuous residence must begin again after the divorce.

2

EXHIBIT L
Page 82

I wish to enroll the following Other Eligible Adult (OEA) and OEA's children:

OEA:

| Name | Birthdate | Social Security # |
|------|-----------|-------------------|

Children:

| Name | Birthdate | Social Security # |
|------|-----------|-------------------|
| Name | Birthdate | Social Security # |
| Name | Birthdate | Social Security # |
| Name | Birthdate | Social Security # |

I certify that the OEA named above currently meets the OEA eligibility criteria for the program and that neither the OEA nor any of the OEA's listed children is disqualified from eligibility as described above. I understand that I am responsible for immediately notifying FSU in writing if my OEA or any of my OEA's children ceases to satisfy one or more of the eligibility criteria or if my OEA should be disqualified from eligibility under the program. I understand that I am responsible for any premium co-pays attributable to participation of my OEA or my OEA's children in any FSU-sponsored health care plan, and for all costs and expenses attributable to participation by an OEA or OEA's children who are ineligible, and I authorize FSU to deduct such premium co-pays, costs and expenses from my periodic pay. I understand that state and or federal law may not recognize "Other Eligible Adults" as being qualified for tax exempt status regarding the employer paid benefit. Therefore, I understand that the value of the health care coverages is subject to income tax and FICA taxes and will be reported as income on my W-2 form. I have been advised to consult with my own tax counsel at my own expense to determine the tax implications of the receipt of these benefits. I also understand that I will be responsible for paying any taxes associated with enrolling my OEA and my OEA's children. I also understand that in addition to all of the above that an OEA must meet the requirements of the insurance carrier to be eligible for insurance benefits.

*Any information falsified on this document may result in discipline up to and including termination from employment.*

| Employee Name (please print) | Birthdate | Social Security # |
|------------------------------|-----------|-------------------|

Signature: _____     Date: _____

FOR THE UNION/DATE:                    FOR THE EMPLOYER/DATE:

_____ Date          _____ 12-22-09 Date

                                       Fritz Erickson, Provost and Vice
                                       President for Academic Affairs

                                       _____ 12/22/29 Date

                                       David Eisler, President

3

83

EXHIBIT L
Page 83

**Appendix B**
**Intellectual Property Rights And Electronic**
**Distance Learning Materials Letter of Agreement**

A.  **Introduction.**  Ferris State University is dedicated to teaching, scholarly activity, and the extension of knowledge and services to the public, particularly the citizens of Michigan.  The University community recognizes its responsibility to produce and disseminate knowledge.  Inherent within this responsibility is the need to encourage the production of creative and scholarly works and the development of new and useful materials, devices, processes, and other intellectual property, some of which may have potential commercial value.  These activities contribute to the professional development of the individuals involved, enhance the reputation of the University in which they work, provide additional educational opportunities for students, and promote the public welfare.

B.  **Applicability of this Agreement**.

1.  Property Covered.

This Agreement addresses the creation, use and ownership of intellectual property including but not limited to the following ("intellectual property"):

a.  Copyrights (as defined in Title 17 of the United States Code, referred to herein as "Copyright Law").  This includes but is not limited to scholarly works, creative/artistic works, copyrightable software and courseware, and other developing areas including but not limited to multimedia works, and various forms of electronic communications including media used for distance learning.

b.  Patent rights (as defined in Title 35 of the United States Code, referred to herein as "Patent Law").  This includes and covers any new form of patentable intellectual property that may arise during the time this Agreement is in effect.

c.  Other.  This Agreement will also include and cover any new forms of intellectual property that may be added to the above categories during the time this Agreement is in effect.

This Agreement further addresses the development and use of all type of materials used in distance learning by the Employer, as is more fully set forth below.

2.  Purpose.  The purpose of this Agreement is to protect the rights of the bargaining unit Members; to clarify their relationship with the Employer; and to encourage the creation, offering, and use of quality distance learning programs whenever the results of their scholarly activity or creative endeavors are patentable, copyrightable, or otherwise commercially marketable.

**EXHIBIT L**
**Page 84**

3. <u>Exclusions</u>. In the event of a conflict between the provisions of this Agreement and those of any duly authorized and executed Agreement between the Employer and a creator (or a person who assists in the creation of intellectual property), or between the Employer and an external funding agency, the terms of the duly authorized and executed agreement will prevail.

4. <u>Persons Covered</u>. This Agreement applies to all bargaining unit Members working with or without monetary compensation on any project under the direction and control of the Employer.

5. Contracts and subcontracts shall include language determining the ownership of intellectual property that is developed by those working under the terms of the contract or subcontract. This is also true for those hired as independent contractors.

6. <u>Intellectual Property Covered by the Agreement</u>. The Agreement covers all intellectual property, including anything that is patentable, copyrightable, or otherwise marketable and/or may be protected. This includes, but is not limited to, the following: inventions, books, articles, study guides, syllabi, workbooks or manuals, bibliographies, instructional materials, tests, video or audio recordings, films, slides, transparencies, charts, other graphic materials, photographic or similar visual materials, film strips, multi-media materials, three-dimensional materials, exhibits, computer software, and web courseware or distance learning materials, which are covered in greater detail below.

7. Any separate agreement with a bargaining unit Member shall be consistent with the terms and provisions of this Agreement. In addition, such agreements shall provide a complete release of the Association.

**C.** **Interpretation of this Agreement**. The responsibility for the interpretation and implementation of the provisions contained in this Agreement is delegated to the provost/vice president for Academic Affairs or his/her designee for all of FSU (including FSU-GR), such responsibility to be exercised in consultation with the General Counsel's office as needed. Appeals of the decision made by the provost/vice president for Academic Affairs or his/her designee are to be made to the University's Intellectual Property Rights Committee, which shall advise the president, who will make the final decision for the Employer.

**D.** **Intellectual Property Rights Committee**. The Intellectual Property Rights Committee is hereby established as a new University committee, whose Membership shall consist of five (5) persons appointed by the president, one of which shall be a Member of the faculty.

**E.** **General Principles of Copyright Law**.

1. Copyright Law applies to any original work of authorship, which has been fixed in any tangible medium, including but not limited to computer media, from which the original work can be perceived, reproduced, or otherwise

85

**EXHIBIT L**
**Page 85**

communicated. A copyright owner has the exclusive right to reproduce his or her work, prepare derivative works, distribute by sale or otherwise, and display or perform the work publicly.

     a.      Literary works; musical works; dramatic works; pantomimes and choreographic works; pictorial, graphic, and sculptural works; motion pictures and other audiovisual works; and sound recordings are all examples of materials that are copyright protected. Copyright protection does not extend to any "ideas, procedures, systems, methods of operation, concepts, principles, or discoveries" as defined in Copyright Law.

     2.      Copyright is automatically conferred at the time the work becomes expressed in a tangible medium of expression. Neither registration nor the copyright notice, © [owner's name] [year of publication], is required, but this notice and either state or federal registration may confer additional rights, defenses, statutory damages and a right to recover attorney's fees in any litigation that may take place involving the copyright, and registration is required before a suit for infringement can be filed.

     a.      The purpose of copyright, as set out in the *U.S. Constitution*, is to "promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." Copyrights last for the life of the author plus 70 years. For employers, copyright protection of a work extends for 95 years from year of first publication or 120 years after creation. When the copyright expires, the work belongs to the public domain. The copyright owner may put it in the public domain at any time by expressly saying so.

     3.      The copyright may be held by a single author or by all those who contributed to the creation of a collective work. If a work is created by a bargaining unit Member within the scope of his or her employment on the Employer's time or using the Employer's resources, Copyright Law specifies that the employer owns the copyright in the work, absent an agreement to the contrary. This is known as the "work for hire" doctrine.

     4.      There has historically been an "academic exception" to the "work for hire" doctrine. The academic tradition has been that faculty own the copyright on course materials and books that they produce. The Employer's implementation of this exception is set forth under the ownership rights section of this Agreement.

**EXHIBIT L**
**Page 86**

**F.**     <u>**Ownership Rights**</u>.

    1.     <u>Ownership retained solely by creator</u>.

        a.     Intellectual property developed on the employee's own initiative, outside his/her scope of University responsibilities, and without use of substantial University resources (as defined in this Agreement) is owned by the creator. If the intellectual property bears a reasonable relationship to his/her employment responsibilities, then it is the employee's obligation to show that the intellectual property was developed according to these criteria.

        b.     Faculty shall have personal ownership of books, journal articles, other written reports of scholarly activity, creative works of fiction, textbooks, tests, course-related materials, slides, transparencies, bibliographies, music, and art work and any other material that would fall within the "academic exception" to the "work for hire doctrine" and which were created without substantial Employer support. Intellectual property created by faculty while on sabbatical or "paid leave" shall be deemed created with substantial Employer support, unless otherwise determined during the application and approval process for the sabbatical or paid leave.

        c.     Ferris State University should be appropriately acknowledged in all instances.

        d.     Ownership of multimedia materials, video and audio recordings, films, and other works that are created with substantial Employer support and resources are addressed elsewhere in this Agreement.

        e.     Inventions and other patentable property and software are excluded from this list and are addressed elsewhere in this Agreement.

        f.     The Employer shall enter in a course development agreement with the bargaining unit Member at issue prior to the creation of any courseware or product offered to be developed by the Employer, said agreement incorporating a list of the material that the bargaining unit Member shall remain the owner of the intellectual property rights in the same.

