# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

Case No: 1:22-cv-00071

Honorable:

BARRY MEHLER,

    Plaintiff,

v.

FERRIS STATE UNIVERSITY; DAVID L. EISLER, Individually and in his Official Capacity as the President of Ferris State University; RANDY CAGLE, Individually and in his Official Capacity as the Dean of Ferris State University's College of Arts, Sciences and Education; Ferris State University's BOARD OF TRUSTEES; and Amna P. Seibold, Anna L. Ramirez-Saenz, Rupesh K. Srivastava, LaShanda R. Thomas, George K Heartwell, Kurt A. Hofman, and Ronald E. Snead, in their Official Capacities as the Trustees of Ferris State University's Board of Trustees,

    Defendants.

---

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR EMERGENCY TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

Matthew J. Hoffer (P70495)
Matt@BradShaferLaw.com
Zachary M. Youngsma (MI P84148)
Zack@BradShaferLaw.com
**Shafer & Associates, P.C.**
3800 Capital City Boulevard, Suite 2
Lansing, Michigan 48906
T: 517-886-6560
F: 517-886-6565

*Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 2

ARGUMENT ........................................................................................................... 5

I.   TRO STANDARDS ................................................................................ 5

II.  PLAINTIFF'S CIVIL RIGHTS CLAIMS ARE NOT BOUND BY THE CBA  6

III. PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE
     MERITS OF HIS FIRST AND FOURTEENTH AMENDMENT CLAIMS ... 6

     A.  Defendants Have Impermissibly Retaliated Against Plaintiff Based on the
         Content and Viewpoint of his Speech ........................................................ 6

         1.  Plaintiff's Video—his speech—is protected by the First Amendment
             and satisfies the Speech Prong ............................................................ 7

             a.  Plaintiff was speaking on matters of public concern ..................... 8

             b.  Plaintiff's interests outweigh Defendants' ..................................... 9

         2.  Defendants have taken multiple adverse actions against Dr. Mehler
             that satisfy the Adverse Action Prong ................................................ 10

         3.  Plaintiff's video was the sole motivating factor for Defendants' actions,
             thus, satisfying the Causation Prong ................................................. 13

     B.  Defendants' Application of Section 4.1(A) of the CBA and the ESD Violate
         the First Amendment ................................................................................. 14

     C.  The ESD is not Narrowly Tailored ............................................................ 16

     D.  The Letter Effectuates an Impermissible Prior Restraint ...................... 18

     E.  The ESD is Unconstitutionally Vague ...................................................... 19

     F.  The ESD is Unconstitutionally Overbroad ............................................... 21

IV.  PLAINTIFF, AND OTHERS, HAVE SUFFERED AND WILL CONTINUE
     TO SUFFER IRREPARABLE FOR WHICH THERE IS NO ADEQUATE
     REMEDY AT LAW ................................................................................. 22

V.   AN INJUNCTION WOULD CAUSE NO HARM TO OTHERS AND THE
     PUBLIC INTEREST WEIGHS IN FAVOR OF THE ENTRY OF A TRO ... 23

VI.  NO BOND SHOULD BE REQUIRED ...................................................... 25

CONCLUSION ..................................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**

Am. C.L. Union Fund of Mich. v. Livingston Cty., 796 F.3d 636 (6th Cir. 2015) ..... 24

Am. C.L. Union of Ky. v. McCreary Cty., Ky., 354 F.3d 438 (6th Cir. 2003) ........... 22

Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp., 698 F.3d 885 (6th Cir. 2012) ................................................................................ 14

Americans for Prosperity Found. v. Bonta, 141 S. Ct. 2373 (2021) ......................... 16

Anders v. Cuevas, 984 F.3d 1166 (6th Cir. 2021) ...................................................... 10

Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co., 714 F.3d 424 (6th Cir. 2013) ................................................................................. 25

Arizona Free Enter. Club's Freedom Club PAC v. Bennett, 131 S. Ct. 2806 (2011) 16

Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio, 502 F.3d 545 (6th Cir. 2007) ............................................................................................ 20

Bailey v Callagan, 715 F.3d 956, 958 (6th Cir. 2013) ................................................. 5

Bazaar v. Fortune, 476 F.2d 570 (5th Cir. 1973) ...................................................... 22

Bd. of Trustees of State Univ. of New York v. Fox, 492 U.S. 469 (1989) ................. 17

Bell v. Johnson, 308 F.3d 594 (6th Cir. 2002) ............................................................. 7

Benison v. Ross, 765 F.3d 649 (6th Cir. 2014) .......................................................... 10

Bloch v. Ribar, 156 F.3d 673 (6th Cir. 1998) ............................................................ 12

Bromley v. Michigan Educ. Ass'n-NEA, 82 F.3d 686 (6th Cir. 1996) ......................... 6

City of Erie v. Pap's A.M., 529 U.S. 277 (2000) ........................................................ 17

Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936 (9th Cir. 2011) ............................................................................................ 21

Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d 1326 (M.D. Fla. 2009) ................................................................................................. 25

Connick v. Meyers, 461 U.S. 138 (1983) ................................................................. 7, 8

Crowley v. Local No. 82, 679 F.2d 978 (1st Cir. 1982) ............................................. 25

Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro, 477 F.3d 807 (6th Cir. 2007) ............................................................................................................. 11

Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth., 975 F.3d 300 (3d Cir. 2020) ................................................................................................................ 23

Dambrot v. Cent. Mich. Univ., 55 F.3d 1177 (6th Cir. 1995) ...................................... 8

DeCrane v. Eckart, No. 1:16-cv2647, 2020 WL 2475357 (N.D. Ohio May 13, 2020) 12

Def. Distributed v. United States Dep't of State, 865 F.3d 211 (5th Cir. 2017) ........ 24

Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tenn., 274 F.3d 377 (6th Cir. 2001) ........................................................................................ 21

Diaz v. Brewer, 656 F.3d 1008 (9th Cir. 2011) .......................................................... 25

Dodds v. United States Dep't of Educ., 845 F.3d 217 (6th Cir. 2016) ...................... 23

Doe v. Harris, 772 F.3d 563 (9th Cir. 2014) .............................................................. 23

Duncan v. Becerra, 970 F.3d 1133 (9th Cir. 2020) .................................................... 17

Dye v. Off. of the Racing Comm'n, 702 F.3d 286 (6th Cir. 2012) .............................. 11

E. Brooks Books, Inc. v. Shelby Cty., Tenn., 588 F.3d 360 (6th Cir. 2009) .............. 18

Elrod v. Burns, 427 U.S. 347 (1976) .......................................................................... 22

Ex Parte Young, 209 U.S. 123 (1908) .......................................................................... 6

Fla. Businessmen for Free Enters. v. City of Hollywood, 648 F.2d 956 (5th Cir. 1981) ................................................................................................................................ 24

Fowler v. Bd. of Educ. of Lincoln Cty., Ky., 819 F.2d 657 (6th Cir. 1987) ............... 22

Frisby v. Schultz, 487 U.S. 474 (1988) ...................................................................... 17

Fritz v. Charter Twp. of Comstock, 592 F.3d 718 (6th Cir. 2010) ............................ 11

FW/PBS, Inc. v. City of Dallas, 493 U.S. 215 (1990) ................................................ 19

G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071 (6th Cir. 1994) 22

Garcetti v. Cabellos, 547 U.S. 410 (2006) ................................................................... 7

Gean v. Hattaway, 330 F.3d 758, 767 (6th Cir. 2003) ................................................ 6

Gordon v. Holder, 721 F.3d 638 (D.C. Cir. 2013) ..................................................... 24

Grayned v. City of Rockford, 408 U.S. 104 (1972) .................................................... 19

Hardy v. Jefferson Cmty. Coll., 260 F.3d 671 (6th Cir. 2001) ........................... 8, 9, 10

Harris v. Detroit Pub. Sch., 245 F. App'x 437 (6th Cir. 2007) ................................. 12

