## UNITED SATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BARRY MEHLER,

      Plaintiff,

vs.

FERRIS STATE UNIVERSITY, DAVID L.
EISLER, individually and in his official
capacity as President of Ferris State University;
RANDY CAGLE, individually and in his
official capacity as Dean of Ferris State
University's College of Arts, Sciences and
Education; FERRIS STATE UNIVERSITY
BOARD OF TRUSTEES; and AMNA P.
SIEBOLD, ANNA L. RAMIREZ-SAENZ,
RUPESH K. SRIVASTAVA, LASHANDA R.
THOMAS, GEORGE K. HEARTWELL,
KURT A. HOFMAN, and RONALD E.
SNEAD, in their Official Capacities as Trustees
of Ferris State University's Board of Trustees,

      Defendants.

Case No. 1:22-CV-00071

Hon. Jane M. Beckering
Hon. Magistrate Judge Ray Kent

---

**MATTHEW J. HOFFER (P70495)**
**SHAFER & ASSOCIATES, P.C.**
3800 Capital City Blvd., STE 2
Lansing, MI 48906
T: (517) 886-6560
F: (517) 886-6565

Attorneys for Plaintiff

**ROBERT M. VERCRUYSSE (P21810)**
**ANNE-MARIE VERCRUYSSE**
**WELCH (P70035)**
**CLARK HILL PLC**
500 Woodward Avenue, Suite 3500
Detroit, MI  48226
(313) 965-8325  (313) 309-6958
rvercruysse@clarkhill.com
awelch@clarkhill.com
Attorneys for Defendants

---

## DEFENDANTS' RESPONSE BRIEF TO
## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND
## PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

INDEX OF AUTHORITIES................................................................................. ii

QUESTIONS PRESENTED ............................................................................. vi

MOST CONTROLLING AUTHORITY ........................................................ viii

INTRODUCTION ...............................................................................................1

   I.     UNDISPUTED FACTS ...........................................................................2

   II.    STANDARD OF REVIEW ....................................................................4

   III.   PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF FAILS ...............5

      A. Plaintiff Will Not Succeed on the Merits ..............................................5
        1.  Plaintiff's Video is Not Free Speech .............................................6
        2.  Defendant's Use of the Faculty Administrators' Collective Bargaining Agreement and the Employee and Student Discipline Policy Does Not Violate the First Amendment........................................................12
        3.  Plaintiff has not Suffered Adverse Action ....................................16
          a.  Plaintiff Is Receiving Full Pay and Benefits Pending a Timely Investigation..............................................................16
          b.  Defendants Have Not Taken Any other Actions That Deterred Plaintiff From Exercising His First Amendment Rights ........17

      B. Plaintiff Would Not Suffer Irreparable Harm Without the Injunction ................20
      C. The Issuance of An Injunction Will Cause Harm to the University and Would Not Serve the Public Interest ........................................................20

   IV.  DEFENDANTS ARE ENTITLED TO FEES AND COSTS ...........................22

CONCLUSION...................................................................................................23

i

# TABLE OF AUTHORITIES

**Cases**

*Abney v. Amgen, Inc.*,
443 F.3d 540 (6th Cir. 2006) ......................................................................... 4

*Agrawal v. Univ. of Cincinnati*
977 F. Supp. 2d 800 (S.D. Ohio 2013) ........................................................ 19

*Bennett v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*
977 F.3d 530 (6th Cir. 2020) ......................................................................... 6

*Bidasaria v. Cent. Michigan Univ.*
No. 10-15079, 2012 WL 3077211, at *2 (E.D. Mich. July 30, 2012) ......................................... 23

*Bonnell v. Lorenzo*
241 F.3d 800 (6th Cir. 2001) ................................................ 6, 8, 9, 10, 19, 21

*Broadrick v. Oklahoma*
413 U.S. 601 (1973) ...................................................................................... 12

*Buchanan v. Alexander*
919 F.3d 847 (5th Cir. 2019) ......................................................................... 9

*Christiansburg Garment Co. v. EEOC*
434 U.S. 412; 985 S. Ct. 694 (1978) ........................................................... 22

*Connick v. Myers*
461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)) ................................. 6

*CRST Van Expedited, Inc. v. EEOC*
578 U.S. 419 (2016) ...................................................................................... 22

*Dambrot v. Central Mich. Univ.*
55 F.3d 1177 (6th Cir. 1995) ............................................. 6, 7, 8, 10, 14

*Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tenn*
274 F.3d 377 (6th Cir. 2001) ....................................................................... 12

*Ehrlich v. Kovack*
710 F. App'x 646 (6th Cir. 2017) ................................................................ 16

*Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*
958 F.3d 532 (6th Cir. 2020) ......................................................................... 4

ii

*FCC v. Pacifica Found*
438 U.S. 726 (1978) ........................................................................................................... 9

*Garcetti v. Cabellos*
547 U.S. 410 (2006) ........................................................................................................... 6

*Hamilton's Bogarts, Inc. v. Michigan*
501 F.3d 644 (6th Cir. 2007)) ........................................................................................... 4

*Hardy v. Jefferson Cmty. Coll.*
260 F.3d 671 (6th Cir. 2001) ............................................................................... 9, 10, 21

*Harris v. Detroit Pub. Schools*
245 F. App'x 437 (6th Cir. 2017) .................................................................................... 16

*Hensley v. Eckerhart*
461 U.S. 424 (1983) ......................................................................................................... 22

*Hughes v. Rowe*
449 U.S. 5; 101 S. Ct. 173 (1980) .............................................................................. 22, 23

*Jackson v. City of Columbus*
194 F.3d 737 (6th Cir. 1999) ........................................................................................... 17

*Keen v. Penson*
970 F.2d 252 (7th Cir. 1992) ..................................................................................... 10, 11

*Keyishian v. Board of Regents*
385 U.S. 589 (1967) ................................................................................................... 10, 11

*Leary v. Daeschner*
228 F.3d 729 (6th Cir. 2000) ............................................................................................. 7

*Leonardson v. City of East Lansing*
896 F.2d 190 (6th Cir. 1990) ........................................................................................... 12

*Marshall v. Ohio Univ.*
No. 2:15-CV-775, 2015 WL 1179955, at *1 (S.D. Ohio Mar. 13, 2015) ....................... 13

*Martin v. Parrish*
805 F.2d 583 (5th Cir. 1986) ............................................................................................. 7

iii

*Mazurek v. Armstrong*
555 U.S. 7, 24 (2008) ................................................................................... 5

