# EXHIBIT 5

2015 WL 1179955
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio,
Eastern Division.

Michael MARSHALL, Plaintiff,

v.

OHIO UNIVERSITY, et al., Defendants.

No. 2:15–cv–775.
|
Filed March 13, 2015.

**Attorneys and Law Firms**

Michael Kurt Allen, Cincinnati, OH, Joshua A. Engel, Joshua A. Engel, LLC, Michael K. Allen & Assoc., Mason, OH, for Plaintiff.

*OPINION AND ORDER*

GEORGE C. SMITH, District Judge.

**\*1** Plaintiff Michael Marshall initiated this case against Defendants Ohio University, Ryan Lombardi, and Diane Bouvier alleging a violation of his First Amendment right to free speech, a violation of his civil rights under 42 U.S.C. § 1983, and violations under Title IX of the Education Amendments of 1972. (*See* Doc. 1, Compl.). Plaintiff has been suspended from the University, and this matter is currently before the Court on Plaintiff's Motion for Temporary Restraining Order (Doc. 2), seeking reinstatement. Defendants filed a Response in opposition to Plaintiff's motion (Doc. 10). The issue is now ripe as Plaintiff has waived the opportunity to file a reply brief and both parties have agreed to forego an oral hearing on the matter. (*See* Doc. 9, Sch. Order). For the reasons that follow, Plaintiff's Motion for Temporary Restraining Order is **DENIED.**

**I. BACKGROUND**

The following facts are set forth for the limited purpose of addressing the immediate motion before the Court. It should be noted that any findings of fact and conclusions of law made by a district court in addressing a request for injunctive relief are not binding at a trial on the merits. *See United States v. Edward Rose & Sons,* 384 F.3d 258, 261 (6th Cir.2004) (citing *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)).

**A. The Parties**

Plaintiff Michael Marshall is a student at Ohio University ("OU") in Athens, Ohio. He has completed three full semesters of courses at OU and has five semesters remaining before he can graduate. Prior to the incidents giving rise to this case, Marshall had no history of misconduct at the school. (*See* Doc. 1, Compl. at ¶ 3).

Defendant OU is a public university. OU voluntarily participates in federal spending programs. Accordingly, OU has waived its Eleventh Amendment immunity for Title IX purposes, pursuant to 42 U.S.C. § 2000d–7. Defendant Ryan Lombardi is the Assistant President for Student Affairs at OU. Defendant Diane Bouvier is the Interim Executive Director at the OU Office for Institutional Equity and the OU Title IX Coordinator. The OU Office for Institutional Equity is charged with enforcing OU's Sexual Misconduct Policy. (*Id.* at ¶¶ 4–6).

**B. Ohio University's Sexual Misconduct Policy**

OU adopted its current Sexual Misconduct Policy ("Policy") on August 3, 2012. (*Id.* at ¶ 14). The Policy applies to all students, employees, volunteers, and agents of OU. The Policy is intended to prohibit "sexual misconduct in any of its employment situations or educational programs and activities." (*See* Policy at 1, attached as Exhibit A to Plaintiff's Compl.). The purpose of the Policy is "to provide a fair process for determining if a violation of this policy occurred, to remediate the effects of conduct that violates this policy, and to provide information to prevent sexual misconduct." (*Id.*).

The Policy defines six types of sexual misconduct offenses: sexual harassment by *quid pro quo,* sexual harassment by hostile environment, non-consensual sexual intercourse, nonconsensual sexual conduct, sexual exploitation, and retaliatory harassment. Of relevance to this case is the Policy's provisions regarding sexual harassment by hostile work environment. The Policy states in pertinent part:

**\*2** **§ 03.004: Sexual Misconduct**

....

## V. Definitions of Sexual Misconduct Offenses

Sexual harassment includes sexual advances, requests for sexual favors, and other physical or verbal conduct of a sexual nature that is unwelcome and is sufficiently severe or pervasive from both a subjective (the complainant's) and an objective (a reasonable person's) viewpoint. Sexual harassment occurs under either of two circumstances, as discussed in Subsections A and B, immediately below.

....

### B. Sexual Harassment by Hostile Environment

1. Such conduct has the purpose or effect of unreasonably interfering with a person's work or academic performance or creating an intimidating, hostile, or offensive environment for working, learning, or living on campus.

    2. The determination of whether an environment is "hostile" is often contextual and must be based on the circumstances. These circumstances could include:

    • The frequency of the conduct;

    • The nature and severity of the conduct;

    • Relationship between alleged harasser and subject of the alleged harassment;

    • Location and context in which the alleged conduct occurs;

    • Whether the conduct was physically threatening;

    • Whether the conduct was humiliating;

    • Whether the conduct arose in the context of other discriminatory conduct.

    3. A hostile environment could be created by repeated, unwanted, sexually oriented stares (maintaining eye contact is, of course, acceptable).

The Office for Institutional Equity is responsible for investigating complaints of sexual misconduct under the Policy. The OU Code of Conduct states that OU provides the following rights to students:

a. The right to remain silent;

b. The right to cross-examine the complainant and witnesses;

c. The right to examine all written materials;

d. The right to present evidence, including character witnesses;

e. The right to request the removal of any University Hearing Board member by showing written or verbal evidence of bias against the accused;

f. The right to be accompanied by an advisor who must be a member of the University community;

g. The right to be accompanied by an attorney in cases where criminal charges are pending or likely to be pending. The policy "Hearing Board Guidelines for Lawyers" is available from the Office of Community Standards; and

h. The right to file an appeal

(Compl.¶ 21).

If a person is found to have violated the Policy following an investigation, he/she will be subject to disciplinary action which may include "sanctions up to and including, termination of employment or expulsion from the university." (Policy at 7). Additionally, OU has adopted "sanctioning guidelines" for certain violations of the Policy, informing students to "expect a minimum of 1 semester suspension" for any sexual misconduct violations of the Policy. (*See* Compl. ¶ 19).

### C. The Alleged Conduct

**\*3** In the case at bar, Plaintiff Marshall met a fellow OU student, A .H., in 2013 when A.H. transferred into the Honors Tutorial College. (*Id.* at ¶ 24). Plaintiff and A.H. became friendly and would often exchange text messages about both academic assignments and social events. (*Id.*). In Fall 2014, both students lived in the same honors residence hall complex. (Doc. 10, Ex. A, Frith Aff. ¶ 7). They also were scheduled to take a small group "tutorial class," in which they were the only two students enrolled. (*Id.* at ¶¶ 4–6). During the fall semester, Plaintiff began sending A.H. several text messages

Case 1:22-cv-00071-JMB-RSK ECF No. 12-6, PageID.472 Filed 02/14/22 Page 4 of 37
Marshall v. Ohio University, Not Reported in F.Supp.3d (2015)
2015 WL 1179955

in an attempt to engage in a romantic relationship with her. Examples of these texts from early October include:

"I'm very drunk right now, and I've tried to compose something to send to you but I cannot. Therefore I say to you:



"I heard that you made out with the girl with the eyebrow piercing. I agree. Goddamn. That's my goal tonight, although I have serious doubts about whether or not I will be successful, because I can no longer conduct myself in a comely fashion"

"I don't know what you think or feel. What I do know is that you are fabulously attractive and fabulously intelligent in that I know that I can tell you all this and that nothing will change between us"

(Compl.¶ 26).
A.H. responded to Plaintiff's texts by writing: "it might take me a while to give you a proper response but I don't want to leave you hanging in the meantime." She later responded, "I like you a lot, but in a platonic way." Marshall texted back, "there is nothing I can say to change your mind. I know that.... Like I really like you and I don't know why. Well, life goes on." (Id. at ¶ 27).

Despite A.H.'s polite declinations, Plaintiff continued his pursuit. On October 12, 2014, Marshall again tried to convince A.H. to enter into a romantic relationship, and the following texts were exchanged:

Marshall: "just come, I'm not asking for any commitment here. Or, and I want to be clear, you do have the less amicable option of politely, but plainly, tell me to fuck off and general and I will respect it and not hold it against you."

A.H.: "I'm not interested in getting dinner with you. I been very patient with you because I know you're a good guy, but you being a good guy is not enough to make me interested in dating you. I do not want to fuel the fire by going to dinner with you. I'm also not going to apologize. You

presented me with multiple opportunities to go out with you and I'm politely declining."

Marshall: "I know and I understand. I've been out of hand and I am the one who should apologize. I hope we can maintain a courteous friendship."

(Id. at ¶ 29).

Plaintiff continued to send additional text messages to A.H., to which she ultimately responded: "I'm going to tell you honestly that you need to leave me alone, let it be, it's not going to happen ." Marshall said, "I know." He added, "however, since I'm still drunk enough to make a fool out of myself, Let me propose to you that if you ever need a friends with benefits, or anything of that sort I am available and I will still be totally willing to leave you alone." She responded, "I'm not interested." (Id. at ¶ 30).

**\*4** On November 14, 2014, following a party attended by both Marshall and A.H., Marshall again texted A.H. and stated: "use that perfect ass so no one else has to." A.H. responded, "Actually fuck you. I have serious problem. With you." (Id. at ¶ 31).

A.H. notified one of her professors at the Honors Tutorial College about Plaintiff's behavior. (Frith Aff. ¶ 8). A.H. acknowledged that she did not feel unsafe, but claimed that her "academic environment has been disrupted." (Compl. ¶ 36). She further complained that "Marshall had touched her shoulders while intoxicated at a party, but also indicated that Marshall did not continue to touch her after she told him that this made her uncomfortable." (Id.). On November 18, 2014, a formal complaint was filed with the OU Office for Institutional Equality. (Id. ¶ 36).

On December 12, 2014, Plaintiff was notified that the Office for Institutional Equality had begun an investigation in A.H.'s complaint. (Id. at ¶ 37). In addition to Plaintiff, five other witnesses were interviewed. (Id. at ¶ 38). OU held a hearing on the complaint on January 29, 2015. The hearing panel found that Plaintiff's conduct met the criteria for the definition of sexual harassment, stating that Marshall "repeatedly continue [sic] to communicate with [A.H.] in a manner that made her feel uncomfortable and disrupted our [sic] ability to focus in the academic environment, due to their classroom requirements and future frequent interactions." (Id. at ¶ 39). The hearing panel recommended that Marshall be suspended for a semester, but that he could petition for readmittance after completing certain tasks, including a

research paper and an alcohol and drug assessment. (*Id.* at ¶ 40). Plaintiff appealed the decision. On February 24, 2015, Lombardi completed his review of Marshall's appeal and upheld the decision and sanction of the hearing panel. (*Id.* at ¶ 42).

Plaintiff then initiated this case on March 4, 2015 seeking injunctive relief to be reinstated as a student for the current semester.

## II. STANDARD OF REVIEW

Rule 65(b) of the Federal Rules of Civil Procedure permits a party to seek injunctive relief to prevent immediate and irreparable injury. A temporary restraining order is an extraordinary remedy whose purpose is to preserve the status quo. *Proctor & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 226 (6th Cir.1996). The burden of proving that the circumstances "clearly demand" such an extraordinary remedy is a heavy one: "[t]he party seeking the injunction must establish its case by clear and convincing evidence." *Overstreet v. Lexington–Fayette UrbanCnty. Gov't,* 305 F.3d 566, 573 (6th Cir.2002); *Honeywell, Inc. v. Brewer–Garrett Co.,* 145 F.3d 1331 (6th Cir.1998).

The factors considered in granting a temporary restraining order or a preliminary injunction are similar in nature. In the Sixth Circuit, it is well-settled that the following factors are to be considered in determining whether a temporary restraining order is necessary:

> **\*5** (1) whether the movant has a strong or substantial likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the relief requested; (3) whether issuance of the injunction will cause substantial harm to others; and (4) whether the public interest will be served by issuance of the injunction.

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati,* 363 F.3d 427, 432 (6th Cir.2004). The factors are not prerequisites; rather, they must be balanced. *Capobianco, D.C. v. Summers,* 377 F.3d 559, 561 (6th Cir.2004); *see also Michigan Bell Tel. Co. v. Engler,* 257 F.3d 587, 592 (6th Cir.2001) (no single factor is determinative).

The decision whether to issue a temporary restraining order or preliminary injunction falls within the sound discretion of the district court. *See Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 102 (6th Cir.1982). Ultimately, "[t]he purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.,* 163 F.3d 341, 348 (6th Cir.1998) (citing *Stenberg v. Checker Oil Co.,* 573 F.2d 921, 925 (6th Cir.1978)).

## III. DISCUSSION

Plaintiff Michael Marshall initiated this case against Defendants asserting claims for violation of his First Amendment right to free speech, a violation of his civil rights under 42 U.S.C. § 1983, and violations under Title IX of the Education Amendments of 1972. Plaintiff seeks a temporary restraining order, reinstating him to OU, on his claims for violation of his First Amendment rights and violation of Title IX, asserting that he has a strong likelihood of success on the merits of his claims, and that he has sufficiently set forth the other requirements justifying a temporary restraining order. The Court will consider each of Plaintiff's claims in the context of the four factors listed above to determine whether a temporary restraining order is warranted in this case.

### A. Likelihood of Success on the Merits

#### 1. First Amendment Claims

Plaintiff argues that there is a substantial likelihood that he will succeed on the merits of his First Amendment claim because the Policy (1) is overbroad, and (2) "lacks any relationship to the intent of the speaker to cause harm." (Doc. 2, Pl.'s Mot. at 7). To the contrary, OU asserts Plaintiff's free speech arguments are devoid of any merit, as the Policy is narrowly tailored to fully comport with the First Amendment.

#### a. Overbreadth

Plaintiff first argues that the "sweeping" language of the Policy, specifically § 3.004, is overbroad, and thus constitutionally invalid. In considering whether a statute or policy violates the First Amendment on overbreadth grounds, the Court must resolve two issues. First, the Court must "determine whether the regulation reaches a substantial amount of constitutionally protected speech."

*Leonardson v. City of E. Lansing,* 896 F.2d 190, 195 (6th Cir.1990). Second, the Court must address whether the policy is constitutionally invalid under the void for vagueness doctrine. *See id.;* *Dambrot v. Cent. Michigan Univ.,* 55 F.3d 1177, 1183–84 (6th Cir.1995). A policy will be considered "void for vagueness" if it (1) "denies fair notice of the standard of conduct to which a citizen is held accountable" or (2) constitutes "an unrestricted delegation of power," inviting "arbitrary, discriminatory and overzealous enforcement." *Leonardson,* 896 F.2d at 196 (quoting *Washington Mobilization Committee v. Cullinane,* 566 F.2d 107 (D.C.Cir.1977)).