    2.     <u>Ownership rests with the University</u>.

        a.     Intellectual property rights are owned by the University and the net proceeds shall be shared with the creator(s) even when the property is considered a "work for hire," except as otherwise specified by a duly authorized and executed contract and/or this Agreement.

**EXHIBIT L**
**Page 87**

b.      Intellectual property rights are owned by the University when the property is offered to the University in the form of a gift or under terms of the agreement, and the Employer agrees to accept the property.  The distribution of any income accruing from the property will be determined according to the terms of the acceptance agreement.

c.      Intellectual property rights for inventions, whether patented or not patented, other patentable products and software will be owned by the University.  Income derived from these types of intellectual property shall be shared between the University and the creator as set forth later in this Agreement.

d.      Intellectual property, which is not described elsewhere in this Agreement and is developed with substantial Employer support, will be owned by the University.  Income derived from the intellectual property will be shared as set forth later in this Agreement.  Substantial Employer support includes, but is not limited to, use of University facilities (other than one's own office and standard office equipment and software); University-owned equipment (including multimedia equipment, videotaping equipment, software or other equipment beyond that routinely supplied to all bargaining unit Members, except as provided through grants or by other means); other staff salaries and effort; and computing and graphic services.

3.      Ownership determined by third party agreements.

a.      Whenever there is a possibility that an externally funded project will result in intellectual property, the ownership of that property will be determined prior to the Employer accepting the award.  If the funding agency is a federal or state agency, then the standard practices of that agency will determine ownership rights.  The University's ownership rights *vis a vis* all other sponsors will be determined by written agreement.

b.      The other provisions of this Agreement will determine the employee's ownership or income rights *vis a vis* the University.

4.      Materials developed by bargaining unit Members in conjunction with their teaching and scholarly activity responsibilities.

a.      The Employer disclaims ownership of:

i.      Lecture notes, course outlines, hand-outs, class exercises, class tests, etc. developed by bargaining unit Members for use in their own teaching activities or on their own initiative, even if the materials have commercial value for use in other classes and at other universities.

88

EXHIBIT L
Page 88

    ii.  Scholarly activity data or written reports of scholarly activity that are developed on one's own initiative because one is pursuing one's scholarly activity work, provided the scholarly activity is not covered under other sections of this Agreement. However, where the University may own all or part of the intellectual property rights for inventions, software, or other patentable products, the author and the Employer must consult and have written agreement from the provost/vice president for Academic Affairs' office before publication of the written reports so that the rights of both the author and the University may be protected.

    iii.  The Employer agrees to execute and deliver at the request of the creating bargaining unit Member to perform any reasonable acts to vest all rights, title, and interest in the materials described in 4.a.i and 4.a.ii above in the bargaining unit Member and/or provide such person with evidence to support any of the foregoing in the event such evidence is deemed necessary by the bargaining unit Member.

  b.  Except to the extent provided under 4.a above, the University shall have ownership of:

    i.  All of its courses.

    ii.  Course syllabi that are submitted to departmental offices by bargaining unit Members for every course.

    iii.  Course outlines, class tests, proficiency exams, etc., that are developed in response to a specific assignment beyond that of preparing to teach one's own classes.

      a)  For example, course-related materials that were developed specifically to benefit teaching activities of more than the individual who developed the materials, such as a multi-section course or as part of a series of lectures for use in some courses. When it is initially made clear to the bargaining unit Member that these materials are for use by anyone who is responsible for the course, then the University owns the materials.

    iv.  Instructional materials developed at the request of Extended and International Operations or any academic unit when the individual is paid or receives release time for the development, then it is a "work for hire."

  c.  Ownership of the intellectual property rights is not to be confused with the Employer's right of access to materials. The Employer

**EXHIBIT L**
**Page 89**

reserves the right to review all materials used in the teaching of a course or in the conduct of or resulting from scholarly activity at the University. These materials must be made available upon request and at no cost to the Employer when the Employer needs access to these materials in fulfilling its institutional responsibilities. When the Employer requires access to the materials, it will, to the best of its ability, do nothing that will impair the commercial value of the materials to the employees.

     5.    <u>Decision regarding ownership issues</u>. When there are questions of ownership, the initial decision about ownership shall be made by the provost/vice president for Academic Affairs or his/her designee. Any appeal of a decision made by the provost/vice president for Academic Affairs or his/her designee shall be made to the University's Intellectual Property Rights Committee, which shall advise the president, who shall make the final decision for the Employer.

**G.**    **<u>Transferring Ownership Rights</u>.**

    1.    <u>Copyrightable property</u>.

        a.    If the Employer determines that it does not wish to retain the ownership of copyrightable materials, it may elect to place the materials in the public domain, assign the ownership rights to an outside party, or offer the rights to the creator, unless a third party agreement prevents such an assignment. Any transfer of ownership must be in writing, and signed by the vice president for Administration and Finance or the president.

        b.    If the copyright is assigned to the creator, the Employer may require that the University be allowed to use the copyrighted materials without charge; provided such use is only on the University's campus or satellite campus. A satellite campus is defined as any campus where the University is delivering a course for credit or non-credit.

        c.    If the copyright is assigned to an outside party, the Employer may enter into an agreement, which sells the copyright, licenses the copyright, or gives the copyright to the third party. It may require that the Employer be allowed to use the copyrighted materials without charge.

        d.    If the transfer of the copyright to a third party results in revenue for the University, the principles of this Agreement or a written agreement between the Employer and the bargaining unit Member will determine if and how those revenues will be shared with the creator.

    2.    <u>Patentable property</u>.

        a.    If the Employer determines within six months from the date the invention is reduced to practice and notice of the same is provided to

90

**EXHIBIT L**
**Page 90**

the Employer that it does not wish to patent, license, or otherwise market an invention, the Employer will offer the intellectual property rights to the creator, unless a third party agreement prohibits such an offer.

      b.     A mutually agreeable written agreement will determine the terms of the ownership transfer. For the University, the Agreement must be signed by the vice president for Administration and Finance or the president.

**H.**     **Responsibilities of Inventors and Authors**.

    1.    <u>Disclosure responsibilities</u>.

      a.     If there will be no royalties or other income resulting from the intellectual property and if it is absolutely unambiguous that, under the terms of this Agreement, the ownership will be retained by the creator, there is no obligation to report to the Employer the development of intellectual property.

      b.     Prior to filing any patent or copyright applications and prior to signing any agreements that will produce royalties or other income in regards to intellectual property, the creator must notify the provost/vice president for Academic Affairs' office even if the creator believes they have sole rights to the intellectual property.

          i.     No agreements should be signed until the provost/vice president for Academic Affairs' office provides written confirmation that the University does not own the property.

    2.    <u>Ownership rests with the University</u>.

      a.     For potentially patentable products, as soon as the inventor recognizes that there is a possibility of a patentable product or discovery and before disclosing it to any party outside the University, the creator must notify the provost/vice president for Academic Affairs' office about the product.

      b.     For intellectual property not subject to patent law; if there is any possibility that the University will own the intellectual property rights, the creator is encouraged to discuss the idea with the provost/vice president for Academic Affairs' office when the creator first recognizes that the intellectual property will be developed.

      c.     If funding was provided by an external agency that requires notification when intellectual property is developed, the principal investigator is responsible for notifying the agency and the provost/vice president for Academic Affairs' office. The project director is responsible

**EXHIBIT L**
**Page 91**

for assisting the provost/vice president for Academic Affairs' office by providing the necessary information and completing any required forms.

3. Ownership determined by third party agreement. The provost/vice president for Academic Affairs' office, in consultation with the General Counsel's office should be consulted for assistance in determining the appropriate disclosure procedures for intellectual property developed pursuant to a grant or contract with an external entity.

### I. Other Responsibilities.

1. When the University owns the intellectual property rights, each creator is expected to work cooperatively with the Employer and with anyone to whom the Employer designates the right to evaluate or commercialize the intellectual property.

2. When the University does not have an ownership interest in the intellectual property, the name of the University shall not be used in connection with the property without prior written permission from the provost/vice president for Academic Affairs' office, (such permission shall not be unreasonably withheld), except as specified below:

      a.    Copyrightable materials may indicate that the author is an employee of the University; and

      b.    If the Employer has provided substantial support in connection with producing the work, the creator shall acknowledge in writing the support of Ferris State University in producing the work.

### J. Control of the Intellectual Property Owned by the Employer.

Appropriate University personnel are responsible for decisions regarding the patenting, copyrighting, licensing, loaning, selling, or otherwise controlling the marketing and disposition of intellectual property that is owned in whole or part by the University. When the creator is entitled to a share of the earnings, the provost/vice president for Academic Affairs or his/her designee will consult with the creator prior to finalizing any decisions. The creator has the right to appeal to University's Committee on Intellectual Property Rights and no actions will be taken while a decision is being appealed.

1. Copyrightable property.

      a.    The Employer will determine, in consultation with the creator, whether to file an application with the U.S. Copyright Office. If a copyright is pursued, the author is expected to cooperate in filing the necessary paperwork. All costs will be paid by the Employer or as otherwise agreed in writing.

      b.    The Employer will develop and approve agreements about the assignment of copyright and the publishing and/or marketing of the

**EXHIBIT L**
**Page 92**

work.  The creator may not enter into any agreements to publish or otherwise market the intellectual property, but he/she is encouraged to advise the Employer on the best outlets for the copyrightable material.

      c.     As owner of the copyright, the Employer may allow or direct others to create derivatives of the material, including course material developed as a "work for hire" for Extended and International Operations or other academic units.  Notwithstanding the terms and conditions contained in this paragraph, if the creating bargaining unit Member has used his or her best efforts to comply with the applicable material terms and conditions of this Agreement and/or Course Development Agreement, such bargaining unit Member shall have the option to elect to create any and all derivatives of the materials at issue.