Helms v. Zubaty, 495 F.3d 252 (6th Cir. 2007) ........................................................ 14

iv

Hill v. Lappin, 630 F.3d 468 (6th Cir. 2010)............................................................. 10

Iancu v. Brunetti, 139 S. Ct. 2294 (2019) ................................................................ 15

Jackson Women's Health Org. v. Currier, 760 F.3d 448 (5th Cir. 2014)................... 23

Joelner v. Vill. of Wash. Park, 378 F.3d 613 (7th Cir. 2004) .................................... 23

Keefe v. Geanakos, 418 F.2d 359 (1st Cir. 1969)...................................................... 22

Keenan v. Daniel, 63 F. App'x 180 (6th Cir. 2003)..................................................... 11

Keyishian v. Board of Regents, 385 U.S. 589 (1967)............................................. 9, 20

KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261 (11th Cir. 2006).................. 24

Kolender v. Lawson, 461 U.S. 352 (1983) ................................................................. 19

Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 757 (1988) ................................ 19

Leonard v. Robinson, 477 F.3d 347 (6th Cir. 2007)................................................... 13

Little Rock Fam. Plan. Servs. v. Rutledge, 398 F. Supp. 3d 330 (E.D. Ark. 2019)... 24

Matal v. Tam, 137 S. Ct. 1744 (2017) ....................................................................... 15

McCreary Cty., Ky. v. Am. C.L. Union of Ky., 545 U.S. 844 (2005) ......................... 22

McCullen v. Coakley, 573 U.S. 464  (2014)......................................................... 16, 17

McCutcheon v. Fed. Election Comm'n, 572 U.S. 185 (2014)..................................... 17

McDonald v. West Branch, 466 U.S. 284 (1984).......................................................... 6

Meriwether v. Hartop, 992 F.3d 492 (6th Cir. 2021)........................................... 7, 8, 9

Miller v. City of Cincinnati, 622 F.3d 524 (6th Cir. 2010) ........................................ 14

Moltan Co. v. Eagle-Picher Indus., Inc., 55 F.3d 1171 (6th Cir. 1995)..................... 25

Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell, 467 F.3d 999 (6th Cir. 2006) ..................................................................................... 6

Nightclubs, Inc. v. City of Paducah, 202 F.3d 884 (6th Cir. 2000) ........................... 18

Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221 (10th Cir. 2005)...................... 23

Packingham v. North Carolina, 137 S. Ct. 173 (2017)............................................... 17

Parate v. Isibor, 868 F.2d 821 (6th Cir. 1989) .......................................................... 22

Peltier v. United States, 388 F.3d 984 (6th Cir. 2004)......................................... 11, 12

Phelps-Roper v. Nixon, 545 F.3d 685 (8th Cir. 2008) ................................................ 23

Pickering v. Bd. of Educ., 391 U.S. 563 (1986) ............................................................ 7

Portee v. Holland, No. CV 6:16-281-GFVT, 2018 WL 2767312 (E.D. Ky. June 8, 2018) ................................................................................................................................ 11

Reed v. Town of Gilbert, 576 U.S. 155 (2015) ..................................................... 15, 16

Rest. Assocs., Inc. v. Bd. of Adjustment of City of Fort Worth, Texas, 91 F. App'x 958 (5th Cir. 2004) ........................................................................................................ 18

Rodgers v. Bryant, 942 F.3d 451 (8th Cir. 2019) ....................................................... 23

Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819 (1995) ............ 15

S.H.A.R.K. v. Metro Parks Serving Summit Cty., 499 F.3d 553 (6th Cir. 2007) ...... 14

Scott v. Roberts, 612 F.3d 1279 (11th Cir. 2010) ....................................................... 24

Se. Promotions, Ltd. v. Conrad, 420 U.S. 546 (1975) .......................................... 18, 19

Sensabaugh v. Halliburton, 937 F.3d 621 (6th Cir. 2019) .............................. 7, 10, 13

Shuttlesworth v. City of Birmingham, Ala., 394 U.S. 147 (1969) ............................. 19

Speech First, Inc. v. Schlissel, 939 F.3d 756, 763 (6th Cir. 2019) .............................. 5

Stolle v. Kent State Univ., 610 F. App'x 476 (6th Cir. 2015) .............................. 10, 11

Sweezy v. State of N.H. by Wyman, 354 U.S. 234 (1957) ........................................... 9

Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503 (1969) .......................... 7

United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth., 163 F.3d 341 (6th Cir. 1998) .......................................................................................... 14

United States v. Albertini, 472 U.S. 675 (1985) ........................................................ 17

United States v. Stevens, 559 U.S. 460 (2010) ........................................................... 21

Vereecke v. Huron Valley Sch. Dist., 609 F.3d 392 (6th Cir. 2010) .......................... 13

Virginia v. Hicks, 539 U.S. 113 (2003) ...................................................................... 21

Washington State Grange v. Washington State Republican Party, 552 U.S. 442 (2008) ................................................................................................................................ 21

Wenk v. O'Reilly, 783 F.3d 585 (6th Cir. 2015) ........................................................ 11

Wooley v. Maynard, 430 U.S. 705 (1977) .................................................................... 7

Wurzelbacher v. Jones-Kelley, 675 F.3d 580 (6th Cir. 2012) .................................... 11

**Other Authorities**

Employee and Student Dignity Policy, Ferris State University, https://www.ferris.edu/administration/adminandfinance/human/Forms/HRPPs/E mployeeDignity.pdf (last visited Jan. 24, 2022)..................................................20

Mission Statement, FSU, https://www.ferris.edu/ferrisfaq/mission.htm#:~:text=Ferris%20State%20Univer sity's%20Vision%20Statement,for%20a%20dynamic%20global%20society (last visited Jan. 25, 2022) ..........................................................................................25

# INTRODUCTION

COVID-19 is deadly. But at Ferris State University, freedom of speech and academic freedom are deadlier. While the prevalence of COVID-19 may not justify removing a professor from the classroom at Ferris State University ("FSU or the "University"), critiquing its COVID-19 policies sure does. And that's not the only censorship it warrants. Apparently, it warrants a complete ban from campus, a broad gag order, suspension, and an erasure of the professor's faculty biography webpage and class Canvas pages. And for what? For speech. For speech critical of those in positions of power.

Prof. Barry Mehler, Ph.D. ("Plaintiff" or "Dr. Mehler"), is a tenured professor who has served the University with distinction for over 30 years. Over the past two or so decades, Dr. Mehler has developed and used "The Show," a performance by him that includes strong themes, colorful language, and modern cultural references, to capture students' attention and challenge them to think critically.

On January 9, 2022, Dr. Mehler included a performance of The Show in an introductory video for his history classes and shared it with his students via a private URL. The Show retread classic ground. It included an adaptation of a coarse scene from the television series *Deadwood* to dramatically illustrate plagiarism and informed his students that course grading was based on the Calvinistic doctrine of predestination to draw attention to his syllabi. The Show also addressed the topic du jour: COVID-19. It included reading a Clemson University professor's letter to the editor published by the New York Times that criticized that university's lack of a vaccine mandate.

In response, FSU not only placed Dr. Mehler on paid leave pending an investigation, but it removed his coursework web pages, deleted his faculty profile from the University webpage, banned him from campus, and directed him not to speak of the matter with current or former students or faculty.

To restore Dr. Mehler's basic constitutional rights, this Motion follows.

## STATEMENT OF FACTS

Prof. Barry Mehler, Ph.D., is a tenured professor who has served as an instructor at Ferris State University for over 30 years. [Verified Complaint, ECF 1, ("Verified Compl."), at ¶¶ 2, 33-34, PageID.2, 6]. Dr. Mehler's distinguished academic career began in 1976 as a Fellow Research Associate in the History of Science department of Washington University. [Id. at ¶ 32, PageID.6]. From there, he spent time at the University of Illinois and in 1988 began teaching at FSU in its Department of Humanities as an instructor. [Id. at ¶ 34]. Dr. Mehler earned tenure in 1994. [Id.].