*McCullen v. Coakley*
573 U.S. 464 (2014) ..................................................................................... 15

*Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*
945 F.2d 150 (6th Cir. 1991) ......................................................................... 5

*Obama for America v. Husted*
697 F.3d 423 (6th Cir. 2012) ......................................................................... 5

*Pickering v. Board of Education*
391 U.S. 563, (1968) ................................................................................. 7, 12

*Ryan v. Blackwell*
979 F.3d 519 (6th Cir. 2020) ....................................................................... 18

*Samad v. Jenkins*
845 F.2d 660 (6th Cir. 1998) ....................................................................... 18

*Sensabough v. Halliburton*
937 F.3d 621 (6th Cir. 2019) ....................................................................... 16

*S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*
860 F.3d 844 (6th Cir. 2017) ......................................................................... 4

*Smock v. Bd. of Regents of Univ. of Michigan*
353 F. Supp. 3d 651 (E.D. Mich. 2018) .................................................... 12, 14

*Swierkiewicz v. Sorema N.A.*
534 U.S. 506 (2002) ..................................................................................... 17

*Tumblebus Inc. v. Cranmer*
399 F.3d 754 (6th Cir. 2005) ......................................................................... 4

*White v. Burlington N. & Santa Fe R. Co.*
364 F.3d 789 (6th Cir. 2004) ....................................................................... 16

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)
555 U.S. 7 (2008) ...................................................................................... 4, 5

iv

**<u>Statutes</u>**

42 U.S.C. § 1983 .................................................................................................................. ix, 23

28 U.S.C. § 1927 .................................................................................................................. 22, 23

v

## QUESTION PRESENTED

I.      Whether Plaintiff has sufficient evidence to carry his burden of proof on the merits of his claims where Plaintiff has not engaged in constitutionally protected speech or conduct, Ferris State University's Employee and Student Dignity Policy is not unconstitutionally vague or overbroad, and Plaintiff has suffered no adverse action as a result of any protected conduct?

Defendants Answer: No.

Plaintiff Answers: Yes.

II.     Whether Plaintiff will carry his burden of proof to show that he will suffer irreparable harm without a preliminary injunction where Plaintiff has been placed on administrative leave with full pay and benefits and is still speaking with media and via his YouTube account regarding the investigation and his students and colleagues have not been deterred from speaking out in support of him?

Defendants Answer: No.

Plaintiff Answers: Yes.

III.    Whether the issuance of an injunction will cause harm to the University and will not serve the public interest where the University has already received complaints from students who disenrolled from Plaintiff's class based on Plaintiff's profane and vulgar speech, and students will continue to be subjected to Plaintiff's inappropriate speech, which may lead to complaints of retaliation, Title IX, discrimination or harassment and cause more students to disenroll from the class, disrupting their education, if Professor Mehler returns to teaching at the University in the midst of the ongoing investigation?

Defendants Answer: Yes.

Plaintiff Answers: No.

IV.    Whether Defendants are entitled to attorneys' fees and costs under 42 U.S.C. § 1988 where Plaintiff has brought a vexatious and non-meritorious lawsuit as he cannot succeed on the merits of any of his claims?

        Defendants Answer: Yes.

        Plaintiff Answers: No.

ClarkHill\09225\437562\265805686.v1-2/14/22

## <u>MOST CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

*Abney v. Amgen, Inc*., 443 F.3d 540, 547 (6th Cir. 2006)

*Bennett v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, 977 F.3d 530, 537 (6th Cir. 2020), cert. denied, 141 S. Ct. 2795, 210 L. Ed. 2d 928 (2021)

*Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001)

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421; 985 S. Ct. 694 (1978)

*Dambrot v. Cent. Michigan Univ*., 55 F.3d 1177 (6th Cir. 1995)

*Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tenn*, 274 F.3d 377, 387 (6th Cir. 2001)

*Garcetti v. Cabellos*, 547 U.S. 410 (2006)

*Leary v. Daeschner*, 228 F.3d 729 (6th Cir. 2000)

*Sensabough v. Halliburton*, 937 F.3d 621 (6th Cir. 2019)

*Smock v. Bd. of Regents of Univ. of Michigan*, 353 F. Supp. 3d 651 (E.D. Mich. 2018)

28 U.S.C. § 1927

42 U.S.C. § 1988

ClarkHill\09225\437562\265805686.v1-2/14/22

Defendants FERRIS STATE UNIVERSITY, FERRIS STATE UNIVERSITY BOARD OF TRUSTEES, DAVID L. EISLER, RANDY CAGLE, AMNA P. SIEBOLD, ANA L. RAMIREZ-SAENZ, RUPESH K. SRIVASTAVA, LASHANDA R. THOMAS, GEORGE K. HEARTWELL, KURT A. HOFMAN, and RONALD E. SNEAD, by and through their counsel Clark Hill PLC, Robert M. Vercruysse, and Anne-Marie Vercruysse Welch, and for their Response to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction state as follows:

## <u>INTRODUCTION</u>

Ferris State University received complaints from students who disenrolled from Professor Mehler's class after viewing the "welcome" video Professor Mehler sent to his incoming students. During the video, Professor Mehler uses derogatory and profane language towards students and administrators and calling them "cocksuckers", tells students to "stay the fuck away" and to "fuck you." The use of gratuitous profanity directed at students and the administration was unrelated to the subject matter that Professor Mehler teaches.

Ferris State University has placed Professor Mehler on administrative leave with full pay and benefits pending investigation. He and his union were informed of the charges against him in written communication. His Union and Counsel Hoffer were participating in the investigation until this lawsuit was filed on January 26, 2022 and have continued to represent him during the ongoing investigation. No disciplinary action has been administered because the matter is still under investigation.

Just as a Professor has no First Amendment right to call his students the N-word, no Ferris State University Professor has a First Amendment Right under the University Policies to call their students cocksuckers or swear at them repeatedly, telling them "fuck you" and "keep your fucking

distance" (hereinafter c*cksuckers and f*ck).   Whether Professor Mehler violated University

Policy is still being investigated.

Contrary to his claim that the University's actions while investigating the complaints would

chill someone from exercising their right to free speech, in an apparent effort to seek publicity

Professor Mehler released all of his videos on YouTube, including a press release, and spoke with

the media since being placed on administrative leave.  He fails, however, to inform those with

whom he speaks, including this Court, that he irreverently called his students and administrators

c*cksuckers and repeatedly used profanity towards students throughout the video, for example:

> "I want to introduce myself before we actually meet F2F . .
> . which everybody knows, means 'f*ck to f*ck.'"