*6 The Court finds that Plaintiff has failed to demonstrate he is likely to prevail on his allegations that the Policy, set forth above in Section I.B., reaches a substantial amount of constitutionally protected speech and/or implicates the void for vagueness doctrine. OU's policy is carefully drafted and narrowly tailored, balancing the need to prohibit certain types of harassing behavior with a student's free speech rights. Plaintiff argues that the Policy "seems to reach a substantial amount of constitutionally protected speech-including any effort by any student to ask another student out on a date." (Doc. 2, Pl.'s Mot. at 8). But the Court finds Plaintiff overstates the Policy's reach: to be actionable, § 3 .004 requires an individual's actions to be objectively and subjectively severe or pervasive so as to cause, or be intended to cause, an intimidating, hostile, or offensive work, academic, or living environment. Ordinarily, asking someone on a date in a reasonable manner does not require or entail severe and pervasive behavior that rises to a level of intimidation, hostility, or offensiveness (even if the offer is unwelcome or rejected).

Further, despite Plaintiff's contentions, the Policy explicitly considers the situation not only from a complainant's point of view, but also from "an objective (reasonable person's) viewpoint." (Policy at 2–3). This safeguard effectively protects individuals from the danger oversensitive complainants may pose in punishing or restricting otherwise reasonable protected speech. Finally, the Policy does not

merely define "Sexual Harassment by Hostile Environment" in a general sense: it also puts individuals on notice as to what specific circumstances OU will consider in reviewing their behavior, such as the frequency, nature, and severity of the harassment, whether the harassment was physically threatening or humiliating, and other contextual issues such as the relationship between the parties.

Plaintiff relies predominately on two cases in his motion: *Dambrot v. Central Michigan University,* 55 F.3d 1177 (6th Cir.1995) and *DeJohn v. Temple University,* 537 F.3d 301 (3d Cir.2008). In both of these cases, the Courts of Appeals found that each university's respective policy violated the First Amendment on overbreadth grounds. But the policies underlying both of those decisions were significantly less detailed and narrowly tailored than the one at issue here. For instance, in *Dambrot,* the Court criticized the university's policy for its overinclusiveness and for its failure to include any objective viewpoint. *Dambrot,* 55 F.3d at 1182–84. The Third Circuit shared similar concerns about Temple University's sexual harassment policy in *DeJohn.* *See* *DeJohn,* 537 F.3d at 316–19. But Plaintiff has not clearly explained how OU's policy shares these deficiencies. Section 3.004 appears to be narrowly tailored to only proscribe conduct that, when viewed both subjectively *and* objectively, (1) is unwelcome, (2) is of a sexual nature, (3) is severe or pervasive, and (4) has the purpose or effect of unreasonably interfering with the complainant's work or studies or otherwise creating a hostile environment. These requirements not only provide significantly more detail and notice than the policies reviewed by the *Dambrot* and *DeJohn* courts, they specifically track Title VII's definition of "sexual harassment" as well as the language used by the U.S. Supreme Court in reviewing sexual harassment cases. *See* 29 C.F.R. § 1604.11 ("Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when ... such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."); *see also, e.g.,* *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."); *Wilkie v. Robbins,* 551 U.S. 537, 582, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007) (quoting

2015 WL 1179955

*Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)) ("For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment ."); *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 631, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (for plaintiff to succeed on Title IX sexual harassment claim, he or she must demonstrate harassment that is "severe, pervasive, and objectively offensive").

**\*7** Based on the foregoing, the Court finds that Plaintiff has not demonstrated a likelihood of success on the merits of his claim that the Policy is overbroad and encompasses or punishes constitutionally protected speech. Additionally, the Court finds Plaintiff has ignored the fact that § 3.004 contains both a subjective and objective component, which seemingly protects individuals from arbitrary and unreasonable outcomes.

### b. Lack of Intent

Plaintiff next argues that the First Amendment requires OU "to demonstrate that he had a subjective intent to cause harm to A.H. before he can be suspended from school." (Doc. 2, Pl.'s Mot. at 10). OU contends that a *mens rea* requirement is not necessary to regulate the kind of harassing speech at issue here.

The Court finds Plaintiff's second argument not well-taken for many of the same reasons set forth above. OU's Sexual Misconduct Policy is narrowly tailored and mirrors federal regulations and case law. That it does not require malicious intent on behalf of the speaker does not render the provision unconstitutional; it is the *effect* on the school/working environment that allows schools to regulate disruptive speech, not the intent behind it. See *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 512–14, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Finally, the Court notes that Plaintiff has provided the Court with no precedent in which a court has deemed a harassment policy void for "lack of intent."

For these reasons, the Court finds both of Plaintiff's free speech arguments unavailing. Thus, the Court finds Plaintiff has failed to show that he has a substantial likelihood of succeeding on the merits as to his First Amendment cause of action.

### 2. Title IX Claim

Title IX of the Education Amendments of 1972 is a federal statute designed to prevent sexual discrimination and harassment in educational institutions receiving federal funding. Title IX specifically provides: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX is enforceable through an implied right of action for monetary damages, as well as injunctive relief. *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).

Plaintiff asserts violation of Title IX under two separate theories of relief: erroneous outcome and deliberate indifference.

### a. Erroneous Outcome

To prevail on an erroneous outcome theory Plaintiff would ultimately need to prove the hearing was flawed due to his gender. *Yusuf v. Vassar College,* 35 F.3d 709, 715 (2d Cir.1994) (reversed on other grounds). Specifically, a plaintiff must allege "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary hearing" as well as "a causal connection between the flawed outcome and gender bias." *Yusuf,* 35 F.3d at 715. The Second Circuit explained:

> **\*8** If no such doubt exists based on the record before the disciplinary tribunal, the claim must fail. We do not believe that Congress meant Title IX to impair the independence of universities in disciplining students against whom the evidence of an offense, after a fair hearing, is overwhelming, absent a claim of selective enforcement.

*Id.* Further, "a plaintiff must thus also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.* Examples of these circumstances include "statements by members of

the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*

Plaintiff does not dispute that he sent A.H. a series of inappropriate text messages as set forth above. However, he argues that his "suspension for sending text messages without any suggestion of a threat of violence—are sufficient to raise an inference of gender bias." (Pl.'s Mot. at 11). But allegations of an erroneous outcome "combined with a conclusory allegation of gender discrimination" cannot form the basis of Plaintiff's TRO request. *See* *Yusuf,* 35 F.3d at 715 (noting that a conclusory statement of gender bias is not sufficient to survive a motion to dismiss). As OU points out, Plaintiff has not pled any facts to support his contention that gender bias was "a motivating factor" of his suspension. He has not provided any gender-biased statements or questions posed by university officials during the disciplinary hearing, nor has he alleged that OU has had any issues with the Department of Education, in the past, or currently, that would require them to issue a harsh sanction. Further, the sanctions were clearly set forth by OU in its "sanctioning guidelines" and were not arbitrarily determined by the panel. The sanctioning guidelines explicitly state that any violation of the Policy will likely result in a minimum of one semester suspension. [1]

The Court notes that Plaintiff seeks to conduct expedited discovery "aimed at determining whether OU has a pattern of decision-making based on gender," which may ultimately provide Plaintiff with support for his claim. (Pl.'s Mot. at 13). But Plaintiff has the burden of proving that a TRO is warranted, and that he is substantially likely to succeed on the merits of his claim, *now.* Plaintiff may use evidence obtained in discovery to support his request for a preliminary injunction down the road, but at this juncture the Court cannot find that his unsupported speculations and inferences rise to the level of "a substantial likelihood of success." [2]

For these reasons the Court finds Plaintiff has failed to show that he has a substantial likelihood of succeeding on the merits of his Title IX "erroneous outcome" cause of action.

### b. Deliberate Indifference

To maintain a deliberate indifference claim under Title IX, Plaintiff must establish that an official of the institution who had the authority to institute corrective measures had actual notice of, and failed to correct, the alleged misconduct.

*Mallory v. Ohio University,* 76 Fed. App'x. 634, 640 (6th Cir.2003). It is unclear as to how exactly this claim applies to the facts of this case, as usually, this claim is asserted by a victim against a school or university official who *failed* to protect him or her from harassment or otherwise address the alleged misconduct-actions that OU officials undisputedly took, to *protect* the alleged victim *from* Marshall. Even if the Court construed Plaintiff's claim liberally as alleging that the university was deliberately indifferent towards the panel's gender discrimination against Plaintiff, the Court finds it would still fail for many of the same reasons articulated above. Plaintiff admits to persistently sending unwelcome sexual text messages to A.H. OU became aware of the situation, and-so as *not* to be deliberately indifferent to student harassment-initiated an investigation of the matter. After a hearing, the panel found Plaintiff violated the Policy and issued a one-semester suspension, pursuant to its sentencing guidelines. Without being presented with any facts or evidence to the contrary, the Court cannot find that OU's decision was the result of gender discrimination or anything other than Plaintiff's inappropriate behavior towards A.H.

**\*9** For these reasons, the Court finds Plaintiff has failed to establish that he has a substantial likelihood of success on the merits of both his First Amendment and Title IX claims.

### B. Irreparable Harm

After examining a plaintiff's likelihood of success on the merits of their claims, a court must balance those conclusions and findings with other factors, including the possibility that the denial of a temporary restraining order will cause irreparable harm to the plaintiff.

Plaintiff asserts that his dismissal from OU would "deny him the benefits of education at his chosen school, would damage his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career." (Pl.'s Mot. at 14). Further, even if readmitted to OU, he faces the possibility of permanent exclusion from the Honors Tutorial College, although he can appeal for reinstatement. (*See* Frith Aff. ¶ 9).

Other courts have found that a student's suspension from school can cause irreparable harm. *See* *Boman v. Bluestem Unified Sch. Dist.,* 2000 U.S. Dist. LEXIS 5389, 2000 WL 297167 (D.Kan. Jan. 28, 2000); *see also Bhandari v. Trustees of Columbia Univ. in N.Y.,* 2000 U.S. Dist. LEXIS 3720, at \*15–16, 2000 WL 310344 (S.D.N.Y.2000). The Court agrees

2015 WL 1179955

that the denial of a temporary restraining order here will likely cause Plaintiff irreparable harm. His suspension effectively denied him the benefit of the work already performed in the classes this semester and delayed the completion of his degree. Finally, Plaintiff will forever have this disciplinary action on his academic record, which may impact his ability to enroll at another institution, or affect his future career possibilities. Thus, the Court finds this factor weighs in favor of Plaintiff.

### C. Harm to Others

Plaintiff asserts that a temporary restraining order in this case will not cause any harm to third parties. Defendants, however, point to the basic (and obvious) fact that the reason Plaintiff has been suspended is that his admitted actions disrupted A.H.'s learning and living environment. The Court accordingly finds that issuance of a temporary restraining order would potentially cause harm to A.H. In this regard, both Plaintiff and A.H. are students in OU's honors tutorial program. A review of the record reveals that their presence in the program necessarily places them in potentially close proximity with each other given the program's dynamics-small class sizes and small number of students-and the fact that they lived in the same dorm. (*See* Frith Aff. ¶¶ 3–6). For instance, during the fall of 2014 (when the harassment occurred) they were the only two students in their required tutorial class. (*Id.* ¶ 6). Over the course of several weeks during that semester, Plaintiff repeatedly sent text messages (some of a suggestive or sexual nature) to A.H. seeking a romantic relationship even after his advances were clearly and definitively rebuffed by A.H. While Plaintiff's actions did not make A.H. feel physically unsafe, they did cause interference with her academic environment to the point where she finally strongly informed Plaintiff of her "serious problem" with his actions and reported his unwelcome advances.

**\*10**  A.H. can rightfully expect to pursue her education in an environment free from the harassing behavior of a fellow student. From the record before it, the Court concludes that issuance of a temporary restraining order reinstating Plaintiff to the honors tutorial program and thus placing Plaintiff and A.H. into close proximity, could potentially interfere with that right, thereby causing significant harm to A.H.

### D. Public Interest

Turning to the final factor, Plaintiff asserts that the public interest also favors the granting of a temporary restraining order. There is no question that there is a strong public interest

in protection of our constitutional rights. *See Am. Freedom Def. Initiative v. Suburban Mobility for Reg. Transp.,* 698 F.3d 885, 896 (6th Cir.2012) ("the public interest is promoted by the robust enforcement of constitutional rights"). However, as set forth above, Plaintiff has not established a strong likelihood of succeeding on his constitutional claims and the Court accordingly cannot reach the conclusion that the Policy in fact violates constitutional rights. As such, Plaintiff cannot show that issuance of a temporary restraining order is in the public interest.

The Court also agrees with Defendant's argument that university officials should be afforded some level of deference in their disciplinary decisions and processes. *See Woodis v. Westark Cmty. Coll.,* 160 F.3d 435, 438 (8th Cir.1998). Issuing a temporary restraining order in this case, and in others similar to it, would likely interfere with OU's ability to enforce its disciplinary standards. Absent facts or evidence evincing a substantial likelihood of success on the merits, the Court is reluctant to interfere with OU's disciplinary processes, which are specifically designed to "provide an environment that facilitates learning." (Defs.' Resp. Br. at 13).

For these reasons, the Court finds the "public interest" factor weighs in favor of OU.

### E. Balance of Factors

In summary, the Court finds that Plaintiff has not demonstrated a substantial likelihood of success on the merits of his First Amendment and Title IX claims-the factor often deemed "most important" to the Court's analysis. *See H & H Indus., Inc. v. Miller,* No. 2:13–CV–907, 2013 WL 6858760, at \*5 (S.D.Ohio Dec.27, 2013) (Graham, J.) ("Though no one factor is controlling, likelihood of success on the merits is often the most important factor in evaluating a motion for preliminary injunctive relief."); *see also Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir.1998) (noting that the likelihood of success on the merits will "often be the determinative factor" especially in First Amendment cases). The Court also finds that the "harm to others" and "public interest" factors weigh against the issuance of a TRO at this juncture. Therefore, although Plaintiff may indeed suffer irreparable harm if OU's suspension is allowed to stand, the Court cannot find that the factors, when balanced against each other, weigh in his favor. Accordingly, the Court concludes that the issuance of a temporary restraining order is not warranted in this instance.