    2.    <u>Patentable property.</u>

      a.     The Employer will determine whether to pursue a domestic and/or foreign patent, and if so, through what means.  The Employer will also make decisions relating to the licensing and marketing of patentable products.

      b.     The inventor will advise the Employer on the best course of action.

      c.     If the Employer wishes to file for a patent or for an evaluation for a patent, the inventor will cooperate by completing all of the necessary paperwork.  All costs will be paid by the Employer or as otherwise agreed in writing by the inventor and the Employer.

## K.   <u>**Sharing of Royalties or Other Income**</u>.

    1.    <u>Ownership retained by creator</u> (materials other than distance learning materials).  Neither the University nor any of its employees should benefit financially from the sale of materials that are developed solely for sale to Ferris State University students (e.g., course packs).

    2.    <u>Distribution of Royalties for Intellectual Property Owned by the University</u>.

      a.     An agreement or contract between the Employer and the creator(s) will specify whether the material is patented or copyrighted, what constitutes the Employer's direct expenses in creating the material, who the creator(s) are that receive distribution of royalties, and what percentage of the distribution each contributor will receive and any related issues.

      b.     The determination of direct expenses will include, but is not limited to, the costs associated with investigating and/or obtaining the

EXHIBIT L
Page 93

patent, filing the copyright, use of University resources, or other extraordinary resources, such as outside consultants or resources not available from the University. The Employer will recover its direct expenses incurred on patenting, copyrighting, and licensing of the materials from its sales or licensing proceeds before distributing the net proceeds remaining in accordance with the following royalty schedule, except where Section L. applies or unless otherwise agreed to by contract.

      c.    Sales and Licensing Proceeds shall include any revenues generated in connection with the sale, license, and use of patentable or copyrightable materials including any amounts recovered by the Employer, its licensees, or sublicensees in connection with any infringement claims based on the materials but excluding tuition.

| Net Sales or Licensing Proceeds | Creator | College or Equivalent Unit | Academic Affairs or Division | General Fund |
|---|---|---|---|---|
| The first $5,000 | 100% | | | |
| The portion between $5,001 – $50,000 | 60% | 20% | 20% | |
| The portion between $50,001 – $100,000 | 40% | 30% | 20% | 10% |
| The portion over $100,000 | 25% | 15% | 15% | 45% |

**L.**    **Electronic Distance Learning Materials**.

    1.    Definitions.

      a.    Distance education is defined as a formal educational process in which the instruction occurs when students and instructors are not in the same place. Instruction may be synchronous or asynchronous, and employ audio, video or computer technologies.

      b.    Electronic distance learning materials are instructional materials or courseware that requires the creation of copyright-protected work in a medium provided by the Employer. Electronic distance learning materials shall include all instructional materials produced, stored and/or reproduced in any form including in any form of computer storage or in digital format, such as on CD-ROM, digital video disc, and server hard drives for access on computers, computer work stations, and through the internet/extranet.

**EXHIBIT L**
**Page 94**

2.     Copyright Ownership and Royalty Rights for Distance Learning Instructional Materials.

a.     Copyright.

i.     The copyright of all distance learning instructional materials shall vest in the University except as otherwise provided in this Section L., or as otherwise provided in a written agreement between the Employer and the bargaining unit Member, so long as the Employer asserts rights/ownership in the materials.

ii.     If the Employer does not assert rights of ownership in the materials within six (6) months from creation and notice to the Employer, the ownership of such materials shall vest in the creating bargaining unit Member. The Employer agrees to execute and deliver at the request of the creating bargaining unit Member and to perform any reasonable acts to vest all rights, title, and interest in the materials at issue in the bargaining unit Member and/or provide such person with evidence to support any of the foregoing in the event such evidence is deemed necessary by the bargaining unit Member, except to the extent such ownership issues are addressed in separate written agreement between the parties.

iii.     The Employer shall bear all costs in protecting the materials.

iv.     All such materials will be marked with a "© Ferris State University" indicator in a manner appropriate to the medium and the bargaining unit Member shall receive full credit on the materials as the named author or principal developer of all copies of the materials. The bargaining unit Member, however, shall have the right to remove his or her name from any copies of the materials upon written notice of the same to the Employer. For materials recorded on fixed media, such as videotapes or CD-ROMs, the developer will place a warning at the beginning of each recording or affixed as a label on the medium that Ferris State University owns the copyright and that it is against federal copyright law to duplicate the recording.

b.     Related Issues.

i.     Copyright Ownership. Bargaining unit Members own the copyrights in scholarly works created by the bargaining unit Members and any and all additional materials that would fall within the "academic exception," including, but not limited to, those materials specifically listed on any Appendix attached to any

EXHIBIT L
Page 95

applicable Course Development Agreement. Therefore, bargaining unit Members shall hold copyright in electronically published materials they create solely on their own initiative. Copyright in final works created under contract, with substantial support from the Employer, and/or as works for hire reside with the University. As a result of the University's ownership of the approved distance learning course, it shall have the exclusive right to reproduce, sell, market, lease, license, commercially exploit, publish, and distribute the approved distance learning course; provided, nothing contained in this sentence shall prohibit or bar the bargaining unit Member from retaining or making copies, royalty free, of the works for use in connection with his or her University teaching, scholarship and research, creating compilations or other composite works and as a part or use in the bargaining unit Member's personal or professional portfolio or for job, tenure, or graduate school interviews or consulting profession, upon receiving the prior written consent of the Employer, such consent shall not be unreasonably withheld. The obligations, representations, warranties, confirmations and acknowledgements of the parties set forth herein shall continue, survive and shall remain in full force and effect after termination or expiration of this Agreement or the termination of the bargaining unit Member's employment relationship with the University, if applicable, and shall be binding upon and inure to the benefit of the parties and their administrators, heirs, successors and assigns.

ii.      Course Development. Bargaining unit Members may receive release time or other compensation as determined by the appropriate dean(s) for duties performed in the best interests of the University's distance education instructional program, including the development of electronically published course materials. Courseware created by bargaining unit Members receiving course release or receiving other compensation is the property of the University.

iii.      Revision Rights. Bargaining unit Members that have used their best efforts to comply with the material applicable terms of this Agreement and/or Course Development Agreement shall have the right to elect to update, edit and otherwise revise electronically developed course materials that become out of date, or, in certain circumstances may by agreement with the Employer, place a time limit upon the use of electronically developed course materials that are particularly time sensitive, regardless of who owns copyright in the electronically developed course materials. Such rights and limitations may be negotiated by the bargaining unit Member and the Employer in advance of the creation of the electronically developed course materials and should be reduced to

96

EXHIBIT L
Page 96

writing.  Absent a written agreement, each bargaining unit Member
will have the right and moral obligation to revise work on an
annual basis in order to maintain academic standards.  If a
bargaining unit Member chooses to revise the work and the
revision is made in a satisfactory manner, the bargaining unit
Member retains the right to full royalties and fees as set forth
herein.  If the Employer believes a revision is necessary and no
timely revision is made, or the revisions made do not maintain
academic standards, the Employer may refuse to market the
product, employ another bargaining unit Member, faculty Member,
staff Member or other person to update the work, and charge the
cost of doing so against any royalties or fees paid to the original
author

        iv.      Royalties.  In accordance with this Agreement,
bargaining unit Members shall receive all royalties that may accrue
from the commercialization of electronically published course
materials they create on their own initiative, unless they are
commercialized through the joint effort of the bargaining unit
Member and the Employer, then royalties shall be shared pursuant
to written agreement.  The Employer retains all royalties that may
accrue from the commercialization of electronically published
course materials created by bargaining unit Members pursuant to
contract or as a work for hire, including electronically published
course materials created as a condition of employment, except as
otherwise provided in this Agreement.  Copyright law permits joint
owners to pursue commercialization either jointly or separately,
with accounting.  Other circumstances may require review on a
case-by-case basis.  Absent a written agreement to the contrary,
specific division of royalties is addressed in subsection xi below.
In instances of joint ownership between bargaining unit Members
where the Employer also retains rights to royalties, the bargaining
unit Members shall mutually agree in writing as to the division of
royalties.  Absent a written agreement of division of royalties, the
bargaining unit Members shall divide their share *pro rata* based on
the number of bargaining unit Members, faculty Members, staff
Members, or other persons who have contributed to the materials at
issue.

        v.      Contributed Materials.  Liabilities may be incurred
with respect to the inclusion of materials in electronically
published course materials other than materials created by the
author of the electronically developed course materials and
inclusion of voices or images of persons in the electronically
developed course materials, including audience Members and
guest lecturers.  It is the policy of the University that all faculty
and staff comply with the law, including copyright and privacy

**EXHIBIT L**
**Page 97**

laws; therefore, it is the responsibility of the creator of electronically published course materials (normally the bargaining unit Member) to obtain all permissions and releases necessary to avoid infringing copyright or invading the personal rights of others. The bargaining unit Member shall be deemed to have complied with the obligations contained in this paragraph if he or she has used his or her best efforts upon reasonable due diligence to comply with the same. Nothing contained in this paragraph, Agreement, and/or Course Development Agreement shall prohibit or bar any bargaining unit Member from requesting defense and indemnification under the Legal Representation and Indemnification Policy provided in Board Policy and/or business policy letters.