Throughout his career, Dr. Mehler has developed a certain pedagogy aimed at capturing and maintaining his students' attention and encouraging them to think critically. He is well known at FSU, and beyond, for his teaching philosophy of "Thinking History vs Teaching History." [Verified Compl., at ¶ 37, PageID.7]. His pedagogy centers on designing his class, particularly early on in the semester, as a TV variety show. [Id.]. He refers to this as "The Show," which he previously titled, "Sympathy for the Devil," and more recently, "More Bad News," (both brought to you by Camel Cigarettes). [Id. at ¶ 38]. The Show is edgy and a bit irreverent by design. The Show contains profanity, soliloquies, cultural references, jokes about the Calvinist doctrine of predestination, a plagiarism lesson, and a discussion of his attendance policy.

The Show is well known to FSU and its administrators. In 2014, Dr. Mehler applied for a merit-based promotion. In his essay in support of the promotion, he explains The Show and his use of The Show to stimulate and engage with his students. [Verified Compl., at ¶¶ 41-42, PageID.7]. FSU granted Dr. Mehler's promotion request. [Id. at ¶ 45, PageID.8]. Later, in 2016, Defendant Cagle's predecessor, Dr. Kristi L. Haik, along with her assistant and interim Dean, Trinidy Williams, sat with the students and viewed The Show; complete with profanity and

the use of a *Deadwood* scene as an illustration of plagiarism. [Id. at ¶ 51, PageID.9]. After viewing The Show, Defendant Cagle's predecessor hugged Dr. Mehler, applauded The Show, and conveyed that she wished she had a professor like Dr. Mehler when she was in school. [Id. at ¶ 52]. The following year, 2017, Dr. Mehler was nominated for the Distinguished Teaching Award. Members of the Award Selection Committee all attended a number of Dr. Mehler's lectures and saw The Show for themselves. [Id. at ¶¶ 53-54].

In 2014, Dr. Mehler took The Show beyond the classroom and brought it to FSU at large. On April 4, 2014, on FSU's campus, Dr. Mehler presented a "Passion for the Past" series sponsored by FSU's Honors Program. [Verified Compl., at ¶ 46, PageID.8]. In 2015, Dr. Mehler was nominated for a Distinguished Teaching Award. [Id. at ¶ 47]. In his consent to nominate write up, Dr. Mehler described his pedagogy as:

> My teaching techniques are totally original.  Two days before the new semester started this Fall, I sent all my students an email welcoming them to the new season of my show, "Sympathy for the Devil."  The attachment was headed: "WARNING," in inch high bold red print. Below the student reads:
>
>> Dr. Mehler's show, "Sympathy for the Devil," is rated NC-17 – NOT FOR CHILDREN, CHILDREN NOT ADMITTED.  The show contains gratuitous violence, lots of profanity and all kinds of perversions.  The show is about American history and therefore contains insulting depictions of virtually every racial, ethnic and religious group. If profanity offends you or you do not want to have your values challenged, please do not take this class.  This is Satan's show and no respect is show to prophets or saints of any description.
>
> My courses are all designed as a TV variety show entitled, "Sympathy for the Devil." The idea is to present the course material in an unusual way which takes the students out of the normal classroom environment and transports them onto the set of a TV show, where the rules of the game are all new and strange. None of this is explained.  The medium is the message. Many students have reported in their initial journals, a collective experience of bewilderment, often expressed as, "Am I in the right room? This can't be a history class?"

[Id. at ¶ 48].

Fast-forward to January of 2022. Dr. Mehler is scheduled to instruct two sections of History 122, two sections of History 230, and one section of History 361 for the 2022 Spring Semester term. [Verified Compl., at ¶¶ 74, 80, PageID.12-14]. Along with providing each section a copy of the course specific syllabus, Dr. Mehler uploads course-specific videos for each course that orients the students to him, his teaching style, the class, and his syllabus. [Id. at ¶ 80]. Dr. Mehler then uploads to Youtube and distributes via a private URL a 14 minute 14 second video recording of The Show (hereafter, the "Video"). [Id. at ¶¶ 77-78]. The Video is available for viewing at this link: https://youtu.be/RrOzY86YcEM (last visited Jan. 25, 2021).

Describing the Video does not do it justice. It is peppered with jokes, cultural references, acting, profanity, irreverence, soliloquy, and sarcasm. It begins with Dr. Mehler in a helmet pretending to have landed on earth from the fictitious *Star Trek* planet Ringel VII (in the *Star Trek* series Ringel VII is a quarantined planet) where he references Earth's current COVDI-19 Pandemic. He jokes about how this new season of The Show is brought to his students by Camel Cigarettes. He then moves into a profanity laced soliloquy adapted from the popular television series *Deadwood*, plays the actual *Deadwood* scene from which his soliloquy was adopted, and uses this to pivot to a discussion and lesson plagiarism.

Next, Dr. Mehler transitions to answering his students' burning question of how to get an A in his class. Dr. Mehler jokes that his grading style is adopted from the Calvinist doctrine of predestination where grades are randomly assigned. He then discusses his attendance policy and his COVID-19 concerns. He shares a letter from the *New York Times* written by a Clemson University professor that details the impact COVID-19 has on the classroom. Dr. Mehler then voices his concern about COVID-19 and FSU's policies to address COVID-19 and concludes by informing his students his class is set up where everything they need to get an A is available online.

He makes clear, however, that he will be conducting in person classes because, pursuant to FSU policy, he has no choice.

Shortly after uploading the Video on January 9, 2022, the Video went viral—Dr. Mehler became a YouTube sensation. [Verified Compl., at ¶ 97, PageID.16]. As of January 25, 2022, the Video had been viewed more than 528,000 times and the Video is also showing up on the popular app. TikToc.  On January 11, 2022, Dr. Mehler received a letter from Defendant Cagle (the "Letter") informing him that he had been placed on immediate paid suspension and that he was 1) banned from campus, 2) under investigation for potentially violating Section 4.1(A) of the Faculty and Administrators' Collective Bargaining Agreement (the "CBA") and Section 8-701 of the University's Policies (the "ESD" for Employee and Student Dignity policy), 3) forbidden to talk to current and former students or colleagues regarding the investigation, and was forbidden from using his University e-mail account to communicate with any students; all as a result of the Video. [Id. at ¶¶ 84-85, 96, PageID.14, 16]. The University also removed Dr. Mehler's faculty biography page from its website and removed Dr. Mehler's classes' Canvas, a course management program, pages. Defendants made the choice to suspend Dr. Mehler from his instructional duties while investigating his pedagogy.  [Id. at 95, PageID.16].

This action follows.

ARGUMENT

## I.    TRO STANDARDS.

When determining whether to grant or deny a motion for preliminary injunction, this Court must weigh: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. Speech First, Inc. v. Schlissel, 939 F.3d 756, 763 (6th Cir. 2019) (quoting

Bailey v Callagan, 715 F.3d 956, 958 (6th Cir. 2013)). "[T]he same factors [are] considered in determining whether to issue a TRO or a preliminary injunction." Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell, 467 F.3d 999, 1009 (6th Cir. 2006). Plaintiff's request for a TRO is permitted under Ex. Parte Young's exemption to Eleventh Amendment immunity, which "allows suits against state actors in their official capacities for injunctive relief because such actions are not deemed to be part of the state." Gean v. Hattaway, 330 F.3d 758, 767 (6th Cir. 2003) (citing Ex Parte Young, 209 U.S. 123, 155-56 (1908)).

These standards demand the entry of a TRO and preliminary injunction here.