> "[N]o limber dick c*cksucker of an administrator is going to
> tell me how to teach my classes, because I'm a f*cking tenured
> professor. So, if you want to complain to your dean, f*ck you.  Go
> ahead.  I'm retiring at the end of this year, and I couldn't give a
> flying f*ck any longer."

> "None of you c*cksuckers are good enough to earn an "A"
> in my class[.]"

> "And don't come f*cking complaining to me."

> "[S]tay the f*ck away from me."

A simple review of the transcript, script, and video of the "welcome" supplied as exhibits

to the Court in this matter evidence that this is an undisputed fact.  The classroom is not a public

forum and there is no pedagogical reason or need to call students by sexually harassing and profane

names or to use gratuitous profanity to teach or think about history.

## I.       UNDISPUTED FACTS

1. Ferris State University has employed Plaintiff, Professor Berry Mehler, as a

   history professor since 1988. *ECF No. 1-2. Page ID. 37.*

2.  In his March 15, 2020 post tenure review, Professor Mehler admits that profanity

is vulgarity which is not essential to his pedagogy:

> I developed a highly original teaching method, described in detail in my last PTR. I will include my description of "The Show" in the appendix to this report. I have modified my presentation method since taking on the Shoah program. I couldn't run the Shoah and treat the past as a vulgar joke that had no meaning. Something more subtle was called for. Thus, after spending over a decade developing and refining a very unique teaching method, that I loved and students clearly enjoyed. I stripped away the musical introduction, the advertisements for Camel cigarettes and the vulgarity. What I was left with were the core ideas behind my pedagogy.

> *Exhibit 1, Post Tenure Review Packet.*

3.  On Sunday, January 9, 2022, Professor Mehler sent his incoming students a welcome video ("Welcome Video").  He called the video a "soliloquy," which he defined as "speaking one's thoughts aloud when by oneself or regardless of any audience." In this "soliloquy," he stated that ""[N]o limber dick c*cksucker of an administrator is going to tell me how to teach my classes, because I'm a f*cking tenured professor. So, if you want to complain to your dean, f*ck you.  Go ahead. I'm retiring at the end of this year, and I couldn't give a flying f*ck any longer." *ECF No. 1-9; ECF No. 1-10; Exhibit 2, Transcript.*

4.  In the Welcome Video, Professor Mehler called his incoming students and administrators c*cksuckers and repeatedly swore at them, exclaiming "f*ck you" and "keep your f*cking distance."  *Id.*

5.  Ferris State University learned of Professor Mehler's Welcome Video via complaints from students who were so offended that the students disenrolled from Professor Mehler's class.  *Exhibit 3, Cagle declaration.*

6.  On Tuesday, January 11, 2022, Professor Mehler's Dean, Professor Cagle requested a meeting with Professor Mehler and his union representative.  When the meeting was declined, Dean Cagle sent Professor Mehler and his union an email, with a letter attached advising that he was being "placed on temporary paid administrative leave while an investigation is conducted into allegations about your conduct as set out in the presentation at this link. . . .Your conduct appears to violate Section 4.1(A) of the Collective Bargaining Agreement and Section 8-701 of the University policies."  *ECF No. 1-11  (described properly in Plaintiff's Index of Exhibits as "Combined-email from Defendant Cagle and letter attached thereto"ECF No. 1-1).*  To guard against retaliation, Professor Mehler was advised to remain off campus and "refrain from contact with current or former students or colleagues **regarding the investigation** or your employment status other than your Union."  The letter further advised, however, "[i]f you need to

initiate any contact within the University community while on paid leave, please make arrangements through [the Dean's] office," and that "you may have access to your University e-mail account."

7.  Since being placed on paid leave, Professor Mahler admits in his Complaint that he has received an "outpouring of support including a flood of letters of support for him and The Video from ..students, instructors. . . . " In his demand letter, Counsel Hoffer admits that Professor Mehler's Ferris State University colleagues support him.  *Exhibit 4.*

8.  Since being placed on paid leave, Professor Mehler has continued to publish his videos and views publicly via YouTube and in the media. *See* *https://www.youtube.com/channel/UCEA6lxFdyzZwAA5BeyjVzaw/videos?view=0 &sort=dd&flow=grid* (last visited February 14, 2022).

## II.   STANDARD OF REVIEW

Preliminary injunctive relief is an extraordinary remedy that is never awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A preliminary injunction, "is an extraordinary remedy reserved only for cases where it is necessary to preserve the status quo until trial." *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC,* 958 F.3d 532, 535 (6th Cir. 2020). **In determining whether to issue a preliminary injunction, courts consider these four factors: (1) whether the movant has shown a strong or substantial likelihood of success on the merits; (2) whether irreparable harm will result without an injunction; (3) whether issuance of a preliminary injunction will result in substantial harm to others; and (4) whether the public interest is advanced by the injunction.** *Abney v. Amgen, Inc.*, 443 F.3d 540, 547 (6th Cir. 2006); *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.,* 860 F.3d 844, 849 (6th Cir. 2017). The decision of whether to issue a preliminary injunction lies within the district court's sound discretion. *Id.* at 540–41 (citing *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007); *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005).

ClarkHill\09225\437562\265805686.v1-2/14/22

The first factor, likelihood of success on the merits, is the most important factor in the case of an alleged constitutional violation and is typically determinative. *Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

Regarding the second factor – irreparable harm - the "key word" in determining the extent of an injury sufficient to support the award of injunctive relief is "irreparable." *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). "Issuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (*per curiam*)). Mere injuries, however substantial, are not enough. *Id.* Rather, "the harm alleged must be both certain and immediate, rather than speculative or theoretical." *Id.* "In order to substantiate a claim that irreparable injury is likely to occur, a movant must provide some evidence that the harm has occurred in the past and is likely to occur again." *Id.* (internal citations omitted).

To determine if a preliminary injunction would result in harm to others, a court "must balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 24 (2008).

Plaintiff's evidence is insufficient to carry his burden of proof to satisfy the high standard to obtain injunctive relief.

## III.   PLAINITFF'S REQUEST FOR INJUNCTIVE RELIEF FAILS

### A.   Plaintiff Will Not Succeed On The Merits

To establish his claim for First Amendment retaliation, Professor Mehler must show that: (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against

him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct. *Bennett v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, 977 F.3d 530, 537 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 2795, 210 L. Ed. 2d 928 (2021) (internal citations omitted).