2015 WL 1179955

### IV. CONCLUSION

**\*11**  Based on the foregoing reasons, Plaintiff's Motion for Temporary Restraining Order is **DENIED.**

The Clerk shall remove Documents 2 and 3 from the Court's pending motions list.

The telephone conference on Plaintiff's Motion for Preliminary Injunction remains scheduled for Tuesday, March 17, 2015 at 10 a.m.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1179955

---

### Footnotes

1   It seems that the guidelines could allow for a warning and/or probation in some instances, like the case at bar. But even if this Court agrees with Plaintiff that the punishment does not seem to fit the crime here, that sentiment alone does not equate to a "substantial likelihood of success on the merits." The Court is not tasked with rewriting OU's sanctioning guidelines; it is tasked only with determining whether there was some gender bias behind an erroneous outcome. Considering that Plaintiff does not contest that he actually sent the inappropriate texts, there does not appear to be any allegation of an erroneous finding by the panel. Nor has Plaintiff made sufficient allegations or suggestions that there is evidence of gender bias with respect to his case.

2   The Court has reviewed the case of *Wells v. Xavier University,* 7 F.Supp.3d 746 (S.D.Ohio 2014), which Plaintiff relies on in support of his arguments, but finds that it does not affect the Court's conclusion. In *Wells,* the case was before the court on a motion to dismiss. Therefore, the court only had to consider whether the plaintiffs had *plausibly* pled a claim for violation of Title IX. In the case at bar, Plaintiff must establish that he has a substantial likelihood of success on the merits of his claim, a standard much more demanding than that required to survive a motion to dismiss or even summary judgment. *See* *Leary v. Daeschner,* 228 F.3d 729, 739 (6th Cir.2000) ("[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion.").

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

710 Fed.Appx. 646
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Annette EHRLICH, Plaintiff-Appellant,

v.

Michael KOVACK, Individually and in his official
capacity; Joan Heller; Medina County, Ohio; Medina
County, Ohio Commissioners Defendants-Appellees.

No. 16-4751
|
Filed September 14, 2017

**Synopsis**

**Background:** Former county employee brought suit against
county auditor, his deputy and county commissioners alleging
that her employment was terminated in violation of her
First Amendment right to free speech. The United States
District Court for the Northern District of Ohio, Patricia
A. Gaughan, 2016 WL 6995264, dismissed federal claims.
Former employee appealed.

**Holdings:** The Court of Appeals, Cole, Chief Judge, held that:

former employee failed to establish that her protected speech
was a motivating factor for her termination;

denial of former employee's discovery request to access
auditor and his deputy's complete computer hard drives was
not abuse of discretion; and

denial of former employee's request to question auditor
regarding sealed Ohio records was not abuse of discretion.

Affirmed.

Karen Nelson Moore, Circuit Judge, filed dissenting opinion.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**\*647** ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE NORTHERN DISTRICT OF
OHIO

**Attorneys and Law Firms**

Theodore J. Lesiak, Kristopher Immel, Roderick Linton
Belfance, Akron, OH, for Plaintiff-Appellant

Frank H. Scialdone, Mazanec, Raskin & Ryder, Cleveland,
OH, for Defendants-Appellees Michael Kovack, Joan Heller

Kimberly Vanover Riley, Montgomery, Rennie & Jonson,
Cleveland, OH, for Defendants-Appellees Medina County,
OH, Medina County, Ohio Commissioners

BEFORE: COLE, Chief Judge; BATCHELDER and
MOORE, Circuit Judges.

OPINION

COLE, Chief Judge.

Annette Ehrlich filed a complaint against Michael Kovack;
Joan Heller; Medina County, Ohio; and the Medina County,
Ohio Commissioners pursuant to 42 U.S.C. § 1983. The
complaint alleged that the defendants terminated Ehrlich's
employment in violation of her First Amendment right to
free speech. The district court granted summary judgment
to Kovack, the only remaining defendant on Ehrlich's First
Amendment claim, and declined to exercise supplemental
jurisdiction over Ehrlich's state-law claims. Ehrlich appeals
the grant of summary judgment and two related denials of
requested discovery. We affirm.

## I. BACKGROUND

Ehrlich worked at the Medina County Auditor's Office
("Auditor's Office") as a network administrator. Michael
Kovack holds the elected position of Auditor of Medina
County and Joan Heller served as his deputy.

Ehrlich requested permission to attend a computer training
session related to a program known as Pictometry. Kovack
denied her request because he did not believe her attendance
would be beneficial to her work as an administrator. Ehrlich
then emailed Kovack and Heller informing them that she

intended to take a vacation day to attend the training. She wrote:

> I will be taking vacation to attend this training that I helped set up. I am unsure why you are so vehemently adamant that I be banned from this training. This has happened before with pricing in MVP. I was denied the opportunity **\*648** for training right here at our office but then I had to answer pricing questions first from Kathy who had the training and then from Jim. In fact, he was asking me questions about pricing just this week.

Heller considered the email to be an act of insubordination and recommended that Kovack take disciplinary action against Ehrlich and deny her requested vacation.

Heller advised Ehrlich by letter of Kovack's intent to discipline her for insubordination. The letter informed Ehrlich that insubordination is classified as a Category 3 offense and could result in a three-day suspension. The letter further noted that Ehrlich's conduct violated the Rules of Conduct of the Auditor's Policy and Procedure Manual, which delineates the rules of conduct for the Auditor's Office. The manual, however, actually states that Category 3 offenses are subject to termination of employment on the first offense.

Prior to Ehrlich's receiving Heller's letter, she delivered Kovack a letter stating that she had discovered his allegedly inappropriate use of the office printer for his campaign events. The letter discussed a number of issues, including Ehrlich's frustration at not being allowed to attend the training, her concerns that Heller's and Kovack's actions were creating a hostile work environment, and her investigation into the print logs which showed Kovack's campaign-related use of the county printer. As related to the campaign, the letter said:

> I also wanted to point out that in February, through checking of the print logs on the print server, which I do regularly to make sure the printers are working properly, I noticed that you were printing your Chili Cook-off

campaign literature from the printers here in the office. I have been so upset over it and I don't know how to address it considering how I have been treated by both you and Joan [Heller]. I constantly fear for my job and so I did not disclose this to anyone. However, I believe it is wrong to do that. This must be addressed, as this knowledge is causing me so much emotional distress.

(Ex. C, Ehrlich Dep., R. 89-1, PageID 1899.)

A disciplinary hearing was held in March and was attended by Heller, Kovack, and Lisa Nichols, Ehrlich's direct supervisor. Either Heller, Kovack, or Nichols suggested that Ehrlich contact an employee assistance program for help in managing her stress. Heller stated that Ehrlich threw the signed hearing notification at her during the meeting. Kovack confirmed this incident. Ehrlich also sent a letter to the sheriff's office notifying it of Kovack's purported use of the printers for his election campaign.

Kovack issued Ehrlich a written reprimand that would be expunged from her personnel file after six months as punishment for the email she sent Kovack regarding the training. Kovack also formed a three-member committee to look into Ehrlich's claim that she worked in a hostile work environment. The committee concluded that Ehrlich had not been subjected to a hostile work environment. Kovack also notified the sheriff of Ehrlich's allegations.

In June 2014, Kovack contacted Mike Warner, a computer technician in Medina, to discuss possible instability in information technology personnel at the Auditor's Office.

In July 2014, Ehrlich took leave under the Family Medical Leave Act. Ehrlich was to return to work on August 25, 2014, but Kovack placed her on paid administrative leave prior to her return. Kovack's stated reason for doing so was to "allow [the Auditor's Office] to complete preparations **\*649** for [her] return." (Ex. 29, Kovack Dep., R. 88-1, PageID 1420.) Kovack testified that leaks of information from the Auditor's Office concerned him and he wanted to limit Ehrlich's access to the computer system before she returned. Kovack extended Ehrlich's administrative leave on August 29, 2014, citing

Ehrlich v. Kovack, 710 Fed.Appx. 646 (2017)

2017 IER Cases 324,108

concerns about Ehrlich's access to the data center and the Auditor's Office network.

Kovack asked Ehrlich to attend a meeting on September 5, 2014, to discuss his concerns about the information leaks. Kovack said that at the meeting Ehrlich admitted to providing information from the Auditor's Office to Commissioner Pat Geissman, a political opponent of Kovack's. After the meeting, Ehrlich remained on administrative leave but was not given a date to return to work.

On September 17, 2014, a reporter contacted Ehrlich. The reporter had spoken with Heller and had reviewed Ehrlich's personnel file, which stated that Heller was afraid of Ehrlich.

On September 18, 2014, while still on administrative leave, Ehrlich went to the Auditor's Office with her dog to obtain her personnel file. Heller testified that Ehrlich's behavior was "out of control" and that she was loud and disruptive. (Heller Dep., R. 90-1, PageID 2130.) Fifteen witnesses prepared statements regarding the incident. Most of the witnesses testified that Ehrlich's behavior was inappropriate and threatening. Ehrlich denies this characterization.

Kovack reviewed the witness statements and determined that Ehrlich's actions necessitated discipline. He sent a predisciplinary hearing letter to Ehrlich on September 19, 2014, and set the hearing for September 25, 2014. In the letter, Kovack described Ehrlich's conduct at the Auditor's Office as a Category 3 offense which potentially could result in termination of employment. After the hearing, Kovack terminated Ehrlich's employment at the Auditor's Office.

Ehrlich then filed this lawsuit, setting forth four state-law claims and the instant First Amendment retaliation claim. The district court granted judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure to all of the defendants, except Kovack in his individual capacity as to the First Amendment claim. The district court then granted summary judgment to Kovack on the First Amendment claim and declined to exercise supplemental jurisdiction over the state law claims.

Ehrlich appeals the grant of summary judgment in favor of Kovack. She also appeals two of the district court's discovery decisions: (1) the district court's denial of Ehrlich's Motion to Compel Discovery relating to the production of Kovack's and Heller's Auditor's Office computer hard drives and (2) the order prohibiting the questioning of Kovack regarding evidence in his sealed criminal record.

## II. ANALYSIS

### A. Summary Judgment Standard

We review a summary judgment determination de novo. *Carl v. Muskegon Cty.*, 763 F.3d 592, 595 (6th Cir. 2014). Summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Courts consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is "genuine" only if it is "based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." **\*650** *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). "The mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

### B. First Amendment Retaliation Claim

"The First Amendment prohibits retaliation by a public employer against an employee on the basis of certain instances of protected speech by the employee." *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006). "In a First Amendment retaliation claim, we must consider whether the alleged adverse employment action 'would chill or silence a person of ordinary firmness from future First Amendment activities.' " *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir. 2012) (quoting *Ctr. for Bio–Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007)). A termination from employment is the quintessential example of an adverse employment action. *Id.*

A prima facie case for a First Amendment retaliation claim raised through a 42 U.S.C. § 1983 action has three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing

to engage in that conduct"; and (3) "the adverse action was motivated at least in part by the plaintiff's protected conduct."

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). "This inquiry is intensely context-driven: '[a]lthough the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary with the setting.' " *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010) (quoting *Thaddeus-X*, 175 F.3d at 388).

Ehrlich argues that the March 18, 2014 letter she sent to Kovack and Heller and the March letter to the sheriff's office constitute protected speech. She also argues that her termination and her being placed on administrative leave constitute adverse actions. Our precedents make clear that termination is an adverse employment action, but we have previously found that being placed on paid administrative leave while an investigation is conducted into suspected wrongdoing is not an adverse action. *See Harris v. Detroit Pub. Sch.*, 245 Fed.Appx. 437, 443 (6th Cir. 2007); *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004).

We focus on causation, the third element in a First Amendment retaliation claim, because failure to establish any element of a prima facie retaliation case results in the failure of that claim. *See Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 403 (6th Cir. 2010) (holding that failure to establish causation supported the grant of summary judgment for the defendant). To establish causation, a plaintiff must demonstrate that her protected speech is "a substantial or motivating factor" of the adverse action. *Id.* at 400 (quoting *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003)). This inquiry is "essentially but-for cause." *Id.* (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)). We have adopted a burden-shifting framework for this part of the analysis. *Id.* Under this framework, once the plaintiff has met her initial burden of demonstrating that her speech was a substantial or motivating factor of the adverse action, the burden shifts to the defendant to show that he would have taken the same action absent the protected speech. *Id.* A plaintiff can meet her initial burden through direct evidence or circumstantial evidence such as temporal **\*651** proximity. *Thaddeus-X*, 175 F.3d at 399. Although our cases recognize "the possibility that, on a particular set of

facts, extremely close temporal proximity could permit an inference of retaliatory motive, ... often evidence in addition to temporal proximity is required to permit the inference."

*Vereecke v. Huron Valley School Dist.*, 609 F.3d 392, 401 (6th Cir. 2010). In fact, "we have rarely found a retaliatory motive based only on temporal proximity." *Id.* at 401; *see, e.g.*, *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) (finding a four-month gap between a protected action and an adverse action insufficient to establish causation without other indicia of retaliatory conduct).

The district court found that the approximately six months between the letters and the adverse action "[was] on the outer edges with regard to temporal proximity." (Mem. Op. & Order, R. 113, PageID 3164.) To establish her initial burden on causation, Ehrlich points to temporal proximity as well as intervening incidents such as her March disciplinary action, that Kovack was attempting to replace her as early as June, and her placement on administrative leave. (Ehrlich Br. 25–27.)

The district court concluded that Ehrlich failed to establish a prima facie case. It found that the intervening incidents were not indicia of retaliatory conduct and that the temporal proximity alone was not enough to demonstrate but-for causation. It further determined that Kovack had an unrelated reason to terminate Ehrlich's employment in September because of the disturbance she caused at the Auditor's Office while on administrative leave.

We agree with the district court that Ehrlich did not produce evidence sufficient to establish that her protected speech was a motivating factor for her termination. First, the district court correctly found that the evidence does not support Ehrlich's contention that Kovack tried to replace her shortly after her protected speech. On appeal, Ehrlich argues an email that Warner sent Kovack indicates Kovack had already planned to fire Ehrlich. This email plainly does not support this contention. Rather, it supports the deposition testimony of Kovack who stated that he believed that Ehrlich might leave the Auditor's Office based on her complaints of a hostile work environment. Kovack also specifically stated that he had no plans to fire Ehrlich in June.