      vi.    Use of University's Name. Bargaining unit Members must observe the same requirements that apply in other contexts with respect to the use of the University's name as set forth in this Agreement.

      vii.    Protecting the Work. The Employer will determine whether to register the copyright and will be responsible for enforcement of University-owned works. Bargaining unit Members will make such decisions and take such steps to protect works they own. Any one of the authors of a joint work may register and enforce the copyright in the names of all owners, with accounting upon giving prior written notice of same to the other joint owners.

      viii.    Retention of Nonexclusive License. Except in Category I, as set forth in subsection xii below, the University shall retain an exclusive educational license to reproduce and use the electronically developed course materials in teaching University classes on or off campus. Compensation to the bargaining unit Member for use of the course shall be as specified below in subsection xii.

      ix.    Administration. The provost/vice president for Academic Affairs shall be responsible for the administration of this Agreement and applying the Agreement equitably throughout the University. The bargaining unit Member should meet with his/her department head and dean to determine which category the electronically published materials will be assigned and the ownership, institutional resource commitment, and the royalties. A copy of the Agreement will be forwarded to the provost/vice president for Academic Affairs' office for his/her review and assurance that the Agreement is being applied in an equitable manner. The provost/vice president for Academic Affairs shall

98

EXHIBIT L
Page 98

inform the dean and department head of any inequitable applications of the Agreement and it shall be the responsibility of the provost/vice president for Academic Affairs or his/her designee, dean, and department head to resolve the issue with the bargaining unit Member. If the bargaining unit Member and the dean and department head cannot resolve the issue, the provost/vice president for Academic Affairs or his/her designee will resolve the issue. Appeals of the decision made by the provost/vice president for Academic Affairs or his/her designee are made to the University's Intellectual Property Rights Committee, which shall advise the president, who makes the final decision for the Employer.

      x. <u>Ownership Rights and Compensation Relative to Category</u>.

      (1) <u>Category I</u> – Totally Bargaining Unit Member Generated. The work resulting from an individual's efforts on his own personal time without any direct support from or through the Employer and without the use of any University resources beyond those normally provided by the Employer. The individual owns the property and may receive compensation for the work and retains distribution rights. Notwithstanding the foregoing, the individual may negotiate with the Employer for the use of the materials within the University and for the sale of the property outside the University.

      (2) <u>Category II</u> – Employer Contracts with a Bargaining Unit Member to Develop a Work. A bargaining unit Member is contracted to develop a specific product. The Employer provides all resources for the work. The work was carried out totally as a part of the bargaining unit Member's assigned time or for additional compensation. The University owns all intellectual property in the final products other than the material incorporated into the final products that fall within the "Academic Exception" and those materials specifically listed on any Appendix to any applicable separate written agreement, and have an exclusive educational and commercial ownership and license authority. The bargaining unit Member is not entitled to payment of royalty except to the extent the proceeds are generated by the Employer as a result of sale or license of the products to a third party and except to the extent otherwise provided under this Agreement and/or as agreed in a separate written agreement.

99

**EXHIBIT L**
**Page 99**

(3)    Category III.  The bargaining unit Member is using a work that he/she created as part of teaching at the University using, in whole or in part, University resources. The University owns all intellectual property except as otherwise agreed in writing or as set forth in this Section. There will be no extra compensation beyond normal teaching compensation for use of the work on its campuses or satellite campuses as defined in Section G. and except as otherwise agreed in writing.

xi.    Sale of Courses and Royalties.

(1)    After consultation with the bargaining unit Member and dean, the Employer may sell courses in a variety of media.

(2)    FSU office or offices identified by the provost/vice president for Academic Affairs will consult with the bargaining unit Member and dean to sell a selected course prior to the start of class.

(3)    FSU office or offices identified by the provost/vice president for Academic Affairs will be responsible for producing the copies in appropriate format as well as for any special editing required and packaging for shipment.

(4)    The bargaining unit Member will be afforded the opportunity to review segments of the course prior to its sale and for the duration of the use and distribution by the Employer as long as employed by the University.  The bargaining unit Member may request editing or re-recording from the Employer.  Final decisions regarding requests for re-editing or re-recording will be made by the provost/vice president for Academic Affairs or his/her designee, after consultation with the appropriate department head and dean.

(5)    Net proceeds received from the sale of courses (e.g., royalty or fee payments to the Employer or any amount recovered by the Employer in connection with any claim of infringement based on the courses) will be distributed with the bargaining unit Member(s) receiving 40%, the division 20%, the bargaining unit Member's college and department 20%, and the general fund 20%, in accordance with the royalty schedule set forth in Section K. 2.

100

EXHIBIT L
Page 100

(6)    FSU office or offices identified by the provost/vice president for Academic Affairs, in conjunction with the vice president for Administration and Finance, may also market and sell noncredit programs for which it holds licensing and distribution agreements. Royalties for the use of such a program will be paid to individuals, both internal and external to the University, according to the licensing and distribution agreement executed for the specific program.

xii.    Compensation for Use of Course/Materials.

(1)    If an entirely previously recorded course is offered for credit in subsequent semesters, the bargaining unit Member who created and/or taught the course may be given first right to administer/teach and revise the rebroadcast of the course, provided that he/she has used his/her best efforts to comply with the applicable material terms of this Agreement and/or any applicable written agreement.

(2)    If the bargaining unit Member who created and/or taught the course is unable or declines to administer/teach the course, the sponsoring department may recruit another bargaining unit Member, faculty Member, staff Member, or other person with appropriate expertise to administer the course, but the bargaining unit Member who created and/or taught the course shall be paid a fee of one-tenth (1/10th) of overload pay, so long as they are employed at the University for the first three (3) years after development of the material. The bargaining unit Member is responsible for requesting this payment. The bargaining unit Member will be responsible for consulting with and providing support to other bargaining unit Members, faculty Members, staff Members or other persons using the course materials.

(3)    If an entirely previously-recorded course is offered in additional sections, the sponsoring department may recruit other bargaining unit Members, faculty Members, staff Members, or other persons with appropriate expertise to administer/teach the additional sections, but the bargaining unit Member who created and/or taught the course shall be paid a fee of one-tenth (1/10th) of overload pay. The bargaining unit Member is responsible for requesting this payment. The bargaining unit Member will be responsible for consulting with and providing support to

101

EXHIBIT L
Page 101

other bargaining unit Members, faculty Members, staff Members or other persons using the course materials.

xiii.    <u>Licensing Agreements and Releases</u>.

(1)    Whenever the Employer produces a video program, those who appear in the program (i.e., the talent) may be required to sign a release permitting the recording and use of an "image of their person and sound of their voice." The provost/vice president for Academic Affairs or his/her designee will be responsible for obtaining signed releases during the production of technology-based programs provided the bargaining unit Member has used his or her best efforts upon reasonable due diligence to provide the provost/vice president for Academic Affairs or his/her designee with the necessary information needed to obtain such releases, the Employer shall hold the bargaining unit Member harmless from any and all claims, costs and expenses arising in connection with the same.

(2)    The provost/vice president for Academic Affairs or his/her designee and/or bargaining unit Member is responsible for obtaining all releases for intellectual property used in the production of technology-based programs and executing licensing agreements with those holding the copyrights for such intellectual property.

(3)    Vice president for Administration and Finance will be responsible for developing and executing license agreements for programs produced by the Employer.  At a minimum, each agreement will include stipulations that:

(a)    the licensee will not duplicate the recording, unless expressly provided in the license;

(b)    the license is provided for a specified period of time, usually one year;

(c)    the licensee will not retransmit the program, unless expressly provided in the license; and

(d)    the licensee will not edit or resell the program.

102

EXHIBIT L
Page 102

**M.** **Term**. The term of this Agreement shall be for the duration of the current 2018-2023 Agreement between the Ferris Faculty Association and the Ferris State University Board of Trustees.

**N.** **Reporting and Payment**. The Employer shall provide the bargaining unit Member and the president of the Association with annual statements related to any applicable patentable or copyrightable materials (the "materials") indicating the quantity of the materials sold, licensed or distributed and the amount due the Member in accordance with this Agreement and shall simultaneously pay to the bargaining unit Member the amount shown due the bargaining unit Member in such statement. The Employer shall keep accurate books of account and records at its principal place of business covering all transactions related to the materials, and the bargaining unit Member or his/her agents shall have the right, at reasonable hours of the day, to audit not more than once annually, the Employer's books of account and records on ten (10) days prior notice. Should an audit by the bargaining unit Member or his/her agents establish a deficiency between the amounts found to be due and the amount actually paid or reported by the Employer, the Employer shall pay the Member's amount of the deficiency, plus interest at a rate of one percent (1.0 %) per month from the date such amount became due until the date of payment. The Employer shall remit payment in such amount within thirty (30) days of the bargaining unit Member's delivery to the Employer of written notice of the same. The Employer shall keep all such materials, books of account and records available for at least four (4) years after the date its rights granted herein to the materials are hereby terminated and/or from the date the bargaining unit Member's employment with the University is terminated.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

**EXHIBIT L**
**Page 103**

**Appendix C**
**Course Development Agreement**

This Course Development Agreement ("CDA") is made and freely and voluntarily entered into this ___ day of _____, 20___ by and between Ferris State University (hereinafter referred to as "the Employer") and _____, whose address is _____ _____ (hereinafter referred to as "the course developer").