## II.    PLAINTIFF'S CIVIL RIGHTS CLAIMS ARE NOT BOUND BY THE CBA.

Though the CBA contains a mandatory arbitration provision [*see generally*, **Ex. L**, PageID.160-161], mandatory arbitration provisions in a union contract do not preclude § 1983 actions. "The statutory right to have an Article III court adjudicate suits brought pursuant to § 1983 for vindication of rights secured by the First Amendment of the Constitution cannot be foreclosed by non-statutory arbitration conducted by a privately appointed decisionmaker." Bromley v. Michigan Educ. Ass'n-NEA, 82 F.3d 686, 692 (6th Cir. 1996) (citing McDonald v. West Branch, 466 U.S. 284 (1984).

In other words, Dr. Mehler does not need to exhaust his remedies or procedures under the CBA before bringing his § 1983 claims—his claims are properly before the Court. Indeed, Defendants are expected to argue that they have not yet taken any adverse *employment* action against Dr. Mehler within the meaning of the CBA.  [Ex. L, §4.1(B), PageID.135]

## III.   PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON HIS FIRST AND FOURTEENTH AMENDMENT CLAIMS.

### A. Defendants Have Impermissibly Retaliated Against Plaintiff Based on the Content and Viewpoint of his Speech.

In order to state a First Amendment retaliation claim, Dr. Mehler must establish three elements: 1) he engaged in protected conduct [the "Speech" prong]; 2) Defendants took one or more adverse actions against him that would deter a person of ordinary firmness from continuing to engage in that conduct [the "Adverse Action" prong]; and 3) the adverse action was motivated at least in part by his conduct [the "Causation" prong]. Sensabaugh v. Halliburton, 937 F.3d 621, 628 (6th Cir. 2019) (quoting Bell v. Johnson, 308 F.3d 594, 602 (6th Cir. 2002)). Each of these prongs certain nuisances that are fleshed out, *infra*.

### 1. *Plaintiff's Video—his speech—is protected by the First Amendment and satisfies the Speech Prong.*

Starting with the basics: "The First Amendment protects 'the right to speak freely[.]'" Meriwether v. Hartop, 992 F.3d 492, 503 (6th Cir. 2021) (quoting Wooley v. Maynard, 430 U.S. 705, 714 (1977)). "Courts have often recognized that the Free Speech Clause applies at public universities," thus, "the state may not act as though professors or students 'shed their constitutional rights to freedom of speech or expression at the' university 'gate.'" Id. (quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969)).

Because normally, pursuant to Garcetti v. Cabellos, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment Purposes," thus, the "Constitution does not insulate their communications from employer discipline," 547 U.S. 410, 421 (2006), the Sixth Circuit applies "the longstanding Pickering-Connick framework to determine whether [Dr. Mehler] has plausibly alleged that his in-class speech was protected by the First Amendment." Meriwether, 992 F.3d at 507. Under that framework, the court asks two questions: "First, was [Dr. Mehler] speaking on a 'matter of public concern'? And second, was his interest in doing so greater than the university's interest in 'promoting the efficiency of the public services it performs through' him?"

7

Id. (internal citations omitted) (quoting <u>Connick v. Meyers</u>, 461 U.S. 138, 146 (1983);
<u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568 (1986)).

### a.  Plaintiff was speaking on matters of public concern.

"To determine whether speech involves a matter of public concern, we look to the
'content, form, and context of a given statement, as revealed by the whole record.'"
<u>Meriwether</u>, 992 F.3d at 508 (quoting <u>Connick</u>, 461 U.S. at 147-48). Speech addresses
a matter of public concern when it relates "to *any matter* of political, social, or other
concern to the community[.]" <u>Connick</u>, 461 U.S. at 146 (emphasis added). In
particular, "[b]ecause the essence of a teacher's role is to prepare students for their
place in society as responsible citizens, *classroom instruction will often fall within the
Supreme Court's broad conception of 'public concern.'*" <u>Hardy v. Jefferson Cmty. Coll.</u>,
260 F.3d 671, 679 (6th Cir. 2001) (emphasis added). "'The linchpin of the inquiry is,
thus, for both public concern and academic freedom, the extent to which the speech
advances an idea transcending personal interest or opinion which impacts our social
and/or political lives.'" <u>Meriwether</u>, 992 F.3d at 508 (quoting <u>Dambrot v. Cent. Mich.
Univ.</u>, 55 F.3d 1177, 1189 (6th Cir. 1995)).

Here, the Video was the introduction to all three sections of Dr. Mehler's classes.
It discussed, among other things, plagiarism, Dr. Mehler's attendance policy, Dr.
Mehler's COVID-19 policy, and it introduced himself and his pedagogy to his
students. Dr. Mehler's Video expressed viewpoints regarding COVID's disparate
impact on the elderly population, FSU's administration's over-involvement in
regulating Professors' pedagogy, and Dr. Mehler's disagreement with FSU's COVID-
19 policy. These were irreverently made for the purpose of informing the public
debate—making his students think critically about the issues of the day.

Given the broad interpretation of what is and is not public concern, the Video clearly touches on a "matter of political, social, or other concern to the community." <u>Connick</u>, 461 U.S. at 146.

### b. Plaintiff's interests outweigh Defendants' interests.

This test requires a balancing of "'the interests of the' professor 'as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs thorough its employees.'" <u>Meriwether</u>, 992 F.3d at 509 (quoting <u>Pickering</u>, 391 U.S. at 568).

Here, as with the professor in <u>Meriwether</u>, "in the college classroom there are three *critical* interests (*all supporting robust speech protection*): (1) the students' interest in receiving informed opinion, (2) the professor's right to disseminate his own opinion, and (3) the public's interest in exposing our future leaders to different viewpoints." <u>Meriwether</u>, 992 F.3d at 507 (emphasis added). As to the second and third interests, the "'robust tradition of academic freedom in our nation's post-secondary schools,'" "*alone offers a strong reason to protect*" Dr. Mehler's speech. <u>Id.</u> (emphasis added) (quoting <u>Hardy v. Jefferson Cmty. Coll.</u>, 260 F.3d 671, 680 (6th Cir. 2001)) As the Sixth Circuit points out, "[a]fter all, academic freedom is 'a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.'" <u>Id.</u> (quoting <u>Keyishian v. Bd. of Regents of Univ. of State of N. Y.</u>, 385 U.S. 589, 603 (1967)).

Moreover, Dr. Mehler's Video espoused, among other things, his disagreement with Defendants' COVID-19 policies, the Calvinist beliefs, and the health effects of smoking. Given that his students have an "interest in hearing even contrarian views," <u>Meriwether</u>, 992 F.3d at 510 (quoting <u>Sweezy v. State of N.H. by Wyman</u>, 354 U.S. 234, 250 (1957)), and the strong interest in exposing future leaders to a variety of viewpoints, it's nearly uncontestable that the balance swings heavily in Dr. Mehler's

favor. This is particularly acute in secondary education where "[t]eachers and students *must always* remain free to inquire, to study and to evaluate, and to gain new maturity and understanding.'" Id. (emphasis added) (quoting Sweezy, 354 U.S. at 250).

Defendants will no doubt point to their interest in "promoting efficiency in the educational services" FSU provides. Hardy, 260 F.3d at 680. Dr. Mehler's most recent production of the Show via the Video cannot be said to disrupt that interest. The Video's production of the Show is largely the same as the version FSU administrators witnessed in 2014. There, Defendant Cagle's predecessor, Dr. Kristi Haik, praised the Show and FSU gave Dr. Mehler a merit based promotion. [Verified Compl., at ¶¶ 51-52, PageID.9]. Put plainly, Dr. Mehler's Show has never interrupted FSU's efficiency and has only added to its educational services.

### 2. *Defendants have taken multiple adverse actions against Dr. Mehler that satisfy the Adverse Action Prong.*

Dr. Mehler asserts that Defendants took the following adverse actions against him; each of which would, independently and certainly collectively, deter a person of ordinary firmness from future First Amendment activities: 1) banning him from campus, 2) removing his classes' Canvas pages, 3) describing his speech to the news media as "profane, offensive, and disturbing," 4) prohibiting him from speaking with current and former students and colleagues, and 5) removing his faculty biograph webpage from FSU's website.