### 1.    *Plaintiff's Video is Not Free Speech*

Sending a Welcome Video to incoming students in a classroom calling them derogatory, profane, sexually harassing names such as C*cksuckers and repeatedly swearing at them with statements such as "f*ck you" is not protected or public speech.  As Plaintiff recognized, "'when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment Purposes,' thus, the 'Constitution does not insulate their communications from employer discipline.'" *ECF No. 4, Page ID. 274, quoting Garcetti v. Cabellos,* 547 U.S. 410, 421 (2006).

Further, speech is not protected, public speech when made only to a "captive audience of students" enrolled in a university class who cannot "effectively avoid further bombardment of their sensibilities" by simply averting their ears. *See Bonnell v. Lorenzo*, 241 F.3d 800, 820–21 (6th Cir. 2001). Here, Plaintiff admits the non-public nature of his speech in Paragraph 77 of his Complaint that, "On January 9, 2022, Dr. Mehler uploaded an introductory video for the students in the five classes he was to instruct in the 2022 Spring Term. He then shared that video with his students via a private YouTube URL; meaning, only those with the URL could find and view the video."

The Sixth Circuit applies the two-step analysis laid out in *Connick v. Myers* to determine whether a university employee has engaged in protected speech.  *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995) (citing *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). First, the Court must determine whether the statement in question

6

constitutes speech on a matter of public concern. *Bennet, supra.*  Then, if it does, the court must apply the *Pickering* balancing test to determine whether the Plaintiff's "interest in commenting upon matters of public concern ... outweigh[s] the interest of [the University], as an employer, in promoting the efficiency of the public services it performs through its employees." *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731).

The Sixth Circuit has repeatedly held that calling students profane harassing names is not speech on a matter of public concern.  In *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1188 (6th Cir. 1995), the head coach of the University's basketball team asked his players, who he claimed were not working that hard, "do you mind if I use the N word?" Some players indicated it was okay, so he continued by stating, "you know we need to have more n*ggers on our team, Coach McDowell is a n*gger, . . . Sand[er] Scott who's an academic All-American, a Caucasian, I said Sand[er] Scott is a n*gger.  He's hard nose, [sic] he's tough, et cetera." According to the coach, he intended to use the term in a "positive and reinforcing" manner and "to connote a person who is fearless, mentally strong and tough."  Dambrot had also previously told his players that he wanted them to "play like n*ggers on the court," but "[d]on't be n*ggers in the classroom."  Represented by Professor Robert Sedler, plaintiff Dambrot argued that his statements were protected by his First Amendment rights to free speech and academic freedom when instructing his players. Writing for the Sixth Circuit, Judge Damon Keith disagreed, explaining, "**[a]n instructor's choice of teaching methods does not rise to the level of protected expression**. . . . Dambrot's speech served to advance no academic message and is solely a method by which he attempted to motivate – or humiliate – his players. . . . **The University has a right to disapprove of the use of the word "n*gger" as a motivational tool just as the college in *Martin* was not forced to tolerate profanity**. . . Dambrot's resort to the First Amendment for protection is not well taken." *Dambrot,*

7

55 F.3d 1190-1191; *citing Martin v. Parrish,* 805 F.2d 583 (5th Cir. 1986) (professor's profanity (hell, sucks, bullshit, damn, goddamn) used to motivate them did not touch a matter of public concern) (emphasis added).

These cases are directly on point. In Professor Mehler's own words, the Welcome Video "was intended to get his students' 'juices flowing.'" He added, "If a professor comes in and he's all high and mighty and using words they don't understand — that doesn't help them relax." *See* *https://abcnews.go.com/US/wireStory/suspended-professor-made-salty-video-juices-flowing-82275170* (last visited February 7, 2022). In his March 15, 2020 post tenure review, Professor Mehler admits that profanity is vulgarity which is not essential to his pedagogy:

> I developed a highly original teaching method, described in detail in my last PTR. I will include my description of "The Show" in the appendix to this report. I have modified my presentation method since taking on the Shoah program. I couldn't run the Shoah and treat the past as a vulgar joke that had no meaning. Something more subtle was called for. Thus, after spending over a decade developing and refining a very unique teaching method, that I loved and students clearly enjoyed. I stripped away the musical introduction, the advertisements for Camel cigarettes and the vulgarity. What I was left with were the core ideas behind my pedagogy.

*Exhibit 1, Post Tenure Review Packet.* Professor Mehler represents that his prior use of profanity was simply to motivate students to relax, but nonetheless had no relevancy to his pedagogy. – In his 2022 video, calling students c*cksuckers and saying f*ck you advanced no actual academic message and was not protected speech.

Courts since *Dambrot* have reiterated that use of profanity unrelated to the subject matter in the college classroom context is not of public concern. In *Bonnell v. Lorenzo,* 241 F.3d 800, 810 (6th Cir. 2001) (Hon. J. Clay), Macomb Community College received a student complaint about an English professor's use of obscene and vulgar language in the classroom; in particular, the words "fuck," "pussy," and "cunt." The professor maintained that none of the terms at issue were

directed to a particular student and were only used to "point out the chauvinistic degrading attitudes in society that depict women as sexual objects, as compared to certain words to describe male genitalia, which are not taboo or considered to be deliberately intended to degrade." The Court reversed the District Court's injunction relief as to the College's disciplinary suspension from his teaching position and held that a professor "may have a constitutional right to use words such as 'pussy,' 'cunt,' and 'fuck,' but he does not have a constitutional right to use them in a classroom setting where they are not germane to the subject matter, in contravention of the College's sexual harassment policy." *Bonnell,* 241 F.3d at 820 (citing *FCC v. Pacifica Found,* 438 U.S. 726, 747 (1978) (finding speech that is "'vulgar, offensive,' and 'shocking' . . . is not entitled to absolute constitutional protection under all circumstances.")).  *See also Buchanan v. Alexander,* 919 F.3d 847 (5th Cir. 2019) (Buchanan's use of profanity was not related to the subject matter or purpose of training Pre-K-Third grade teachers and therefore not protected by the First Amendment).