Ehrlich further argues that Kovack's disciplinary action in March constitutes evidence that Kovack terminated her because of her protected speech. While the March disciplinary decision occurred after Ehrlich engaged in protected speech,

Ehrlich v. Kovack, 710 Fed.Appx. 646 (2017)

2017 IER Cases 324,108

Heller had drafted the pre-disciplinary hearing letter prior to Ehrlich's speech and Ehrlich actually received a more lenient punishment for her insubordination than allowed for in the policy. This is not evidence of causation.

Finally, Ehrlich claims that her placement on administrative leave in August establishes but-for causation. However, there is no dispute that Ehrlich improperly leaked information from the Auditor's Office, which is the reason Kovack placed her on administrative leave.

Even if Ehrlich had established a prima facie case, Kovack established through substantial evidence that he would have terminated Ehrlich's employment in September absent her protected speech. Kovack has presented evidence that Ehrlich's behavior on September 18, 2014, was in and of itself a sufficient independent reason to terminate Ehrlich's employment. Ehrlich criticizes the evidence, but she identifies no counter-evidence sufficient to create a genuine dispute of material fact. Indeed, Ehrlich agrees that she went to **\*652** the Auditor's Office with her dog on September 18th and engaged in a heated exchange with Heller. That conduct alone is sufficient to constitute a Category 3 offense. Moreover, Ehrlich's objections to certain employee statements do not create a genuine dispute of material fact. Despite some factual differences among the employees, each individual described Ehrlich's conduct as loud or threatening and each individual submitted an affidavit stating that Ehrlich's conduct constituted a Category 3 violation. In this case, no jury would return a verdict in Ehrlich's favor because Kovack presented evidence that Ehrlich engaged in terminable behavior and Ehrlich has not identified any counter-evidence. See Anderson, 477 U.S. at 249, 106 S.Ct. 2505 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").

Because Ehrlich has failed to establish a prima facie case for First Amendment retaliation claim, we affirm the district court's grant of summary judgment.

### C. Discovery Decisions

Ehrlich appeals two of the district court's discovery decisions: (1) denial of her request to access Kovack's and Heller's complete computer hard drives and (2) denial of her request to question Kovack "regarding [his] criminal charges." (Ehrlich Br. 36.)

We review limits or denials of discovery under an abuse of discretion standard. See Bentkowski v. Scene Magazine, 637 F.3d 689, 696 (6th Cir. 2011). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." Davis by Davis v. Jellico Cmty. Hosp. Inc., 912 F.2d 129, 133 (6th Cir. 1990) (internal quotation marks omitted).

As to the hard drives, the district court found that the request was overly broad and "any failure on the part of defendants to comply with plaintiff's discovery requests does not rise to the level of necessitating production of the entire hard drives." (Order, R. 86, PageID 1050.) The scope of discovery is "within the sound discretion of the [district] court." Lavado v. Keohane, 992 F.2d 601, 604 (6th Cir. 1993). Ehrlich does not argue that she needed the entire hard drives, but rather that the parties were unable to agree on what files should be produced. (Ehrlich Br. 40–41.) The district court did not abuse its discretion in determining under these circumstances that Ehrlich's request for the complete hard drives was overly broad.

The district court held that Ehrlich was not permitted to "question defendants regarding any record contained in the Sheriff's file that has been sealed." (Order, R. 86, PageID 1052.) Kovack's records were sealed in accordance with Ohio state law. See Ohio Rev. Code Ann. § 2953.52(A). The protection this section affords may be waived, but the district court found that Kovack had not waived that protection when he publicly disclosed some of the information on his blog. The district court did not abuse its discretion in denying Ehrlich's request to question Kovack on the sealed records. We, therefore, affirm as to the discovery claims.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment and denial of Ehrlich's discovery requests.

KAREN NELSON MOORE, Circuit Judge, dissenting.

I write separately because I believe that the evidence establishes a genuine dispute of material facts as to Ehrlich's First **\*653** Amendment retaliation claim. I therefore

respectfully dissent from the majority's analysis in section II.B.

We will uphold a district court's grant of summary judgment only if "no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016); Fed. R. Civ. P. 56(a). A dispute of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In reviewing the evidence under Rule 56(a), "we view the evidence, 'and all inferences drawn therefrom, in the light most favorable to the non-moving party.' " *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015) (quoting *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000)). Summary judgment must not be granted if the party against whom the motion is made has produced evidence "such that a reasonable jury could return a verdict" in her favor. *Id.* The ultimate question on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505).

The majority correctly notes initially that a prima facie case of First Amendment retaliation "has three elements: '(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct'; and (3) 'the adverse action was motivated at least in part by the plaintiff's protected conduct.' " Maj. Op. at 650 (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). If the plaintiff meets her burden, the burden shifts to the defendant to demonstrate that he would have taken the same action absent the plaintiff's protected speech. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010).

The majority focuses its analysis on the third element of the prima facie case "because failure to establish any element of a prima facie retaliation case results in the failure of that claim." Maj. Op. at 650 (citing *Vereecke*, 609 F.3d at 403). In this

regard, *Thaddeus-X*'s third element bears emphasis—that "the adverse action was motivated *at least in part* by the plaintiff's protected conduct." *Thaddeus-X*, 175 F.3d at 394 (emphasis added). In concluding that summary judgment should be granted for Kovack, the majority overlooks critical disputes of material fact regarding both whether Ehrlich established that her protected speech was a motivating factor for her termination and whether Kovack produced undisputed evidence that he would have terminated Ehrlich's employment absent her protected speech.

The record contains evidence sufficient to create a material factual dispute regarding the motivation behind Kovack's firing of Ehrlich. Ehrlich first points to the fact that she was disciplined by Kovack for informing Kovack that she intended to take a vacation day so that she could attend a training seminar. This is material to the question of causation because it occurred after Ehrlich provided to Kovack, the sheriff, and others, information about Kovack's potential criminal activity. Ehrlich also adduced evidence that suggests her speech in 2014 bothered Kovack so much that he was considering replacing her. Additionally, Ehrlich placed in the record evidence that shows Kovack's shifting motivations for placing Ehrlich on administrative **\*654** leave. This evidence suffices to present a dispute on the material issue of causation. I would therefore conclude that a grant of summary judgment for Kovack based on the causation element of Ehrlich's prima facie case is improper.

I also believe that there exists a dispute of material fact regarding whether Kovack would have terminated Ehrlich's employment in September absent her protected speech. True, several individuals indicated that Ehrlich's behavior in the office on September 18 was threatening, insubordinate, and offensive. But because we are reviewing a summary-judgment motion, we must draw all inferences in favor of the non-moving party, and assume that Ehrlich's factual allegations are true. Ehrlich testified at her deposition that the statements of employees claiming to be scared by her alleged behavior on September 18 constituted "lies" and that the employees' statements were "untrue." R. 89 (Ehrlich Dep. at 133) (Page ID #1673). Ehrlich's deposition testimony, even in light of other employees' statements to the contrary, is sufficient to preclude summary judgment on the question of whether Ehrlich's actions on September 18 independently justified her termination. A fact-finder should weigh the competing testimony, judge credibility, and find the facts regarding the reason for Ehrlich's termination—not this

court. Therefore, I conclude that summary judgment cannot be granted on the issue of whether Kovack would have terminated Ehrlich's employment absent her protected speech.

Because I believe that the material factual disputes present in this case preclude a grant of summary judgment, I would reverse the judgment of the district court. The factual issues surrounding the circumstances of Ehrlich's termination should be dissected at a trial, not by an appellate court on summary-judgment review. For those reasons, I respectfully dissent from section II.B. of the majority opinion.

**All Citations**

710 Fed.Appx. 646, 2017 IER Cases 324,108

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

245 Fed.Appx. 437
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Dr. Sammie E. HARRIS, Plaintiff–Appellant,

v.

DETROIT PUBLIC SCHOOLS
et al., Defendants–Appellees.

No. 06–1476.
|
July 13, 2007.

**Synopsis**
**Background:** Former high school principal sued school
district and several individual district employees, alleging
violations of the First and Fourteenth Amendments and §
1983, and asserting various state-law claims. The United
States District Court for the Eastern District of Michigan,
2006 WL 568354, granted summary judgment for the district,
and the principal appealed.

**Holdings:** The Court of Appeals, Karen Nelson Moore,
Circuit Judge, held that:

the district did not take any adverse action against the
principal for exercising his First Amendment right to speak
out on a matter of public concern, thus defeating his First
Amendment retaliation claim;

placing the principal on paid leave did not violate any of his
procedural due process rights;

the district did not violate the principal's procedural due
process rights by refusing to allow him to rescind his
resignation; and

there was no substantive due process violation in any
deprivation of the principal's contractual rights.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

**\*438** On Appeal from the United States District Court for
the Eastern District of Michigan.

Before: KEITH, BATCHELDER, and MOORE, Circuit
Judges.

## OPINION

KAREN NELSON MOORE, Circuit Judge.

**\*\*1** Plaintiff–Appellant Dr. Sammie E. Harris ("Harris")
sued Defendant–Appellee Detroit Public Schools ("DPS")
and several individual DPS employees in the United States
District Court for the Eastern District of Michigan, alleging
violations of the First and Fourteenth Amendments and 42
U.S.C. § 1983 and asserting various state-law claims. The
district court declined to exercise supplemental jurisdiction
over Harris's state-law claims. DPS subsequently moved for
summary judgment on all of Harris's federal claims, and the
district court referred the motion to a magistrate judge, whose
Report and Recommendation ("R & R") suggested that the
motion be granted. Neither party filed objections to the R &
R, and the district court subsequently adopted it. Harris now
appeals the district court's grant of summary judgment. For
the reasons set forth below, we **AFFIRM** the judgment of the
district court.

## I. BACKGROUND

Harris was the principal of DPS's Northern High School
("NHS") from August 2000 until June 30, 2004. His
employment was governed by a year-to-year Employment
Agreement ("the Agreement," or "the contract"), which
provided that Harris was an at-will employee whose
employment could, at any time, be terminated by DPS's Chief
Executive Officer ("CEO"), "at his/her sole discretion with or
without cause, and with or without notice subject to the terms
of this Agreement." J.A. at 36 (Agreement at 1 ¶ 3.1).

The Agreement also provided for automatic renewal
"annually if Employee does not receive notice of non-
renewal." J.A. at 41 (Agreement at 6 ¶ 16). It required Harris
"to notify the District in writing by February 1 of each year

if [he] does not wish for the contract to rollover [sic] to the following year" and "to give the District 60 days['] written notice prior to terminating this contract." *Id.* The Agreement could be amended only "by a written document signed by both parties." J.A. at 43 (Agreement at 8 ¶ 21); *see also* J.A. at 36 (Agreement at 1 ¶ 3. 1) ("No modification to this [at-will employment] provision shall be binding unless expressed in writing and signed by the [DPS] CEO.").

**\*439** Harris claims that he discovered in April 2001 that NHS's bookkeeper had engaged in improper accounting practices and, as a result, that funds were missing. Harris then requested, and DPS performed, an audit of NHS's books dating back to 1998, which confirmed that thousands of dollars were unaccounted for. The bookkeeper resigned in June 2001, upon learning of the audit, and Harris assigned social-studies teacher Richard Davis ("Davis") to serve as interim bookkeeper, but later removed Davis from the bookkeeping position and returned him to the classroom after the Detroit Federation of Teachers complained about Davis's reassignment. DPS did not approve the hiring of a permanent NHS bookkeeper until October 31, 2003.

On December 30, 2003, Defendant–Appellee David Porter ("Porter"), NHS's Executive Director, informed Harris that Davis had reported financial irregularities relating to NHS's "Sign–A–Rama" program. DPS then undertook a follow-up audit to investigate Davis's allegations. On January 21, 2004, while the audit was still ongoing, Harris sent a memorandum to Defendant–Appellee Debra Williams ("Williams"), DPS's Chief Human Resources Officer, stating his intention to retire at the end of the 2003–2004 school year:

> **\*\*2** Be advised that I will retire at the end of June 2004. As a result of minimum sight in my right eye, it has become very difficult for me to keep up with reading the numerous daily correspondence, reports, and e-mails.
>
> It was my intent to work for an additional five years, however, I realized that I would not be able to give the students one-hundred percent in terms of leadership.
>
> Would you please advise as to what I need to do or what to submit to Human Resources to bring about closure. Also would you submit in writing how many hours I will be compensated for in terms of the 195 days of sick time accumulated.
>
> I thank you for your assistance. It is greatly appreciated.

J.A. at 255 (Jan. 21, 2004 Mem.).

Perrie Johnson ("Johnson"), DPS's Interim Director of Benefits and Compensation, responded to Harris's memorandum the following week:

> Dear Mr. Harris:
>
> In response to your January 21, 2004 memorandum to Debra F. Williams, Chief Human Resources Officer, and our telephone conversation on January 26, enclosed is Form 4149 Separation from Service Form. Once completed, you indicated that you would return the form to me for submission to Human Resources Operations.
>
> The Form 4149 is completed after you have notified the Office of Retirement Services (ORS) that you plan to retire and ORS has determined you are eligible for retirement. Once your eligibility is confirmed, the completed Form 4149 terminates your services with the Detroit Public Schools.
>
> In addition, this letter serves to confirm that a review of your leave accrual as of January 26, 2004 indicates that you would be paid for 35 days (280 hours) from your sick bank upon retirement.
>
> If you have further questions or need assistance, please contact me....

J.A. at 257 (Jan. 27, 2004 Letter).

Also on January 27, 2004, DPS publicly released the results of its follow-up audit of NHS. The audit report concluded that "General School Fund expenditures were not in compliance with guidelines," "Monthly Bank Reconciliations and Trial Balances were not prepared monthly," and "Fundraiser Approvals and Profit and Loss Statements were not completed." **\*440** J.A. at 173–74 (Follow–Up Audit Report at 4–5 ¶ 1). As a result, a total of $19,735.39 in NHS funds were not reconciled with bank statements—meaning that those funds "could not be traced to deposit into the school's checking account"—between July 1, 1998 and June 30, 2002. J.A. at 175 (Follow–Up Audit Report at 6 ¶ 2). The report recommended that the DPS Human Resources Department hold a formal hearing and, "[i]f warranted, ... take appropriate action." J.A. at 170 (Follow–Up Audit Report at 6 ¶ 2). Moreover, the audit revealed that, "between October 1998 and April 2000," during a time period that, the report noted, was "prior to the current Principal's administration," [1] "other expenditures, totaling $2,579.16, ... were not in compliance

227 Ed. Law Rep. 145

with General School Fund guidelines." J.A. at 173 (Follow–Up Audit Report at 4 ¶ 1).