### BACKGROUND

A.    The Employer agrees to have created the approved distance learning course _____ _____ (course title and number) which will be included in the curriculum at FSU, pursuant to the responsibilities contained in Attachment C-1 (Course Developer Responsibilities);

B.    The course developer agrees to create for the Employer the approved distance learning course ("the approved distance learning course") in exchange for the compensation described herein;

C.    The Employer and the course developer recognize the mutual benefits to be derived from creation of the approved distance learning course and the necessity for faithful performance of the terms and conditions of this CDA;

NOW THEREFORE, the parties hereby mutually agree as follows:

1.    The course developer will create, for approval, the distance learning course in accordance with the Employer requirements for distance learning courses.  A set of suggested guidelines for tasks to be performed by the course developer are set forth in Attachment C-2 (Suggested Online Course Development Guidelines - filling out this chart is optional).

2.    As used in this CDA, the term "approved distance learning course" includes, without limitation, all materials submitted to the Employer in accordance with this CDA, including but not limited to videotapes, audio tapes, text, graphics, study guides, syllabi, tests, study aids of any type, written protocols, outlines, drafts, articles or other literary work in any format, including paper, electronic, computer-readable, machine-readable, CD-ROM, sound or video recording.

3.    In consideration for the services to be provided by the course developer under this CDA  the following compensation or release time will be provided to the course developer.

     a.    <u>First</u> course developed by the course designer

          i.    Development of a new online course - $1,864 per credit hour

**EXHIBIT L**
**Page 104**

        ii.     Conversion of a hybrid/mixed course to fully online - $1400 per credit hour

        iii.    Online Course redesign - $850 per credit hour

b. Release time may be granted by the college with prior arrangements made between the college and the developer.

4. The course developer warrants that all of his/her work associated with the creation, preparation, construction or development of the approved distance learning course will be in accordance with the provisions of the 2018-2023 Collective Bargaining Agreement between the Ferris State University Board of Trustees and the Ferris Faculty Association/MEA/NEA including Appendix B, the Intellectual Property Rights and Electronic Distance Learning Materials Agreement.

5. The course developer will work with _____ (dean) of _____ _____ (college) and/or the Dean of Extended and International Operations or his/her designee, (and, if necessary, the provost/vice president for Academic Affairs) to develop the distance learning course.

6. If the completed version of the distance learning course is not accepted by _____ (dean) of _____ (college) or the Dean of Extended and International Operations, as set forth in Paragraph 5 above and Attachment C-3 (Distance Learning Course Completion Checklist and Course Payment Authorization), the course developer will make reasonable efforts and allocate a reasonable amount of time to resolve any outstanding issues or concerns. The provost/vice president for Academic Affairs will attempt to resolve any disputes that cannot be resolved by mutual agreement between the deans and the course developer. If compensation takes the form of a stipend, after the completed course is accepted, the dean of _____ (college) or the Dean of Extended and International Operations will process the Distance Learning Course Completion Checklist and Course Payment Authorization Form (Attachment C-3) to acknowledge that release time obligations have been met.

7. Upon request, before the distance learning course is accepted as set forth above, the course developer agrees to make reasonable changes related to the course developer responsibilities listed on Attachment C-1 and allocate a reasonable amount of time in the making of the same to the distance learning course as deemed necessary by the _____ (dean) of _____ (college). The course developer shall make any such changes within a mutually agreed upon timeline.

8. The course developer's signature on the Distance Learning Course Completion Checklist and Course Payment Authorization Form (Attachment C-3) also constitutes his/her agreement to grant, assign, transfer and relinquish to the University all present, future or potential rights, including patent rights, copyrights or other intellectual property rights, in the approved distance learning course, including the right to modify, rearrange or create derivative works. Notwithstanding the terms and conditions of the

**EXHIBIT L**
**Page 105**

preceding sentence, the Employer agrees and acknowledges that all works created by the course developer, and owned exclusively by the course developer, prior to the creation of the approved distance learning course that is the subject matter of this CDA, including but not limited to, those works or items specifically listed in Attachment C-4 (List of Works Created and Owned Exclusively by Course Developer Prior to Creation of Distance Learning Course) and attached and made a part of this CDA (to be delivered before the course development work begins), and that is incorporated in the course, is and shall remain the intellectual property of the course developer. Course developer grants an irrevocable nonexclusive license to the Employer to use these materials as incorporated in the course or subsequent versions of the course or in derivative works. The Employer further agrees that, provided course developer has used his or her best efforts to comply with the material terms and conditions of this CDA, and while an employee at FSU, course developer shall have the right to elect to make any and all modifications, rearrangements, updates and/or create any and all derivative works of the approved distance learning course. As a result of the University's ownership of the approved distance learning course, it shall have the exclusive right to reproduce, sell, market, lease, license, commercially exploit, publish, and distribute the approved distance learning course; provided, nothing contained in this sentence shall prohibit or bar the course developer from retaining or making copies, royalty free, of the approved distance learning course for use in connection with his/her FSU teaching, scholarship and research, creating compilations or other composite works and as a part of or use in the course developer's personal or professional portfolio or for job, tenure, or graduate school interviews or consulting profession upon receiving the prior written consent of the Employer, such consent shall not be unreasonably withheld. The course developer will cooperate fully with and assist the Employer, at the Employer's expense, in obtaining patent protection, copyright protection, or any other intellectual property protection for the approved distance learning courses that the Employer may desire. Nothing contained herein grants such license to any other person or entity or grants the course developer any right to convey or grant to any third party any rights whatsoever in the approved distance learning course or employ or permit any third party to teach the approved distance learning course in any educational setting. The obligations, representations, warranties, confirmations and acknowledgements of the parties set forth in this paragraph shall continue, survive and shall remain in full force and effect after termination or expiration of this CDA or the termination of the course developer's employment relationship with the University, if applicable, and shall be binding upon and inure to the benefit of the parties and their administrators, heirs, successors and assigns. Notwithstanding the foregoing, the course developer's right to receive compensation or royalties under this CDA, right to revise or update, and right to teach the course shall terminate with the termination of his/her employment with the University.

9.      The approved distance learning course contains trade secrets, confidential information and proprietary information. It is the express intention of the parties hereto that the University shall remain the sole owner of all proprietary information which is in any way related to the approved course, which information, as a matter of necessity is known or may be disclosed, in whole or in part, to the course developer in the development of the approved course. Title to all proprietary information and to the approved course, whether in the form of documents, data, software programs or otherwise,

EXHIBIT L
Page 106

shall at all times belong to the University. The approved course shall not be used or divulged to others by the course developer without the Employer's prior, written consent. Any such proprietary information shall remain with and be returned to the Employer. Notwithstanding the terms and conditions of the preceding sentence, the Employer agrees and acknowledges that all works or proprietary information created by the course developer prior to the creation of the approved distance learning course that is the subject matter of this CDA, and owned exclusively by the course developer, including but not limited to, those works or items specifically listed in Attachment C-4 (List of Works Created and Owned Exclusively by Course Developer Prior to Creation of Distance Learning Course), attached and made a part of this CDA (to be delivered before the course development work begins) is and shall remain the sole property of the course developer; and the parties further agree that nothing contained in this sentence shall prohibit or bar the course developer from retaining or making copies, royalty free, of the proprietary information owned by the University for use in connection with his/her FSU teaching, scholarship and research, creating compilations or other composite works and as a part or use in the course developer's personal or professional portfolio or for job, tenure, or graduate school interviews or consulting profession, upon receiving the prior written consent of the Employer, such consent shall not be unreasonably withheld.

10. Based on information and belief after exercising reasonable due diligence, to course developer's knowledge, the course developer represents and warrants that he/she has full power to enter into this CDA; that the materials he/she will provide do not violate any rights, are not defamatory, libelous, or obscene; and do not infringe upon any statutory or common law copyright. Nothing contained in this paragraph shall prohibit or bar the course developer from making a claim under the legal representation and indemnification policy contained in Business Policy Letter 99:10 (Attachment C-5).

11. If course developer is a teaching faculty Member at FSU, the course developer hereby acknowledges the approved distance learning course developed pursuant to this CDA is developed and created pursuant to the course developer's employment with the University and not on an independent contractor basis. The course developer however acknowledges that the approved distance learning course is being created pursuant to the specific request, order and commission of the Employer. The parties hereto expressly agree that the approved distance learning course shall be considered a work made for hire, owned solely by the University, except to the extent ownership shall remain or vest in the course developer as set forth in paragraphs 8 and 9 above.

12. The course developer acknowledges that the restrictions contained herein are reasonable and necessary and that any violation of these restrictions would cause substantial injury to the University. In the event of any material violation of this Agreement by either party, the Employer and the course developer shall retain the right to seek money damages, preliminary and permanent injunctive relief, and/or any other remedies at law.

13. The Employer and the course developer release and discharge the Ferris Faculty Association/MEA/NEA from any and all known claims, demands, actions, causes of action, damages, obligations, agreements and/or losses of every kind and description

107

**EXHIBIT L**
**Page 107**

whether in law, in equity, or otherwise, which it may have ever had or have upon the execution of this Agreement, against the Ferris Faculty Association/MEA/NEA arising out of this Agreement.