"[A]n adverse action [is] 'one that is *capable* of deterring a person of ordinary firmness form exercising the constitutional right in question," "the deterrent effect on speech '*need not be great' to be actionable*." Anders v. Cuevas, 984 F.3d 1166, 1176 (6th Cir. 2021) (some emphasis added) (quoting Hill v. Lappin, 630 F.3d 468, 472 (6th Cir. 2010); Thaddeous-x v. Blatter, 175 F.3d 3789, 397 (6th Cir. 1999)); *see also* Sensabaugh, 937 F.3d at 628 (quoting Benison v. Ross, 765 F.3d 649, 659 (6th Cir.

2014)) ("To establish an adverse action for First Amendment retaliation purposes, 'a plaintiff must show that the action would chill or silence a person of ordinary firmness from future First Amendment activities.'"). This is an objective test, *e.g.*, Stolle v. Kent State Univ., 610 F. App'x 476, 483 (6th Cir. 2015); Keenan v. Daniel, 63 F. App'x 180, 181–82 (6th Cir. 2003); Portee v. Holland, No. CV 6:16-281-GFVT, 2018 WL 2767312, at *4 (E.D. Ky. June 8, 2018), and "[a] plaintiff need not show that he was 'actually deterred' from exercising his free speech rights." Stolle, 610 F. App'x at 483 (quoting Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro, 477 F.3d 807, 822 (6th Cir. 2007)).

Here, it is important not to confuse Plaintiff's claims. Plaintiff is not claiming relation under any employment related law, as with Peltier v. United States, 388 F.3d 984 (6th Cir. 2004) (Title VII discrimination claims), which several opinions that confuse these claims rely upon; rather, Plaintiff is claiming an adverse action strictly under the First Amendment. The distinguishment is important because in the First Amendment context, the thrust of the inquiry is whether a person of ordinary firmness would be deterred; whereas, in the employment context, the battle is usually over whether the acclaimed adverse action nests into one of caselaw's pigeonholed actions, *i.e.* "'actions such as discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote.'" Id. (quoting Dye v. Off. of the Racing Comm'n, 702 F.3d 286, 303 (6th Cir. 2012)); *see* Stolle, 610 F. App'x at 483 (listing these adverse actions "[i]n the employment law context"); Wenk v. O'Reilly, 783 F.3d 585, 595 (6th Cir. 2015) (comparing the term "adverse action" in the ADA context and the First Amendment context).

The Sixth Circuit addressed the difference in Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 583 (6th Cir. 2012). There, after listing the adverse actions in the employment context, it notes that "[i]n the First Amendment context, . . . we have held that 'any action that would deter a person of ordinary firmness from exercising

11

protected conduct will' constitute a sufficient adverse action, 'which may include harassment or publicizing facts damaging to a person's reputation.'" <u>Wurzelbacher</u>, 675 F.3d at 583 (quoting <u>Fritz v. Charter Twp. of Comstock</u>, 592 F.3d 718, 724 (6th Cir. 2010)). In those cases, the adverse action must be something more than an inconsequential or de minimis injury. <u>Id.</u> As the Northern District of Ohio recently reminded, however, "[t]he gravity of the adverse action is not key . . . courts have often repeated that, [in the First Amendment retaliation context], something as trivial as refusing to hold a birthday party for a public employee is actionable when intended to punish for exercising free speech rights." <u>DeCrane v. Eckart</u>, No. 1:16CV2647, 2020 WL 2475357, at *7 (N.D. Ohio May 13, 2020), <u>aff'd in part, appeal dismissed in part,</u> 12 F.4th 586 (6th Cir. 2021) (citing <u>Rutan v. Republican Party of Ill.,</u> 497 U.S. 62, 76 n.8 (1990)); <i>see also</i> <u>Bloch v. Ribar</u>, 156 F.3d 673, 681 (6th Cir. 1998) (releasing confidential and humiliating information constitutes an adverse action).

Here, Dr. Mehler's colleagues, when viewing Defendants' actions towards him objectively, would certainly be chilled from engaging in First Amendment speech. What FSU professor in their right mind would want their biography page—their academic account—pulled from FSU's website or be banned from campus or be banned from talking to their friends? What dedicated professor would, knowing that their speech could result in their inability to engage with, teach, mentor, and grow the minds of their pupils, would engage in speech Defendant Eisler could whimsically label "profane, offensive, disturbing" and non-reflective of FSU and its values? More broadly, what employee, whose boss just took the actions Defendants did, would engage in speech as Dr. Mehler did? The answers are obvious, no one would, thus, Defendants actions meet the adverse action prong.

To the extent Defendants will point to the Sixth Circuit's jurisprudence that holds "suspension with pay and full benefits pending a timely investigation into suspected

wrongdoing is not an adverse employment action,'" Harris v. Detroit Pub. Sch., 245 F. App'x 437, 443 (6th Cir. 2007) (quoting Peltier, 388 F.3d at 988), Dr. Mehler reminds Defendants that the term "adverse action," in the strict First Amendment context, refers to any action that would deter a person of ordinary firmness. To restate, Dr. Mehler is not asserting that his suspension with pay is the adverse action; rather, he is asserting that Defendants actions as listed at the beginning of this subsection, each one individually and certainly collectively, constitute adverse action[s] that would deter persons of ordinary firmness.

Stated plainly, the Court should look past such adornments Defendants will no doubt sprinkle throughout their brief and focus on the true inquiry—whether their actions would deter a person of ordinary firmness from engaging in First Amendment activity. An adverse employment action is a sufficient, but not a necessary retaliatory act to trigger First Amendment Protections.

### 3. *Plaintiff's Video was the sole motivating factor for Defendants' actions, thus, satisfying the Causation Prong.*

"To show causation, [Dr. Mehler], 'must demonstrate that the speech at issue represented a substantial or motivating factor in the adverse employment action,'" which "'is essentially but-for caus[ation][.]'" Sensabaugh, 937 F.3d at 629 (quoting Vereecke v. Huron Valley Sch. Dist., 609 F.3d 392, 400 (6th Cir. 2010); Leonard v. Robinson, 477 F.3d 347, 355 (6th Cir. 2007)).

Here, it cannot be contested that the Video is the but for cause of Defendants' actions—Defendant Cagle stated as much: "This e-mail is to inform you" of the various actions Defendants are taking against you "pending investigation of the posting of your video[.]" [**Ex. J**, PageID.111]; *see also* [Id. at PageID.112 (identifying the Video as the "reason" FSU has to believe that Dr. Mehler may have engaged in misconduct). This prong is met.

Because all required elements of Dr. Mehler's First Amendment retaliation claim against Defendants are met, Dr. Mehler has a substantial likelihood of success on the merits of this claim.

### B. Defendants' Application of Section 4.1(A) of the CBA and the ESD Violate the First Amendment.

"To determine the constitutionality of a government restriction on speech on publically-owned property, we must considered three questions: (1) whether the speech is protected under the First Amendment; (2) what type of forum is at issue and, therefore, what constitutional standard applies; (3) whether the restriction on speech in question satisfies the constitutional standard for the forum." Miller v. City of Cincinnati, 622 F.3d 524, 533 (6th Cir. 2010) (citing S.H.A.R.K. v. Metro Parks Serving Summit Cty., 499 F.3d 553, 559 (6th Cir. 2007)).

Clearly, as discussed in depth, *supra*, Dr. Mehler's speech is protected under the First Amendment. And, to avoid a detailed forum analysis at this stage—*in arguendo* for the purposes of this TRO request—Dr. Mehler will stipulate that his classes are subject to a nonpublic forum analysis. "The government may limit access to a nonpublic forum 'based on subject matter and speaker identity so long as [1] the distinctions drawn are reasonable in light of the purpose served by the forum and [2] are viewpoint neutral.'" Miller, 622 F.3d at 535 (clarification added) (quoting Helms v. Zubaty, 495 F.3d 252, 256 (6th Cir. 2007)).