Plaintiff's reliance on *Hardy v. Jefferson Cmty. Coll.,* 260 F.3d 671 (6th Cir. 2001), is misplaced; and, in fact, supports Defendants.  There, the Court found that the instructor's use of terms "n\*gger" and "b\*tch" as part of class discussion on social deconstructivism and language during an interpersonal communications course involved matters of public concern and was protected by First Amendment.  *Hardy* is clearly distinguishable from Professor Mehler's gratuitous use of language such as C\*cksuckers and F\*ck you towards his incoming students, as Hardy was using derogatory language for the purpose of academic discussion which related to his course's subject matter, as opposed to calling his students names and swearing at them. The *Hardy* Court explained the difference as follows:

> "Relying on this court's recent decision in *Bonnell v. Lorenzo,* 241 F.3d 800 (6th Cir.2001), Green and Besser argue that Hardy's use of "racially vulgar words" failed to touch upon a matter of public concern, and therefore was not entitled to protection under the First Amendment. The college professor

in *Bonnell,* however, was disciplined for his gratuitous in-class use of the words "pussy," "cunt," and "fuck," which had given rise to a sexual harassment complaint filed by one of the professor's students. *Id.* at 803. Because Bonnell's offensive language was "not germane to the subject matter," the court concluded that he did "not have a constitutional right to use [these terms] in a classroom setting." *Id.* at 820. **Unlike Bonnell's frequent in-class use of gratuitous profanity and offensive language, however, Hardy's speech was germane to the subject matter of his lecture on the power and effect of language. The course was on interpersonal communications, and Hardy's speech was limited to an academic discussion of the words in question.**

This case is similarly distinguishable from the facts in *Dambrot,* where the court held that the coach of a state university basketball team did not engage in protected speech when he used the word "n*gger" during a locker-room peptalk. *See Dambrot,* 55 F.3d at 1187. The *Dambrot* court found it significant that "Dambrot's use of the N-word was intended to be motivational and was incidental to the message conveyed." *Id.* Dambrot's argument that his speech was protected by academic freedom was rejected because it failed to "advance[ ] an idea transcending personal interest or opinion which impacts our social and/or political lives." *Id.* at 1189. Unlike Dambrot's motivational use of the "N" word removed from any academic context, Hardy's in-class use of the objectionable word was germane to the subject matter of his lecture on the power and effect of language. Moreover, this and the other offensive words were suggested by the students in the context of the discussion, not gratuitously used by Hardy in an abusive manner.

As explained by the *Hardy* Court, because Professor Mehler's profane and vulgar speech served no academic purpose and it is not related to a matter of public concern; it is not protected[1].

Further, even if this court assumes for purposes of the preliminary injunction hearing that Professor Mehler's Welcome Video did constitute speech on a matter of public concern, Professor Mehler's First Amendment interests are outweighed by Ferris State University's academic interest in promoting the efficiency of its educational services by ensuring that its students are not subjected to insulting, threatening, and inappropriate comments by a professor. In *Keen v. Penson*, 970 F.2d 252, 257 (7th Cir. 1992), a university professor attempted to rely on *Keyishian v. Board*

---

[1] Any discussion related to the University's pre-determined COVID policy made in the classroom was not made in a public setting and was not germane to the classroom material regarding history.  It was personal speech.

*of Regents*, 385 U.S. 589 (1967), to support his argument that academic freedom under the First Amendment protected his demeaning and insulting letters written to a student in attempts to extract an apology for in-class comments made by the student. The *Keen* court rejected the professor's argument and explained that the concept of academic freedom does not grant a professor license to engage in uncontrolled speech to the exclusion of the university's interest:

> On appeal, Keen argues that he cannot be punished for the letters he wrote to [a student] and the grade he gave her because they are protected by the First Amendment under the concept of academic freedom. Academic freedom prohibits state actions that "cast a pall of orthodoxy over the classroom," which is traditionally the "marketplace of ideas." *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). As this case reveals, the asserted academic freedom of a professor can conflict with the academic freedom of the university to make decisions affecting that professor. . . . This Court has recognized the supremacy of the academic institution in matters of curriculum content. . . . [W]e do not conceive academic freedom to be a license for uncontrolled expression * * * internally destructive of the proper functioning of the institution.

*Keen v. Penson*, 970 F.2d 252, 257 (7th Cir. 1992)

Professor Mehler attempts to ignore the distinctions between his production of the Show in 2014 and the Welcome Video provided to incoming students in 2021 to establish that his Show and teaching style has never interrupted Ferris State University's interest in efficiency of its educational services. However, in the 2021 Welcome Video Professor Mehler told his students, "I'm a f*cking tenured professor. So, if you want to complain to your dean, f*ck you.  Go ahead. I'm retiring at the end of this year, and I couldn't give a flying f*ck any longer.," directly called his students "c*cksuckers" and swore at them, stating "f*ck you" and "keep your f*cking distance," which he has not established he has done in previous productions of the Show, and Ferris State University received a complaint from students who decided to drop the class. Were Plaintiff permitted to continue to call his students and administrators c*ocksuckers and stating f*ck you, he could subject the University to Title IX and other complaints. Clearly, Professor Mehler's

11

video has interrupted the efficiency of Ferris State University's educational services where the University is receiving complaints and students disenrolled in Professor Mehler's class directly in response to the Welcome Video, which has curtailed and disrupted student' educational journey and learning experience. Professor Mehler's speech is not protected under the *Pickering* balancing test.

     **2.**     ***Defendants' Use of the Faculty Administrators' Collective Bargaining Agreement and the Employee and Student Discipline Policy Does Not Violate the First Amendment***

Ferris State University's Employee and Student Discipline Policy ("ESD") is neither unconstitutionally overbroad nor unconstitutionally vague. For a policy to be found unconstitutional on its face on overbreadth grounds, "there must be realistic danger that the [policy] itself will significantly compromise recognized First Amendment protections of parties not before the court." *Leonardson v. City of East Lansing*, 896 F.2d 190, 195 (6th Cir. 1990). A law is overbroad under the First Amendment if it "reaches a substantial number of impermissible applications" relative to the law's legitimate sweep. *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tenn*, 274 F.3d 377, 387 (6th Cir. 2001). "Application of the overbreadth doctrine is "strong medicine," and should be used by courts "sparingly and only as a last resort." *Smock v. Bd. of Regents of Univ. of Michigan*, 353 F. Supp. 3d 651 (E.D. Mich. 2018) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

In *Smock, supra,* the court held the University of Michigan's civility policy applying to faculty was not overbroad and declined to intervene with the University of Michigan's balancing of professional freedom with its expectations of professionalism because the policy provided that only certain conduct be sanctioned. 353 F. Supp. 3d at 658-60 (E.D. Mich. 2018). Specifically, the policy sanctioned behaviors that included oral, written, visual, or physical actions by a member of the faculty that, according to a reasonable person standard:

12

a) have the purpose or effect of unreasonably interfering with an individual's employment or educational performance and/or b) have the purpose or effect of creating an intimidating, hostile, offensive, or abusive climate for an individual's employment, academic pursuits, living environment, or participation in a University activity.