 **\*3** Harris submitted his Form 4149 on February 2, 2004, indicating that his reasons were "[h]ealth" and "lack of support regarding needed personnel." J.A. at 259 (Form 4149). The following day, the Detroit Free Press published an article titled "Audit: 5 high schools in Detroit misspent thousands." J.A. at 261. The article did not mention Harris by name but reported that "$19,735 was missing [from NHS accounts] from 1998 to 2002" and, "[i]n addition, $2,579 was misspent on items such as a refrigerator for the office, staff luncheons, flowers and gifts." [2] *Id.* One day after the article was published, Harris sent a memorandum to Defendant–Appellee Kenneth E. Burnely ("Burnely"), [3] DPS's Chief Executive Officer, complaining that DPS's release of the audit report to the media constituted "character assassination." J.A. at 263 (Feb. 4, 2004 Mem. at 1). In the memorandum, Harris asked why the DPS news release did not mention the fact, known to DPS, that the missing and misspent funds had already disappeared by the time Harris became NHS principal.

DPS responded on February 6, 2004, with a letter notifying Harris that he was being placed on paid administrative leave "pending the final results of an investigation into the school's finances." J.A. at 272 (Feb. 6, 2004 Letter). The same day, Chief Human Resources Officer Williams sent a confidential memorandum to Chief Academic Officer and Defendant–Appellee Juanita Chambers ("Chambers"), "to again clarify the notification requirement set forth in the 2003–2004 school year administrative contracts." J.A. at 270 (Feb. 6, 2004 Mem.). The memorandum stated as follows:

> Once the notice of retirement is received by the district, steps will be taken to process the retirement of the administrator and fill the position being vacated by the administrator. It has been brought to my attention that administrators have been informed by their Executive Directors that they may change their minds after submitting the retirement form, and that there is a deadline date of May 1, 2004 by which to rescind the retirement notice. That information is incorrect. The administrator has no automatic right to withdraw the retirement notice. Once a retirement notice is received by the district, it will be within the school district's sole discretion **\*441** whether to allow the retirement to be rescinded.

> Please provide the Executive Director of Accountability with this information so that consistent and correct information is communicated to the school based leadership in this regard.

*Id.*

On February 13, 2004, The Detroit News reported Harris's suspension below the headline "Detroit district puts principal on paid leave." J.A. at 48. The article quoted DPS spokesman Mario Morrow as stating that "[n]o one is assumed guilty of anything.... It is just proper procedure." *Id.* (internal quotation marks omitted). It also mentioned Harris's assertion that "after June 2001 he didn't have a bookkeeper and used a teacher to keep track of the money. But in October 2003, he was given clearance by the district to hire a part-time accountant." *Id.* The article continued: "None of the [audits] have been referred to the prosecutor's office, but Morrow said that is still possible depending on further investigation." *Id.*

 **\*4** Two months later, on April 19, 2004, Harris sent a letter to Williams attempting to rescind his letter of retirement. Williams responded the following week, advising Harris that "rescissions are granted at the option of the District. Your request to rescind is denied." J.A. at 276 (April 26, 2004 Letter). Harris continued to receive his full salary through the end of his contract term (i.e., until June 30, 2004). [4]

Harris filed suit on May 27, 2004 against DPS and various of its employees in the United States District Court for the Eastern District of Michigan, alleging retaliation in violation of the First Amendment; deprivations of the procedural and substantive due process rights guaranteed by the Fourteenth Amendment; and violations of 42 U.S.C. § 1983. [5] DPS moved for summary judgment on all of Harris's claims. The district court referred the motion to a magistrate judge, who issued a Report and Recommendation ("R & R") suggesting that it be granted as to all of Harris's federal claims. Neither party filed objections to the R & R, which the district court subsequently adopted. [6] Harris **\*442** now appeals the grant of summary judgment.

## II. JURISDICTION

The district court possessed jurisdiction over Harris's federal claims pursuant to 28 U.S.C. § 1331. It declined to exercise

jurisdiction over Harris's state claims pursuant to 28 U.S.C. § 1367(c)(2). We have jurisdiction over Harris's appeal from the district court's final order pursuant to 28 U.S.C. § 1291.

## III. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of showing the absence of any genuine issues of material fact. *Plant v. Morton Int'l, Inc.,* 212 F.3d 929, 934 (6th Cir.2000). Once the movant has satisfied its burden, the nonmoving party must produce evidence showing that a genuine issue remains. *Id.*

The court must credit all evidence presented by the nonmoving party and draw all justifiable inferences in that party's favor. *Id.* The nonmovant must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is proper when the nonmoving party has had adequate time for discovery and yet "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. This Court reviews a district court's grant of summary judgment de novo. *See, e.g., Spencer v. Bouchard,* 449 F.3d 721, 727 (6th Cir.2006).

### B. First Amendment Retaliation

**\*\*5** Harris first alleges that DPS, acting under the color of state law, violated 42 U.S.C. § 1983 by retaliating against him for exercising his First Amendment right to speak out on a matter of public concern.

A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Bell v. Johnson,* 308 F.3d 594, 602 (6th Cir.2002) (internal quotation marks omitted). "Although the elements of a First Amendment retaliation claim are constant, the underlying concepts that they signify will vary with the setting—whether activity is 'protected' or an action is 'adverse' will depend on context." *Id.* at 602–03 **\*443** (internal quotation marks and brackets omitted). Harris's retaliation claim fails because he cannot establish the second prong of the prima facie case. [7]

The evidence indicates that Harris voluntarily resigned his position as NHS principal; his argument to the contrary— that he merely *offered* to resign, and then rescinded that offer before it was accepted—is unavailing. Even if we construe Harris's January 21, 2004 letter to Williams (which begins, "Be advised that I will retire at the end of June 2004") as an offer to resign rather than a resignation, and further construe Johnson's response on behalf of DPS, requesting that Harris submit a Form 4149, as a counter-offer, it is clear that Harris accepted that counter-offer by submitting the form, whether that submission constituted performance (thus forming a unilateral contract) or a promise to retire (forming a bilateral contract). *See, e.g., Combs v. Int'l Ins. Co.,* 354 F.3d 568, 599–600 & nn. 17–18 (6th Cir.2004) ("A unilateral contract consists of a promise or group of promises made by one of the contracting parties only, usually assented to by the other.... A bilateral contract consists of mutual promises, made in exchange for each other by each of the two contracting parties.").

Johnson's letter, which included a copy of Form 4149, plainly stated: "The Form 4149 is completed after you have notified the Office of Retirement Services (ORS) that you

227 Ed. Law Rep. 145

plan to retire and ORS has determined you are eligible for retirement. Once your eligibility is confirmed, *the completed Form 4149 terminates your services with the Detroit Public Schools.*" J.A. at 257 (Jan. 27, 2004 Letter) (emphasis added). Accordingly, by signing and submitting the form, Harris performed the action necessary to accept what we assume, arguendo, to be DPS's counter-offer. Moreover, even if Harris had succeeded in rescinding his resignation, DPS's April 26, 2004 refusal to accept the rescission satisfied the rollover provision of the Agreement by notifying Harris, more than sixty days before the June 30, 2004 expiration of his contract term, that DPS did not intend to renew the contract for another year.

**\*\*6** Harris also argues that his suspension constituted an adverse employment action. We have held, however, "that a suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action." *Peltier v. United States,* 388 F.3d 984, 988 (6th Cir.2004) (internal quotation marks omitted). Accordingly, because Harris has failed to satisfy **\*444** the prima facie requirements of a First Amendment retaliation claim, we **AFFIRM** the district court's grant of summary judgment in favor of DPS on that claim.

## C. Procedural Due Process

Harris next argues that the district court erred in granting summary judgment for DPS on Harris's claim that DPS violated his Fourteenth Amendment rights by placing him on paid leave without affording him due process of law. As "the Supreme Court stated in [ *Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 544–55, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ]," however, "the suspension of [even] a tenured public employee *with pay* ... avoid[s] due process problems entirely." *Jackson v. City of Columbus,* 194 F.3d 737, 749 (6th Cir.1999), *abrogated on other grounds by* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (holding that the burden-shifting test established by *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), does not apply at the pleading stage). Furthermore, the evidence establishes that Harris's suspension did not constitute a constructive discharge. As explained supra, it is clear from the record that Harris voluntarily resigned effective June 30, 2004. Moreover, Harris himself admitted that his resignation was motivated not by the suspension or the post-audit

investigation but, rather, by his "health" and the "lack of support regarding needed personnel." J.A. at 259 (Form 4149); *see also* J.A. at 192–94 (Harris Dep. at 52–54).

Harris also contends that DPS violated his due-process rights by refusing to allow him to rescind his resignation, thereby effectively terminating his employment, under circumstances that tarnished his professional reputation. Because Harris voluntarily resigned, however, he cannot satisfy the "stigma-plus" standard established by *Paul v. Davis,* which requires a plaintiff to demonstrate the infringement of "some more tangible interest [ ]" than reputation alone, "such as employment." 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In addition, Harris's failure to request a name-clearing hearing precludes him from asserting such a claim. *Quinn v. Shirey,* 293 F.3d 315, 323 (6th Cir.) ("[A] plaintiff must request and be denied a name-clearing hearing in order to have been deprived of a liberty interest without due process."), *cert. denied,* 537 U.S. 1019, 123 S.Ct. 538, 154 L.Ed.2d 426 (2002). Accordingly, because Harris has not established a deprivation of a constitutionally protected interest, we **AFFIRM** the district court's grant of summary judgment in favor of DPS on Harris's procedural due process claim.

## D. Substantive Due Process

**\*\*7** Harris also alleges that DPS unconstitutionally deprived him of his protected contractual interest in continued employment. As support for this claim, he relies primarily on his contention that he did not resign as NHS principal. For the reasons set forth supra, that argument fails. Even if Harris had established the deprivation of a contractual right, moreover, "[t]he substantive Due Process Clause is not concerned with the garden variety issues of common law contract"; that is, because Harris's contractual interest, if any, in his employment may be "redressed adequately in a state breach of contract action, [it] is simply not a proper subject of federal protection under the doctrine of substantive due process." *Bowers v. City of Flint,* 325 F.3d 758, 763–64 (6th Cir.2003) (internal quotation marks and citation omitted).

**\*445** [I]n light of the fact that governments breach contracts virtually every day without dire consequences ensuing to the human dignity or basic autonomy of the

Harris v. Detroit Public Schools, 245 Fed.Appx. 437 (2007)

227 Ed. Law Rep. 145

promisees .... in the usual breach of contract case such as this, failure to meet contractual obligations cannot be equated with the sort of injustice inherent in egregious abuse of government power.

*Id.* at 765–66 (Moore, J., concurring) (internal quotation marks and brackets omitted). Accordingly, we **AFFIRM** the district court's grant of summary judgment in favor of DPS on Harris's substantive due process claim.

**E.** Section 1983

Finally, Harris asserts that the district court erred in granting summary judgment in favor of DPS on his claims arising under 42 U.S.C. § 1983. "Because Section 1983 is not itself a source of substantive rights, but only a method for vindicating federal rights elsewhere conferred, a plaintiff must set forth specific constitutional grounds for asserting a Section 1983 claim." *Adair v. Charter County of*

*Wayne,* 452 F.3d 482, 492 (6th Cir.2006), *cert. denied,* 549 U.S. 1279, 127 S.Ct. 1828, 167 L.Ed.2d 319 (2007). The section of Harris's brief discussing § 1983 does not assert any independent right not discussed above. Accordingly, we need not separately address it.

## IV. CONCLUSION

Because Harris cannot establish a prima facie retaliation claim under the First Amendment or the deprivation of a constitutionally protected interest sufficient to trigger due-process protections, and because 42 U.S.C. § 1983 does not create substantive rights, we **AFFIRM** the district court's grant of summary judgment in favor of DPS on all of Harris's federal claims.

**All Citations**

245 Fed.Appx. 437, 2007 WL 2050645, 227 Ed. Law Rep. 145

## Footnotes

1    The report noted that Harris had been appointed NHS principal in September 2000. J.A. at 170 (Follow–Up Audit Report at 1).

2    The latter amount was that reported by the auditor to have been misspent prior to Harris's appointment as principal.

3    The parties' filings contain varying spellings of Burnely's name. We use the spelling that appears on our docket sheet and in Harris's complaint.

4    In fact, it appears that DPS continued to pay Harris until the second week of August. Although the record is not conclusive on this point, the extra pay appears to have constituted compensation for Harris's accrued sick leave.

5    The complaint also alleges violations of 28 U.S.C. § 1343(a)(3) and various provisions of the Michigan constitution and laws. Section 1343 is, however, a purely jurisdictional provision, and Harris does not appeal the district court's refusal to exercise supplemental jurisdiction over his state-law claims. Accordingly, we do not address those claims. The parties' briefs also discuss the issue of qualified immunity as it applies to the individual Defendants–Appellants. Because, however, neither the magistrate judge's Report and Recommendation nor the district court's opinion addressed that issue, and because the district court correctly dismissed Harris's claims on the merits, we need not reach the question of qualified immunity. *See*

*R.S.W.W., Inc. v. City of Keego Harbor,* 397 F.3d 427, 440 (6th Cir.2005) ("Because the Court upholds the

district court's dismissal of the equal protection claim on its merits, it need not address whether the officers were entitled to qualified immunity.").

6    The district court adopted the R & R on the ground that Harris had failed to object to it. J.A. at 396 (Dist. Ct. Order Accepting R & R at 2); *see also* FED. R. CIV. P. 72(b) (requiring the district court to review R & R de novo upon any party's objection). We have held that a party's failure to object to the recommendations of a magistrate judge constitutes a waiver of the right to appeal. *United States v. Walters,* 638 F.2d 947, 949–50 (6th Cir.1981). But "[t]he *Walters* court also made clear that a party shall be informed by the magistrate that objections must be filed within ten days or further appeal is waived." *Mattox v. City of Forest Park,* 183 F.3d 515, 519 (6th Cir.1999) (internal quotation marks omitted) (noting that the Supreme Court approved the *Walters* rule in *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985)). When the R & R "contains no such notice to the plaintiffs, and therefore does not comport with the *Walters* rule[, w]e cannot presume that the plaintiffs have waived their argument that the substance of the report is still at issue." *Id.* at 519–20. In this case, moreover, DPS has not raised the waiver issue on appeal.