14. This CDA and the intellectual property rights and electronic distance learning materials (Appendix B of the 2018-2023 Collective Bargaining Agreement between the Ferris State University Board of Trustees and the Ferris Faculty Association/MEA/NEA) herein incorporated constitute the entire agreement between the parties hereto concerning the subject matter hereof. It may not be changed orally, but only by an agreement in writing, signed by the parties against whom enforcement of any waiver, change, modification, extension or discharge is sought.

15. The invalidity or unenforceability of any particular provision of this CDA or the related attachments shall not affect its other provisions, and this CDA shall be construed in all respects as if such invalid or unenforceable provision were omitted.

16. This CDA may be executed in one or more counterparts, but in such event, each counterpart shall constitute an original, and all such counterparts shall constitute one CDA.

17. This CDA shall be construed and performance hereunder shall be governed by and controlled by the 2018-2023 Collective Bargaining Agreement between the Board of Trustees of Ferris State University and the Ferris Faculty Association/MEA/NEA including Appendix B, the Intellectual Property Rights and Electronic Distance Learning Materials Agreement, the laws of the State of Michigan, with the exception of the provisions dealing with patent and copyright protection, which shall be governed by federal law.

18. The waiver by either party of a breach of any portion of this CDA by the other party shall not operate or be construed as a waiver of any subsequent breach.

19. Any controversy or claim arising out of, or related to this CDA, or the interpretation or breach thereof, shall be settled by binding arbitration as set forth in Section 9.3 – Step 5 – Arbitration of the 2018-2023 Collective Bargaining Agreement between the Board of Trustees of Ferris State University and the Ferris Faculty Association/MEA/NEA.

20. The course developer shall have full control of the substantive and intellectual content of the approved distance learning course, both at the time of its production and any time during the use by the Employer subject to the oversight consistent with normal FSU curricular processes. Notwithstanding the foregoing, others using the materials to teach the approved distance learning course shall have the right to exercise their own academic freedom in delivering the approved distance learning course while adhering to the approved course standards, if any, of the academic college in which the course originates.

21. Supplemental Updates. Subject to the terms and conditions of this CDA as set forth above, the course developer may at his/her discretion produce any revised or

108

EXHIBIT L
Page 108

supplemental materials or reflect developments or insights that come to the course developer's attention following completion of the approved distance learning course.

22.     Procedures for updates.  In the event the course developer becomes aware of the need or desire to produce a supplemental update to the approved distance learning course, the course developer shall notify, in writing, the department head/dean that offers the course of such a need.  Upon delivery of the written notice, the course developer shall thereby have the authority to create the supplemental materials as soon as practically possible but in any event no later than the period of forty-five (45) calendar days after delivery of the written notice.  If the department head/dean recognizes the need to prepare such a supplemental update, the department head/dean may deliver a written notice to the course developer, which shall also authorize the course developer to make such updates as soon as practically possible but no later than the subsequent forty-five (45) calendar days.

23.     Pending updates.  Before updates or supplemental materials are ready for distribution with the approved distance learning course, the Employer and the course developer or others using the materials shall use their best efforts to coordinate with the course developer regarding the continued use of portions of the approved distance learning course that may not reflect current or the most accurate information.  Absent agreement between the Employer and the course developer, the Employer shall use its best efforts to inform users of the approved distance learning course about the availability of current or more accurate information.

24.     The course developer shall receive full credit as the named author or principal developer of all copies of the approved distance learning course prepared by or authorized by the Employer.  The course developer shall have the right to remove the course developer's name from any copies of approved distance learning course made or authorized by the Employer upon written notice of the same to the Employer.

25.     Right to teach.  Provided that the course developer has complied with the materials terms and conditions of this CDA, the course developer who has created the approved distance learning course shall have the first option to teach the course for which the approved distance learning course shall be used.  This option shall be exercised within a reasonable manner and period of time.  Notwithstanding the foregoing option, the Employer shall have the right to reasonably distribute its course load among the faculty available to teach its courses in a manner consistent with the Collective Bargaining Agreement.

26.     All notices and other required communications must be in writing and will be deemed to have been duly received: (a) five (5) business days after the date of mailing if sent by registered or certified U.S. mail, postage prepaid, with return receipt requested to the address specified below; or (b) when delivery is made in person, or sent by a commercial courier service.  Notices must be sent to the party at the address shown below or to such other place as the party may subsequently designate for receipt of notices.

If provided to the Employer, mail or give to:

109

EXHIBIT L
Page 109

Provost/Vice President for Academic Affairs
Ferris State University
1201 S. State St., CSS 310
Big Rapids, MI 49307

If provided to course developer, mail or give to:

Name:_____

Address:_____

City/State/Zip_____

27.  Neither this CDA nor performance hereunder can be assigned without the Employer's prior, written consent and, upon any such assignment, this CDA shall be binding upon all successors and assigns hereto.

IN WITNESS WHEREOF, the undersigned parties have caused this CDA to be executed under their hands and seals this _____ day of _____, 20___.

**COURSE DEVELOPER     FERRIS STATE UNIVERSITY**

By: _____     By: _____
                                                          Provost/Vice President for Academic
                                                          Affairs or his/her designee

Copies of signed contract sent to:

                        Dean of the College of _____
                        Dean of Extended and International Operations
                        Provost/vice president for Academic Affairs (File Copy)
                        President of the Ferris Faculty Association/MEA/NEA

**EXHIBIT L**
**Page 110**

**Attachment C-1**
**Distance Learning Course Completion Checklist**
**Course Payment Authorization**

Date:_____  Course Name:_____  Course #:_____

      We, the undersigned, agree that the following items have been completed and verified and are included in the online course:

_____Instructor profile – instructor's photo is optional

_____Course Syllabus
- Course description
- Prerequisite skills or knowledge for the course
- Textbooks and other instructional materials
- Goals and learning outcomes
- Course assignment and activities (general statement)
- Face-to-face requirements (if any)
- Grading scale
- Performance standards (student assessment or performance criteria)
- Schedule of events (may be done by calendar dates or by week or by another format) – it is understood that, for pedagogical reasons or unforeseen circumstances, the instructor may need to change the schedule as the class progresses
- Bibliography and Web Links

_____Course communication standards

_____Course assignments and activities
- Directions
- Assignments
- Submission criteria
- Evaluation criteria
- Feedback

_____Copyright clearances for the use of others' instructional materials and images in the online course. Extended and International Operations will assist the course developer in securing the copyright permissions.

_____Copyright clearances

_____Participation in meetings

111

**EXHIBIT L**
**Page 111**

Check one:

Option A: ☐

The contract for the development of this course has been fulfilled and is authorized for payment.

Option B: ☐

The contract for the development of this course has been fulfilled and release time obligations have been met.


_____       _____
Instructional Designer                                      Date


_____       _____
Course Developer                                           Date


_____     _____
Dean of Extended and International Operations Ferris State University     Date


_____     _____
Dean, College of _____     Date _____

**EXHIBIT L**
**Page 112**

**Attachment C-2**
**List of Works Created and Owned Exclusively by Course Developer**
**Prior to Creation of Distance Learning Course**

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

11.

12.

13.

14.

15.

_____          _____
Course Developer                                                              Date

113

**EXHIBIT L**
**Page 113**

**Attachment C-3**
**FSU Business Policy Letter 99:10**
**Legal Representation and Indemnification**
**(Supersedes 89.11)**

## I.    LEGAL REPRESENTATION

A.    General Policy.  Subject to the limitations, conditions and procedural requirements established elsewhere in this resolution, Ferris State University shall indemnify all of its officers and employees (including student employees and properly appointed volunteers) for the cost of legal representation made necessary or desirable by the existence of all of the following conditions:

1.    The officer or employee has been made a party to, or is threatened to be made a party to a civil, criminal or administrative suit, proceeding, action, or investigation.

2.    The suit, proceeding, action, or investigation related to conduct or inaction of the officer or employee which was within his/her scope of authority and course of employment, or, which the officer or employee reasonably believed to be within his/her scope of authority and course of employment.

3.    The conduct or inaction at issue was the result of the officer or employee acting in good faith.

B.    Limitations of Indemnification for Legal Representation

1.    The University may, in its discretion, designate and engage an attorney on behalf of the officer or employee who is in need of legal representation.  If the officer or employee declines such representation, the University shall have no obligation to indemnify the officer or employee for the cost of legal representation.

2.    The officer or employee seeking indemnification for legal representation shall have a duty to cooperate fully with the counsel approved by or appointed by the University.  If the officer or employee fails to cooperate with the counsel, legal representation may be withdrawn, and the University shall have no obligation to indemnify the officer or employee for the cost of legal representation.  In the event that legal representation is withdrawn, the Board of Trustees will be provided with a summary of the reasons for such withdrawal at the next meeting of the Board of Trustees.

**EXHIBIT L**
**Page 114**

3.    If at any time during the suit, proceeding, action or investigation, it is determined by the University that a) the officer or employee does not satisfy the requirements for indemnification set forth in A.1, 2 and 3 above, or b) the employee did not comply with number III below, legal representation shall be withdrawn, and the University shall have no obligation to indemnify the officer or employee for the cost of legal representation.

4.    The obligation to provide legal counsel or indemnification for legal representation shall not apply if the suit, proceeding, action or investigation is commenced by the Board of Trustees of Ferris State University.

5.    The duty to provide legal counsel or indemnification for legal representation shall not apply if the officer or employee fails to seek prior approval of indemnification as specified below.