Here, the restrictions drawn by Defendants via the Letter denying Dr. Mehler access to his classrooms are neither reasonable nor, as applied, viewpoint neutral. "The reasonableness inquiry turns on 'whether the proposed conduct would actually interfere with the forum's stated purposes.'" Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp., 698 F.3d 885, 892 (6th Cir. 2012) (quoting United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth., 163 F.3d 341, 358 (6th Cir. 1998)). The Show has never interfered with the classroom's purpose

before; rather, it has been praised as a teaching tool. Also, the distinctions are unreasonable because they constitute an impermissible prior restraint, as discussed, *infra*, Sec. III.D.

The distinctions are not, as applied, viewpoint neutral. "Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" Reed v. Town of Gilbert, 576 U.S. 155, 168 (2015) (quoting Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 829 (1995)). The restrictions suffer from two forms of viewpoint discrimination.

First, the restrictions are viewpoint based for the same reasons the Patent and Trademark Office's ("PTO") ban on "immoral," "scandalous," and "disparaging" trademarks were viewpoint based in Iancu v. Brunetti, 139 S. Ct. 2294 (2019) and Matal v. Tam, 137 S. Ct. 1744 (2017). Iancu and Tam both dealt with the PTO denying various trademarks based on its rules that prohibited registration of marks that were "immoral," "scandalous," (Iancu) and "disparaging," (Tam). The Supreme Court struck down the disparaging regulation first in Tam noting that, as here, "[g]iving offense is a viewpoint." Tam, 137 S. Ct. at 1763. Defendants clearly believe Dr. Mehler's speech is offensive—just ask Defendant Eisler, who was happy to tell any news outlet willing to listen that "this video . . . is . . . *offensive*[.]" [*E.g.*, **Exs. M-P**, PageID.244, 247, 249, 250].

Just as the Supreme Court had to remind the PTO of the "bedrock First Amendment principle" that the "government cannot discriminate against ideas that offend," Iancu, 139 S. Ct. 2299, for its efforts to resist registering "offensive" marks like the "Slants," for an Asian-American band (Tam), or "FUCT" for a clothing brand (Iancu), so to must this Court remind Defendants that they cannot trample Dr. Mehler's First Amendment rights simply because they find it offensive to be referred to, in a plagiarism soliloquy, as "limbered-dick cocksucker[s]." [**Ex H**, PageID.105].

15

Second, Defendant Eisler's statements further evince that Defendants' have taken one side in the academic freedom/pedagogy debate. Professors whose classroom instruction is dignified, agreeable, and pacific—being antonyms for Defendant Eisler's chosen adjectives—will not receive the treatment Dr. Mehler has. But those that cross the opaque, faint, and undefined lines that Defendants happen to find offensive that morning[1] are cast out and denied access.

Finally, viewpoint discrimination, wherever found, is subject to strict scrutiny. *See* Reed, 576 U.S. at 165, 168-69 (noting facially content based laws are subject to strict scrutiny and viewpoint discrimination is the more blatant and egregious form of content discrimination). Strict scrutiny "'requires the [Defendants] to prove that the restriction furthers a compelling interest that is narrowly tailored to achieve that interest.'" Reed, 576 U.S. at 171 (quoting Arizona Free Enter. Club's Freedom Club PAC v. Bennett, 131 S. Ct. 2806, 2817 (2011)). Under strict scrutiny, "the government must adopt 'the *least restrictive* means of achieving a compelling state interest[.]'" Americans for Prosperity Found. v. Bonta, 141 S. Ct. 2373, 2383 (2021) (quoting McCullen v. Coakley, 573 U.S. 464, 478 (2014)).

Here, Defendants lack a compelling state interest. Defendants have also not chosen the least restrictive means to accomplish whatever interest they claim. A complete ban is nearly impossible to justify as the least restrictive option and certainly is not here. A lesser restrictive approach to enforcing the CBA and the ESD would be to wait for a harassment complaint to actually be made and then address the issue pursuant to the CBA.

### C. The ESD is not Narrowly Tailored.

The level of scrutiny applied to the ESD depends on whether it is content-based or content neutral. Here, however, that is a distinction without a difference—both

---

[1] Previous administrations found Dr. Mehler's work to be promotion worthy.

intermediate and strict scrutiny require the ESD to be narrowly tailored to either a compelling state interest (strict scrutiny) or to an important state interest (intermediate scrutiny). *Compare* Ams. for Prosperity Found., 141 S. Ct. at 2383 (under strict scrutiny, the law must be necessary to a compelling state interest and must be the least restrictive (of expression) means available to achieve that interest), *with* City of Erie v. Pap's A.M., 529 U.S. 277, 301 (2000) (emphasis added) (under intermediate scrutiny, the restriction can be "no greater than is essential to the furtherance of the government interest."), and McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 218 (2014) (quoting Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989)) (noting "[e]ven when the Court is not applying strict scrutiny, we still require" the government employ "'a means narrowly tailored to achieve the desired objective'"); and McCullen v. Coakley, 573 U.S. 464, 486  (2014) (emphasis and clarification added) ("To meet the requirement of narrow tailoring [under intermediate scrutiny], the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interest[.]").[2]

Here, assuming a compelling interest in preventing harassment exists, the ESD tasks "the President, or his/her designee," with "establish[ing] and administer[ing] University policy to support" the policy. As interpreted by Defendants, that includes

---

[2] McCullen and McCutcheon completed the shift *away* from the deferential intermediate scrutiny standard of United States v. Albertini, and to an enhanced obligation placed on the government. 472 U.S. 675, 689 (1985) (noting narrow tailoring is satisfied "so long as the neutral regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation."). The McCullen and McCutcheon intermediate scrutiny standard has recently been reiterated by the Supreme Court as: "the law must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" Packingham v. North Carolina, 137 S. Ct. 173, 1736 (2017) (quoting McCullen, 573 U.S. at 486). The Ninth Circuit more recently described the standard as one that "has bite" and is a "demanding test" that requires a "searching inquiry" and "scrutinize[s] a challenged law with a healthy dose of skepticism," void of any "*Chevron*-like deference[.]" Duncan v. Becerra, 970 F.3d 1133, 1165 (9th Cir. 2020).

completely banning speech, banning speakers, and suspending tenured professors for their speech. Complete bans are hardly ever found to meet narrow tailoring and are only narrowly tailored "if each activity within the proscription's scope is an appropriately targeted evil." Frisby v. Schultz, 487 U.S. 474, 485 (1988). If the targeted evil is harassment, a complete speech ban is not the least restrictive means of accomplishing that. A significantly less restrictive means would be to first, await an actual complaint of harassment as a result of the Video and then address the issue under the CBA; not a complete ban on speech. Another example of a less restrictive action would be to ban Dr. Mehler from having contact with the individual complainant(s); not banning him from campus and from speaking to his students and colleagues.

### D. The Letter Effectuates an Impermissible Prior Restraint.

Laws, orders, edicts, statutes, ordinances, etc., that regulate speech and are "contingent on the discretion of an official are burdens of speech classified as prior restraints." Rest. Assocs., Inc. v. Bd. of Adjustment of City of Fort Worth, Texas, 91 F. App'x 958, 962 (5th Cir. 2004); Nightclubs, Inc. v. City of Paducah, 202 F.3d 884, 889 (6th Cir. 2000) (citing Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1973)) ("A 'prior restraint' exists when speech is conditioned upon the prior approval of public officials."). Constitutionally invalid prior restraints result from "one or both of two evils (1) the risk of censorship associated with the vesting of unbridled discretion in government officials; and (2) the risk of indefinitely suppressing permissible speech when a licensing law fails to provide prompt issuance of a license." E. Brooks Books, Inc. v. Shelby Cty., Tenn., 588 F.3d 360, 369 (6th Cir. 2009) (cleaned up).