*Id.* at 658.

The court explained that the policy was clearly aimed at promoting "an environment of trust, openness, civility, and respect," which are acceptable goals for the government as a university employer. *Id.* at 659. The court also noted that "although public universities may not force professors to endorse or eschew specific viewpoints, the First Amendment does not bar a public university form requiring that its faculty treat each other and their students with civility." *Id.* at 659-60. *See also Marshall v. Ohio Univ.*, No. 2:15-CV-775, 2015 WL 1179955, at *1 (S.D. Ohio Mar. 13, 2015)[2] (holding university's sexual misconduct policy was not unconstitutionally overbroad where the policy put individuals on notice as to what specific circumstances the university will consider in reviewing behavior, such as the frequency, nature, and severity of the harassment and specifically tracked Title VII's definition of "sexual harassment" as well as the language used by the U.S. Supreme Court in sexual harassment cases).

Similarly, Ferris State University's ESD is aimed at promoting an environment of civility, dignity, and respect. The policy specifically describes the certain types of behavior that are sanctionable by defining harassment as "the creation of a hostile or intimidating environment in which verbal or physical conduct, because of its severity of pervasiveness, is likely to significantly interfere with an individual's work or education, or adversely affect a person's living conditions" such that individuals are on notice of what behavior may be considered a violation of the policy.

---

[2] Unpublished cases as attached as Exhibit 5.

This language also tracks the language used by both Michigan state and federal courts in reviewing harassment cases.

Professor Mehler has no evidence the policy has been applied in a broad-sweeping manner. Professor Mehler was placed on paid administrative pending an investigation for profane, offensive, harassing, and disturbing speech made in violation of the ESD and only after Defendants received complaints from students who dropped his class based on his vulgar behavior in the Welcome Video. This is exactly the way Professor Mehler describes how the ESD should be applied. The ESD is not unconstitutionally overbroad and the court should not intervene in Defendants' efforts to require faculty treat each other and their students with dignity and respect.

A university policy is considered impermissibly vague where "it provides no principle for distinguishing between sanctionable speech and protected speech." An ordinance or policy is void for vagueness "if it is an unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory, and overzealous enforcement. *Smock*, 353 F. Supp. 3d at 660 (citing *Dambrot*, 55 F.3d at 1183-1184). In *Smock*, *supra* the court found the University's civility policy was not void for vagueness as it did not baldly prohibit hostility, intimidation, offensiveness, or abuse, but instead prohibited creating a climate marked by any of those four descriptors. *Id.* The court also found that the University faculty members had ample notice as to the standards of professionalism expected from them based on the policy's inclusion of examples of prohibited conduct. *Id.* at 660-61.

Likewise, Defendants' ESD provides both faculty and students with ample notice as to the standards of professionalism expected from them. The ESD includes examples of prohibited conduct, including harassment that is likely to significantly interfere with an individual's work or education, or adversely affect a person's living conditions. Professor Mehler's only support that

14

the ESD is unconstitutionally vague is the alleged "subjective and ad hoc enforcement" of the ESD over the years. Professor Mehler mischaracterizes the actions of Defendants in relying on this argument. While Professor Mehler alleges that he was praised in 2014 for "the Show" and his teaching style, and claims he was praised even for his use of profanity, he has not established that he had previously directed the profanity towards students with statements such as "f*ck you" or called them vulgar names such as "c*cksuckers," and therefore, he cannot establish that Defendants have subjectively changed the way they apply and enforce the ESD as the circumstances involving Professor Mehler in 2014 were different than they are today. Moreover, on March 15, 2020, in his post-tenure review, Professor Mehler recognized his use of vulgarity was not essential to his teaching pedagogy and claimed he "stripped away" the vulgarity from "the Show." Professor Mehler's admission that the vulgarity was not essential to his teaching style evidences his understanding that the behavior was not appropriate and his agreement that he would no longer engage in it. Professor Mehler ignores these changes when claiming the ESD was applied on an ad hoc and subjective basis. The ESD is not void for vagueness.

Professor Mehler also asserts that Defendants' use of the Faculty Associations' Collective Bargaining Agreement and ESD is not narrowly tailored because a significantly less restrictive means of preventing harassment exists than a "complete speech ban." To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interest. *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). Here, Professor Mehler indicates a less restrictive means would have been to first, "await an actual complaint of harassment as a result of the [Welcome] Video and then address the issue under the CBA." However, that is exactly what Defendants did. Ferris State University placed Professor Mehler on leave, with pay and benefits, after it received complaints

15

from students who disenrolled from Professor Mehler's class after viewing the "Welcome Video." Professor Mehler cannot possibly establish the ESD was not narrowly tailored when Defendants responded in the manner Professor Mehler suggests was the "less restrictive" approach.  Professor Mehler's other suggestion of banning him from having contact with the individual complainant(s) is equally inappropriate as such an action would not achieve the University's interest of curtailing profane and discriminatory speech that serves no academic purpose. Just as students and administrators cannot be called the N-word, they cannot be called c*cksuckers and told f*ck you. Academic freedom and the First Amendment do not give Plaintiff the right to use such terms to harass and discriminate against the students of Ferris State University.  The ESD does not violate the First Amendment.

### 3. *Plaintiff Has Not Suffered Adverse Action*

#### a. **Plaintiff is Receiving Full Pay and Benefits Pending a Timely Investigation**

Both the United States Supreme Court and the Sixth Circuit recognize that being placed on administrative leave or suspension with full pay and benefits pending a timely investigation does not constitute an adverse action. *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 803 (6th Cir. 2004), *aff'd sub nom. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (holding that a suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action); *Sensabough v. Halliburton,* 937 F.3d 621, (6th Cir. 2019) (finding letter of guidance and letter of reprimand issued to plaintiff did not constitute adverse action to establish First Amendment Retaliation claim where Letter of Guidance had no detrimental effect on Plaintiff's job and Letter of Reprimand amounted to a suspension with pay pending investigation by outside counsel, which several courts have held does not constitute an adverse action); *Ehrlich v. Kovack,* 710 F. App'x 646, 650 (6th

16

Cir. 2017) (holding being placed on paid administrative leave while an investigation is conducted into suspected wrongdoing is not an adverse action to establish First Amendment retaliation claim); *Harris v. Detroit Pub. Schools,* 245 F. App'x 437, 443 (6th Cir. 2017) ("Harris also argues that his suspension constituted an adverse employment action. We have held, however, that a suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action. Accordingly, because Harris has failed to satisfy the prima facie requirements of a First Amendment retaliation claim, we **AFFIRM** the district court's grant of summary judgment in favor of DPS on that claim.")(Internal citation and quotation marks omitted).