7    It is possible, in light of the Supreme Court's recent holding in *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), that Harris also cannot satisfy the first prong of the test by showing that he engaged in protected speech. *See id.* at 1960 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."); Appellant Br. at 39 ("Plaintiff–Appellant spoke out concerning school reform issues in a large gathering of principals, and strongly criticized Dr. Porter, and the manner in which administration policies impacted, adversely, his ability to manage Northern High School...."). Although *Garcetti* was decided after the issuance of both the magistrate judge's R & R and the district court's opinion, it nonetheless applies to this direct appeal. *Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review...."). Because no party has relied upon or even cited *Garcetti,* however, and because the record does not conclusively establish that all of Harris's speech was encompassed by his job responsibilities, we decline to hold this issue dispositive.

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

574 Fed.Appx. 570
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Dharma AGRAWAL, Plaintiff–Appellant,
v.
Carlo MONTEMAGNO, John G. Bryan, and
University of Cincinnati, Defendants–Appellees.

No. 13–4313.
|
July 23, 2014.

**Synopsis**
**Background:** Indian professor brought action in state court
against state university and its officials, alleging defendants
violated his constitutional rights and discriminated against
him on the basis of his national origin or race. Defendants
removed the action. Subsequently, officials moved for
summary judgment. The United States District Court for the
Southern District of Ohio granted motion. Professor appealed.

**Holdings:** The Court of Appeals, Helene N. White, Circuit
Judge, held that:

defendants' removal from state court did not constitute
a waiver of sovereign immunity on professor's state-law
contract claim against university;

professor could not rely on continuing violations theory to
recover for any alleged discriminatory acts that occurred more
than two years before he filed his § 1983 complaint;

official's comments about "cultural differences" in
appropriate education and development of graduate students
did not constitute direct evidence of official's discrimination
against professor;

university's investigations into suspected wrongdoing by
professor was not materially adverse employment action;

temporary grant expenditure restrictions imposed upon Indian
professor were not materially adverse employment actions;

claim for money damages was not cognizable under § 1981;
and

claim for injunctive relief was cognizable under § 1981.

Affirmed in part, and reversed and remanded in part.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

**\*572** On Appeal from the United States District Court for
the Southern District of Ohio.

BEFORE: SUHRHEINRICH, MOORE, and WHITE, Circuit
Judges.

**Opinion**

HELENE N. WHITE, Circuit Judge.

Dr. Dharma Agrawal, a tenured professor at the University of
Cincinnati (UC), brought this action asserting constitutional
violations under 42 U.S.C. § 1983; violation of 42
U.S.C. § 1981 with regard to terms and conditions of
his employment; and a state-law breach of contract claim.
Defendants removed the case. On Defendants' motion, the
district court dismissed all claims against UC. Following
discovery, the individual Defendants moved for and were
granted summary judgment. We AFFIRM the dismissal of
the claims against UC. We AFFIRM the grant of summary
judgment to the individual Defendants except as to the §
1981 injunctive relief claim, as to which we REVERSE and
REMAND.

### I. *Grant of UC's Motion to Dismiss*

We review de novo the district court's order granting
UC's motion to dismiss under Fed.R.Civ.P. 12(b)(6).
*D'Ambrosio v. Marino,* 747 F.3d 378, 383 (6th Cir.2014).
Agrawal argues that his state-law breach-of-contract claim
against UC was an equitable action requesting injunctive
relief, not an action at law for damages, and that the district
court erred by dismissing it. He also argues UC waived its
immunity by removing this action to federal court.

Although Agrawal concedes that the Ohio Court of Claims is the primary venue for hearing cases involving money damages **\*573** against the state, he argues that the Court of Claims statute permits other courts of the state "to hear and determine a civil action in which the sole relief that the claimant seeks against the state is a declaratory judgment, injunctive relief, or other equitable relief." Ohio Rev.Code § 2743.03. Pl. Br. at 66.

"[N]ot all relief falling under the rubric of restitution is available in equity." *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 214, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). Seeking recovery of a sum of money caused by a breach of contractual duties is ultimately an action at law.

*Id. Cristino v. Ohio Bureau of Workers' Compensation,* 118 Ohio St.3d 151, 886 N.E.2d 857, 861 (Ohio 2008) ("a claim against the state for money due under a contract is not a claim of equitable restitution and must be brought in the Ohio Court of Claims"). Agrawal's amended complaint sought, among other relief, the reinstatement "*per his contract* " of $360,000 in research funds and "control of research funds and grants as well as other support *promised in his contract* of employment." PID 96 (emphasis added). He sought the award of monies he claims were granted to him under a contract, but not paid by UC.

The district court properly determined that Agrawal's breach-of-contract claim was a "retrospective claim for damages" and that Defendants had not waived immunity by voluntarily removing the case to federal court. Although Agrawal cites *Lapides v. Board of Regents of University System of Georgia,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002), which held that the defendants (state university officials) waived Georgia's sovereign immunity from state law claims by voluntarily removing plaintiff's case against them to federal court, *Lapides* is limited to state law claims for which the state has waived or abrogated its immunity from damages claims in the state trial courts. *See Dantz v. Am. Apple Group, LLC,* 123 Fed.Appx. 702, 706–07 (6th Cir.2005) (unpublished) (*Lapides* "was limited to the context of state-law claims, in respect to which the State has explicitly waived immunity from state-court proceedings"); *see also, Indep. Living Ctr. of S. Cal., Inc. v. Maxwell–Jolly,* 572 F.3d 644, 661 (9th Cir.2009) (holding that a state that consents to suit in state court cannot invoke a sovereign immunity

defense after removing the suit to federal court); *Stewart v. N. Carolina,* 393 F.3d 484, 488 (4th Cir.2005). Because that is not the case here, Defendants' removal from state court does not constitute a waiver of sovereign immunity on the state-law contract claim against UC. That claim was properly dismissed.

## II. *Grant of Summary Judgment to Individual Defendants*

We review de novo the district court's grant of summary judgment, viewing the facts and inferences therefrom in a light most favorable to Dr. Agrawal. *Zomba Enters., Inc. v. Panorama Records, Inc.,* 491 F.3d 574, 581 (6th Cir.2007).

The district court's order granting summary judgment sets forth the extensive pertinent background, which we adopt and do not repeat here. *Agrawal v. Univ. of Cincinnati,* 977 F.Supp.2d 800, 805–18 (S.D.Ohio 2013). The district court agreed with the individual Defendants that most of Agrawal's challenges are time barred; that Agrawal established only one materially adverse employment action, the denial of a merit pay increase in 2010, but failed to establish that a similarly situated person was treated more favorably than he; and that Agrawal failed to show that Defendants' asserted legitimate reasons for their actions were pretextual. Alternatively, the court determined that the individual **\*574** Defendants are entitled to qualified immunity.

### A.

Agrawal argues that the district court "accepted the defendants' rendition of facts *in toto* ... and ignore[d] the central theme of [his] case: Montemagno deliberately brought Agrawal up on charges known to be false, causing Agrawal to spend tens of thousands of dollars on defense lawyers." Br. at 12. We disagree. The district court recognized Agrawal's "central theme":

> Montemagno notified Dr. Agrawal that he was initiating an Article 9 investigation ... Dr. Agrawal responded ..., protesting that he signed the labor verification statements and that the issues about Xie

had been aired and resolved by the first grievance panel's decision. He also objected to that hearing panel's report ... He strenuously objected to a second disciplinary investigation, complaining that he had already incurred attorney's fees and suffered great emotional distress. Notwithstanding Dr. Agrawal's objections, Ackerman continued her office's investigation into Dr. Agrawal's grants....

PID 6210. The court stated several times that Agrawal maintained that Montemagno intentionally set out to destroy his research career and intentionally discriminated against him, and that Agrawal denied that his own wrongdoing brought on UC's two investigations of him. PID 6198, 6200–01, 6210, 6221, 6228–29, 6243, 6245.

Citing many examples, Agrawal claims that the district court improperly accepted the defense's view of the facts. Included in his claims is that the district court "adopted, without scrutiny," the grievance committee's findings as uncontested facts. The court did no such thing. It summarized the grievance panel's findings, PID 6206–09, 6215–17, a logical and necessary thing to do given that Agrawal's grievances are central to his case. The court did not state or suggest that it adopted as fact the grievance panel's findings, only that it took them into account, along with other evidence (*see, e.g.,* PID 6245 "Based upon the facts discussed in the audit reports, Dr. Agrawal's own admissions at the disciplinary hearings, *and* the conclusions of two hearing panels, the Court cannot conclude that the reasons Defendants have offered concerning the denial of merit pay are mere pretext to disguise discrimination"; PID 6244 "The Internal Audit report, entirely separate from Bryan and Montemagno, recommended that the four controls that Dr. Agrawal agreed to in December 2009 be made permanent. The second grievance panel concluded that 'respondents had good reason to distrust Dr. Agrawal and to restrict student related grant activity. The internal controls are fully warranted administrative fiscal remedies ...' The findings of two separate internal investigations fully support Defendants' assertion that the grant restrictions were imposed based on Dr. Agrawal's own conduct.")

Agrawal contends that the district court again usurped the jury's role when it "cited Harold Carter for the proposition that Agrawal's funding proposals were not well written and consequently rejected ..." when "[t]here is no hint of this position in Carter's letter." Br. at 14, n. 32, 18. Carter testified on deposition regarding Dr. Agrawal's first grant proposal:

[i]t was a terribly written proposal, I'm sad to say. It was very disjointed. It was just kind of a collection of these disparate kinds of things that were loosely connected because they were the same general area.

And the English was not good.

**\*575** PID 1085. That Carter's *letter* to Agrawal dated May 16, 2006, PID 1209, did not critique Agrawal's proposal writing does not negate Carter's deposition testimony. These claims are without merit, as are Agrawal's remaining claims that the district court did not abide by its obligation to view the facts in the light most favorable to him.

**B.** *Time-barred Claims & Continuing Violation Theory*

We review de novo the district court's determination that many of Agrawal's alleged adverse employment actions are largely time-barred. *See* Banks v. City of Whitehall, 344 F.3d 550, 553 (6th Cir.2003) (an Ohio plaintiff must bring a § 1983 case within two years of the alleged adverse employment action.)

Agrawal filed his complaint in state court on October 1, 2010. The district court properly concluded that the alleged adverse actions that occurred before October 1, 2008 were time barred, i.e., the transfer of OBR funds, transfer of office space, reduction of laboratory space and reduction in the number of his graduate students. *See* Banks, 344 F.3d at 553.

The continuing-violation theory does not revive these time-barred claims. "This Circuit employs the continuing violations doctrine most commonly in Title VII cases, and rarely extends it to § 1983 actions." Sharpe v. Cureton, 319 F.3d 259, 267 (6th Cir.2003) (concluding that "the Supreme Court's recently imposed limits on the viability of the [continuing violation] doctrine" in National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114–15, 122 S.Ct.

Agrawal v. Montemagno, 574 Fed.Appx. 570 (2014)

308 Ed. Law Rep. 778

2061, 153 L.Ed.2d 106 (2002), apply to § 1983 claims). In *Morgan,* the Supreme Court reversed the court of appeals' application of the continuing violation doctrine, observing that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges," and that "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct."

This circuit recognizes two continuing-violation types, the first applies only to hostile-environment claims. *Sharpe,* 319 F.3d at 267; *Morgan,* 536 U.S. at 114–15, 122 S.Ct. 2061. Agrawal's amended complaint does not allege a hostile environment claim. *See* PID 84 (amended complaint filed in Court of Common Pleas, Hamilton County, Ohio). On appeal, he nonetheless argues that a review of the record makes clear "that the department overseen by Defendants was generally hostile to Indians in particular, and "Easterners" in general. The two prime examples of this are Montemagno's mistreatment of Bhattacharya ... and Dr. Purdy's mostly-undisciplined mistreatment of students." Br. at 30–31. As the district court noted, Bhattacharya denied that Montemagno discriminated against him; he described Montemagno as autocratic and "vicious," and that he appeared to be closer to several other department heads, but that "I don't think it had anything to do with national origin." PID 2752. And, Dr. Purdy's conduct (a professor who made inappropriate comments to students in 2000, including using the term "turbanheads" or "towelheads") cannot be attributed to either Montemagno or Bryan since the former arrived at UC in 2006 and Bryan assumed the Vice–Provost post in or around early 2009. In addition, neither of these examples suggest or establish that Agrawal himself suffered harassment that unreasonably interfered with his work performance or created an intimidating, hostile, or offensive work environment. *See, e.g.,* *Delaney v. Skyline Lodge, Inc.,* 95 Ohio App.3d 264, 642 N.E.2d 395, 399–400 (1994). Because Agrawal did not allege a **\*576** hostile-environment claim, the time-barred claims are not revived under this continuing-violation theory.

Agrawal also claims the second type of continuing violation applies, under which discrete discriminatory acts that are part of a longstanding and demonstrable policy of discrimination, toll the statute of limitations. *See* *Sharpe,* 319 F.3d at 269. "To establish this category of continuing violation, appellant must demonstrate something more than the existence of discriminatory treatment in his case, *Sharpe,* 319 F.3d at

268" (internal quotations and citation omitted), such as a continuing overarching policy of discrimination, *see* *LRL Properties v. Portage Metro Hous. Auth.,* 55 F.3d 1097, 1106 (6th Cir.1995).

This claim fails as well, because Agrawal relies on the same instances: Montemagno's alleged discrimination toward Bhattacharya and Purdy's inappropriate comments to students in 2000. Agrawal's argument that the statute of limitations should be equitably tolled during the pendency of the investigations is raised for the first time on appeal, and is thus waived. *See, e.g.,* *Geiger v. Tower Auto.,* 579 F.3d 614, 622 n. 3 (6th Cir.2009).

### C. Race and National–Origin Discrimination

Agrawal alleged that the individual Defendants, acting under color of state law in their capacities as UC officers, discriminated against him and violated his equal protection rights on the basis of his national origin and race. PID 6221. The district court properly determined that Agrawal presented no direct evidence of discrimination. Direct evidence, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Martinez v. Cracker Barrel Old Country Store, Inc.,* 703 F.3d 911, 914 (6th Cir.2013). Agrawal relies on Montemagno's remark alluding to a "cultural divide" at Agrawal's second grievance hearing, but the district court correctly concluded that this statement could be interpreted several ways. Dr. Purdy's statements about Asian students in the year 2000 cannot be attributed to either Montemagno or Bryan, and Purdy played no role in Defendants' decisions regarding Agrawal.