6.    The conduct or inaction involved did not constitute an intentional violation of federal or State law.

C.    Procedure for Requesting Indemnification and/or Legal Counsel

1.    An officer or employee may request that counsel be provided or that indemnification for the cost of legal representation be approved by writing a letter to the University's General Counsel requesting such representation or provision of counsel. The letter shall outline the reason for the request, and shall have attached all legal documents which are relative to the request. This letter shall be delivered to the General Counsel immediately after an officer or employee becomes aware that he/she is a party to (or subject of) a suit, proceeding, action or investigation, or is threatened with such involvement. In no event shall this letter be delivered more than three (3) working days after the date when the officer or employee first became aware of his/her involvement in the suit, proceeding, action or investigation.

2.    The General Counsel, in cooperation with the Risk Manager, may designate legal counsel to represent the officer or employee, pending approval by the Board of Trustees at its next regularly scheduled meeting.  Such interim representation shall be approved unless the General Counsel determines that providing such representation would not be consistent with this policy.

3.    The Board of Trustees will take formal action on all requests for indemnification, or for the provision of legal representation, at the next regularly scheduled meeting after the request is received.  In addition, the Board will be provided with information regarding

**EXHIBIT L**
**Page 115**

employees who were denied interim representation by the General Counsel.

## II. INDEMNIFICATION FOR JUDGMENTS, SETTLEMENTS, AND FINES

A.  If a judgment is entered against an officer or employee of the University; if a settlement is entered into by an officer or employee of the University; or if a fine is assessed against an officer or employee of the University, Ferris State University shall indemnify the officer or employee for the amount of the judgment, settlement, or fine, if, and only if, all of the following conditions are satisfied.

1.  Within ten (10) business days of the date when the officer or employee first became aware of his/her involvement in the suit, proceeding, action or investigation, he/she submitted a letter to the General Counsel summarizing his/her involvement and requesting legal counsel (or indemnification for legal representation).

2.  Within five (5) business days of the date when the officer or employee first became aware that a judgment or fine had been entered against him/her, or, prior to entering into a settlement, the officer or employee sends written notice to the General Counsel, with all relevant legal documents, and requests indemnification for the judgment, fine, or proposed settlement.

3.  The officer or employee has cooperated with his/her University approved or provided counsel at all times during the process.

4.  The Board of Trustees determines that the conduct or inaction resulting in the judgment, fine or settlement occurred within the officers or employees course of employment and scope of authority, (or that the officer or employee reasonably believed his/her actions to be within the course of employment and scope of authority) and that the officer or employee acted in good faith. This determination shall be separate from and in good faith. This determination shall be separate from and in addition to the Board's initial determination for the purpose of providing counsel or approving indemnification for legal representation.

5.  The suit, proceeding action or investigation was not commenced by the Board of Trustees or at the direction of the Board of Trustees.

6.  The officers or employees conduct or inaction did not constitute an intentional violation of federal or State law.

116

**EXHIBIT L**
**Page 116**

### III.    COMMUNICATIONS

A University employee who receives any communication regarding a suit, proceeding, action or investigation involving his/her employment at the University, shall decline to respond to such communication unless authorized to respond by the University's General Counsel.  All such communications, including requests for information, shall be immediately reported to the Office of the General Counsel.

> Jerry Scoby, Vice President
> Administration and Finance
> Contact: Office of the General Counsel

**EXHIBIT L**
**Page 117**

**Appendix D**
**LETTER OF AGREEMENT – AGENCY SHOP**

This Agreement is between the Board of Trustees of Ferris State University and the Ferris Faculty Association.

**WHEREAS**, based on the passage of 2012 PA 349, certain language in the Agency Shop Section of the 2010-2013 contract had to be removed for the 2013-2018 collective bargaining agreement; and

**WHEREAS**, the parties are aware of several legal challenges pending challenging the constitutionality and/or validity of PA 349; and

**WHEREAS**, the parties are willing to address the Agency Shop Section of the contract in the event PA 349 no longer prevents an agency shop during the course of the 2013-2018 collective bargaining agreement.

**NOW, THEREFORE**, the parties have agreed to the following:

1.      If at any time during the course of the 2013-2018 collective bargaining agreement 2012 PA 349 is declared invalid, unconstitutional, or otherwise no longer prevents or prohibits an agency shop provision, by any court of appropriate jurisdiction (to which there is no appeal filed), or PA 349 is repealed, all of the language removed from the Agency Shop Section of the 2010-13 contract for the 2013-18 contract shall be immediately returned to the contract and shall be operable between the parties. (See attached).

2.      Nothing in this Agreement shall be construed as amending or deleting any other provision in the parties' collective bargaining agreement.

3.      This Agreement is without precedent for any further relationship or practice between the parties.

FOR THE UNION:                          FOR THE EMPLOYER:


_____    _____        _____    _____
Charles Bacon, President/Chief    Date              David L. Eisler, President      Date
Negotiator Ferris Faculty
Association/MEA/NEA



_____    _____        _____    _____
Kurt Murray, MEA/NEA        Date              Paul Blake, Provost/Vice      Date
Uniserv Director                              President for Academic
                                              Affairs


118

**EXHIBIT L**
**Page 118**

Attachment to Appendix D

2.6     Agency Shop

A.     Each member covered by the negotiated Agreement between the Employer and the FFA shall, as a condition of employment, on or before thirty-one (31) days from the date of commencement of professional duties, join the FFA or pay a service fee to the FFA equivalent to the amount of dues uniformly required of members of the FFA, less any amounts not permitted by law; provided, however, that the member may authorize payroll deduction for such fee. In the event that a member shall not pay such service fee directly to the FFA or authorize payment through payroll deduction, the Employer shall, at the request of the FFA, deduct the service fee from the member's salary and remit the same to the FFA under the procedure provided below.

B.     The procedure in all cases of non-payment of the service fee shall be as follows:

1.     The FFA shall notify the member of non-compliance by certified mail, return receipt requested, explaining that he/she is delinquent in not tendering the service fee, specifying the current amount of the delinquency, and warning him/her that unless the delinquent service fees are paid or a properly executed deduction form is tendered within fourteen (14) days, he/she shall be reported to the Employer and a deduction of service fee shall be made from his/her salary; and

2.     If the member fails to comply, the FFA shall give a copy of the letter sent to the delinquent member and the following written notice to the Employer at the end of the fourteen (14) day period:

The FFA certifies that (name) has failed to tender the periodic service fee required as a condition of employment under the faculty Agreement and demands that under the terms of this Agreement, the Employer deduct the delinquent service fee(s) from the collective member's salary. The FFA certifies that the amount of the service fee includes only those items authorized by law; and

3.     The Employer, upon receipt of said written notice and request for deduction, shall act pursuant to Section A above. In the event of compliance at any time prior to deduction, the request for deduction will be withdrawn. The FFA, in enforcing this provision, agrees not to discriminate among members.

C.     With respect to all sums deducted by the Employer pursuant to this Section, the Employer agrees promptly to disburse said sums directly to the FFA.

D.     A member paying the service fee provided for herein, or whose service fees have been deducted by the Employer from his/her salary, may object to the use of the service fee for matters not permitted by law. The procedure for

EXHIBIT L
Page 119

making such objections is that officially adopted by the FFA. A copy of the FFA policy will be provided by the FFA upon a request of a member.

      E.      The FFA agrees, upon request, to defend the Employer, its officers, agents or employees in any suit brought against all or any of them regarding this Section of the collective Agreement, and to indemnify the Employer, its officers, agents or employees, for any costs or damages which may be assessed against all or any of them regarding this Section of the collective Agreement, provided, however, that:

      1.      Neither the duty to defend nor the duty to indemnify shall arise where the damages and costs, if any, have resulted from the negligence, misfeasance or malfeasance of the Employer, its officers, employees or agents, provided, however, that such negligence, misfeasance or malfeasance took place after the execution of this Agreement; and

      2.      The FFA has the right to choose the legal counsel to defend any such suit or action, after consultation with the Employer; and

      3.      If the Employer, its officers, agents or employees elects to select its or their own counsel in any such suit, then the FFA shall have no duty to indemnify those defendants it does not represent in the suit; provided, however, that if the FFA, through counsel it selects after consultation with the Employer, does represent the Employer, its officers, agents or employees in such suit, such defendants may additionally hire their own counsel to assist in the defense of any such suit; and

      4.      The FFA, in defense of any such suit, after consultation with the Employer, has the right to decide whether to defend any said action or whether or not to appeal the decision of any court or other tribunal regarding the validity of this Section; and

      5.      The FFA, in defense of any such suit, shall have the right to compromise or settle any monetary claim made against the Employer, its officers, employees or agents under this Section, after consultation with the Employer.

      F.      This Section shall be effective for each academic year of this Agreement and all sums payable hereunder shall be determined from the beginning of each academic year. Persons becoming members of the collective bargaining unit during the course of an academic year shall have their service fee prorated over the academic year.

      G.      Payroll deduction shall be made each pay period on a *pro rata* basis throughout the academic year.

**EXHIBIT L**
**Page 120**

H.     The Employer will have no obligation to deduct or remit the dues or service fee payable for the account of any member for any pay date where his/her withholding authorization reaches the Payroll Office later than the pay ending date for each pay period one (1) week prior to each pay date.

I.     The FFA will certify, at least annually to the Employer, fifteen (15) days prior to the date of the first payroll deduction for dues or service fees, the amount of said dues and the amount of the service fee to be deducted by the Employer, and that said service fee includes only those amounts permitted by the Agreement and by law.