Here, Defendants' impermissible prior restraint takes the former form and results from the Letter, which precludes Dr. Mehler from certain speech and from speech altogether on FSU's campus. Though "not unconstitutional per se," a "system of prior restraint . . . 'comes to this Court bearing a heavy presumption against its

constitutional validity,'" <u>Se. Promotions</u>, 420 U.S. at 558, and "the State carries a heavy burden of showing justification for the imposition of such a restraint." <u>Cap. Cities Media, Inc. v. Toole</u>, 463 U.S. 1303, 1305 (1983) (cleaned up). This presumption flows from "a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." <u>Se. Promotions</u>, 420 U.S. at 558.

A prior restraint is unconstitutional when it "places 'unbridled discretion in the hands of a government official or agency[.]'" <u>FW/PBS, Inc. v. City of Dallas</u>, 493 U.S. 215, 225 (1990) (quoting <u>Lakewood v. Plain Dealer Pub. Co.</u>, 486 U.S. 750, 757 (1988)). To obviate this unbridled discretion, the restraint must be "accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech." <u>Se. Promotions</u>, 420 U.S. at 559. More specifically, a prior restraint is only constitutional when the scheme contains "narrow, objective, and definite standards to guide the licensing authority[.]" <u>Shuttlesworth v. City of Birmingham, Ala.</u>, 394 U.S. 147, 151 (1969)

Here, there are no standards to reign in Defendants' censorship. The Letter cites to § 4.1(A) of the CBA and the ESD as the basis for its censorship; however, neither of those provisions contain any standards to guide the administrators' approach to dealing with protected speech. Because there are no standards to guide administrators and because Defendants unilaterally vest themselves with complete censorious power to eliminate speech and speakers, the Letter is an unconstitutional prior restraint.

### E.  The ESD is Unconstitutionally Vague.

Laws that are so vague that they cannot be readily understood by persons of common intelligence deny due process and are, therefore, unconstitutional. <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972). To pass muster, the law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited,

so that he may act accordingly," and must provide clear guidance to officials so that there is not ad hoc, arbitrary, or discriminatory enforcement. Id.; Kolender v. Lawson, 461 U.S. 352, 358 (1983). These constitutional concerns are heightened when a vague law "abuts upon sensitive areas of basic First Amendment freedoms." Grayned, 408 U.S. at 109. Most notably, "'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis.'" Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio, 502 F.3d 545, 551 (6th Cir. 2007) (quoting Grayned, 408 U.S. at 108-09). Succinctly put, *precision in draftsmanship* is the touchstone of constitutionality for a law that impacts upon First Amendment rights. *See, e.g.*, Keyishian, 385 U.S. at 603-04; Reno, 521 U.S. at 871-72.

FSU's actions with regard to the Show demonstrate the ESD's vagueness by its subjective and ad hoc enforcement. Dr. Mehler has been presenting the Show, which the Video encapsulates, since at least 2014. Defendant Cagle's predecessor, after sitting in on a live version of The Show, praised Dr. Mehler for the show and Dr. Mehler received 1) a merit-based promotion and 2) multiple nominations for the Distinguished Teaching Award. [Verified FAC, at ¶¶ 45, 47, 51-53]. Fast-forward to 2022, Dr. Mehler is now banned from campus, prohibited from talking to his current and former students and colleagues, and is on suspension. What changed? Certainly not the ESD as the current version pulled from FSU's website bears the effective date "October 22, 2004."[3] The only thing that changed is now Defendants Eisler and Cagle hold the levers of power and have chosen to apply it on an ad hoc and subjective basis. The subjective basis of its application is apparent from Defendant Eisler's press

---

[3]Employee and Student Dignity Policy, Ferris State University, https://www.ferris.edu/administration/adminandfinance/human/Forms/HRPPs/EmployeeDignity.pdf (last visited Jan. 24, 2022).

statements where he notes he was personally "shocked and appalled by [the] [V]ideo." [**Ex. M**, PageID.144].

Defendants' ad hoc and subjective application of the ESD reveal its vagueness. Plaintiff, thus, has a substantial likelihood of success on the merits of this claim.

### F.  The ESD is Unconstitutionally Overbroad.

"In the First Amendment context . . . a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" United States v. Stevens, 559 U.S. 460, 473 (2010) (quoting Wash. State Grange v. Wash. State Republican Party ("Grange"), 552 U.S. 442, 449 n.6 (2008)). "A law is overbroad under the First Amendment if it 'reaches a substantial number of impermissible applications" relative to the law's legitimate sweep." Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tenn., 274 F.3d 377, 387 (6th Cir. 2001). Thus, "any law imposing restrictions so broad that it chills speech outside the purview of its legitimate regulatory purpose will be struck down." "The party challenging the law need not necessarily introduce admissible evidence of overbreadth, but generally must at least 'describe the instances of arguable overbreadth of the contested law.'" Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 944 (9th Cir. 2011) (quoting Grange, 552 U.S. at 499 n.6). Although overbreadth is doctrinally a facial challenge, the actual breadth of a law is judged by its text and "from actual fact." Virginia v. Hicks, 539 U.S. 113, 122 (2003).

Here, in actual fact, the ESD has been stretched to silence lawful speech—an end state the ESD says that it was not designed to do. [ESD, § 8-703 "Importance of Free and Open Discussion. Nothing in this subpart shall be construed as limiting free and open discussion of all matters[.]"). Limiting discussion, however, is precisely what Defendants used the ESD to do. Based on actual fact, the ESD should read: "nothing in this subpart shall be construed as limiting free and open discussion of all matters

unless adjudged by the Administration to be profane, offensive, and disturbing," so that the policy matches the application.

In essence, if an anti-harassment policy has been stretched to silence speech Defendants do not like in the past, with no harassment complaint to even base it on, then in what instances or applications wouldn't the ESD be used to silence speech?

## IV.   PLAINTIFF, AND OTHERS, HAVE SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE FOR WHICH THERE IS NO ADEQUATE REMEDY AT LAW.

"The loss of First Amendment freedoms, for even minimal periods of time, *unquestionably* constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). *Accord* G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1078 (6th Cir. 1994) (noting the defendant's "proposition is flatly inconsistent with well-settled precedent" and then quoting Elrod, *supra*). The Sixth Circuit, under Elrod, has, however, taken it a step further. When a "constitutional right is being threatened or impaired, a finding of irreparable injury *is mandated*." Am. C.L. Union of Ky. v. McCreary Cty., Ky., 354 F.3d 438, 445 (6th Cir. 2003) (emphasis added), aff'd sub nom. McCreary Cty., Ky. v. Am. C.L. Union of Ky., 545 U.S. 844 (2005). Moreover, loss of academic freedom rights similarly constitutes irreparable injury. *See, e.g.*, Parate v. Isibor, 868 F.2d 821, 827 (6th Cir. 1989) ("Although judicial concern has been expressed for the academic freedom of the university, the courts have also afforded substantial protection to the First Amendment freedoms of individual university professors."); Keefe v. Geanakos, 418 F.2d 359, 363 (1st Cir. 1969) ("Academic freedom is not preserved by compulsory retirement, even at full pay."); Fowler v. Bd. of Educ. of Lincoln Cty., Ky., 819 F.2d 657, 661 (6th Cir. 1987) (noting "[m]any courts have recognized that a teacher's First Amendment rights encompass the notion of 'academic freedom' to exercise professional judgment in selecting topics and materials for use in the course of the educational process"); Bazaar v. Fortune, 476 F.2d 570, 580 (5th Cir. 1973) ("[W]e break no new constitutional ground in

reaffirming this Nation's dedication to safeguarding academic freedom."), modified on reh'g, 489 F.2d 225 (5th Cir. 1973).