Plaintiff's Claim Under the Fourteenth Amendment is devoid of any specificity. Nonetheless, it is not ripe.  *Jackson v. City of Columbus,* 194 F.3d 737, 749 (6th Cir. 1999), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S. Ct. 992, 152 L.Ed.2d 1 (2002) ("The holding in Loudermill, however, only extended to the termination of public employees.  Indeed, the Supreme Court stated in Loudermill that suspension of a tenured public employee with pay would avoid due process problems entirely.") (Internal citation omitted).

Here, whether framed as an administrative leave or a suspension, Professor Mehler has been provided his full pay and benefits while the University has been conducting an investigation into complaints regarding his Welcome Video.  He has, as a matter of law, not suffered an adverse action and therefore he cannot establish his claims under the First or Fourteenth Amendments.

b.      **Defendants Have Not Taken Any Other Actions That Deterred Plaintiff From Exercising His First Amendment Rights**

In addition to being factually inaccurate, Plaintiff is talking out of both sides of his mouth. He alleges in his brief that "1) banning him from campus, 2) removing his classes' Canvas pages, 3) describing his speech to the news media as "profane, offensive, and disturbing," 4) prohibiting

17

him from speaking with current and former students and colleagues, and 5) removing his faculty biography webpage from FSU's website . .  each one individually and certainly collectively, constitute adverse action[s] that would deter persons of ordinary firmness . . . from engaging in First Amendment activity."  In the context of public employment, an adverse action is one that would "likely chill a person of ordinary firmness from continuing to engage in that activity.*" Ryan v. Blackwell*, 979 F.3d 519, 525 (6th Cir. 2020). Plaintiff alleges his colleagues would be chilled from engaging in First Amendment speech. *ECF No. 4, PageID. 277-80.* Yet, Plaintiff admits at Paragraph 111 of his Complaint that "Since Defendants' actions described herein, Dr. Mehler has received an outpouring of support including a flood of letters of support for him and The Video from students, instructors, and lawyers from across the country and, indeed, the world – along with a number of racist and anti-Semitic threats." *ECF No.1, PageID. 18.*  In his demand letter, Counsel Hoffer admits that Professor Mehler's Ferris State University colleagues support him.  By the terms of his letter from the Dean, Plaintiff has had access to his email account and is able to connect with others at the University. Plaintiff certainly has not been deterred from speaking to the media about the investigation.

Ferris State University's description of Professor Mehler's speech as "profane, offensive, and disturbing" is also not an adverse action. In *Samad v. Jenkins*, the court held a letter threatening to reveal accurate collected information about a tenured professor was not an adverse employment action. 845 F.2d 660, 663 (6th Cir. 1998); *see also Ryan, supra,* 979 F.3d at 525 (holding defendant's single statement to the press regarding an audit report claiming professor misused department resources to make a larger profit off a textbook he authored did not rise to the standard of an adverse action). Similarly, here, Ferris State University's description of Professor Mehler's speech as "profane, offensive, and disturbing" is an accurate summation of his Welcome Video

18

and his choice of teaching expression. Plaintiff himself admits in Paragraph 48 of his Complaint that his Show contains "lots of profanity" and it may "offend" people. Ferris State University's statement to the news media describing Plaintiff's Welcome Video in the same way Plaintiff describes his own video and teaching method cannot be considered an adverse action or one that would chill an ordinary person from exercising their free speech rights.

Like Professor Mehler, in *Bonnell, supra* the professor alleged that he had a First Amendment right to distribute a complaint of sexual harassment against him and a letter regarding the student's complaint to his students, fellow faculty members, and the media.  The Sixth Circuit disagreed and found that "[the College's] purported interests, including maintaining the confidentiality of student sexual harassment complaints, disciplining teachers who retaliate against students who file sexual harassment claims, and creating an atmosphere free of faculty disruption, outweigh Plaintiff's purported interests."  *Id.* at 823.

Here, the University's actions serve to protect complaining parties from retaliation and to create an atmosphere free of disruption and confusion.  The temporary removal of a canvas web page and biography go hand-in-hand with an administrative leave and serve to remove any student confusion while courses are being taught by alternate instructors.  Requesting a respondent not to discuss a pending investigation into a complaint of inappropriate comments serves to protect Professor Mehler from accusations of retaliation and to protect students, to whom Professor Mehler told "I'm a f*cking tenured professor. So, if you want to complain to your dean, f*ck you. Go ahead.  I'm retiring at the end of this year, and I couldn't give a flying f*ck any longer." from retaliation as well.  Banning Plaintiff from campus pending the results of the investigation also serves to protect both Professor Mehler and the student from retaliation and does not constitute an adverse action where Plaintiff has no evidence this temporary ban has caused him any specific

damage or material loss. *See Agrawal v. Univ. of Cincinnati*, 977 F. Supp. 2d 800, 823 (S.D. Ohio 2013), *aff'd in part, rev'd in part on other grounds and remanded sub nom. Agrawal v. Montemagno*, 574 F. App'x 570 (6th Cir. 2014) (finding transfer of professor's office space and reduction in laboratory space were not materially adverse actions where plaintiff could not establish the reduced laboratory space affected his research program or caused him material loss). Professor Mehler's claims of adverse action are simply unfounded.

### B.    Plaintiff Would Not Suffer Irreparable Harm Without the Injunction

Plaintiff has been on leave with full pay and benefits.  He has suffered no harm, nor will he suffer any harm while the University continues to investigate this matter.  As set forth in section III(A)(3)(b), *supra*, the other acts which Plaintiff attempts to enjoin are not protected by the First Amendment; and, in any event, are not causing any harm since Plaintiff is speaking with the media and publicly expressing himself via his YouTube account, and since he alleges his students and colleagues have not been deterred from speaking out in support of him. Plaintiff has also not alleged any specific damage or material loss he has suffered as a result of the requirement that he remain away from campus while the investigation is ongoing.