Absent direct evidence, Agrawal must present circumstantial evidence under the burden-shifting scheme of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to survive summary judgment. *Sjostrand v. Ohio State Univ.,* 750 F.3d 596, 599 (6th Cir.2014). Agrawal established the first two prima facie elements, i.e., that he is a member of a protected class and was qualified for his position. *Adair v. Charter Cnty. of Wayne,* 452 F.3d 482, 493 (6th Cir.2006).

Dr. Agrawal must also establish that the actions he challenges were adverse employment actions, that is, "more

disruptive than a mere inconvenience or an alteration of job responsibilities." *Mitchell v. Vanderbilt Univ.,* 389 F.3d 177, 182 (6th Cir.2004). The first conduct within the two-year limitations period Agrawal points to is Montemagno's October 3, 2008 letter initiating the first Article 9 proceeding. But employer investigations into suspected wrongdoing, standing alone, are not generally considered actionable adverse employment actions, *see Arnold v. City of Columbus,* 515 Fed.Appx. 524, 531 (6th Cir.2013), and Montemagno's proposed discipline was not implemented, *see Mitchell,* 389 F.3d at 182; PID 6211. Finally, the letter of discipline that was to have been placed in Agrawal's personnel file has never been located, and a letter of reprimand is not a materially adverse employment action unless accompanied by a loss such as demotion **\*577** or salary reduction, neither of which occurred here. *See Taylor v. Geithner,* 703 F.3d 328, 338 (6th Cir.2013) (written reprimand that does not lead to a materially adverse consequence such as lowered pay, demotion, suspension, or the like, is not a materially adverse employment action); *Jones v. Butler Metro. Hous. Auth.,* 40 Fed.Appx. 131, 137 (6th Cir.2002).

Bryan's temporary grant restrictions imposed in August 2009 were also within the two-year limitations period. But the district court properly determined that these were not materially adverse employment actions. *See Mitchell,* 389 F.3d at 182 (actions including reduction in the plaintiff professor's research lab space, revocation of mentor status, loss of graduate research assistant, proposed but unimplemented reduction in pay, forced review of grant applications, and removal from Director position were not materially adverse employment actions, independently or collectively). The investigations that prompted these restrictions were brought on by Xie's letter and Agrawal's own testimony, and Agrawal has not demonstrated that his material responsibilities were diminished or that the temporary grant restrictions had a materially adverse effect on his salary or status of employment at UC. *See Mitchell,* 389 F.3d at 183.

The district court properly determined that Agrawal failed to establish the third prima facie element, that he suffered an adverse employment action, except as to the denial of a merit pay increase in 2010. *Id.* Only the denial of a merit pay increase in 2010 constituted "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Defendants concede that the 2010 denial of merit pay constituted a materially adverse employment action. *See Szeinbach v. Ohio State Univ.,* 493 Fed.Appx. 690, 694–95 (6th Cir.2012). The question then is whether Agrawal established the fourth prima facie element, that he was less favorably treated than a similarly situated person outside his protected class. *See Noble v. Brinker Int'l, Inc.,* 391 F.3d 715, 728–29 (6th Cir.2004). To be similarly situated a plaintiff and his proposed comparator "must have engaged in acts of comparable seriousness." *Wright v. Murray Guard,* 455 F.3d 702, 710–11 (6th Cir.2006) ("Wright and Bradley are not similarly situated because their alleged acts of misconduct are of a very different nature, and there are legitimate reasons why Murray Guard would treat them differently.").

Agrawal inadequately briefed this issue. He asserts simply that he "presented a multitude of facts and charts to support his position that he out-performed every other member of his department, yet the raise he was granted, unlike theirs, was reversed." Even if the issue is not waived, *Geiger,* 579 F.3d at 622 n. 3, Agrawal has not presented evidence from which a jury could conclude that any alleged comparator was treated more favorably than he for similar misconduct.

### D. *Section 1981 Claim*

Agrawal argues that the district court erred by granting summary judgment on his § 1981 claim. Agrawal's amended complaint alleged that Defendants intentionally discriminated against him with respect to compensation, terms, conditions and privileges of employment because of his race and color.

Section 1981 prohibits discrimination in the making and enforcement of private contracts, *McCormick v. Miami Univ.,* 693 F.3d 654, 659 (6th Cir.2012). A plaintiff **\*578** must present evidence sufficient to raise an inference of *intentional* race discrimination in a § 1981 action; that is, § 1981 reaches only purposeful discrimination. *See Gen. Bldg. Contractors Ass'n v. Penn.,* 458 U.S. 375, 389, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). "The express cause

Agrawal v. Montemagno, 574 Fed.Appx. 570 (2014)

308 Ed. Law Rep. 778

of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units." *Arendale v. City of Memphis,* 519 F.3d 587, 599–600 (6th Cir.2008) (quoting *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)).

The district court properly determined that money damages are not available under § 1981; claims for money damages against state officers in their official capacities are barred by the Eleventh Amendment. *Id.* at 662; *Freeman v. Mich. Dep't of State,* 808 F.2d 1174, 1179 (6th Cir.1987).

However, the Eleventh Amendment does not bar continuation of a § 1981 action to the extent it seeks injunctive relief from state officers sued in their official capacities. *McCormick,* 693 F.3d at 662; *Freeman,* 808 F.2d at 1179. In dismissing the claim for injunctive relief, the district court stated that Agrawal named the individual Defendants only in their individual capacities and went on to conclude that because neither Defendant remains at UC, any prospective claim for relief against them is moot. The district court was mistaken; Agrawal clearly named Montemagno and Bryan both in their individual and official capacities. In addition, Agrawal asserts that the successor officers continue to enforce decisions made by Montemagno and Bryan: that he remains ejected from his laboratory and office, the OBR money remains under another's control, he is still suffering under Bryan's 4–point accounting structure, and he is still lacking his merit-pay increase.

Under these circumstances, since Montemagno and Bryan left UC after Agrawal brought this action, the successor officers are automatically substituted under Fed.R.Civ.P. 25(d). We thus remand for substitution of Montemagno and Bryan's successors and leave to the district court how to proceed on remand. *See Spomer v. Littleton,* 414 U.S. 514, 522–23, 94 S.Ct. 685, 38 L.Ed.2d 694 (1974) (remanding to court of appeals for a determination "whether the former dispute regarding the availability of injunctive relief against the State's Attorney is now moot [because new State's Attorney was elected and respondents did not allege that he intends to continue his predecessor's practices] and whether respondents will want to, and should be permitted to, amend their complaint to include claims for relief against the [new

State's Attorney].); *Patterson v. MacDougall,* 506 F.2d 1 (5th Cir.1975) (where State officer resigned after the plaintiff filed his complaint, court of appeals remanded to district court to determine whether claims for injunctive relief were moot and whether MacDougall's successor should be substituted as a defendant in the claims for injunctive and declaratory relief.").

## E. *Property Interest in Employment Contract and Reputation*

The district court did not err in concluding that Agrawal's procedural due process claims failed. "A procedural due process claim requires a showing that the plaintiff has been deprived of a protected property interest without adequate process." *City of Pontiac Retired Emps. Ass'n v. Schimmel,* 751 F.3d 427, 432 (6th Cir.2014). When Bhattacharya *recommended* that Agrawal receive a merit pay increase in 2010, no increase was implemented. A protected property interest is one to which a plaintiff has a legitimate **\*579** claim of entitlement under state law. *See Ferencz v. Hairston,* 119 F.3d 1244, 1247 (6th Cir.1997). Potential merit pay increases for tenured professors are not property rights; Agrawal was not entitled to a hearing or other process before a merit pay increase was denied. *See Richardson v. Twp. of Brady,* 218 F.3d 508, 517 (6th Cir.2000) ("Simply put, [plaintiff] can have no legitimate claim of entitlement to a discretionary decision.") Similarly, Agrawal had no protected property interest in a particular office, laboratory space or control over the OBR funds, which funds were subject to the Board of Regents' discretion. *Id.*

## F. *Substantive Due Process*

Agrawal asserts that the district court erred in determining that Defendants infringed none of his substantive due process rights: "vindictive motives and arbitrary State action give rise to constitutional causes of action," arguing that Montemagno's treatment of him "shocks the conscience because bringing false, uninvestigated, malicious allegations would shock the conscience even if not brought against fully-tenured senior university professors." Br. at 59.

"Most, if not all, state-created contract rights, while assuredly protected by procedural due process, are not protected by substantive due process." *Charles v. Baesler,* 910 F.2d

1349, 1353 (6th Cir.1990) (rejecting the plaintiff's claim that denial of a promotion constituted a violation of substantive due process). "Substantive due process affords only those protections so rooted in the traditions and conscience of our people as to be ranked as fundamental.... It protects those interests, some yet to be enumerated, implicit in the concept of ordered liberty." *Id.* (internal quotations and citations omitted).

Asserting that Montemagno's conduct violated his right of equal protection, Agrawal relies on *Gutzwiller v. Fenik,* 860 F.2d 1317 (6th Cir.1990), which has been interpreted as recognizing a narrow substantive due process right to protection against losing one's job because of an independent constitutional violation, *Hopkins v. Canton City Bd. of Educ.,* 477 Fed.Appx. 349, 365–66 (6th Cir.2012). The district court properly disposed of Agrawal's equal protection claim with

his discrimination claims under § 1983. "The elements for establishing an Equal Protection claim under § 1983 and the elements for establishing a violation of Title VII disparate treatment claim are the same." *Deleon v. Kalamazoo Cnty. Rd. Comm'n,* 739 F.3d 914, 917–18 (6th Cir.2014); *Gutzwiller,* 860 F.2d at 1325.

For these reasons, we AFFIRM the district court's order granting UC's motion to dismiss, and AFFIRM the order granting the individual Defendants' motion for summary judgment with the exception of the § 1981 injunctive relief claim, as to which we REVERSE and REMAND.

**All Citations**

574 Fed.Appx. 570, 308 Ed. Law Rep. 778

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3077211
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Northern Division.

Hari BIDASARIA, Plaintiff,
v.
CENTRAL MICHIGAN UNIVERSITY, Defendant.

No. 10–15079.
|
July 30, 2012.

**Attorneys and Law Firms**

Victor J. Mastromarco, Jr., The Mastromarco Firm, Saginaw, MI, for Plaintiff.

Gary S. Fealk, Vercruysse, Murray, Bingham Farms, MI, Robert M. Vercruysse, Vercruysse, Murray, Bingham Farms, MI, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SANCTIONS

THOMAS L. LUDINGTON, District Judge.

 **\*1** On February 15, 2012, the Court entered an opinion and order granting in part and denying in part Defendant's motion for summary judgment, dismissing Plaintiff's federal claims with prejudice and declining jurisdiction over Plaintiff's state law claims. ECF No. 47. The Court also ordered supplemental briefing on Defendant's motion for sanctions to address (i) the particular attorney, law firm, or party that Defendant contends "violated the rule or is responsible for the violation" of Rule 1 1(c)(1); (ii) a more particular explanation of the conduct Defendant contends constitutes the violation of Rule 11(b) or 28 U.S.C. § 1927; and (iii) the particular sanction Defendant seeks and the legal authority for the request. Defendant filed its supplemental brief on February 28, 2012, and Plaintiff filed a response on March 12, 2012. The factual and procedural history of the case are adequately set forth in the Court's February 15, 2012 opinion and order.

### I. Legal Standard

When an attorney submits a pleading to a federal court, the attorney certifies that to the best of his or her "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances":

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed.R.Civ.P. 11(b)(1)-(3).

An attorney may be sanctioned for violations of Rule 11(b), after the attorney is provided "notice and a reasonable opportunity to respond." Fed.R.Civ.P. 11(c)(1).[1] A party seeking to file a motion for sanctions must serve it on the opposing party pursuant to Rule 5 of the Federal Rules of Civil Procedure, but the motion "must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." Fed.R.Civ.P. 11(c)(2).[2] Defendants emphasize that a motion for sanctions may be filed after entry of a final judgment, so long as the moving party afforded the allegedly offending party at least twenty-one days to correct a pleading, citing Divane v. Krull Elec. Co., 200 F.3d 1020, 1025 (7th Cir.1999).

Sanctions imposed pursuant to Rule 11 "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed.R.Civ.P. 11(c)(4). When a motion for sanctions has been filed, sanctions may include "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation," if "warranted for effective deterrence." Id. Other possible sanctions include "nonmonetary directives" or "an order to pay a penalty into

court." *Id.* Monetary sanctions cannot be imposed "against a represented party for violating Rule 11(b)(2)." Fed.R.Civ.P. 11(c)(5).

**\*2** In the Sixth Circuit, "the test for the imposition of Rule 11 sanctions [is] 'whether the individual's conduct was reasonable under the circumstances.' " *Union Planters Bank v. L & J Dev. Co. .,* 115 F.3d 378, 384 (6th Cir.1997) (quoting *Lemaster v. United States,* 891 F.2d 115, 118 (6th Cir.1989)) (further citations omitted). The standard of "reasonable under the circumstances" is "objective," and thus, a demonstration of "good faith" does not defeat a motion for sanctions. *Mann v. G & G Mfg., Inc.,* 900 F.2d 953, 959 (6th Cir.1990) (citing *INYST Fin. Group, Inc. v. Chem. Nuclear Sys.,* 815 F.2d 391, 401 (6th Cir.1987)). Allegations of sanctionable conduct should not be viewed with "the wisdom of hindsight," but "by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." *Id.* (quoting *INYST,* 815 F.2d at 401).

Additionally, pursuant to 28 U.S.C. § 1927, an "attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Being penal in nature, this section permitting a district court to require an attorney to personally satisfy costs is to be strictly construed. *United States v. Ross,* 535 F.2d 346 (6th Cir.1976). Sanctions are not appropriate unless an attorney is shown to have acted in bad faith, with improper motive, or with reckless disregard of duty owed to the court, and decision to award attorney fees thereunder is committed to court's discretion. *See* *Cypress–Fairbanks Independent School Dist. v. Michael F. by Barry F.,* 931 F.Supp. 474 (S.D.Tex.1995); *see also* *Specht v. Google, Inc.,* 805 F.Supp.2d 551 (N.D.Ill.2011) (noting that a court has discretion to impose sanctions for unreasonably and vexatiously multiplying the proceedings when an attorney has acted in an objectively unreasonable manner by engaging in serious and studied disregard for the orderly process of justice, has pursued a claim that is without plausible legal or factual basis and lacking in justification, or has pursued a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound). Section 1927 does not require a showing of subjective bad faith but, rather, is satisfied "when an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation

tactics will needlessly obstruct the litigation of nonfrivolous claims." *Riddle v. Egensperger,* 266 F.3d 542, 553 (6th Cir.2001) (quoting Ridder, 109 F.3d at 298). Mere negligence or inadvertence, however, will not support a § 1927 sanction. *Riddle,* 266 F.3d at 553. Rather, "[t]here must be some conduct on the part of the subject attorney that trial judges, applying the collective wisdom of their experience on the bench, could agree falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party." *Id.* (quoting *In re Ruben,* 825 F.2d 977, 984 (6th Cir.1987)). No advance service, "safe harbor" rule applies to a request for sanctions pursuant to 28 U.S.C. § 1927.