J.     Should the provisions of Section 2.6, Agency Shop, be found contrary to law as a result of a final decision from which no appeal is processed, and which is binding on the parties to this Agreement, the parties will meet on written request of either party to negotiate to bring Section 2.6 into compliance with any such final decision. Such negotiations are to be limited to the provisions of Section 2.6 and will not affect the terms and conditions of this Agreement which shall remain in full effect for the life of this Agreement.

K.     The procedure approved by the court in the case of <u>Lehnert v FFA/MEA/NEA, FSU, et al.</u> is incorporated by reference into this Agreement.

121

EXHIBIT L
Page 121

**Appendix E**
## LETTER OF AGREEMENT – DEPARTMENT CHAIR

**Whereas**, the FFA and Employer have previously agreed to a uniform method for selecting department chairs, and

**Whereas**, the parties desire to continue the agreement with revisions,

**THE PARTIES AGREE AS FOLLOWS:**

A. The Department Chair Position

1. A department chair, as distinguished from a department head, shall be a member of the bargaining unit.  A majority vote of members in an affected college/school is required for the creation of departmental chairs.

2. The department chair is a tenured member who manages the activities of the department, subject to the approval of the Dean. The chair is responsible to the Dean for the development of department plans, guidelines and internal office operation; directs the department's administrative organization and may delegate authority and assign responsibility in accordance with departmental policies and procedures; and represents the academic discipline both on and off campus either personally or by designation of department representatives.

3. The department chair is responsible for recommending to the Dean such matters as personnel evaluation and discipline, curricular changes, course offerings, teaching assignments, the department budget and other related responsibilities.

4. The department chair shall follow department policy and procedures and involve members in the decision-making process regarding matters of departmental concern. The department chair shall provide not less than thirty (30) calendar days for department member input before the following:

   a. Forwarding a new course or curriculum to the Dean or next level of course/curricular review;

   b. Forwarding a revision of an existing course or curriculum to the  Dean or next level of course/curricular review;

   c. Submission of the department's course schedule and proposed teaching assignments to the Dean;

   d. Submission of the annual department budget request or any other matters which the department chair and the members agree to consider.

**EXHIBIT L**
**Page 122**

5. If the department chair must take action in less than thirty (30) days or learns of the need to take action such that it is impracticable to provide thirty (30) days written notice, the chair shall provide the opportunity for input as soon as reasonably practicable. Failure to provide such opportunity shall not be the basis for either delay of such action or for overturning such action. When less than thirty (30) days written notice is given, the member may respond directly to the Dean.

6. Any referendum or vote on department matters used to determine the view of the majority of the members of a department shall be limited to the members of that department.

7. In the event a rotation list needs to be established, the initial rotation shall be based on the seniority of the affected members. A new member is added to the bottom of the rotation list as it exists on the first day the member reports for work as a bargaining unit member.

8. In all phases of department affairs, the chair should be sensitive and responsive to the sentiment of the majority of the members of the department.

9. The Chair (or faculty Director) shall not sit as a member of a Candidate Tenure Committee or the Department Tenure Committee, nor have a vote on either committee.

B. Selection and Removal

1. A committee composed preferably of a minimum of three tenured members from among the members of the department, selected in accordance with departmental policy and procedures, shall designate the tenured individual or individuals who is/are acceptable to the department to serve in the position of department chair. This list shall be sent to the Dean who will consult with the Provost and Vice President for Academic Affairs to formalize a single mutually agreed upon ballot from the list generated by the department committee. If a deletion occurs for an individual, and upon request, the Dean shall communicate the reason(s) for the deletion to the candidate and to the President of the Ferris Faculty Association. Such reason(s) shall not be reviewable through the grievance and arbitration procedure under this Agreement unless a violation of Section 2.10 is alleged. The chair shall be elected by a majority of the voting members from within the department by a secret ballot vote. Except as provided in paragraph b, below, this procedure shall apply with respect to the appointment of an interim or acting department chair. In the event that a single candidate does not receive a majority vote, the process above will be repeated and a vote shall be held within 30 days.

2. In the event there can be no agreement as to a mutually acceptable candidate for the position of department chair, the Dean, with approval of the Provost and Vice President for Academic Affairs,  may implement one or more of the following options.

   a. Option One: appoint an interim chair from among the tenured members of the department for a period not to exceed twelve (12) months provided

123

EXHIBIT L
Page 123

this appointee shall not be an individual who received support from less than 40 percent of the members of the department in the most recent election. In the event that a suitable interim chair cannot be found from among the tenured members of the department, the Dean may, with the consultation of the department members and with approval of the Provost and Vice President for Academic Affairs, appoint an interim chair from among the tenured members of the university for a period not to exceed twelve (12) months.

b. Option Two: upon a request from the majority of the members of the department or at the initiation of the Dean and following consultation with the members of the department, the Dean, with approval of the Provost and Vice President for Academic Affairs, may direct the members of the department to conduct an external search.

3. After the initial election, a department chair election shall be conducted every three (3) years. The election shall be concluded no later than April 15. A newly elected department chair shall take office August 1 of the year in which elected. An outgoing department chair shall continue to receive their stipend until the end of the summer session. Incoming department chair may petition the Dean for a Summer Transition Stipend. Should a vacancy occur during the term of office, a special election must be held under the terms described above with the newly elected chair serving until the next regularly scheduled round of departmental elections.

4. Where there is mutual agreement between the chair and the Dean as to the need for one or more assistant department chairs, such an assistant(s) shall be appointed by the chair so long as the proposed appointee receive the approval of the majority of the members of the department and the approval of the. In the event a new chair is selected for the department, the term of an assistant chair shall also terminate.

5. The Dean may remove the chair from office. Also, a majority of the members of a department may request that the Dean remove the department chair. The request from the majority of members must be in writing, must be signed by those members making the request, and must contain a statement of the reasons for the request. Given such a request, the Dean may, at his/her discretion, take such action. The removal of a chair from office by the Dean shall not be reviewable through the grievance and arbitration procedure under this Agreement unless a violation of Section 2.10 is alleged. Following the removal of a chair by the Dean, a special election must be held under the terms described above with the newly elected chair serving until the next regularly scheduled round of departmental elections.

EXHIBIT L
Page 124

C. Stipend

    1.  A member who performs the duties and responsibilities of a department chair in accordance with this Section, shall receive a payment in accordance with the following schedule:

        a.  The minimum stipend for a department chair shall be thirty-five percent (35%) of the annual nine month salary of a member plus $5000 or the 12 month annual salary of a member plus $5000. At the discretion of the Dean, additional annual stipend amounts may be awarded in recognition of salary variations based upon academic discipline. All stipends are in addition to and do not become part of the member's base salary.

        b.  A member who performs the duties of assistant department chair shall choose to either receive a stipend equal to a three credit overload for each semester/session in which the duties are performed, or receive a three credit reduction in workload for each semester/session in which the duties are performed; all without the ability to receive additional overload pay.

D. Workload Release Equivalents

A department chair shall be granted minimum workload release equivalents in accordance with the following schedule for the fall and spring semester of the academic year based on the prior academic year's number of members and Full Time Equated (FTE) non-tenure track faculty in a department. In the event that a non-tenure track faculty is assigned to fulfill this workload release equivalent, the FTE proportion of this assignment by non-tenure track faculty is exempt from the provisions of Section 19 of the current collective bargaining agreement. The FTE includes the department chair and any assistant department chair release.

E. Department Size Workload Equivalents:

1-9 members/ FTE non-tenure track faculty: 25% minimum workload release per semester; 10-20 members/ FTE non-tenure track faculty: 50% minimum workload release per semester; 21 or more members/ FTE non-tenure track faculty: 75% minimum workload release per semester.

Workload release equivalents for a department chair beyond the above minimums may be approved by the Dean for departments with complex programmatic and/or administrative responsibilities. A chair is expected to teach at least one course a semester and is not eligible to teach during the summer session.

F. Department Chair Employment Status
Department chairs shall be considered, full-year, twelve-month salaried members during their term of office. As such they will receive paid sick leave (Section 10.1), personal leave days (Section 10.7) and vacation time (Section 12.2) as set forth in the collective bargaining agreement. Department chairs are expected to work when school is not in session unless on approved leave or University designated holiday periods.

**EXHIBIT L**
**Page 125**

G. This Letter of Agreement shall expire June 30, 2023.

FOR THE FFA:

Charles Bacon, President FFA

Kurt Murray, Uniserv Director MEA

FOR THE EMPLOYER:

Paul Blake, Provost & Vice President

Steve Stratton, Director Labor Relations

126

**EXHIBIT L**
**Page 126**

**Section 21 - DURATION OF CONTRACT**

This Agreement shall be in effect from November 13, 2018 until 11:59 p.m., June 30, 2023.

**FERRIS FACULTY ASSOCIATION**

Charles Bacon, President/Chief Negotiator
Ferris Faculty Association/MEA/NEA

John Caserta, Vice President Ferris Faculty
Association/MEA/NEA

Kurt Murray, MEA UniServ Director

Aaron Waltz

Holly Price

**FERRIS STATE UNIVERSITY**

David L. Eisler, President

Paul Blake, Provost/Vice President for
Academic Affairs

James P. Greene, Chief Negotiator

Steven B. Stratton, Director of
Labor Relations

David Damari

Lincoln Gibbs

Leonard Johnson

Joseph Lipar

Steve Reifert

79

**EXHIBIT L**
**Page 127**