Here, as discussed in depth, *supra*, Plaintiff's First Amendment rights have not only been threatened, they have been obliterated. Plaintiff is not able to associate with his students and colleagues to engage in First Amendment protected speech. Plaintiff is unable to set foot on FSU's campus, for any reason, let alone to instruct his classes, *i.e.*, exercise his First Amendment rights of free speech and academic freedom. Plaintiff's academic freedom bundle of sticks has been severely curtailed by Defendants' censorious actions. For example, in order to avoid Defendant Eisler's ire, Plaintiff must conform his speech to non "profane, offensive and disturbing" speech that puppets the university and its values.

Last, but not least, however, as explained, *supra*, Sec. III.B, Plaintiff has been denied use of a nonpublic forum based on the viewpoint he espouses and the unreasonable restrictions placed thereupon. Denial of the use of such a forum under these circumstances undeniably constitutes a violation of First Amendment rights.

## V.   AN INJUNCTION WOULD CAUSE NO HARM TO OTHERS AND THE PUBLIC INTEREST WEIGHS IN FAVOR OF THE ENTRY OF A TRO.

Federal Courts uniformly hold that "protect[ion of individuals'] constitutional and civil rights, . . . is always in the public interest." Dodds v. United States Dep't of Educ., 845 F.3d 217, 222 (6th Cir. 2016).[4] The Sixth Circuit holds this so dear that even

---

[4] *E.g.*, Jackson Women's Health Org. v. Currier, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quoting Awad v. Ziriax, 670 F.3d 1111, 1132 (10th Cir. 2012)) ("'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'"); Joelner v. Vill. of Wash. Park, 378 F.3d 613, 620 (7th Cir. 2004) (quoting Connection Distrib. Co., 154 F.3d at 288) ("[I]t is always in the public interest to protect First Amendment liberties."); Doe v. Harris, 772 F.3d 563, 583 (9th Cir. 2014) (internal quotation marks removed; citations omitted) ("A colorable First Amendment claim is irreparable injury sufficient to merit the grant of relief and if the underlying constitutional question is close [] we should uphold the injunction[.]"); Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest."); Rodgers v. Bryant, 942 F.3d 451, 458 (8th Cir. 2019) (quoting Phelps-Roper v. Nixon, 545 F.3d 685, 690 (8th Cir. 2008)) (noting "'it is always in the public interest to protect constitutional rights' and 'the balance of

"when a constitutional violation is *likely* the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." Am. C.L. Union Fund of Mich. v. Livingston Cty., 796 F.3d 636, 649 (6th Cir. 2015) (emphasis added; cleaned up; citations omitted). This uniformity across the Circuits makes sense because "'the Constitution is the ultimate expression of the public interest.'" Def. Distributed v. United States Dep't of State, 865 F.3d 211, 213 (5th Cir. 2017) (Elrod, Jones, Smith, and Clement, JJ., dissenting) (quoting Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013)).

Likewise, there is no public interest in enforcing unconstitutional laws, policies, and actions. KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1272 (11th Cir. 2006) ("The public has no interest in enforcing an unconstitutional ordinance."); Scott v. Roberts, 612 F.3d 1279, 1297 (11th Cir. 2010); Little Rock Fam. Plan. Servs. v. Rutledge, 398 F. Supp. 3d 330, 423 (E.D. Ark. 2019). For that reason, "[t]he public interest does not support [Defendants'] expenditure of time, money, and effort in attempting to enforce . . . [their policies and actions] that may well be held unconstitutional," either. Fla. Businessmen for Free Enters. v. City of Hollywood, 648 F.2d 956, 959 (5th Cir. 1981). Consequently, because Plaintiff's constitutional rights are at stake and are, in fact, being violated, as detailed herein, and because there is no public interest in validating unconstitutional actions or enforcing unconstitutional laws, the public interest weighs heavily in favor of issuing a TRO.

In that same vain, no harm would befall anyone by entry of a TRO. No one has complained, so far as Plaintiff has been made aware, of harassment as a result of the Video. There is no victim here to protect. Defendants would suffer no harm by

---

equities [] generally favors the constitutionally-protected freedom of expression'"); Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth., 975 F.3d 300, 317 (3d Cir. 2020) ("[T]he public interest does not suffer by enforcing the First Amendment's protection against restrictions on speech that are incapable of reasoned application."), cert. denied, 142 S. Ct. 73, 211 L. Ed. 2d 12 (2021).

allowing Dr. Mehler to resume his teaching schedule, and would, in fact, benefit from Dr. Mehler's return as the burden from his absence is currently being borne by his colleagues covering down on his classes. His return also has the added benefit of paying him to do the thing he was hired to do in the first place—mold young minds "for successful careers, responsible citizenship, and lifelong learning." Mission Statement,                                                                                    FSU, https://www.ferris.edu/ferrisfaq/mission.htm#:~:text=Ferris%20State%20University 's%20Vision%20Statement,for%20a%20dynamic%20global%20society (last visited Jan. 25, 2022).

This factor as well favors injunctive relief.

## VI.    NO BOUND SHOULD BE REQUIRED.

Fed. R. Civ. P. 65(c) permits requiring the posting of a bond as a condition for the entry of a preliminary injunction. This rule, however, has long been interpreted in this circuit to vest the court with "'discretion over *whether* to require the posting of security.'" Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co., 714 F.3d 424, 431 (6th Cir. 2013) (emphasis in original) (quoting Moltan Co. v. Eagle-Picher Indus., Inc., 55 F.3d 1171, 1176 (6th Cir. 1995)). When, however, as here, constitutional rights are at issue, no bond should issue. *See, e.g.*, Diaz v. Brewer, 656 F.3d 1008, 1015 (9th Cir. 2011) (holding no bond was required in a case concerning a violation of constitutional rights); Crowley v. Local No. 82, 679 F.2d 978, 1000 (1st Cir. 1982) (listing authorities establishing that "no bond is required in suits to enforce important federal rights or 'public interests'"), reversed on other grounds, 467 U.S. 526 (1984); Complete Angler, LLC v. City of Clearwater, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009)) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right."). No bond should be required because Defendants will suffer no monetary damages and because constitutional rights are at issue.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, Dr. Mehler respectfully requests this Honorable Court restore the status quo by 1) enjoining Defendants from enforcing the Letter against Dr. Mehler and 2) ordering Defendants to lift the suspension and permit Dr. Mehler to immediately resume teaching his 2022 Spring Semester classes in accordance with the relief more specifically requested in the underlying Motion.

Respectfully submitted,

Dated: January 26, 2022

*/s/* Matthew J. Hoffer
Matthew J. Hoffer (P70495)
Matt@BradShaferLaw.com
Zachary M. Youngsma (MI P84148)
Zack@BradShaferLaw.com
**SHAFER & ASSOCIATES, P.C.**
3800 Capital City Boulevard, Suite 2
Lansing, Michigan 48906
T: 517-886-6560
F: 517-886-6565

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations provided in LCiv.R 7.3(b)(ii). The foregoing brief is set in size 12-point type using the proportionally spaced font Century Schoolbook and contains 8,404 words as counted by Microsoft Word 2013 for Windows 10 Pro.

*/s/ Matthew J. Hoffer*
Matthew J. Hoffer (P70495)
**Shafer & Associates, P.C.**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26, 2022, the foregoing document was filed with the United States District Court for the Western District of Michigan via its CM/ECF utility thereby causing service upon all parties of record by operation of the Court's CM/ECF system, except as follows:

No counsel has appeared on behalf of any Defendant party. Service of the forgoing document will be effectuated along with the Summons and Complaint upon all defendants in accordance with proofs of service to be filed.  A courtesy copy will also be provided on January 26, 2022 to the following individual, via email only, who the undersigned has been informed will serve as counsel for some or all of the Defendants:

> Robert M. Vercruysse
> Clark Hill PLC
> 500 Woodward Ave., Suite 3500
> Detroit, MI  48226
> 313-965-8325 – Tel.
> 313-309-6958 – Fax
> RVercruysse@ClarkHill.com

> */s/ Matthew J. Hoffer*
> Matthew J. Hoffer (P70495)
> **SHAFER & ASSOCIATES, P.C.**

27