### C.    The Issuance of An Injunction Will Cause Harm to the University and Would Not Serve the Public Interest

Plaintiff alleges no harm would befall anyone by entry of a TRO or preliminary injunction because, so far as he has been made aware, no one has complained of harassment as a result of the Welcome Video and there is "no victim here to protect." This is patently untrue. The very impetus for the University's investigation was complaints from students who disenrolled from Plaintiff's class after viewing the "Welcome Video." Allowing Plaintiff to return to the classroom while the investigation is ongoing would directly harm the interests of the students who complained.

Further, students in a university classroom where a college professor is speaking are a "captive audience," and the students cannot "effectively avoid further bombardment of their sensibilities" by simply averting their ears. *See Bonnell v. Lorenzo,* 241 F.3d 800, 820–21 (6th Cir. 2001). Allowing Plaintiff to return to the classroom while the investigation is ongoing would also directly harm the interests of the enrolled students, as Plaintiff, who emphasized to his students that he was tenured and said, "I'm retiring at the end of this year, and I couldn't give a flying f*ck any longer," would be in a position to continue to call students derogatory names and make them uncomfortable with his use of profanity and offensive terms.

By placing Plaintiff on Administrative leave with instructions given, the University has protected its students and administrators from future potential harm that violates Title IX. Academic Freedom and the First Amendment do not give a professor the right to call students or his administrators the N-word or c*cksuckers nor does it give him the right to say f*ck you.  The use of such profanity and discriminatory terms directed toward students and administrators subject the University to possible Title IX claims of sexual harassment.  Moreover, it is simply wrong!

As set forth above, the use of such terms in an academic setting is not protected speech except in very limited circumstances, like *Hardy*, not present here.

Issuing a TRO or preliminary injunction that allows Plaintiff to resume his teaching schedule may also cause additional students to disenroll from Plaintiff's history class, disrupting their educational experience and forcing them to search for new classes in the middle of the fast-paced semester. Returning Plaintiff to his position in the midst of an investigation may also expose the University to additional parent and student complaints. An injunction will only further disrupt Ferris State University's operations and has the potential to create widespread parent and student dissatisfaction with the University and its operations. Plaintiff's concerns regarding the burden of

21

Plaintiff's absence being borne by his colleagues is not supported by any evidence. Ferris State University is operating efficiently with alternate instructors and Plaintiff's paid leave has not negatively affected the educational services the University provides to its students.

## IV.   DEFENDANTS ARE ENTITLED TO FEES AND COSTS

A plaintiff must be a "prevailing party" to recover an attorney's fee under 42 U.S.C. 1988. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939, 76 L. Ed. 2d 40 (1983). To be considered a "prevailing party" for attorney's fees purposes, the plaintiff must succeed on any "significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Id.*  Here, as described in Section III(A), *supra*, Plaintiff will not succeed on the merits of any of his claims. His speech is not constitutionally protected where it did not touch on a matter of public concern. Plaintiff's profane discriminatory and vulgar speech, including directly calling his students and administrators c*cksuckers and repeatedly swearing at them, telling them "f*ck you" and "keep your f*cking distance"), serves no academic purpose and is not germane to the subject of his history classes. Even if Plaintiff's speech did involve a matter of public concern, his First Amendment interests do not outweigh Ferris State University's interests in ensuring its students are not subject to profane and discriminatory comments by a professor. Further, Plaintiff has not suffered an adverse action.

Instead, Defendants in the circumstances of this case should be awarded costs and attorney fees against Plaintiff and his counsel for having filed and persisted in pursuing a vexatious and non-meritorious claim. 28 U.S.C. § 1927; *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421; 985 S. Ct. 694 (1978) (the court has discretion to award defendants attorneys' fees when the plaintiff's action was frivolous, unreasonable, or groundless). *CRST Van Expedited, Inc. v. EEOC*, 136 S. Ct. 1642; 194 L. Ed.2d 707 (2016) (a defendant need not prevail on the merits to be a prevailing defendant and eligible for an attorneys' fees award); 42 U.S.C. 1998; *Hughes v. Rowe*,

22

449 U.S. 5; 101 S. Ct. 173 (1980) (attorneys' fees and costs are available to defendants in Section 1983 cases under the same standards applicable to Title VII); *Bidasaria v. Cent. Michigan Univ.*, No. 10-15079, 2012 WL 3077211, at *2 (E.D. Mich. July 30, 2012), *aff'd* (Mar. 25, 2013) (granting sanctions to Defendant and holding that Section 1927 does not require a showing of subjective bad faith but, rather, is satisfied "when an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims.")

Because Plaintiff clearly cannot succeed on the merits of his claims, Plaintiff and his counsel knew his lawsuit is frivolous, and Defendants are entitled to attorneys' fees and costs under 42 U.S.C. § 1988; 28 U.S.C. § 1927; *Hughes v. Rowe,* supra.

## CONCLUSION

For the reasons stated above, Defendants respectfully requests that this Court deny Plaintiff's motion, as well as award Defendants their costs, attorney fees and any other relief this Court deems reasonable.

Respectfully submitted,

CLARK HILL PLC

By:    s/Robert M. Vercruysse
       Robert M. Vercruysse (P21810)
       Anne-Marie Vercruysse Welch (P70035)
       Attorneys for above named Defendants
       500 Woodward Avenue, Suite 3500
       Detroit, MI  48226
       (313) 965-8325  (313) 309-6958
       rvercruysse@clarkhill.com
       awelch@clarkhill.com

Dated:  February 14, 2022

ClarkHill\09225\437562\265805686.v1-2/14/22

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the limitation of LCivR 7.2(b)(i) because the brief contains

8060 words, excluding parts of the brief exempted by LCivR 7.2(b)(i).

2.      The word count provided herein was generated using Microsoft Word for Office

365.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 14, 2022, I electronically filed the foregoing paper with

the Clerk of the Court using the ECF system which will send notification of such filing to all

attorneys of record.

By:     <u>s/Robert M. Vercruysse</u>
        Robert M. Vercruysse (P21810)
        Attorneys for above named Defendants
        500 Woodward Avenue, Suite 3500
        Detroit, MI  48226
        (313) 965-8325  (313) 309-6958
        rvercruysse@clarkhill.com

ClarkHill\09225\437562\265805686.v1-2/14/22