## II. Discussion

### A. The particular attorney, law firm, or party that Defendant contends "violated the rule or is responsible for the violation" of Rule 11(c)(1)

**\*3** Defendant's response clarifies that it is seeking sanctions against attorneys Victor Mastromarco, who signed the complaint; Manda Westervelt–Danielski, who took the depositions in the case and would only stipulate to dismissal of Plaintiff's age discrimination claim; the Mastromarco Firm; and Plaintiff Hari Bidasaria. Plaintiff correctly notes that Section 1927 sanctions are not awardable against Plaintiff or the Mastromarco firm, and requests that Manda Westervelt–Danielski not be subjected to sanctions because she was working under Victor Mastromarco's supervision.

Rule 11 provides that every pleading, motion, or other paper must be signed by "at least one attorney of record in the attorney's name." Rule 11(c)(1) also provides that if the rule has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation and that a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee absent exception circumstances. Defendant's brief in support of its motion for sanctions, as well as its supplemental brief, make clear that Ms. Westervelt–Danielski was working under Mr. Mastromarco's supervision, and she did not sign any of the papers that Defendant alleges were filed in violation of Rule 11. *See, e.g.,* ECF No. 48 at 6–7 ("Westervelt–Danielski told Defense Counsel that she had discussed Defendant's request

that the case be withdraw with Mastromarco, and that he agreed to the dismissal of the age discrimination claim but not any other claims.") (emphasis omitted).

However, Ms. Westervelt–Danielski signed the stipulation to dismiss Plaintiff's age discrimination claim and likewise made clear in Plaintiff's motion to extend the response deadline to Defendant's motion for sanctions that she was responsible for the discovery in the case as well as the responses to Defendant's motion for summary judgment and motion for sanctions. Rule 11, since its amendment in 1993, gives the district court greater flexibility as to whom it may target with sanctions. *See* Fed.R.Civ.P. 11(c) (authorizing imposition of sanctions upon "the attorneys, law firms, or parties" responsible for violation of Rule). Ms. Westervelt–Danielski thus cannot be shielded from responsibility because Mr. Mastromarco signed the complaint and responses to Defendant's motions.

Plaintiff contends that service of the Rule 11 motion was improper because it was made on Ms. Westervelt–Danielski and not on Mr. Mastromarco. Rule 5(b) states that "if a party is represented by an attorney, service under this rule must be made on the attorney unless the court orders service on the party." Plaintiff does not clarify whether Ms. Westervelt–Danielski has authority to accept service on his behalf even though she is not counsel of record in the case and neither party provides legal authority that fully supports their respective propositions. Regardless of whether service on Ms. Westervelt–Danielski satisfied the requirements of Rule 11's safe harbor provision, as will be discussed below, Section 1927 sanctions are, in part, appropriate and Section 1927 does not have a safe harbor rule.

 **\*4** Plaintiff also notes that Defendant filed its motion for summary judgment only fifteen days after the motion for sanctions had been served upon Ms. Westervelt–Danielski and that further consideration of the motion for sanctions was "academic." A motion for sanctions under Rule 11 must be served on the offending party for a period of "safe harbor" at least twenty-one days prior to the entry of final judgment or judicial rejection of the offending contention. A party seeking sanctions must leave sufficient opportunity for the opposing party to choose whether to withdraw or cure the offense voluntarily before the court disposes of the challenged contention. *Ridder v. City of Springfield,* 109 F.3d 288, 295 (6th Cir.1997). Accordingly, there was nothing inappropriate about Defendant's decision to file a motion for summary judgment before the 21–day safe harbor period had elapsed.

## B. Explanation of the conduct Defendant contends constitutes the violation of Rule 11(b) or 28 U.S.C. § 1927

Defendant contends that the conduct that constitutes a violation of Rule 11(b) or 28 U.S.C. § 1927 is the filing and failure to immediately withdraw the complaint because the contentions therein lacked evidentiary support as well as the failure to dismiss the claims at the close of discovery because no evidence of discrimination was produced during discovery. Defendant notes that at no time during the lawsuit did Plaintiff identify any evidence of national origin discrimination, did not allege that he was treated differently than a similarly-situated individual, nor did he identify a causal connection between his discharge and his 2004 EEOC charge. Plaintiff and his counsel likewise would not agree to a stipulated order that he was not alleging a hostile work environment claim, resulting in Defendant briefing this issue in its motion for summary judgment.

Defendant relies on the arbitration decision and associated record as putting Plaintiff and his counsel on notice that filing the complaint the instant lawsuit was frivolous. However, as noted in the Court's February 15, 2012 opinion and order, the collective bargaining agreement does not expressly mandate that Plaintiff's statutory claims be subject to arbitration as the sole remedy. Moreover, although Plaintiff could have sought his remedy on these claims through the arbitration process, his allegations of national origin discrimination and retaliation were not included in the grievance submitted to the arbitrator, nor are such claims referenced in the arbitral decision. ECF No. 21 Exs. 36, 38. The fact that the arbitrator concluded that there was just cause for Plaintiff's employment being terminated under the collective bargaining agreement is insufficient to conclude that filing a lawsuit for the claims at issue could be considered frivolous or lacked evidentiary support with no reasonable basis to believe that evidentiary support would be found in violation of Rule 11(b)(2) and (b)(3). Nor does the arbitrator's decision give rise an inference that the filing was done for the purpose of harassing Defendant in violation of Rule 11(b)(1).

 **\*5** Even a well-pleaded complaint may contain issues or claims that need not be tried, and should be resolved by stipulation of opposing counsel prior to trial. When counsel reach agreement on such a narrowing of issues, they reduce the amount of litigation remaining. The refusal necessarily multiplies the issues that must be tried to approve such an

agreed-upon order amounts to bad faith, and thus would justify an award of attorney's fees under the court's inherent powers or under § 1927. Here, Defendant attempted to narrow the issues regarding potential claims in the complaint that need not be tried yet Plaintiff refused to agree to an order clarifying that he was not alleging a hostile work environment claim, resulting in Defendant unnecessarily briefing the issue in its motion for summary judgment. Although Plaintiff notes that this claim was not included in Defendant's January 20, 2011, letter to Plaintiff as the claims at issue, Plaintiff does not explain why he would not agree to clarify that he was not asserting a hostile work environment claim when Defendant sought to narrow the issues in the case before filing a motion for summary judgment.

Plaintiff's complaint alleges that he was terminated as a result of national origin discrimination, retaliation for filing a 2004 EEOC charge and for filing a "complaint of harassment." Defendant contends that no evidence was known at the time of the filing, nor was any identified during discovery, that Plaintiff was terminated as a result of national origin discrimination, nor did he allege that he was treated differently than a similarly-situated individual in response to Defendant's motion for summary judgment. Indeed, Plaintiff did not provide any direct evidence of national origin discrimination and Plaintiff did not provide a response to Defendant's arguments on this claim. The record does not contain any supporting evidence that a similarly-situated person not in the protected class was treated differently; Plaintiff only made the general assertion that he is the only member of his department that is of Indian descent. In his motion for reconsideration, Plaintiff generally noted that there were well over 100 faculty members absent from department meetings during the fall 2009 preparation week, none of whom were of Indian descent, and these individuals were thus not held to the same standard and expectation as Plaintiff. As noted on the Court's May 7, 2012, opinion denying Plaintiff's motion for reconsideration, a "plaintiff cannot demonstrate a prima facie case for national origin discrimination by alluding to unidentified 'comparables' that were not of similar national origin, without further explanation regarding the circumstances of the comparable individuals who were allegedly treated more favorably ... [e]ven under the standard espoused in *Provenzano,* ..." ECF No. 57. Defendant is thus correct that even if evidence was not known at the time of the filing, there was not any evidence identified during discovery that Plaintiff was terminated as a result of national origin discrimination or that he was treated differently than a similarly-situated individual and Plaintiff's

claim for national origin discrimination was not supported by existing law in violation of Rule 11(b)(2) and (b)(3) and Plaintiff's counsel knew or should have reasonably known that the claim was frivolous in violation of 28 U.S.C. § 1927.

**\*6** Defendant, however, has not provided an adequate basis for imposing sanctions against Plaintiff. As explained, the sanctionable conduct in this case was the assertion of a national origin discrimination claim that clearly lacked evidentiary or legal support. There is no indication that Plaintiff caused or contributed to the violation: there is no evidence that Plaintiff misled his counsel or failed to provide them accurate information, or that Plaintiff provided anything but truthful deposition testimony regarding his belief that he had been treated unfairly.

Defendant also contends that Plaintiff did not produce any evidence of retaliation for filing an EEOC charge or for filing a complaint of harassment and made no attempt to identify a causal connection between his discharge and his 2004 EEOC charge. This contention is not an accurate assessment of Plaintiff's efforts. Plaintiff provided numerous instances over a lengthy period of time during which he believed he was retaliated against by Stinson, who was responsible for assigning Plaintiff's courses, and his theory was that Stinson caused his termination by submitting an email with untrue allegations to the dean.

"[I]t is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success." *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). Stinson's email to Dean Davison—which Plaintiff contends was the last event of retaliation in a series of retaliatory occurrences—resulted in the dean initiating the Article 16 proceeding and investigation into Plaintiff's alleged misconduct. Plaintiff could not prevail on his claims because Dean Matty's decision was independently made, severing the causal link between Stinson's alleged retaliatory animosity and the adverse employment action, and he thus did not meet his burden for establishing a prima facie case for retaliation. However, this does not lead to the conclusion that Plaintiff's claim was frivolous. The filing and pursuing this claim is not the kind of egregious misconduct that warrants the imposition

of fees and costs on an ultimately unsuccessful civil rights plaintiff.

### C. The particular sanction Defendant seeks and the legal authority for the request

Rule 11 sanctions are proper not only when a frivolous complaint is filed, but also can be awarded during the course of litigation, it becomes clear that the allegations are frivolous and instead of withdrawing a complaint, a plaintiff "continued to litigate after it became clear that his claim was frivolous, unreasonable or without foundation." *Rentz v. Dynasty Apparel Indus., Inc.,* 556 F.3d 389, 395 (6th Cir.2009) (the amount of sanctions must be high enough to sufficiently deter the offending conduct in the future); *Ridder v. City of Springfield,* 109 F.3d 288, 293 (6th Cir.1997). When awarding sanctions, a court should generally calculate the award from the date that the plaintiff and his attorney should have realized that their claims were frivolous. *See Garner v. Cuyahoga County Juvenile Court,* 554 F.3d 624, 643 (6th Cir.2009) (referencing sections under Section 1927); *Dearborn Street Building Assoc., LLC v. Huntington National Bank,* 411 F. App'x 847, 852 (6th Cir.2011) (Rule 11 claims should be calculated from the date that Plaintiff and its counsel should have realized they were unsupportable, which in that case, was the date the Plaintiff received Defendant's complete file). Because "[a]n award of attorney's fees against a losing plaintiff in a civil rights action is an extreme sanction," it "must be limited to truly egregious cases of misconduct." *Jones v. Continental Corp.,* 789 F.2d 1225, 1232 (6th Cir.1986). The court's statement in *Jones* that attorney fee awards against losing plaintiffs in civil rights cases "must be limited to truly egregious cases of misconduct" applies to awards under § 1927 as well. *Jones,* 789 F.2d at 1232.

**\*7** Defendant believes that Plaintiff and his counsel should have reasonably known that there was no factual basis to support Plaintiff's claims prior to filing the lawsuit given that the facts of the case were well developed due to the August 27, 2010 arbitration hearing and November 16, 2010 arbitration decision. After the lawsuit was filed, Defense counsel promptly alerted Plaintiff's Counsel on January 20, 2011 to the fact that the arbitration had been conducted and that there was no evidence of discrimination or retaliation. The amount of fees and costs incurred by Defendant CMU

since January 21, 2011 was about $96,926.58 ($90,265.60 in attorney's fees and $6,600.98 in costs and about $2,000 attorney's fees incurred in filing this Supplemental Brief). As previously noted, however, the filing of the complaint and participation in discovery are not conduct that supports an award of sanctions in this case.

Defendant submits that it incurred attorneys' fees and costs since the September 2, 2011 close of discovery in the amount of $33,350.74 (including $30,353.00 in attorney's fees, $997.74 in costs and about $2,000 incurred in filing this supplemental brief). Defendant does not provide any additional explanation for the costs and fees that were incurred, such as which costs and fees were attributable to the only issue that the Court has concluded constitutes sanctionable conduct—Plaintiff's national origin discrimination and hostile work environment claim after the close of discovery—or the hourly rate billed for the attorney or attorneys for whom Defendant seeks a fee award.

Defendant has not indicated which of its costs and fees were directly related to defending against Plaintiff's national origin claim as opposed to other aspects of this case, and has not explained why the conduct in this case was so egregious as to warrant and award of attorney fees against a losing plaintiff in a civil rights case. As a result, the requested attorney fees will not be awarded. However, because there is no explanation as to why Plaintiff refused to clarify that a hostile work environment claim was not being pursued, the Court will award Defendant $2000 pursuant to Section 1927 for the costs and fees incurred in filing its supplemental brief.

### III. Conclusion

Accordingly, it is **ORDERED** that Defendant's motion for sanctions (ECF No. 25) is **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that Defendant is entitled to sanctions in the amount of $2000.00 pursuant to 28 U.S.C. § 1927 for the costs and fees incurred in filing its supplemental brief. Plaintiff's counsel are **DIRECTED** to pay the sanctions to defense counsel on or before **August 6, 2012.**

### All Citations

Not Reported in F.Supp.2d, 2012 WL 3077211

## Footnotes

1    "Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by
     its partner, associate, or employee." *Id.*

2    "If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees,
     incurred for the motion." *Id.*

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.